**COLE SCHOTZ P.C.**
Michael D. Sirota
Felice R. Yudkin
Ryan T. Jareck
Mark Tsukerman
Rebecca W. Hollander
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
(212) 752-8000
(212) 752-8393 Facsimile

*Proposed Counsel to the Debtor and*
*Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>GEORGE WASHINGTON BRIDGE BUS STATION DEVELOPMENT VENTURE LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. _____ (___) |

**DECLARATION OF BERNARD A. KATZ IN SUPPORT OF**
**CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

I, BERNARD A. KATZ, hereby declare under penalty of perjury that the following is

true to the best of my knowledge, information, and belief:

1.      I am the Manager of George Washington Bridge Bus Station Development

Venture LLC, the debtor and debtor in possession (the "**Debtor**") in the above-captioned case.

To minimize any business disruption caused by the commencement of this Chapter 11 Case (as

defined below), the Debtor seeks various forms of relief through "first day" applications and

---

[1] The last four digits of the debtor's federal taxpayer identification number are 8685.  The debtor's business address is 11890 Sunrise Valley Drive, Suite 554, Reston, VA  20191.

motions filed contemporaneously herewith (collectively, the "**First Day Pleadings**"). I submit

this declaration (this "**Declaration**") in support of (a) the Debtor's voluntary petition for relief

under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and (b) the First

Day Pleadings. I am authorized to submit this Declaration on behalf of the Debtor.

2.       I am a principal of BAK Advisors Inc., a financial advisory firm. I have over

thirty (30) years of experience in forensic accounting, restructuring services and financial

advisory services to growth-oriented and distressed companies. Because of my practice industry

experience, I have been asked to serve on several advisory boards to assist businesses in meeting

their strategic objectives.

3.       On or about July 30, 2019, I was engaged by the Debtor to assist on all financial

issues pending the engagement of a financial advisor, including assessing the Debtor's financial

projections and liquidity needs. Since that engagement, I have attempted to become familiar

with the Debtor's operations, books and records and financial affairs. On or shortly prior to the

Petition Date (defined herein), I was appointed as the sole Manager of the Debtor. In view of

my recent appointment as Manager of the Debtor, my knowledge of the Debtor's operational

history, business activities, capital structure and organizational structure is evolving. Except as

otherwise stated, all facts set forth in this Declaration are based on my personal knowledge, my

discussions with the Debtor's members and advisors, my review of the relevant documents, or

my opinion, and my experience and knowledge of the Debtor's operations and financial

conditions. In making this Declaration, I have relied in part on information and materials that the

Debtor's members and advisors have gathered, prepared, verified, and provided to me, in each

case under my supervision, at my direction, and for my use in preparing this Declaration. If

called upon to testify, I would testify competently to the facts set forth in this Declaration.

48036/0047-17649341v5

4.      This Declaration is divided into three parts. Part I provides background information about the Debtor, its business operations, its corporate and capital structures, and the circumstances surrounding the commencement of the Chapter 11 Case.  Part II sets forth the facts in support of the First Day Pleadings.  Part III contains the information required under Local Bankruptcy Rule 1007-2.

### Background

**A.      The Chapter 11 Case**

5.      On the date hereof (the "**Petition Date**"), the Debtor commenced this case by filing a petition for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**").

6.      The Debtor continues to operate its business and manage its property as a debtor and debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

7.      To date, the Office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") has not appointed a creditors' committee in the Chapter 11 Case nor has any trustee or examiner been appointed herein.

**B.      The Debtor's Business**

8.      The George Washington Bridge Bus Station (the "**Bus Station**"), which originally opened on January 17, 1963, acts as a transit facility operated by the Port Authority of New York and New Jersey (the "**Port Authority**").  The Bus Station is located at the east end of the George Washington Bridge in the Washington Heights section of New York City.  The Bus Station serves approximately 13,000 weekday passengers, mainly commuting between New York City and northern New Jersey.

9.      On June 30, 2011, the Port Authority approved a $183.2 million renovation and improvement plan (the "**Project**") for the Bus Station.  The Project was structured as a public-private venture between the Port Authority, as owner of the Bus Station, and the Debtor, as

3

developer.  The Project included relocating the bus terminals to the third floor of the complex and

creating a state-of-the-art ground transportation hub.  A new 15,000 square foot bus terminal was

built increasing the number of gates from 17 to 22 and 85,000 square feet of the existing bus

station was reconfigured and upgraded.  By relocating the bus station terminal to the third floor

of the complex, a retail center of approximately 129,000 square feet was created.

10.     The Debtor was responsible for the construction of both the retail and bus

terminal components of the Project.  In connection with the construction, on June 25, 2013, the

Debtor entered into a contract (the "**Construction Contract**") with Tutor Perini Building Corp.

("**Tutor Perini**"), as general contractor for the Project, with a guaranteed maximum price of

$100,454,000.  The Construction Contract provided for the demolition and abatement of portions

of the existing structures of the Bus Station to allow the building's reconstruction and

remodeling.  The Construction Contract also provided for Tutor Perini to conduct the

reconstruction and remodeling work, except for the build-out of the majority of the retail spaces.

The Bus Station remained operational during the renovation, which began in 2012 and, after

significant construction delays (described below), was substantially completed in August of

2017.

11.     Pursuant to an Agreement of Lease dated July 21, 2011, in addition to serving as

the developer of the Bus Station, the Debtor was granted a 99-year lease to operate and maintain

the retail portion of the Bus Station (the "**Retail Space**").  The Debtor began leasing operations

on August 1, 2017.  As of the Petition Date, approximately ninety-one percent (91%) of the

Retail Space was occupied by, among others, Marshalls, Gap Factory, Blink Fitness and Fine

Fare.  In addition, the Debtor is in the process of finalizing and executing two (2) additional lease

agreements for approximately two percent (2%) of the Retail Space.  Those tenants have not yet

taken possession because of the ongoing build-out of their respective spaces (at the cost of the tenants).  Approximately seven percent (7%) of the Retail Space, consisting of seven (7) small stores, remains unleased and vacant.

12.     Historically, the Debtor's sole source of revenue has been the collection of rental payments.  As of the Petition Date, tenants paid approximately $380,000 a month in rent and the Debtor had assets and liabilities of approximately $93.5 million and $133 million, respectively.

13.     As of the Petition Date, the Debtor did not have any employees.  The Retail Space is managed by GWB Ninety Nine LLC, an affiliate of the Debtor, pursuant to the terms of a Property Management and Leasing Agreement dated June 3, 2011.  Furthermore, the Debtor utilizes the services of several independent contractors and/or consultants to perform the day-to-day maintenance, operation and management of the Retail Space.

### C.     The Debtor's Corporate and Capital Structure

14.     The Debtor, a Delaware limited liability company, was formed on March 16, 2006.  The members of the Debtor are GWB Development Partners, LLC and Marketplace GWB, LLC ("**Marketplace GWB**"), with ownership interests of 91% and 9%, respectively. The Debtor's organizational structure is set forth in **Exhibit A**.

15.     As of the Petition Date, the Debtor's capital structure consisted of outstanding funded debt obligations in the aggregate principal amount of approximately $105 million.

### (i)    Pre-Petition Loan Agreement with George Washington Bridge Bus Station and Infrastructure Development Venture, LLC

16.     The Debtor is a party to the Senior Secured Loan Agreement with George Washington Bridge Bus Station and Infrastructure Development Fund, LLC (the "**Senior Secured Lender**"), whereby Senior Secured Lender agreed to provide the Debtor a loan

48036/0047-17649341v5

(the "**Senior Secured Loan**")[2] in the aggregate principal amount of not less than $72,000,000 plus all accrued but unpaid interest, fees, expenses, and all other obligations expressly provided for thereunder, or incurred in connection therewith (such obligations under the Senior Secured Loan and the Senior Secured Loan Documents, the "**Senior Secured Loan Obligations**").

17.     The Senior Secured Loan Obligations are guaranteed by non-debtor GWB Development Partners LLC (the "**Senior Secured Loan Guarantor**") pursuant to that certain Deficiency Guaranty dated July 20, 2011 (the "**Senior Secured Loan Guaranty**").  Pursuant to the Senior Secured Loan Guaranty, the Senior Secured Loan Guarantor unconditionally and absolutely guaranteed the prompt and punctual payment of the Senior Secured Loan, provided that the Senior Secured Loan Guaranty is limited to the deficiency obtained by Senior Secured Lender following Senior Secured Lender's suing on the mortgage note and/or foreclosure under the Mortgage (as hereinafter defined).

18.     In addition, to secure the Senior Secured Loan Obligations, the Debtor provided the Senior Secured Lender with a mortgage (the "**Mortgage**") on the leasehold estate on the premises located in New York, New York, known as Section 8, Block 2163, Lot 1 and Block 2176, Lot 17 (i.e., the Bus Station) (the "**Mortgaged Property**").  Under the Mortgage, the Debtor granted to the Senior Secured Lender a security interest in the personalty, the fixtures, plans, leases, rents, property agreements, equipment and all other Mortgaged Property which is personal property (each within the meaning of the Uniform Commercial Code ("**UCC**")).  The Debtor also assigned all right, title and interest in and to the leases and rents in connection with the Mortgaged Property, pursuant to that certain Assignment of Leases and Rents, dated as of

---

[2] The Senior Secured Loan issued under the Senior Secured Loan Agreement, together with any ancillary documents, security agreements, guarantees, pledge agreements and notes issued in connection therewith shall collectively be referred to herein as, the "**Senior Secured Loan Documents**."

48036/0047-17649341v5

July 20, 2011 (the "**ALR**").  Under the ALR (1) the Debtor presently assigned its right to collect rental income to the Senior Secured Lender, (2), the Senior Secured Lender waived its right to collect rental income under a license to the Debtor so long as the Debtor continued to perform its obligations under the parties' agreements, and (3) the Senior Secured Lender retained the right to revoke the license to the Debtor, allowing the Senior Secured Lender to recoup its right to collect rental income in the event of Debtor's default on the parties' agreements.

19.     To further secure the Senior Secured Loan Obligations, the Debtor entered into various security and collateral documents pursuant to and in connection with the Senior Secured Loan Agreement, including the Intercreditor Agreements (as defined below), pursuant to which the Senior Secured Lender was granted the benefit of valid, binding, perfected, enforceable, first-priority liens and security interests in the Senior Collateral (as defined below) (the "**Senior Secured Loan Liens**").  The Senior Secured Loan Liens provide the Senior Secured Lender with valid, binding, perfected, enforceable, first-priority liens, and security interests in the Collateral (as defined in the Senior Secured Loan Agreement) (such Collateral, the "**Senior Collateral**").

20.     As of the Petition Date, approximately $72 million is outstanding under the Senior Secured Loan Agreement, exclusive of accrued but unpaid interest.

**(ii) Pre-Petition Loan Agreement with GWB Leverage Lender, LLC**

21.     On December 26, 2013, GWB NMTC Investment Fund LLC (the "**Funding Borrower**") made investments in, and became the 99.99% member of, each of the Building Lenders,[3] each of which were formed for the purpose of making qualified low-income

---

[3] GSNMF Sub-CDE 12 LLC, as one of the lenders (the "**Building Secured Lender**," and together with the Senior Secured Lender and UMEZ, the "**Prepetition Secured Parties**") of $19,065,000 in loans (the "**Building Loans**") under that certain *Building Loan Agreement*, dated as of December 26, 2013 (as amended, restated, supplemented, or modified from time to time, the "**Building Loan Agreement**") by and among the Debtor, GSB NMTC Investor LLC, as administrative agent, Building Secured Lender, LIIF Sub-CDE XXVI, LLC and DVCI CDE XIII, LLC as co-lenders (collectively with the Building Secured Lender, the "**Building Lenders**").

community investments in connection with the New Markets Tax Credit Program (provided for in Section 45D of the Internal Revenue Code). The Building Lenders made Building Loans in the original aggregate principal amount of up to $19,065,000 to the Debtor to finance the development of the project.

22.     A portion of the Building Loans was funded by Foodco, LLC ("**Foodco**") to Funding Borrower under that certain Senior Leverage Loan Agreement dated as of December 26, 2013 (as amended, restated, supplemented, or modified from time to time, the "**FoodCo Loan Agreement**," and together with any ancillary documents, pledge agreements, guarantees, and notes issued in connection therewith, collectively the "**FoodCo Loan Documents**") in respect of a loan (the "**FoodCo Loan**") in the aggregate principal amount of not more than $10,000,000 plus all accrued but unpaid interest, fees, expenses, and all other obligations expressly provided for thereunder, or incurred in connection therewith (such obligations under the FoodCo Loan and the FoodCo Loan Documents, the "**FoodCo Loan Obligations**"). The FoodCo Loan was utilized by the Funding Borrower to indirectly fund $10,000,000 of the Building Loans (such portion of the Building Loan, the "**FoodCo Building Loan**", and such obligations under the FoodCo Building Loan, the "**FoodCo Building Loan Obligations**").

23.     To secure the FoodCo Loan Obligations, the Funding Borrower entered into various security and collateral documents pursuant to and in connection with the FoodCo Loan Documents, pursuant to which FoodCo was granted or otherwise entitled to the benefit of a valid, binding, perfected, enforceable, pledge of all of Funding Borrower's assets, including all of its non-managing membership interests in each of the Building Lenders (the "**FoodCo Loan Pledge**"). The FoodCo Loan Pledge provided FoodCo with a valid, binding, perfected,

8

enforceable, lien, security interest, and pledge of the Collateral (as defined in the FoodCo Loan Agreement).[4]

24.    George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC ("**Loan Member**") made member loans to GWB Leverage Lender, LLC (the "**Direct Lender**") pursuant to that certain Limited Liability Company Agreement of GWB Leverage Lender, LLC, dated as of April 7, 2014, by and between Loan Member and GWB Development Partners, LLC, in the maximum amount of $19,000,000 (the "**Member Loan**"). With the Member Loan in place, the Direct Lender acquired from and was assigned all rights as lender of the Foodco Loan, under which the Funding Borrower was indebted and liable to FoodCo.

25.    In addition, with the Member Loan in place, Direct Lender entered into that certain Loan Agreement dated as of April 7, 2014, as amended, restated, supplemented, or modified from time to time, along with certain ancillary documents, pledge agreements, guarantees, and notes issued in connection therewith, thereby extending a loan (the "**Direct Loan**", and collectively with the Senior Secured Loan and the FoodCo Building Loan, the "**Prepetition Senior Loans**") to the Debtor in the aggregate principal amount of not less than $9,000,000 plus all accrued but unpaid interest (including at the default rate, as applicable), fees, expenses, and all other obligations expressly provided for thereunder, or incurred in connection therewith (such obligations under the Direct Loan and the Direct Loan Documents, the "**Direct Loan Obligations**", and collectively with the Senior Secured Loan Obligations and the FoodCo Building Loan Obligations, the "**Prepetition Senior Loan Obligations**").

---

[4] Upon the Debtor's repayment of the FoodCo Building Loan Obligations to the Building Lenders, the Building Lenders are required to dividend such proceeds to the Funding Borrower, who is required to repay the FoodCo Loan to the Direct Lender.

48036/0047-17649341v5

26.     Accordingly, as of Petition Date, the Debtor was indebted and liable to the Building Lenders in respect of the Building Loans issued under the Building Loan Agreement (together with any ancillary documents, security agreements, guarantees, pledge agreements and notes issued in connection therewith, collectively, the "**Building Loan Documents**") in the aggregate principal amount of not less than $19,065,000 plus all accrued but unpaid interest, fees, expenses, and all other obligations expressly provided for thereunder, or incurred in connection therewith (such obligations under the Building Loan and the Building Loan Documents, the "**Building Loan Obligations**"), and in accordance with the Intercreditor Agreements, the Building Lenders are subordinated in right of payment to the prior payment in full of (i) the Senior Secured Loan, (ii) the Direct Loan, and (iii) the UMEZ Loan (as defined below), other than in respect of the FoodCo Building Loan, which shall be paid in full before any repayment on account of the UMEZ Loan.

27.     To secure $5,000,000 (plus interest thereon and any and all fees with respect thereto) of Building Loan Obligations (the "**Building Secured Loan Obligations**," and, together with the Senior Secured Loan Obligations and the UMEZ Loan Obligations (as defined below), the "**Prepetition Secured Debt**"), the Debtor entered into various security and collateral documents pursuant to and in connection with the Building Loan Documents pursuant to which the Building Secured Lender (but not the other Building Lenders) was granted or otherwise entitled to the benefit of a valid, binding, perfected, enforceable, mortgage (the "**Building Loan Mortgage**" and, together with the Senior Secured Loan Liens and the UMEZ Mortgage (as defined below), the "**Prepetition Liens**") in the Mortgaged Property (such Mortgaged Property, the "**Building Loan Collateral**," and collectively with the Senior Collateral and the UMEZ Loan Collateral, the "**Prepetition Collateral**").  The Building Loan Mortgage provides the Building

Secured Lender with valid, binding, perfected, enforceable, liens, and security interests in the

Building Loan Collateral that are (i) not subject to avoidance, recharacterization, subordination,

recovery, attack, effect, counterclaim, defense, or claim under the Bankruptcy Code or applicable

non-bankruptcy law and (ii) as of the Petition Date, are subject and subordinate only to certain

valid, perfected, and unavoidable liens, including the Senior Secured Loan Liens, which are

senior to the liens of the Building Secured Lender on the Building Loan Collateral.

28.     A diagram of the debt investment structure in the Debtor, including the flow of

the Building Loans and Direct Loan is attached to the *Debtor's Motion for Interim and Final*

*Orders (I) Authorizing the Debtor to Obtain Postpetition Financing, (II) Authorizing the Debtor*

*to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative*

*Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI)*

*Scheduling a Final Hearing, and (VII) Granting Related Relief* as Exhibit D.

29.     As of the Petition Date, approximately $19,065,000 is outstanding under the

Building Loans, exclusive of accrued but unpaid interest.  As of the Petition Date, approximately

$9,000,000 is outstanding under the Direct Loan, exclusive of accrued but unpaid interest.

### (iii)   Pre-Petition Loan Agreement with Upper Manhattan Empowerment Zone Development Corporation

30.     Before the Petition Date, the Debtor was indebted and liable to Upper Manhattan

Empowerment Zone Development Corporation ("**UMEZ**") in respect of a $5,000,000 loan

(the "**UMEZ Loan**") made pursuant to that certain Loan Agreement dated as of February 27,

2018 (as amended, restated, supplemented, or modified from time to time, the "**UMEZ Loan**

**Agreement**", and together with any ancillary documents, security agreements, guarantees,

pledge agreements and notes issued in connection therewith, collectively, the "**UMEZ Loan**

**Documents**") in the aggregate principal amount of not less than $5,000,000 plus all accrued but

unpaid interest, fees, expenses, and all other obligations expressly provided for thereunder, or incurred in connection therewith (such obligations under the UMEZ Loan and the UMEZ Loan Documents, the "**UMEZ Loan Obligations**"), and in accordance with the Intercreditor Agreement, UMEZ (subject to limited exclusions) is subordinated in right of payment to the prior payment in full of the Prepetition Senior Loans.

31.     To secure the UMEZ Loan Obligations, the Debtor entered into various security and collateral documents pursuant to and in connection with the UMEZ Loan Documents, including the Intercreditor Agreement, pursuant to which UMEZ was granted or otherwise entitled to the benefit of a valid, binding, perfected, enforceable, mortgage (the "**UMEZ Mortgage**") on the Mortgaged Property (as defined in the UMEZ Loan Agreement) (such Mortgaged Property, the "**UMEZ Loan Collateral**").  The UMEZ Mortgage provides UMEZ with a valid, binding, perfected, enforceable, mortgage on the UMEZ Loan Collateral that is (i) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense, or claim under the Bankruptcy Code or applicable non-bankruptcy law and (ii) as of the Petition Date is subject and subordinate only to certain valid, perfected, and unavoidable liens, including the Senior Secured Loan Liens and the Building Loan Mortgage (solely to the extent the Building Loan Mortgage applies to the FoodCo Building Loan Obligations), which are senior to the liens of UMEZ on the UMEZ Loan Collateral.

32.     As of the Petition Date, approximately $4.8 million is outstanding under the UMEZ Loan Agreement, exclusive of accrued but unpaid interest.

### (iv)  Intercreditor Arrangements

33.     The Debtor, the Prepetition Secured Parties, the Direct Lender, and the Building Lenders are subject to that certain Subordination and Intercreditor Agreement dated as of February 27, 2018 (as amended, restated, supplemented or modified from time to time before the

12

date hereof, the "**Intercreditor Agreement**") pursuant to which (i) the Prepetition Secured Parties set forth the respective priorities of the Prepetition Liens on the Prepetition Collateral, and (ii) the Prepetition Secured Parties, the Direct Lender, and the Building Lenders set forth the priority of payment in respect of the Prepetition Secured Debt and the Building Loans.  Pursuant to the Intercreditor Agreement (x) any lien on the Prepetition Collateral securing the Senior Secured Loan Obligations shall have priority over and be senior in all respects and before any lien on the Prepetition Collateral securing any UMEZ Loan Obligations or Building Secured Loan Obligations and (y) any lien on the Prepetition Collateral securing the UMEZ Loan Obligations shall have priority over and be senior in all respects and before any lien on the Prepetition Collateral securing any Building Secured Loan Obligations (other than the liens pertaining to the FoodCo Building Loan Obligations, which such FoodCo Building Loan Obligations shall rank first and prior to the UMEZ Loan Obligations).  Furthermore, pursuant to the Intercreditor Agreement, the UMEZ Loan Obligations and the Building Loan Obligations are subordinated in right of payment to the Prepetition Senior Loan Obligations.

34.     The Prepetition Senior Secured Lender, the Direct Lender, and the Debtor are subject to that certain Subordination and Intercreditor Agreement dated as of February 27, 2018 (as amended, restated, supplemented or modified from time to time, the "**Senior Intercreditor**") pursuant to which the Direct Lender is payment and lien subordinated to the Senior Secured Lender.

35.     The Direct Lender and the Building Lenders are subject to that certain Subordination and Intercreditor Agreement dated as of April 7, 2014 (as amended, restated, supplemented or modified from time to time, the "**Direct Loan Intercreditor**") pursuant to

48036/0047-17649341v5

which the Building Loan Obligations, including the Secured Building Loan Obligations, are lien and payment subordinated in all respects to the Direct Loan Obligations.

36.    The Senior Secured Lender and the Building Lenders are subject to that certain Subordination and Intercreditor Agreement dated as of December 26, 2013 (as amended, restated, supplemented or modified from time to time, the "**Building Loan Intercreditor**", and collectively with the Senior Intercreditor, the Direct Loan Intercreditor, and the Intercreditor Agreement, the "**Intercreditor Agreements**") pursuant to which the Building Loan Obligations, including the Secured Building Loan Obligations, are lien and payment subordinated in all respects to the Senior Secured Loan Obligations.

**D.    Events Precipitating the Chapter 11 Case and Outcome Sought to be Achieved**

37.    At its inception, the Debtor anticipated the Project would cost $183 million and take one year to complete.  The Debtor budgeted its costs and obtained financing for the Project with the expectation that Tutor Perini would meet the substantial completion dates set forth in the Construction Contract.  As set forth herein, Tutor Perini caused the Project to be delayed years beyond the original anticipated dates of substantial completion.

38.    As a result of thirty (30) months of delays by Tutor Perini, significant cost overruns existed on the Project.  The Debtor incurred millions of dollars of unanticipated costs for interest on loans and additional project carrying costs, including approximately $1.7 million in delay charges that the Debtor was forced to pay the Port Authority for the failure to deliver the Project on time.  Additionally, the Debtor paid over $11 million of interest during the delay period and millions of dollars of rent receipts were lost due to the delays.  The Debtor also incurred more than $14 million of expenses while arbitrating its disputes with Tutor Perini (as set forth in more detail below) and the Debtor's principals were forced to infuse an additional $5.5

14

million of new capital to cover the Debtor's arbitration expenses. Those losses are directly attributable to the Project delays caused by Tutor Perini.

39.    After Tutor Perini missed the contractual deadline to complete the Project, the Debtor started withholding approximately $1 million from each of Tutor Perini's progress payments as liquidated damages under the Construction Contract. The $1 million withholdings were largely consumed by debt service, delay charges to the Port Authority, additional architect and engineering costs, legal fees, and lease penalties.

40.    Tutor Perini disputed the Debtor's entitlement to withhold funds from the progress payments. In response to that dispute, on February 26, 2015, the Debtor commenced an arbitration by way of Arbitration Demand submitted to the American Arbitration Association ("**AAA**"). The Arbitration Demand sought a declaration that (i) all claims for payment submitted by Tutor Perini were waived because they were not timely submitted or, alternatively, (ii) Tutor Perini's claims for payment were not valid. On or about January 24, 2017, Tutor Perini filed an Answering Statement and Counterclaim against the Debtor asserting $130 million of damages.

41.    Following a lengthy arbitrator-selection period, the Debtor and Tutor Perini selected an arbitration panel and commenced the arbitration process on August 22, 2018. As of the Petition Date, 67 days of evidentiary hearings had been conducted during which Tutor Perini put on its entire case-in-chief. The Debtor, however, has not yet presented its case. After Tutor Perini's case-in-chief was complete, the Debtor's construction counsel withdrew from representing the Debtor in the arbitration. Tutor Perini took advantage of the Debtor's vulnerability and filed an application for a preliminary injunction and order of attachment. Despite repeated requests for an adjournment or stay to allow the Debtor time to secure

replacement counsel, the arbitration panel held a hearing on Tutor Perini's application.

Ultimately, on June 4, 2019, the panel issued an Interim Order granting Tutor Perini's request for

an order of attachment in the amount of $23 million (the "**Interim Attachment Order**") against

any "EB5 funds, funds paid by the Port Authority and/or net lease payments in the possession of

the [Debtor]."

42.     On June 6, 2019, Tutor Perini filed a petition to confirm the Interim Attachment

Order in the United States District Court for the Southern District of New York.  The Debtor, in

turn, filed a cross-motion to vacate the Interim Attachment Order.  On July 15, 2019, the District

Court entered an order granting Tutor Perini's petition to confirm the Interim Attachment Order

and denying the Debtor's cross-motion. On July 22, 2019, the District Court entered a judgment

to that effect in favor of Tutor Perini.  Since then, Tutor Perini has (i) served the Debtor with a

Subpoena Duces Tecum Ad Testificandum requiring the production of documents and an

examination of the Debtor's representative relating to its satisfaction of the Interim Attachment

Order, (ii) filed a letter motion in the arbitration seeking a remedy for the Debtor's failure to

comply with the Interim Attachment Order, (iii) tried to intervene in the pending foreclosure

action (described below) and (iv) sought to amend its interim award to obtain an attachment on

the Debtor's leasehold interest with the Port Authority.

43.     On September 24, 2019, the AAA held oral argument on the issue of whether the

Interim Attachment Order can affect the rights of third parties such as the Senior Secured Lender

that are not a part of the arbitration proceeding.  On October 3, 2019, the AAA issued an Order,

which held the following:

> (i)     The Debtor willfully violated the Interim Attachment Order;
>
> (ii)    The Debtor transferred funds subject to the Interim Attachment Order for the payment of personal expenses of one of its principals and for the payment of legal expenses; and

16

(iii)    The Debtor wrongfully transferred net rental income received to the Senior Secured Lender.

44.    The AAA ordered all of the aforementioned transfers, among others, be returned to the Debtor's operating account by November 1, 2019.  The Debtor vehemently disagrees with the AAA's ruling.

45.    Due to Tutor Perini's efforts to deprive the Debtor of its cash, the Debtor faces the possibility that it will be unable to pay critical Contractors (defined below) and trade vendors who ensure that the Retail Space is maintained in safe working condition.  For example, if the Debtor is not able to pay its contract counterparties, those parties may cease providing fire prevention and protection services and elevator and escalator maintenance services.  The cessation of such services could have a devastating impact on the Debtor and those individuals who work at, shop at, and/or pass through the Retail Space.

46.    Aside from the Debtor's inability to satisfy the Interim Attachment Order, the Debtor has also been unable to satisfy its debt service obligations to the Senior Secured Lender and defaulted on such obligations on April 10, 2019.  Recognizing the cash shortfall realities of the Project, the Debtor and the Senior Secured Lender entered into negotiations for a consensual restructuring and forbearance.  During the course of those negotiations, the Interim Attachment Order was entered.

47.    Upon entry of the Interim Attachment Order, on July 19, 2019, the Senior Secured Lender commenced a foreclosure action against the Debtor in the Supreme Court of New York, County of New York.  Additionally, given the Debtor's default, the Debtor was obligated to and notified the current tenants of the Retail Space that all current and future rent payments were to be deposited into a lockbox, over which the Senior Secured Lender has control.  A majority of the Debtor's tenants now pay rents directly to the Senior Secured Lender.

48036/0047-17649341v5

48.     Prior to the Petition Date, the Debtor maintained approximately $350,000 in cash from rents received on the Project which, with the consent of the Senior Secured Lender, the Debtor used to pay pre-petition expenses.  As of the Petition Date, the Debtor is not in control or possession of any rent payments from its tenants and the Senior Secured Lender is properly in full control of all funds that emanate from the Project.

49.     On August 28, 2019, Loan Member, as assignee of that certain Pledge and Security Agreement (Direct Loan) dated as of January 31, 2019, provided the Debtor notice of its right to foreclose through a public sale under the UCC of (i) 9% of the issued and outstanding limited liability company interests in the Debtor and (ii) Marketplace GWB's rights, title and interest with respect to the Debtor's Operating Agreement including those rights as Managing Member of the Debtor.  A public foreclosure sale is currently scheduled for October 17, 2019.

50.     In view of the Interim Attachment Order and pending foreclosure actions, the Debtor began exploring potential strategic alternatives to maximize value, including a sale, restructuring, or other transaction.  The Debtor, in consultation with its advisors and counsel, determined that, given its deteriorating liquidity position and pending arbitration with Tutor Perini, a sale of the Debtor was the best available option to maximize value, and that an in-court marketing process was the only reasonably executable structure through which a value-maximizing transaction could be completed.  Led by its experienced proposed investment banker, Houlihan Lokey, the Debtor intends to conduct a thorough post-petition marketing process of no more than 135 days, thereby providing significant opportunity for interested bidders to formally bid for the Debtor's assets and business operations.

51.     To implement the value-maximizing sale process and preserve asset value during the pendency of the Chapter 11 Case, the Debtor realized it would require an infusion of new

liquidity. Before the Petition Date, the Debtor, with the assistance of its professional advisors,

evaluated options to improve postpetition liquidity.  In that regard, the Debtor and I reached out

to several potential lenders including the Senior Secured Lender, the most likely source of

debtor-in-possession ("**DIP**") financing.  After extensive arm's-length and good faith

negotiations, New York City Regional Center, LLC ("**NYCRC**"), an affiliate of the Senior

Secured Lender, agreed to provide the Debtor with DIP financing.  That financing will facilitate

the marketing process and provide the Debtor with new capital—in the form of a senior secured,

priming, superpriority DIP term loan facility in the aggregate principal amount of approximately

$4.4 million—needed to allow the Debtor to continue operations and fund administrative

expenses through the closing of the sale.  The DIP financing is conditioned on certain sale and

plan milestones culminating in the consummation of a sale and/or confirmation of a Chapter 11

plan within 150 days of the Petition Date.

### First Day Pleadings

52.     To facilitate its restructuring efforts, the Debtor has concurrently filed the First

Day Pleadings, each as listed on the attached **Exhibit B**, and respectfully requests that this Court

enter the proposed orders granting such First Day Pleadings.  Among other things, the relief

requested in these pleadings will enable the Debtor to continue to pay critical Contractors  and

trade vendors who ensure that the Retail Space is maintained in safe working condition.  As

described above, in the event of nonpayment, the cessation of certain critical fire, safety, and

maintenance services could have a devastating impact on the Debtor and those individuals who

work at, shop at, and/or pass through the Retail Space.

53.     I have reviewed each of the First Day Pleadings and proposed orders (including

the exhibits thereto), and the facts set forth therein are true and correct to the best of my

knowledge, information, and belief. I believe that the relief sought in each First Day Pleading (a)

48036/0047-17649341v5

is vital to enable the Debtor's transition into, and ability to operate in, chapter 11 with minimum interruption or disruption to its business and to maintain and preserve safety and security services and (b) constitutes a critical element in maximizing value during this Chapter 11 Case and facilitating a successful value-maximizing marketing process.

A.      **Motion to Extend the Debtor's Time to File Schedules and Statements**

54.      The Debtor seeks a 14-day extension of the time within which to file its schedules of assets and liabilities and statement of financial affairs (collectively, the "**Schedules and Statements**").  Such an extension would provide the Debtor with a total of 28 days from the Petition Date in which to file its Schedules and Statements.  Although the Debtor and its professionals have begun preparing the Schedules and Statements, the substantial burdens imposed on the Debtor's management by the commencement of this Chapter 11 Case, including the need to negotiate agreements regarding the post-petition use of cash collateral and the extension of post-petition financing, are such that the Debtor requires additional time to prepare the Schedules and Statements.

B.      **Motion to Authorize the Debtor to Obtain Post-Petition Financing and Use Cash Collateral**

55.      The Debtor requires immediate access to liquidity to ensure that it is able to continue operating during this Chapter 11 Case and preserve the value of its assets and estate for the benefit of all parties-in-interest.  Absent immediate access to the DIP Financing and use of the Cash Collateral, the Debtor simply cannot continue operations.  Specifically, without immediate access to Cash Collateral, the Debtor will be unable to (a) pay for necessary business expenses, including the invoices of vendors critical to business operations, such as, among other safety and security services, elevator and escalator maintenance and repairs, insurance providers, and janitorial services; (b) preserve and maximize the value of its estate; and (c) administer this

Chapter 11 Case, causing immediate and irreparable harm to the value of the Debtor's estate to the detriment of all stakeholders.  Moreover, DIP financing and use of Cash Collateral are necessary to provide vendors with the comfort that the Debtor can continue to operate and pay them in the ordinary course, which is particularly important given vendor concerns regarding the Debtor's current financial situation and the Debtor's intention to market and sell substantially all of its assets during this Chapter 11 Case.

56.     In connection with its liquidity situation and the prospect of a chapter 11 filing, the Debtor, with the assistance of its advisors and myself, as independent manager, analyzed the projected cash needs and prepared the budget outlining the Debtor's post-petition cash needs during this Chapter 11 Case.  The Debtor believes that the DIP financing budget and its projections provide an accurate reflection of the funding requirements for this Chapter 11 Case, will allow the Debtor to meet its obligations, and are reasonable and appropriate under the circumstances.  The Debtor relied on these forecasts to determine the amount of post-petition financing required to administer this Chapter 11 Case.

57.     As set forth above, during the pre-petition period, the Debtor and I reached out to several potential lenders including the Senior Secured Lender.  The discussions I had with third-party financing sources contemplated a "priming" DIP facility, which, in my experience, could not be accomplished in light the current capital structure and the Debtor's lack of unencumbered collateral.

58.     The Debtor found that the terms of the DIP financing proposed  by NYCRC, including the proposed interest rate, fees, and milestones, were reasonable and market-based.  Moreover, it recognized that by obtaining financing from its pre-petition lenders, it could avoid the possibility of an expensive "priming" fight.  Accordingly, the Debtor determined that the

only logical course of action was to obtain a DIP from its existing lenders in the capital structure. The Debtor focused its efforts on the DIP financing proposal provided by NYCRC.  After extensive arm's-length and good faith negotiations, NYCRC agreed to provide the Debtor with DIP financing.

59.    Access to post-petition financing, in the form of a superpriority senior secured multi-draw loan facility extended by NYCRC in an aggregate principal amount of up to $4.4 million (the "**DIP Facility**"), is critical to the Debtor's ability to smoothly enter Chapter 11 and operate post-petition, including by providing sufficient liquidity to fund the administrative cost of this Chapter 11 Case.  As a result, the Debtor believes that the DIP Facility will provide it with sufficient liquidity to stabilize operations and fund this Chapter 11 Case, while the Debtor pursues a transaction.

60.    The Debtor does not have alternative sources of financing available.  Substantially all of the Debtor's assets are encumbered under their existing capital structure, which, along with the Debtor's constrained liquidity position, restricts the availability of, and options for, post-petition financing.

61.    The Debtor and its advisors negotiated for approximately two months regarding the structure and economics of the proposed DIP Facility.  Ultimately, the Debtor and NYCRC agreed to a set of terms that provide the Debtor with necessary access to liquidity during the pendency of this Chapter 11 Case at fees and rates that the Debtor and its advisors consider to be reasonable under the current circumstances. Those terms provide the Debtor with the much-needed liquidity to fund operations and a sale of substantially all of its assets.  Based on the DIP Facility's reasonable and market-based terms and the related benefits provided by NYCRC, the

Debtor determined that entry into the DIP Facility is reasonable, fair, and in the best interests of its estate.

### C.    Motion to Maintain the Debtor's Existing Insurance Policies

62.    The Debtor seeks authority to maintain its existing insurance policies (collectively, the "**Insurance Policies**") in the ordinary course of business and to pay on an uninterrupted basis all premiums, insurance premium financing obligations, deductibles, administration costs, and brokers' fees arising thereunder or in connection therewith (collectively, the "**Insurance Obligations**") in the ordinary course of business and to renew, revise, extend, supplement, change, or enter into new insurance policies as needed in its business judgment without further order of this Court.

63.    Continuation and renewal of the Insurance Policies and entry into new insurance policies is essential to protecting the value of the Debtor's business, property, and assets. Among other things, the Debtor is required to maintain various insurance policies pursuant to its lease with the Port Authority. Moreover, some of the Insurance Policies are required by various regulations, laws, and contracts that govern the Debtor's commercial activities, and section 1112(b)(4)(C) of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case. 11 U.S.C. § 1112(b)(4)(C).

64.    Although the Debtor does not believe any pre-petition Insurance Obligations are currently due and owing, out of an abundance of caution, it also seeks the authority, but not the direction, to pay all pre-petition Insurance Obligations, to the extent any exist, and, specifically, to pay any and all insurance premium financing obligations that become due and owing within the first 21 days of this Chapter 11 Case, if any.  Absent the relief requested in this motion, the Debtor's estate could be irreparably harmed.

E.    **Motion to Pay Pre-Petition Obligations to Independent Contractors and Consultants**

65.    The Debtor principally relies on the services of five (5) independent contractors and/or consultants to perform the day-to-day maintenance, operation and management of the Retail Space (the "**Contractors**").  The Contractors have critical roles with the Debtor, which may generally be described as: (a) a property manager, which oversees and manages all operations, including, among other things, tenants and personnel; (b) an accountant and project bookkeeper, which is responsible for the Debtor's accounting and finances, including, for example, banking, accounting, processing rent, and billing; (c) an onsite building manager and superintendent; (d) a technical and mechanical engineering manager, which oversees and manages all building systems, including elevators and escalators, cooling plant, common area, HVAC, building fire systems and life safety; and (e) a building construction manager and tenant punch-list consultant.

66.    The Debtor does not pay wages, withhold taxes, or provide benefits or paid time off to the Contractors.  Instead, the Debtor makes payments to the Contractors in accordance with their agreed-upon terms.  The Debtor's property manager is paid monthly, and the remaining Contractors are paid bi-weekly on the 15th and the final day of each month (or, if such date is a holiday or weekend, on the immediately preceding business day).  The Debtor spends approximately $56,528 per month on account of payment obligations to the Contractors.  The Debtor estimates that, as of the Petition Date, it owes approximately $43,462 on account of accrued yet unpaid compensation owed to the Contractors, all of which will become due and owing within the first 21 days of the Chapter 11 Case.

67.    In addition, the Debtor routinely reimburses the Contractors for reasonable out-of-pocket travel, lodging, ground transportation, meals, supplies, or other business-related expenses.

24

The Contractors incur such business expenses in the ordinary course of business with the understanding that they will be reimbursed by the Debtor. The Contractor's reimbursable expenses typically amount to less than $1,500 per month in the aggregate. The Debtor estimates that, as of the Petition Date, it owes the Contractors no more than approximately $1,500 for the reimbursement of such expenses.

68.    Given that the Debtor does not have any employees, the Contractors are critical to the Debtor's ongoing operations and ability to safely and effectively manage the Retail Space. If the amounts owed are not received, the Contractors may suffer hardship, potentially making it difficult or impossible for them to continue working for the Debtor. The Contractor's failure to perform their respective services would materially compromise the Debtor's ability to manage and operate the Retail Space and preserve and maximize value during the Chapter 11 Case. The Contractors are critical to the Debtor's ability to maintain the Retail Space in safe, working condition. Non-payment of the Contractors could have a devastating impact on the Debtor and the safety of those individuals who work at, shop at, and/or pass through the Retail Space.

69.    Accordingly, to avoid the hardship the Contractors will suffer if pre-petition obligations are not honored, as well as the harm that would result to the Debtor and various third parties if any of the Contractors fail to effectively perform their duties, it is critical for the Debtor to honor and timely pay its accrued pre-petition obligations to the Contractors as and when such payment obligations become due. Authorization for the Debtor to pay the Contractors (which payments are contemplated by the DIP Budget) is necessary to maintain the value of the Debtor's estate for all creditors and stakeholders.

### F.    Utilities Motion

70.    In the ordinary course of business, the Debtor obtains electricity, internet and technology, water, and similar utility products and services (the "**Utility Services**") from "utilities" as that term is used in sections 366 of the Bankruptcy Code (the "**Utility Companies**").  On average, the Debtor estimates that, prior to the Petition Date, it paid approximately $12,850 per month on account of the Utility Services.

71.    The Debtor has filed a motion requesting that the Court approve (a) the Debtor's proposed form of adequate assurance of post-petition payment (the "**Proposed Adequate Assurance**") to the Utility Companies and (b) the Debtor's proposed procedures for resolving any objections by the Utility Companies to the Proposed Adequate Assurance, and prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtor.

72.    The Debtor submits that its cash on hand and the proceeds of its proposed debtor-in-possession financing facility will provide sufficient liquidity to pay all obligations related to the Utility Services in the ordinary course of business.  As additional Proposed Adequate Assurance, however, the Debtor proposes to, within 20 days of the Petition Date, deposit funds equal to approximately two weeks of compensation for Utility Services for each Utility Company, based on the average monthly cost of the Utility Services determined by an annual average (each such deposit, a "**Utility Deposit**"), into a segregated account that will be created and funded after the Petition Date (the "**Utility-Deposit Account**") or directly with the Utility Company, *provided*, *however*, that the Debtor proposes no Utility Deposit for any Utility Company that already holds a deposit or prepayment equal to or greater than two weeks of

Utility Services. After taking into account existing deposits, the Debtor estimates that the Utility Deposits will be no more than $300.00 in aggregate.

73.    Segregating and maintaining the Utility Deposits in the Utility-Deposit Account and/or providing such Utility Deposits directly to the Utility Company, together with the additional procedures set forth in the motion, adequately protect the rights that I have been advised are provided to the Utility Companies under the Bankruptcy Code, while also protecting the Debtor's need to receive, for the benefit of its estate, uninterrupted Utility Services upon which its business depends. It is critical that the Utility Services continue uninterrupted during the Chapter 11 Case.

## **Information Required by Local Bankruptcy Rule 1007-2**

74.    It is my understanding that Local Bankruptcy Rule 1007-2 requires that the Debtor provide certain information, which is set forth below.

75.    As required under Local Bankruptcy Rule 1007-2(a)(3), to the best of the Debtor's knowledge and belief, no official committee or ad hoc group of creditors was organized prior to the Petition Date.

76.    As required under Local Bankruptcy Rule 1007-2(a)(4), **Exhibit C** lists, to the extent available, the following information with respect to the holders of the Debtor's 20 largest unsecured claims, excluding claims of insiders: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), telephone number, e-mail address, the name(s) of person(s) familiar with the Debtor's accounts, the amount of the claim, and an indication of whether the claim is contingent, unliquidated, disputed or partially secured. In each case, the claim amounts listed on Exhibit C are estimated and subject to verification. In addition, the Debtor expressly reserves its rights to assert remedies, defenses, counterclaims, and offsets with respect to each claim.

27

77.     As required under Local Bankruptcy Rule 1007-2(a)(5), **Exhibit D** provides the following information, to the extent available, with respect to each of the holders of the five largest secured claims against the Debtor: the creditor's name and address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), the amount of the claim, a brief description and an estimate of the value of the collateral securing the claim, and whether the claim or lien is disputed.  In each case, the claim amounts listed on Exhibit D are estimated and subject to verification.  In addition, the Debtor expressly reserves its rights to assert remedies, defenses, counterclaims, and offsets with respect to each claim.

78.     As required under Local Bankruptcy Rule 1007-2(a)(6), the Debtor submits that as of August 31, 2019, the Debtor's unaudited consolidated financial statements, as prepared in accordance with U.S. generally accepted accounting principles, aggregated $93.5 million in total assets and $133 million in total liabilities.

79.     As required under Local Bankruptcy Rule 1007-2(a)(7), there are no shares of stock, debentures or other securities of the Debtor that are publicly held.

80.     As required under Local Bankruptcy Rule 1007-2(a)(8), **Exhibit E** provides a list of all the Debtor's property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the court in which any proceeding relating thereto is pending.

81.     As required under Local Bankruptcy Rule 1007-2(a)(9), **Exhibit F** provides a list of the premises owned, leased, or held under other arrangement from which the Debtor operates its business.

82.     As required under Local Bankruptcy Rule 1007-2(a)(10), **Exhibit G** provides the location of the Debtor's substantial assets, the location of its books and records, and the nature, location, and value of assets held by the Debtor outside the territorial limits of the United States.

83.     As required under Local Bankruptcy Rule 1007-2(a)(11), **Exhibit H** provides a list of the nature and present status of actions or proceedings, pending or threatened, against the Debtor or their property where a judgment against the Debtor or a seizure of the Debtor's property may be imminent.

84.     As required under Local Bankruptcy Rule 1007-2(a)(12), **Exhibit I** provides a list of the names of the individuals who comprise the Debtor's existing senior management, their tenure with the Debtor, and a brief summary of their relevant responsibilities and experience.

85.     As required under Local Bankruptcy Rule 1007-2(b)(1)-2(A) and (C), **Exhibit J** provides the estimated weekly amounts amount to be paid to the Debtor's third-party independent contractors (exclusive of officers, directors, and stockholders) and the estimated amounts proposed to be paid to officers, stockholders, directors, independent managers, and financial and business consultants retained by the Debtor, for the thirty-day period following the Petition Date.

[remainder of page intentionally blank]

48036/0047-17649341v5

86.     As required under Local Bankruptcy Rule 1007-2(b)(3), **Exhibit K** provides the

estimated cash receipts and disbursements, estimated net cash gain or loss, and estimated

obligations and receivables expected to accrue that remain unpaid, other than professional fees,

on a consolidated basis for the 30-day period following the Petition Date.


Dated: October 7, 2019
       New York, New York


_____
Bernard A. Katz
Manager

48036/0047-17649341v5

## <u>EXHIBIT A</u>

**Organizational Chart**

# George Washington Bridge Bus
## Station Marketplace Renovation Project - Developer Structure
### EFFECTIVE AS OF NMTC CLOSING (12/26/13)



## **EXHIBIT B**

### **List of Papers Seeking First-Day Relief**

1. Debtor's Motion for Entry of an Order Extending the Debtor's Time to File Its Schedules of Assets and Liabilities and Statement of Financial Affairs;

2. Debtor's Motion for Interim and Final Orders (I) Authorizing the Debtor to Obtain Post-Petition Financing, (II) Authorizing the Debtor to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Invalidating Any Purported Prepetition Award of Attachment of Funds, (VI) Modifying the Automatic Stay, (VII) Scheduling a Final Hearing, and (VIII) Granting Related Relief;

3. Debtor's Motion for Entry of Interim and Final Orders Authorizing Debtor to Pay Prepetition Obligations to Certain Independent Contractors;

4. Debtor's Motion for Entry of Interim and Final Orders Authorizing It to (I) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder and (II) Renew, Revise, Extend, Supplement, Change, or Enter into New Insurance Policies; and

5. Debtor's Motion for Entry of Interim and Final Orders (I) Approving Debtor's Proposed Form of Adequate Assurance of Payment; (II) Establishing Procedures for Resolving Objections by Utility Companies; and (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service.

## EXHIBIT C

### List of Holders of the Debtor's Twenty Largest Unsecured Claims

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following is a list of creditors holding the Debtor's twenty largest unsecured claims as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor shall it be binding on, the Debtor. The Debtor reserves all rights to (i) assert that any debt or claim included herein is a disputed claim or debt and (ii) challenge the priority, nature, amount, or status of any such claim or debt. In the event of any inconsistencies between (x) the summaries set forth below and (y) the corporate and legal documents underlying or legal principles governing such obligations, the latter shall control.

| Name of Creditor | | Creditor's Address | Nature of Claim | Is the Claim Contingent, Unliquidated, or Disputed? | Amount of Unsecured Claim |
|---|---|---|---|---|---|
| 1. | Tutor Perini Building Corporation | 1600 Arch Street, #300 Philadelphia, PA 19103 <br><br> Nida & Romyn, P.C. 8383 Wilshire Blvd, Suite 810 Beverly Hills, CA 90211 Attn: Robert Nida 310-286-3400 rnida@nidaromyn.com | Litigation claim | CUD | $23,000,000.00 |
| 2. | GSNMF Sub-CDE 12 LLC | c/o Goldman Sachs Bank USA 200 West Street New York, NY 10282-219 Attn: Carrie Van Syckel, James Patchett, and Andrea Gift gs-uig-docs@gs.com 212-902-3000 (facsimile) | Loan | | $14,065,000.00 |

| | Name of Creditor | Creditor's Address | Nature of Claim | Is the Claim Contingent, Unliquidated, or Disputed? | Amount of Unsecured Claim |
|---|---|---|---|---|---|
| 3. | GWB Leverage Lender, LLC | 1930 Isaac Newton Square West Suite 207 Reston, VA 20190 Attn: Stephen J. Garchik 703-517-7004 sgarchik@sjmpartners.com | Loan | | $9,000,000.00 |
| 4. | Zetlin & DeChiara LLP | 810 Second Avenue New York, NY 10017 Attn: Michael Zetlin 212-300-1401 MZetlin@zdlaw.com | Professional services | | $945,781.53 |
| 5. | SJM Partners Inc. | 11890 Sunrise Valley Drive – Suite 554 Reston, VA 20191 Attn: Stephen J. Garchik 703-517-7004 sgarchik@sjmpartners.com | Trade debt | | $898,682.32 |
| 6. | FTI Consulting, Inc. | PO Box 418005 Boston, MA 02241-8005 Attn: Timothy Diffendall 404-731-9084 tim.diffendall@fticonsulting.com | Professional services | | $578,846.94 |
| 7. | DTI | Dept 0250 – PO Box 120250 Dallas, TX 75312-0250 Attn: Adrienne Zipp 913-621-9945 azipp@epiqglobal.com | Trade debt | | $430,950.79 |

| | Name of Creditor | Creditor's Address | Nature of Claim | Is the Claim Contingent, Unliquidated, or Disputed? | Amount of Unsecured Claim |
|---|---|---|---|---|---|
| 8. | STV Incorporated | 205 West Walsh Drive Douglassville, PA 19518 Attn: Michael Meloni 212-505-4956 michael.meloni@stvinc.com | Trade debt | | $418,595.40 |
| 9. | Goldberg & Banks, PC | 1829 Reisterstown Road – Suite 120 Pikesville, MD 21208 Attn: Howard Goldberg 410-580-9530 hgoldberg@gbpclawfirm.com | Professional services | | $227,087.97 |
| 10. | Construction Claims Group | 240 Cedar Knolls Road – Suite 106 Cedar Knolls, NJ 07927 Attn: Karen Berner 973-285-0001 klberner@constructionclaimsgroup.com | Trade debt | | $203,831.53 |
| 11. | American Arbitration Association | 1301 Atwood Avenue - Suite 211N Johnston, RI 02919 866-293-4053 886-644-0204 (facsimile) | Trade debt | | $188,475.00 |
| 12. | Botsaris Morris Realty Group | 358 Fifth Avenue – Suite 902 New York, NY 10001 Attn: Peter Botsaris 212-630-9900 pb@gobotmo.com | Trade debt | | $184,385.83 |

| | Name of Creditor | Creditor's Address | Nature of Claim | Is the Claim Contingent, Unliquidated, or Disputed? | Amount of Unsecured Claim |
|---|---|---|---|---|---|
| 13. | Port Authority of NY & NJ | 225 Park Avenue South - 15 Floor New York, NY 10003 Attn: Amy Fisher, Esq.<br><br>Skadden, Arps, Slate, Meagher & Flom LLP 4 Times Square New York, New York 10036 Attn: Jay M. Goffman, Esq. 212-735-2120 jay.goffman@skadden.com Attn: Christine A. Okike, Esq. 212-735-3491 christine.okike@skadden.com | Landlord | | $141,500.00 |
| 14. | Facility Value Inc. | 5030 Broadway – Suite 633 New York, NY 10034 Attn: Emilio Veras 212-868-8914 everas@facilityvalueinc.com | Trade debt | | $118,035.80 |
| 15. | Baker Tilly Virchow Krause, LLP | 6219 Leesburg Pike – Suite 800 Vienna, VA 22182 Attn: Bradley Nicklin 703-923-8596 brad.nicklin@bakertilly.com | Professional services | | $95,580.00 |
| 16. | Veritext New York Reporting Co. | 330 Old Country Road - Suite 300 Mineola, NY 11501 Attn: Accounts Payable 516-608-2400 billing-li@veritext.com | Professional services | | $90,928.85 |

| | Name of Creditor | Creditor's Address | Nature of Claim | Is the Claim Contingent, Unliquidated, or Disputed? | Amount of Unsecured Claim |
|---|---|---|---|---|---|
| 17. | Daniel B. Katz & Associates, Corp. | 920 Sylvan Avenue – Suite 220 Englewood Cliffs, NJ 07632 Attn: Brian Katz 646-257-4995 BrianKatz@dkatz.com | Professional services | | $85,000.00 |
| 18. | SRS Real Estate Partners-Northeast, LLC | 366 Madison Avenue – 5th Floor New York, NY 10017 Attn: Dan Richman 212-710-5253 Dan.Richman@SRSRE.com | Trade debt | | $65,000.00 |
| 19. | Nautilus Consulting, LLC | 6800 Jericho Turnpike – Suite 216E Syosset, NY 11791 Attn: Marie Brown 631-891-3040 mbrown@nautcon.com | Trade debt | | $59,950.00 |
| 20. | C.A.R.E. Enterprises Inc. | PO Box 725 Bayport, NY 11705 Attn: Lina Torre 631-472-8155 lina@care-hvac.com | Trade debt | | $59,329.62 |

# EXHIBIT D

## List of Holders of the Debtor's Five Largest Secured Claims

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following is a list of creditors holding the five largest secured claims against the Debtor as of the Petition Date.[1]

The information contained herein shall not constitute an admission of liability by, nor shall it be binding on, the Debtor. The Debtor reserves all rights to (i) assert that any debt or claim included herein is a disputed claim or debt and (ii) challenge the priority, nature, amount, or status of any  such claim or debt. The descriptions of the collateral securing the underlying obligations are  intended only as brief summaries. In the event of any inconsistencies between (x) the summaries set forth below and (y) the corporate and legal documents underlying or legal principles governing such obligations, the latter shall control.

| | Creditor Name | Creditor Contact | Amount of Claim | Collateral Description and Value | Is the Claim or Lien Disputed? |
|---|---|---|---|---|---|
| 1. | George Washington Bridge Bus Station and Infrastructure Development Fund, LLC | 99 Hudson Street – 15th Floor New York, NY 10013 | $72,000,000.00 | Senior lien on all or substantially all of the Debtor's assets; value unknown. | |
| 2. | GSNMF Sub-CDE 12 LLC | GS New Markets Fund, LLC 200 West Street New York, NY 10282 | $5,000,000 | Second priority lien on all or substantially all of the Debtor's assets; value unknown. | |
| 3. | Upper Manhattan Empowerment Zone Development Corporation | 55 West 125th Street New York, NY 10027 | $4,800,000.00 | Third priority lien on all or substantially all of the Debtor's assets; value unknown. | |
| 4. | Bank Direct Capital Finance | 150 North Field Drive - Suite 190 Lake Forest, IL 60045 | $178,643.04 | Insurance premium financing company is secured by the Debtor's right, title, and interest in the Policy. | |
| 5. | Stempel Bennett Claman & Hochberg, P.C. | 678 Third Avenue – 31st Floor New York, New York 10017 | $59,509.17 | Cash in excess of $119,000.00. | |

---

[1] The Debtor has ordered and is awaiting information regarding alleged mechanics' liens on its property. To the extent that information necessitates changes to this Exhibit D, the Debtor will promptly file a supplemental exhibit.

## EXHIBIT E

### Summary of Debtor's Property Held by Third Parties

Pursuant to Local Bankruptcy Rule 1007-2(a)(8), the following lists the Debtor's property, as of the Petition Date, that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity.

Certain of the Debtor's property is likely to be in the possession of various other persons, including maintenance providers, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledgees, assignees of rents, secured creditors, or agents. Through these arrangements, the Debtor's ownership interest is not affected. In light of the movement of this property, providing a comprehensive list of the persons or entities in the possession of the property, their addresses and telephone number, and the location of any court proceeding affecting such property would be impractical.

| Third Party Contact Addresses | Description of Property Holdings |
|---|---|
| Consolidated Edison, Inc.<br>JAF Station PO Box 1702<br>New York, NY 10116-1702<br>1-800-752-6633 or 1-212-243-1900 | Utility Deposits |

## EXHIBIT F

**Summary of Debtor's Property from Which the Debtor Operates Its Business**

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangement from which the Debtor operate it business as of the Petition Date.

| Property Address | City, State | Country | Owned or Leased |
|---|---|---|---|
| 4201-4219 Broadway<br>a/k/a 406-422 Fort Washington Avenue<br>a/k/a 701-721 West 178th Street<br>a/k/a 700-720 West 179th Street | New York, New York | USA | Leased |
| 4200-4218 Broadway<br>a/k/a 100-110 Wadsworth Avenue<br>a//k/a 651-667 West 178th Street<br>a/k/a 650-664 West 179th Street | New York, New York | USA | Leased |

## EXHIBIT G

**Location of the Debtor's Substantial Assets, Location of Its Books and Records, and Nature, Location, and Value of Assets held by the Debtor Outside the Territorial Limits of the United States**

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following provides the location of the Debtor's substantial assets, books and records, and the nature, location, and value of any assets held by the Debtor outside the territorial limits of the United States as of the Petition Date.

### Location of Debtor's Substantial Assets

The Debtor's substantial assets are located in New York, New York.

### Location of the Books and Records

The Debtor's books and records are located at 104 Brattle Circle, Melville, New York 11747 and at 46 Beacon Hill, Sparta, New Jersey 07871.

### Debtor's Assets Outside the United States

The Debtor owns no assets outside of the territorial limits of the United States.

## EXHIBIT H

### Summary of Legal Actions Against the Debtor

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), the following lists actions and proceedings pending or threatened against the Debtor or its properties where a judgment against the Debtor or a seizure of its property may be imminent as of the Petition Date.[2] This list reflects actions or proceedings considered material by the Debtor and, if necessary, will be supplemented in the corresponding schedules to be filed by the Debtor in this chapter 11 case.

| Entity | Case Caption | Case No. | Court and Jurisdiction | Nature of Claim | Status |
|---|---|---|---|---|---|
| Tutor Perini Building Corporation | Tutor Perini Building Corporation v. George Washington Bridge Bus Station Development Venture, LLC | 001-0002-7881 | American Arbitration Association | Breach of contract | Arbitration pending.  Interim attachment of funds for $23,000,000 was confirmed by the U.S. District Court for the Southern District of New York. |
|  |  | 19-05344 | U.S. District Court for the Southern District of New York |  |  |
| Stempel Bennett Claman & Hochberg, P.C. | Stempel Bennett Claman & Hochberg, P.C. v. George Washington Bridge Bus Station Development Venture, LLC | 651809/2016 | Supreme Court of the State of New York, County of New York | Non-payment of legal fees | Plaintiff has executed on its judgment and certain of the Debtor's bank accounts were subject to a hold.  In the days prior to the Petition Date, Plaintiff removed assets from the Debtor's bank account and Plaintiff's lien was released.  The Debtor is investigating these transactions. |

---

[2] The Debtor has ordered and is awaiting information regarding certain litigation that it believes to be pending but which is not available online.  To the extent that information necessitates changes to this Exhibit H, the Debtor will promptly file a supplemental exhibit.

| Entity | Case Caption | Case No. | Court and Jurisdiction | Nature of Claim | Status |
|---|---|---|---|---|---|
| Alain Perez | Perez v. Port Authority of New York and New Jersey *et al.* | 154910/18 | Supreme Court of the State of New York, County of New York | Personal injury action under New York's labor law | Paper discovery is ongoing. |
| George Washington Bridge Bus Station and Infrastructure Development Fund, LLC | George Washington Bridge Bus Station and Infrastructure Development Fund, LLC v. George Washington Bridge Bus Station Development Venture LLC *et al.* | 850155/2019 | Supreme Court of the State of New York, County of New York | Foreclosure action | This action was filed in August of 2019 and is in its preliminary stages. |
| SRS Real Estate Partners-Northeast, L.L.C. | SRS Real Estate Partners-Northeast, L.L.C. v. George Washington Bridge Bus Station Development Venture LLC | 653405/2019 | Supreme Court of the State of New York, County of New York | Breach of contract | Plaintiff has moved for a $65,000 default judgment. |
| Jamal Green | Green v. Port Authority of New York and New Jersey *et al.* | 153931/2017 | Supreme Court of the State of New York, County of New York | Personal injury action under New York's labor law | Discovery is ongoing. |
| Lee Williams | Williams v. Port Authority of New York and New Jersey *et al.* | 154033/2017 | Supreme Court of the State of New York, County of New York | Personal injury action under New York's labor law | Discovery is ongoing. |
| Mario Ayars | Ayars v. Port Authority of New York and New Jersey *et al.* | 158178/2017 | Supreme Court of the State of New York, County of New York | Personal injury action under New York's labor law | Discovery is ongoing. |
| Derek Wortham | Wortham v. George Washington Bridge Bus Station Development Venture LLC | 159755/2018 | Supreme Court of the State of New York, County of New York | Personal injury action under New York's labor law | Discovery is ongoing. |

| Entity | Case Caption | Case No. | Court and Jurisdiction | Nature of Claim | Status |
|---|---|---|---|---|---|
| Christopher Mahoney | Mahoney v. George Washington Bridge Bus Station Development Venture LLC *et al.* | 33198/2018E | Supreme Court of the State of New York, Bronx County | Personal injury action under New York's labor law | Discovery is ongoing. |
| FTI Consulting, Inc. | FTI Consulting, Inc. v. George Washington Bridge Bus Station Development Venture LLC | 655425/2019 | Supreme Court of the State of New York, County of New York | Breach of contract | This action was filed in August of 2019 and is in its preliminary stages. |
| Café at 178th LLC MNG 178th, LLC | Café at 178th LLC *et al.* v. George Washington Bridge Bus Station Development Venture LLC | 652001/2019 | Supreme Court of the State of New York, County of New York | Breach of contract | This action was filed in August of 2019 and is in its preliminary stages. |
| C2G International, LLC | n/a | n/a | n/a | Non-payment of fees for consulting services | Demand letter sent in September of 2019. Amount demanded is in excess of amount listed on Debtor's books and records. |

## EXHIBIT I

### Debtor's Senior Management

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtor's existing senior management, their tenure with the Debtor, and a brief summary of their responsibilities and relevant experience as of the Petition Date.

| Name/Position | Relevant Experience/Responsibility | Tenure |
|---|---|---|
| Bernard A. Katz, CPA, CIRA, CFE, CFF Manager | Mr. Katz has over 30 years of practical experience in bankruptcy and corporate restructuring, forensic accounting, and litigation support.  He has provided financial advisory services to distressed companies, conducted corporate investigations, and has audit experience and GAAP knowledge of private companies.  Mr. Katz has significant experience in the commercial real estate, retail, healthcare, manufacturing, distribution, and telecommunications industries.<br><br>Mr. Katz began working with the Debtor in July of 2019.  He initially served as an independent advisor, tasked with assisting the Debtor on all financial issues pending the hiring of a financial advisor.  On September 29, 2019, Mr. Katz was appointed Manager of the Debtor.  In that capacity, he has full control over the Debtor's day-to-day operations, restructuring and sale efforts, and litigation strategy. | September 29, 2019 to Present |

## EXHIBIT J

### Compensation for the Thirty-Day Period Following the Petition Date

Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides, for the 30-day period following the Petition Date, the estimated amount of weekly compensation (exclusive of officers, directors, and stockholders), the estimated amount paid and proposed to be paid to officers, stockholders, and directors, and the amount paid or proposed to be paid to financial and business consultants retained by Debtor.

Estimated amount of monthly compensation to certain independent contractors (exclusive of officers, directors, and stockholders): $71,000.00.

Estimated amount paid and proposed to be paid to officers, stockholders, directors, and independent managers: $60,000.

Amount paid or proposed to be paid to financial and business consultants: $0.00.

## EXHIBIT K

**Debtor's Estimated Cash Receipts and Disbursements for the Thirty-Day Period Following the Petition Date**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the Debtor's estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| Estimated Cash Receipts | $0.00 |
| Estimated Cash Disbursements | ($865,128.00) |
| Net Cash Loss | ($865,128.00) |
| Accrued Obligations | $365,000[3] |
| Uncollected Receivables | $0.00[4] |

---

[3] The estimate of accrued and unpaid obligations reflects general, standardized assumptions on vendor payment terms, gross-to-nets, and monthly disbursements.

[4] The estimate of uncollected receivables reflects standardized assumptions on the timing of the payment of receipts.