**COLE SCHOTZ P.C.**
Michael D. Sirota
Felice R. Yudkin
Ryan T. Jareck
Mark Tsukerman
Rebecca W. Hollander
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
(212) 752-8000
(212) 752-8393 Facsimile

*Proposed Counsel to the Debtor and*
*Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>GEORGE WASHINGTON BRIDGE BUS STATION DEVELOPMENT VENTURE LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. _____ (___) |

**DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING, (II) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) INVALIDATING ANY PURPORTED PREPETITION AWARD OF ATTACHMENT OF FUNDS, (VI) MODIFYING THE AUTOMATIC STAY, (VII) SCHEDULING A FINAL HEARING, AND (VIII) GRANTING RELATED RELIEF**

George Washington Bridge Bus Station Development Venture LLC (the "**Debtor**"), the

debtor and debtor in possession in the above-captioned case (the "**Chapter 11 Case**"), hereby

moves (the "**Motion**") this Court for entry of an interim order (the "**Interim Order**"), in

---

[1] The last four digits of the debtor's federal taxpayer identification number are 8685. The debtor's business address is 11890 Sunrise Valley Drive, Suite 554, Reston, VA 20191.

substantially the form attached hereto as **Exhibit A**, and a final order (the "**Final Order**,"[2] and collectively with the Interim Order, the "**Financing Orders**"), granting the relief described below. In support thereof, the Debtor refers to the contemporaneously filed *Declaration of Bernard A. Katz in Support of Chapter 11 Petitions and First-Day Papers* (the "**First-Day Declaration**"). In further support thereof, the Debtor submits the *Declaration of Bernard A. Katz in Support of the Motion* (the "**Katz Declaration**"), and further represents as follows:

### RELIEF REQUESTED

1.     The Debtor respectfully requests entry of the Financing Orders under sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"):

A.     authorizing the Debtor to obtain secured debtor-in-possession financing (the "**DIP Financing**"), consisting of a superpriority senior secured multi-draw loan facility (the "**DIP Facility**"), in an aggregate principal amount of up to $4,400,000.00 (the "**DIP Commitments**"), all on the terms and conditions set forth in the Financing Orders and the DIP Documents (as defined below), and on an interim basis, to borrow an aggregate principal amount not to exceed $1,225,031.00 (the "**Initial Draw**");

B.     authorizing the Debtor to execute and enter into the *Superpriority Senior Secured Debtor-in-Possession Loan Agreement*, among the Debtor and New York City Regional Center, LLC, as lender thereto (the "**DIP Lender**"), attached hereto as **Exhibit B** (as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, the "**DIP Credit Agreement**" and, together with the schedules and exhibits attached thereto and all agreements, documents, instruments and/or amendments executed and delivered in connection therewith, collectively, the "**DIP Documents**"), and the other DIP Documents, and to perform all such other and further acts as may be required in connection with the DIP Facility and the DIP Documents;

C.     the granting of adequate protection to:

---

[2] A form of Final Order will be filed with the Court in advance of the final hearing on the Motion.

2

(i)    George Washington Bridge Bus Station and Infrastructure Development Fund, LLC, in its capacity as the lender (the "**Senior Secured Lender**") of a $72,000,000 loan (the "**Senior Secured Loan**") made pursuant to that certain *Permanent Loan Agreement*, dated as of July 20, 2011 (as amended, restated, supplemented, or modified from time to time, the "**Senior Secured Loan Agreement**"), between the Debtor and the Senior Secured Lender;

(ii)    Upper Manhattan Empowerment Zone Development Corporation, in its capacity as a lender ("**UMEZ**") of a $5,000,000 loan (the "**UMEZ Loan**") made pursuant to that certain *Loan Agreement*, dated as of February 27, 2018 (as amended, restated, supplemented, or modified from time to time, the "**UMEZ Loan Agreement**"), between the Debtor and UMEZ; and

(iii)    GSNMF Sub-CDE 12 LLC, as one of the lenders (the "**Building Secured Lender**," and together with the Senior Secured Lender and UMEZ, the "**Prepetition Secured Parties**") of $19,065,000 in loans (the "**Building Loans**") under that certain *Building Loan Agreement*, dated as of December 26, 2013 (as amended, restated, supplemented, or modified from time to time, the "**Building Loan Agreement**") by and among the Debtor, GSB NMTC Investor LLC, as administrative agent (the "**Building Loan Agent**"), Building Secured Lender, LIIF Sub-CDE XXVI, LLC ("**LIIF CDE**") and DVCI CDE XIII, LLC ("**DV CDE**") as co-lenders (collectively with the Building Secured Lender, the "**Building Lenders**").

D.    subject to the restrictions set forth in the DIP Documents and the Interim Order, authorizing the Debtor to use Cash Collateral (as defined below) and all other Prepetition Collateral (as defined below) in which any of the Prepetition Secured Parties have an interest and the granting of adequate protection to the Prepetition Secured Parties with respect to, *inter alia*, such use of Cash Collateral and the other Prepetition Collateral;

E.    subject to certain challenge rights of parties-in-interest set forth in the Interim Order, approving certain stipulations by the Debtor with respect to the Prepetition Secured Credit Documents (as defined below) and the liens and security interests arising therefrom;

F.    the granting of superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code to the DIP Lender as well as liens, including priming liens, pursuant to section 364(d) of the Bankruptcy Code, as further described herein, on all pre-petition and post-petition property of the Debtor's estate and all proceeds thereof (including, upon Court approval and entry of the Final Order, any Avoidance Proceeds (as defined below));

G.    subject to approval by the Court and entry of the Final Order, waiving the Debtor's right to surcharge the Prepetition Collateral and the Debtor Collateral (as

3

defined below) pursuant to section 506(c) of the Bankruptcy Code and any right of the Debtor under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

H.      subject to approval by the Court and entry of the Final Order, a finding that none of the DIP Lender or the Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Debtor Collateral;

I.      invalidating any purported prepetition award of attachment of funds in favor of Tutor Perini Building Corp. and authorizing the Debtor to utilize rents and monies prepetition and post-petition to fund necessary expenses in accordance with the Approved Budget;

J.      modifying the automatic stay to the extent set forth herein and in the DIP Documents; and

K.      set the date for the hearing (the "**Final Hearing**") to consider on a final basis the Motion and the entry of the Final Order authorizing and approving the transactions described in the foregoing clauses on a final basis.

## PRELIMINARY STATEMENT

2.      In the weeks leading up to the Petition Date, the Debtor and its advisors engaged in extensive, hard-fought negotiations with the DIP Lender and Senior Secured Lender regarding potential proposals for debtor-in-possession financing and that consensual use of Cash Collateral that would provide the Debtor with critical liquidity to fund its operations and this Chapter 11 Case.  These negotiations culminated in a post-petition financing facility provided by the Senior Secured Lender and the consensual use of cash collateral during this Chapter 11 Case.

3.      By this Motion, the Debtor seeks approval of the DIP Facility provided by the DIP Lender in an aggregate principal amount of $4,400,000.00.  The Debtor is seeking entry of the Interim Order approving (i) the DIP Documents, (ii) the Initial Draw, and (iii) at the Final Hearing, the Debtor will seek authorization to borrow the remaining amounts under the DIP Documents and to reaffirm the borrowing and related obligations authorized by the Interim Order on a final basis.  If approved, the use of Cash Collateral and the DIP Facility will provide

4

the Debtor with sufficient liquidity to fund the Debtor's operations and administrative expenses during this Chapter 11 Case as set forth in the 5-month approved budget (the "**Approved Budget**," which is attached hereto as __Exhibit C__).

4.    For these reasons, for the reasons set forth below, and in the First-Day Declaration and Katz Declaration, the Debtor believes that entry into the DIP Facility will maximize value for the Debtor's stakeholders and represents an exercise of the Debtor's sound business judgment.  Accordingly, the Debtor respectfully requests that the Court approve the entry of the Interim Order and ultimately at the Final Hearing, the Final Order.

## CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001(B) AND LOCAL BANKRUPTCY RULE 4001-2

5.    The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant documents, as required by Bankruptcy Rule 4001(b)(1)(B) and Local Bankruptcy Rule 4001-2.

| Bankruptcy Rule/Local Rule | Summary of Material Terms[3] |
| --- | --- |
| **Borrower**<br>Bankr. R. 4001(c)(1)(B) | George Washington Bridge Bus Station Development Venture, LLC<br><br>*See* DIP Credit Agreement, introductory paragraph. |
| **DIP Lender**<br>Bankr. R. 4001(c)(1)(B) | New York City Regional Center, LLC.<br><br>*See* DIP Credit Agreement, introductory paragraph. |
| **Entities with Interests in Cash Collateral**<br>*Bankr. R. 4001(b)(1)(B)(i)* | The Prepetition Secured Parties.<br><br>*See* Interim Order, ¶ 5. |
| **DIP Commitment** | In an aggregate principal amount of up to $4,400,000.00, and on an |

---

[3] Capitalized terms used but not otherwise defined in this chart shall have the meanings ascribed to them in the DIP Credit Agreement.

| | |
|---|---|
| *Bankr. R. 4001(c)(1)(B) L.R. 4001-2(a)(1), (a)(7)* | interim basis, to borrow an aggregate principal amount not to exceed $1,225,031.00.<br><br>*See* DIP Credit Agreement, § 2.01. |
| **Cash Collateral** *L.R. 4001-2(a)(1)* | Subject to the terms and conditions contained in the DIP Documents and the Financing Orders, the Prepetition Secured Parties consent to the use of their "cash collateral" as defined in Section 363(a) of the Bankruptcy Code.<br><br>*See* Interim Order, ¶ 15. |
| **Term/Maturity** *Bankr. R. 4001(c)(1)(B)* | Five months after the Petition Date.<br><br>*See* DIP Credit Agreement, § 1.01. |
| **Interest Rates** Bankr. R. 4001(c)(1)(B) L.R. 4001-2(a)(3) | The Debtor shall pay to the DIP Lender the then unpaid principal amount of the loan and all interest accrued thereon and costs and expenses then due and owing on the Maturity Date. The funds comprising each Advance shall bear interest at the rate of 10.0% per annum. Interest is earned monthly, but payable-in-kind until the Maturity Date.<br><br>*See* DIP Credit Agreement, §§ 2.06 and 2.08. |
| **Default Rate** Bankr. R. 4001(c)(1)(B) L.R. 4001-2(a)(3) | Default Rate means 10.75% per annum.<br><br>*See* DIP Credit Agreement, § 1.01. |
| **Expenses and Fees** Bankr. R. 4001(c)(1)(B) L.R. 4001-2(a)(3) | The Debtor agrees to pay to the DIP Lender a fee (the "**Origination Fee**") equal to the lesser of 2.00% of the maximum amount of commitments to be available under the DIP Facility and $50,000.00, which shall be earned as of the time of the First Advance and shall be due and payable at the earlier of termination of the DIP Facility and the payment in full of all Advances (whether as of the Maturity Date or at such other time as may be agreed by the Lender), and which Origination Fee may be paid by netting such amount due to the DIP Lender from the disbursement of the First Advance to the Debtor.<br><br>The Debtor agrees to pay to the DIP Lender an exit fee (the "**Exit Fee**") equal to the lesser of 3.00% of the maximum amount of commitments to be available under the DIP Facility and $75,000.00, which Exit Fee shall be earned, due and payable at the earlier of termination of the Loan and the payment in full of all Advances (whether as of the Maturity Date or at such other time as may be agreed by the DIP Lender).<br><br>Without duplication of amounts required to be paid pursuant to the DIP Documents, upon entry of the Interim Order, the Debtor shall pay in cash |

6

| | all fees, expenses, and disbursements payable to the DIP Lender pursuant to the Approved Budget.

*See* DIP Credit Agreement, § 2.11; Interim Order, ¶ 16(c). |
|---|---|
| **Use of Proceeds** Bankr. R. 4001(b)(1)(B)(ii), (c)(1)(B) L.R. 4001-2(a)(2) | Subject to the Financing Orders, the Debtor shall only use the proceeds of the DIP Facility for ordinary course general working capital and operational expenses (including, without limitation, administrative expenses arising in the Chapter 11 Case and post-petition lease payments) in accordance with the Approved Budget subject to the Permitted Variance. For the avoidance of doubt, except as may be set forth in any Financing Order or as consented to by the DIP Lender expressly in writing, none of the Advances, in whole or in part, shall be used (i) to attack the validity, priority or enforceability of any of the claims of the DIP Lender or Prepetition Secured Parties, (ii) to research, review, analyze or investigate with respect to or in connection with any litigation, claim, objection or cause of action of any kind or nature whatsoever against the DIP Lender or Prepetition Secured Parties (whether or not arising from or related to pre-petition or post-petition acts, omissions or other conduct), or (iii) to file, prosecute or otherwise pursue any litigation, claim, objection or cause of action of any kind or nature whatsoever against the DIP Lender or Prepetition Secured Parties (whether or not arising from or related to pre-petition or post-petition liens, acts, omissions or other conduct).

*See* DIP Credit Agreement, § 2.04. |
| **5-Month Budget** Bankr. R. 4001(c)(1)(B) L.R. 4001-2(a)(2) | All advances under the DIP Facility and any Cash Collateral shall be used by the Debtor solely in accordance with the Approved Budget setting forth all forecasted (i) cash receipts of the Debtor (ii) cash operating disbursements of the Debtor, and (iii) non-operating, bankruptcy-related cash disbursements of the Debtor, which Approved Budget shall be approved by the DIP Lender in its sole and absolute discretion.

Compliance with the Approved Budget will be measured every month, starting with the first month during which the Petition Date occurs.

*See* DIP Credit Agreement, §§ 2.02, 2.03 and 3.23. |
| **Liens and Priorities Other Than Adequate Protection Liens** Bankr. R. 4001(c)(1)(B)(i), (xi), L.R. 4001-2(a)(4) | The Debtor pledges, assigns and grants to the DIP Lender new Liens (the "**DIP Liens**") on and security interests in all of the Debtor's right, title and interest in and to and under, the DIP Collateral, pursuant to Sections 364(c)(2), 364(c)(3) of the Bankruptcy Code, which shall at all times rank senior in priority to all Liens as security for the payment and performance of the pre-petition secured obligations and as an element of the consideration for the advances. |

48036/0047-17905922v4

| | |
|---|---|
| | The DIP Lender shall have a super-priority administrative expense claim (the "**DIP Superpriority Claim**") pursuant to Bankruptcy Court approval in the Interim Order and the Final Order with respect to the obligations that will, in accordance with Section 364(c)(1) of the Bankruptcy Code, have priority over any and all administrative expenses of and unsecured claims against the Debtor now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726, and 1114 of the Bankruptcy Code, but shall be subject to the Carve-Out.<br><br>*See* DIP Credit Agreement, § 9.02. |
| **Adequate Protection**<br>Bankr. R. 4001(b)(1)(B)(iv), (c)(1)(B)(ii)<br><br>L.R. 4001-2(a)(2) | The Prepetition Secured Parties will be entitled to receive, as adequate protection for the use of the collateral and the priming of the liens and security interests granted to the Prepetition Secured Parties under the Prepetition Loan Documents, to the extent of any use of, or diminution in the value of, the Prepetition Collateral:<br><br>1.  superpriority claim status;<br><br>2.  replacement liens on all DIP Collateral, junior only to the liens of the DIP Lender, but subject to any Prior Senior Liens; and<br><br>3.  reimbursement of fees, costs and expenses incurred by the Senior Secured Lender in connection with the Chapter 11 Case, subject to the Budget.<br><br>*See* DIP Credit Agreement, § 9.02. |
| **Carve Out**<br>L.R. 4001-2(a)(5), (a)(9) | "**Carve-Out**" means an amount equal to the sum of (i) all fees required to be paid to the clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $25,000.00 (without regard to the notice set forth in (iii) below); and (iii) (A) all paid and unpaid claims for fees, costs, disbursements and expenses to the extent allowed at any time, whether by interim order, final order, procedural order or otherwise of persons or firms retained by the Debtor pursuant to sections 327, 328 or 363 of the Bankruptcy Code, Bernard A. Katz, as independent member of the Debtor, or any official committee of unsecured creditors (the "**Creditors' Committee**") in the Chapter 11 Case (collectively, the "**Professional Fees**", and the retained professionals, the "**Professional Persons**") incurred at any time on or before the Borrower's receipt of the Trigger Notice, plus |

48036/0047-17905922v4

| | |
|---|---|
| | (B) Professional Fees incurred after the Borrower's receipt of the Trigger Notice in an amount not to exceed $200,000 (such amounts incurred in (B), collectively with any paid and unpaid claims in (A), the "**Carve-Out Cap**"), in each case subject to the limits imposed by this Interim Order, the Final Order (if and when entered) or otherwise, on Professional Fees permitted to be incurred, including in connection with any permitted investigation of the claims, liens, and defenses against the Prepetition Secured Parties; *provided* that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii)(A) or (iii)(B) above on any other grounds.  "**Trigger Notice**" shall mean a written notice delivered by the DIP Lender describing the event of default that is alleged to continue under the DIP Documents (or after the payment in full of the DIP Obligations, the Senior Secured Lender describing the reason for termination of the use of Cash Collateral).  Immediately upon delivery of a Trigger Notice, and before the payment to any Prepetition Secured Party on account of any adequate protection or otherwise, the Debtor shall be required to deposit, in a segregated account not subject to the control of the DIP Lender or the Senior Secured Lender (the "**Carve-Out Account**"), an amount equal to the Carve-Out Cap.  The funds on deposit in the Carve-Out Account shall be available only to satisfy obligations benefitting from the Carve-Out, and the (i) DIP Lender and the Senior Secured Lender shall not sweep or foreclose on cash of the Debtor necessary to fund the Carve-Out Account and (ii) the Senior Secured Lender shall have a security interest upon any residual interest in the Carve-Out Account available following satisfaction in cash in full of all obligations benefitting from the Carve-Out.  Professional Fees for Professional Persons retained by the Creditors' Committee shall not exceed $375,000.00 for the duration of the Debtor's Chapter 11 Case.<br><br>*See* Interim Order, ¶ 10(b). |
| **Cross Collateralization** L.R. 4001-2(a)(6) | The DIP Credit Agreement does not provide for cross-collateralization. |
| **Roll Up** L.R. 4001-2(a)(7) | The DIP Facility does not provide for a roll-up of any pre-petition obligations. |

48036/0047-17905922v4

| | |
|---|---|
| **Events of Default** <br> Bankr. R. 4001(c)(1)(B) L.R. 4001-2(a)(10) | Each of the following shall be an Event of Default under the DIP Documents: <br><br> (a)  the Debtor shall fail to pay (i) any principal or interest on the DIP Facility (including without limitation payment-in-full of all principal and interest then due and payable at the Maturity Date or as otherwise applicable in the event of acceleration), or (ii) any fees in connection with the DIP Facility, when and as the same shall become due and payable when due, and if such failure shall continue for three Business Days; <br><br> (b)  except with respect to any default resulting from the commencement of the Chapter 11 Case, if a default occurs under the terms and provisions of any indebtedness, and such holder institutes foreclosure or other proceedings for the enforcement of its remedies thereunder, which foreclosure or other proceedings are not discharged (without affecting the Retail Center) or bonded within 60 days of written notice from the institution thereof (this subsection shall not be construed to imply that the DIP Lender consents to any junior or senior lien or encumbrance except as otherwise provided for herein); <br><br> (c)  the Debtor shall fail to pay any other fee or other amount payable under the DIP Credit Agreement or any other DIP Documents, when and as the same shall become due and payable, and such failure shall continue un-remedied for a period of ten Business days after written notice thereof; <br><br> (d)  any representation or warranty made by Debtor in the DIP Credit Agreement or any amendment or modification hereof or waiver hereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with DIP Credit Agreement or any other DIP Document, or any amendment or modification hereof or thereof or waiver hereunder or thereunder, shall prove to have been incorrect in any material respect when made; <br><br> (e)  the Debtor shall fail to observe or perform any covenant, condition or agreement contained in Sections 5.02, 5.03 (with respect to the Debtor's existence), 5.05, 5.09, 5.11, 5.13, or in 6.03 and such failure shall continue un-remedied for a period of ten days (except in the cause of Section 5.11) after the earlier of (x) knowledge thereof by the Debtor and (y) notice thereof from the DIP Lender to the Debtor; <br><br> (f)  the Debtor shall fail to observe or perform any covenant, condition or agreement contained in the DIP Credit Agreement, and such failure shall continue un-remedied for a period of 30 days after the earlier of (x) knowledge thereof by the Debtor and (y) |

48036/0047-17905922v4

notice thereof from the DIP Lender to the Debtor;

(g)     except with respect to any default resulting from the commencement of the Chapter 11 Case, any event or condition occurs that results in any Indebtedness (other than in respect of the DIP Facility) becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Indebtedness (other than in respect of the DIP Facility) or any trustee or agent on its or their behalf to cause any such Indebtedness to become due, or to require the prepayment thereof, prior to its scheduled maturity and the Debtor fails to pay such Indebtedness or obtain an extension or moratorium;

(h)     one or more judgments for the payment of money in an aggregate amount in excess of $250,000, which sum shall not be subject to full, complete and effective insurance coverage, shall be rendered against the Debtor after the Petition Date and the same shall remain un-discharged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Debtor or any Subsidiary (if permitted by DIP Lender in writing), to enforce any such judgment;

(i)     if, except as specifically provided to the contrary in the DIP Credit Agreement, without the consent of the DIP Lender (which consent in any and all circumstances may be withheld in the sole and absolute discretion of the Lender), the Debtor fails to comply with Sections 6.01, 6.02, 6.03, 6.04, 6.05, and 6.09 hereof;

(j)     if the insurance policies required to be maintained pursuant to Section 3.17 hereof are not kept in full force and effect, or if certificates of such insurance policies are not delivered to the DIP Lender (or copies of such insurance if required by law) upon request and such failure shall continue un-remedied for a period of 15 days after written notice thereof;

(k)     if the Debtor shall be in default beyond any applicable notice and grace period, if any, under any Indebtedness covering any part of the Retail Center whether superior or inferior in lien to the DIP Facility, whether existing as of the date hereof or subsequent to the date hereof;

(l)     if any Contract is cancelled or amended or modified and such modification or amendment would constitute a material modification without the prior written consent of the DIP Lender not to be unreasonably withheld or delayed or if a default beyond applicable

11

periods of notice and grace shall occur under any Contract;

(m)    if the Financing Orders do not give the DIP Lender a good and sufficient lien on the DIP Collateral, or if any Lien created under the DIP Credit Agreement or any of the DIP Documents or the Financing Orders ceases to be valid or enforceable for any reason;

(n)    if the Mortgaged Property is, in the judgment of DIP Lender materially injured or destroyed by fire or otherwise;

(o)    if by reason of acts of God, floods, storms, explosion, fires, labor troubles, strikes, insurrection, riots, acts of the public enemy, or federal, state or local law, order, rule, or regulation, either party is prevented from complying with any condition of the DIP Credit Agreement or from complying with any express or implied covenant in the DIP Credit Agreement, then while so prevented the party shall be relieved of the obligation of complying with such covenant and shall not be liable for damages for failure to comply with it.  Any obligation of either party shall be extended for as long as it is so prevented from complying with any condition or covenant in the agreement.  Notwithstanding the above, nothing contained herein shall be construed to relieve the Debtor from timely making any and all payments required under the Note executed in connection with the DIP Credit Agreement;

(p)    if the Debtor executes any chattel mortgage on any materials, fixtures or articles used in the construction or operation of the Retail Center or appurtenant thereto, or articles of personal property placed on the Mortgaged Property, or if any such materials, fixtures or articles are not reasonably satisfactory to the DIP Lender or are purchased on conditional bill of sale or otherwise so that the ownership thereof will not vest unconditionally in the Debtor, free from encumbrance, on delivery at the Mortgaged Property; and if the Debtor does not furnish to the DIP Lender, if requested in writing, the contracts, bills of sale, statements, receipted vouchers and agreements, or any of them, under which the Debtor claims title to such materials, fixtures and articles;

(q)    the Debtor (except following the DIP Lender's prior written request or with the DIP Lender's express prior written consent) files a motion with the Bankruptcy Court or any other court with jurisdiction in the matter seeking an order, or an order is otherwise entered, modifying, reversing, revoking, staying, rescinding, vacating, or amending the Financing Orders or any of the DIP Documents, without the DIP Lender's express prior written consent (and no such consent shall be implied from any other action, inaction, or acquiescence of the

12

DIP Lender);

(r)    the Borrower files any motion or application, or the Bankruptcy Court grants the motion or application of any other Person, which seeks approval for or allowance of any claim, lien, security interest ranking equal or senior in priority to the claims, liens and security interests granted to the DIP Lender under the Financing Orders or the Loan Documents or any such equal or prior claim, lien, or security interest shall be established in any manner, except, in any case, as expressly permitted under the Financing Orders;

(s)    the entry of an order by the Bankruptcy Court authorizing the Debtor to obtain financing pursuant to Section 364 of the Bankruptcy Code from any person other than the DIP Lender which is secured by Liens of equal or greater priority than the Liens securing the Secured Obligations;

(t)    the entry of an order by the Bankruptcy Court converting the Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code, or dismissing the Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily;

(u)    the entry of an order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code without the DIP Lender's prior written consent (not to be unreasonably withheld), which order permits (i) any creditor, other than the DIP Lender, to realize upon, or to exercise any right or remedy with respect to, any material asset of the Debtor or to terminate any license, franchise, or similar agreement, where such termination could have a Material Adverse Effect or (ii) any material pre-petition litigation, including, for the avoidance of doubt, the Tutor Perini Litigation to continue with respect to the Debtor outside of the Bankruptcy Court;

(v)    if any creditor of the Debtor receives any adequate protection payment which is not specifically set forth in the Budget, or in the Financing Orders with respect to the Prepetition Secured Obligations or other obligations of the Prepetition Secured Lenders, or any Lien is granted as adequate protection other than as set forth in the Financing Orders;

(w)    the Debtor is enjoined by any court or governmental agency from continuing to conduct all or any material part of its business, or if a trustee, receiver or custodian is appointed for the Debtor or any of its properties;

(x)    the Interim Order or Final Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on

13

appeal or by the Bankruptcy Court without the prior written consent of the DIP Lender (and no such consent shall be implied from any other authorization or acquiescence by the Lender) (which consent shall not be unreasonably withheld);

(y)     a trustee is appointed pursuant to Sections 1104(a)(1) or 1104(a)(2) of the Bankruptcy Code;

(z)     an examiner with powers beyond those set forth in Sections 1106(a)(3) and 1106(a)(4) is appointed pursuant to Section 1104(a) of the Bankruptcy Code;

(aa)   the Debtor fails to comply with the Milestones;

(bb)   any sale of the equity interests of the Debtor, or any disposition of all or a material portion of all of the DIP Collateral pursuant to sections 363 or 1129 of the Bankruptcy Code other than as permitted by the applicable Financing Order, or (ii) the entry of any order by the Bankruptcy Court providing for the same, unless in the case of the foregoing clause (ii) only, such order provides that in connection and concurrently with such transaction, the proceeds of such sale shall be used to satisfy, in full and in cash, the Secured Obligations (other than contingent indemnification or reimbursement obligations not then due) under the DIP Documents;

(cc)   except as permitted by the First Day Orders or as otherwise agreed to by the DIP Lender, the Debtor shall make any pre-petition payment other than pre-petition payments authorized by the Bankruptcy Court in accordance with the First Day Orders; or

(dd)   a chapter 11 plan that is not an Acceptable Plan shall be (i) confirmed by any Person or (ii) confirmed or filed by the Debtor, or any order shall be entered which dismisses the Chapter 11 Case of the Debtor and which order does not provide for termination of the DIP Lender's obligation to make Advances and indefeasible payment in full in cash of the obligations under the DIP Documents and continuation of the Liens with respect thereto until the effectiveness thereof (other than contingent indemnity obligations not then due), or the Debtor shall seek confirmation of any such plan or entry of any such order.

(ee)   the Debtor shall take any action in support of any matter set forth in clauses (bb) through (dd) above or in support of any filing by any Person of a chapter 11 plan that is not an Acceptable Plan or any other Person shall do so and such application is not contested in good faith by the Debtor and the relief requested is granted in an order that is not stayed pending appeal, in each case unless the DIP Lender

48036/0047-17905922v4

consents to such action;

(ff)    without the express written consent of the DIP Lender, the Debtor shall seek to, or shall support (whether by way of motion or other pleadings filed with the Bankruptcy Court or any other writing executed by the Debtor or by oral argument) any motion to, (i) disallow in whole or in part any of the obligations arising under the DIP Credit Agreement or any other DIP Document, (ii) disallow in whole or in part any of the Indebtedness owed by the Borrower under the DIP Credit Agreement or the Prepetition Secured Loans, (iii) challenge the validity and enforceability of the Liens or security interests granted under any of the DIP Documents or in any Financing Order in favor of the DIP Lender, (iv) challenge the validity and enforceability of the Liens or security interests granted under the secured loans granted in favor of the Prepetition Secured Lenders, or (vii) challenge the validity and enforceability of the ALR (as defined in the Financing Orders) or any actions taken by the Pre-petition Senior Secured Lender or DIP Lender in relation thereto;

(gg)    termination or expiration of any exclusivity period for the Debtor to file or solicit acceptances for a plan of reorganization;

(hh)    noncompliance by the Debtor with the terms of the Financing Orders;

(ii)    without the express written consent of the DIP Lender, the Debtor shall take any actions (whether by way of motion or other pleadings filed with the Bankruptcy Court or any other writing executed by any Credit Party or by oral argument) with respect to the Tutor Perini Litigation (and for the avoidance of doubt, if the DIP Lender consents, any such motion and other pleadings shall be in form and substance acceptable to the DIP Lender in its sole and absolute discretion); and/or

(jj)    the entry of a court order invalidating the ALR or the right of the Pre-petition Senior Secured Lender to collect and receive Rent.

*See* DIP Credit Agreement, § 7.01.

| | |
|---|---|
| **Affirmative and Negative Covenants Including Financial Covenants**<br>Bankr. R. 4001(c)(1)(B) L.R. 4001-2(a)(8) | The affirmative covenants of the Debtor are set forth in Article V of the DIP Credit Agreement and the negative covenants are set forth in Article VI of the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement, Art. V and VI. |

15

| Milestones | The Debtor is required to comply with the following milestones: |
|---|---|
| Bankr. R. 4001(c)(I)(B)(vi) l.r. 4001-2(A)(10), (12) | (i)   on the Petition Date, the Debtor shall have filed a motion to approve the Credit Agreement, which motion shall be in form and substance reasonably acceptable to the Lender.  The Interim Financing Order approving the Credit Agreement shall be entered by the Bankruptcy Court no later than three Business Days following the Petition Date, which Interim Financing Order shall be in form and substance acceptable to the Lender in its sole and absolute discretion; |
|  | (ii)   no later than five Business Days after the Petition Date, the Debtor shall file an application (or applications, if necessary) with the Bankruptcy Court to retain and employ the Sale Professional(s) (the "**Sale Professional Retention Application**"), which application shall be in form and substance acceptable to Lender in its sole discretion; |
|  | (iii)   no later than 30 days after the Petition Date, a Final Financing Order approving the Credit Agreement shall be entered by the Bankruptcy Court, which Final Financing Order shall be in form and substance acceptable to the Lender in its sole and absolute discretion (and the related motion shall be in form and substance reasonably acceptable to the Lender); |
|  | (iv)   no later than 30 days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Sale Professional Retention Application, which shall be in form and substance acceptable to the Lender in its sole and absolute discretion; |
|  | (v)   no later than 14 days after notice by the Lender, the Borrower shall have filed a motion under Section 365 of the Bankruptcy Code, requesting an extension of the date on which the Borrower must assume or reject leases to 210 days after the entry of the order for such relief, with such order being entered by the Bankruptcy Court no later than 30 days after the motion is filed (such motion and order to be in form and substance acceptable to the Lender in its sole and absolute discretion).  The |

16

Borrower may not assume, assume and assign, or reject any leases or executory contracts (including the Ground Lease) without the prior written consent of the Lender (which consent shall not be unreasonably withheld);

*Sale Milestones*:

(vi)     no later than 30 days after the Petition Date, the Borrower shall file a motion (the "**Bid Procedures Motion**") with the Bankruptcy Court to approve bid procedures and establish the date of an auction (the "**Auction**"), which shall include a form of a stalking horse agreement ("**Stalking Horse Agreement**"), which shall be in form and substance acceptable to Lender in its sole discretion;

(vii)    no later than 60 days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Stalking Horse Agreement and Bid Procedures Motion, which shall be in form and substance acceptable to the Lender in its sole and absolute discretion;

(viii)   no later than 135 days after the Petition Date, the Borrower shall conduct the Auction;

(ix)     no later than 140 days after the Petition Date, the Bankruptcy Court shall enter an order approving the sale of the Borrower's assets to the party determined to have made the highest or otherwise best bid for all or substantially all of the assets of the Borrower (the "**Sale Order**"), which shall be in form and substance acceptable to the Lender in its sole and absolute discretion; and

(x)      No later than 150 days after the Petition Date, the Borrower shall have consummated the sale (the "**Sale**") to the party determined to have made the highest or otherwise best bid for all or substantially all of the assets of the Borrower in accordance with the Sale Order pursuant to the Stalking Horse Agreement or other sale and purchase agreement, which shall be in form and substance acceptable to the Lender in its sole and absolute discretion.

48036/0047-17905922v4

|  | *Plan Milestones*: |
|---|---|
|  | (xi)    no later than 60 days after the Petition Date, the Borrower shall have filed with the Bankruptcy Court an Acceptable Plan and disclosure statement in form and substance acceptable to the DIP Lender in its sole and absolute discretion; |
|  | (xii)    no later than 95 days after the Petition Date, the Bankruptcy Court shall have entered an order approving the disclosure statement; |
|  | (xiii)    no later than 100 days after the Petition Date, the Borrower shall have commenced solicitation on the Acceptable Plan; |
|  | (xiv)    no later than 140 days after the Petition Date, the Bankruptcy Court shall have entered an order confirming the Acceptable Plan in form and substance acceptable to the DIP Lender in its sole and absolute discretion; and |
|  | (xv)    no later than 150 days after the Petition Date, the Acceptable Plan shall have been consummated. |
|  | *See* DIP Credit Agreement, § 5.14. |
| **Borrowing Conditions** Bankr. R. 4001(c)(1)(B) L.R. 4001-2(a)(2) | The Debtor shall request each Advance no more than once every two weeks and not later than 12:00 PM New York City time three Business Days prior to the date the Advance is to be made, or such shorter time period to which the Lender may agree in writing, and such request for an Advance shall be substantially in the form of Advance request included as <u>Exhibit B</u> to the DIP Credit Agreement. Each such request shall set forth the aggregate amount of the requested Advance and the date of borrowing of such Advance, and shall be delivered to the DIP Lender (but only if and when actually received by the DIP Lender) in writing by electronic mail or telecopy transmission, and certified (i) as conforming to the terms of the DIP Credit Agreement and to the parameters of the Budget and (ii) as attaching the relevant invoices evidencing the payment obligations giving rise to the request for such Advance, in each by an authorized representative of the Debtor.<br><br>*See* DIP Credit Agreement, § 2.03. |
| **Funding of Non-Debtor Affiliates** *L.R. 4001-2(a)(15)* | No non-Debtor affiliates will be funded by the DIP Facility. |

48036/0047-17905922v4

| | |
|---|---|
| **Material Terms, Including Duration and Use of Cash Collateral** *Bankr. R. 4001(b)(1)(B)(iii)* | Subject to the terms and conditions set forth in the DIP Credit Agreement and the Financing Orders: <br><br> 1. Upon entry of the Interim Order, in form and substance acceptable to the DIP Lender, the Debtor is authorized to use Cash Collateral, in accordance with the DIP Credit Agreement, Interim Order and Budget during the Initial Interim Cash Collateral Period and any period beyond the Initial Interim Cash Collateral Period approved by the DIP Lender, in its sole and absolute discretion. <br><br> 2. The DIP Lender shall deposit each Advance under the DIP Facility into the Depository Account.  It is contemplated by the DIP Lender and the Debtor that the DIP Facility shall consist of the initial, or first Advance ("**First Advance**") and one or more subsequent Advances ("**Subsequent Advances**").  Each Advance shall be evidenced by DIP Lender's delivery to the Debtor of an update of Schedule A as set forth in the Note which update of Schedule A the Lender shall deliver to the Debtor promptly following each Advance. <br><br> *See* DIP Credit Agreement, § 2.03. |
| **Waiver/Modification of the Automatic Stay** *Bankr. R. 4001(c)(1)(B)(iv) L.R. 4001-2(a)(10)* | Upon the occurrence and during the continuance of any Event of Default, the Debtor agrees that the DIP Lender may, notwithstanding the automatic stay under Section 362 of the Bankruptcy Code (which automatic stay shall be automatically terminated without further notice or order of the Bankruptcy Court) take such action, without notice or demand, as it deems advisable to protect and enforce its rights against the Debtor and in and to the DIP Collateral. <br><br> The automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to permit the DIP Lender to enforce all of its rights under the DIP Documents and (i) immediately upon the occurrence of an Event of Default, declare (A) the termination, reduction or restriction of any further DIP Commitment to the extent any such DIP Commitment remains and (B) all Secured Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Borrower and (ii) upon the occurrence of an Event of Default and the giving of seven (7) days' prior written notice (which shall run concurrently with any notice required to be provided under the DIP Documents) via email to counsel to the Debtor, counsel to the Creditors' Committee, and the U.S. Trustee to (A) withdraw consent to the Borrower's continued use of Cash Collateral and (B) exercise all other rights and remedies provided for in the DIP Documents and under applicable law.  In any hearing regarding any exercise of rights or remedies under the DIP Documents, the only issue that may be raised by the Debtor and the Prepetition Secured |

48036/0047-17905922v4

| | |
|---|---|
| | Parties in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing.<br><br>*See* DIP Credit Agreement, § 7.02; Interim Order, ¶ 12(d). |
| **Indemnification**<br>*Bankr. R.*<br>*4001(c)(1)(B)(ix)* | The Debtor shall indemnify the DIP Lender against, and hold DIP Lender harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel or other advisor for DIP Lender, incurred by or asserted against DIP Lender arising out of, in connection with, or as a result of (i) work done by the Debtor in connection with the Retail Center or (ii) any actual or alleged presence or release of Hazardous Materials as set forth in the Environmental Indemnity, (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on Contracts, tort or any other theory and regardless of whether Lender is a party thereto or (iv) any action or claim arising under the DIP Credit Agreement, the DIP Documents and/or the DIP Facility and the use of proceeds thereof; <u>provided</u> that such indemnity shall not be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of DIP Lender.<br><br>*See* DIP Credit Agreement, § 8.03(b). |
| **Debtor's Stipulations**<br><br>*Bankr. R.*<br>*4001(c)(1)(B)(iii) L.R.*<br>*4001-2(a)(18)* | The Debtor has made customary stipulations as to the validity of the Prepetition Obligations.<br><br>*See* Interim Order, ¶ 5. |
| **Section 506(c) Waiver**<br>*Bankr. R.*<br>*4001(c)(1)(B)(x)*<br>*Bankr. R*<br>*4001(c)(1)(B)(viii)* | The Final Order approves the waiver of all section 506(c) surcharge claims. In addition, effective upon the entry of the Final Order, the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral.<br><br>*See* Interim Order, ¶ 13. |
| **Section 552(b) Waiver**<br>*L.R. 4001-2(a)(4)*<br>*Bankr. R*<br>*4001(c)(1)(B)(viii)* | The Final Order shall approve the waiver of rights under section 552(b) of the Bankruptcy Code.<br><br>*See* Interim Order, ¶ 12(d). |

48036/0047-17905922v4

| | |
|---|---|
| **Liens on Avoidance Actions** *Bankr. R 4001(c)(1)(B)(xi)* | The DIP Collateral excludes the Debtor's claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**"), but includes the proceeds or property recovered, unencumbered or otherwise from Avoidance Actions, whether by judgment, settlement or otherwise ("**Avoidance Proceeds**")), but only upon entry of the Final Order.<br><br>*See* Interim Order, ¶ 11(a). |

## JURISDICTION AND VENUE

6.     This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference*, M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

7.     The legal predicates for the relief requested herein are Bankruptcy Code sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503 and 507, Bankruptcy Rules 2002, 4001, 6003 and 9014, and Local Rule 4001-2.

## BACKGROUND

8.     On June 30, 2011, the Port Authority of New York and New Jersey (the "**Port Authority**") approved a $183.2 million renovation and improvement plan for the 294,000 square foot George Washington Bridge Bus Station (the "**Bus Station**"), a commuter bus terminal located at the east end of the George Washington Bridge in the Washington Heights section of New York City.  The renovation project was structured as a public-private venture between the Port Authority, as owner of the Bus Station, and the Debtor, as developer.  The redevelopment project included relocating the bus terminals to the third floor of the complex and creating a state-of-the-art ground transportation hub.  A new 15,000 square foot bus terminal was built increasing the number of gates from 17 to 22 and 85,000 square feet of the existing bus station

48036/0047-17905922v4

was reconfigured and upgraded.  By relocating the bus station operations to the third floor of the complex, a retail center of approximately 129,000 square feet was created.  The Bus Station remained operational during the renovation, which began in 2012 and was officially completed on May 6, 2017.

9.      Pursuant to an Agreement of Lease dated July 21, 2011, in addition to serving as the developer of the Bus Station, the Debtor was granted a 99-year lease to operate the retail portion of the Bus Station (the "**Retail Space**").  After significant construction delays, the Debtor began leasing operations in the Retail Space on August 1, 2017.

### A.      The Chapter 11 Case

10.     On the date hereof (the "**Petition Date**"), the Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code.

11.     The Debtor continues to operate its business and manage its property as a debtor and debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

12.     To date, the Office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") has not appointed a Creditors' Committee in the Chapter 11 Case, nor has any trustee or examiner been appointed in the Chapter 11 Case.

### B.      The Debtor's Pre-Petition Capital Structure

13.     As of the Petition Date, the Debtor's capital structure consisted of outstanding funded debt obligations in the aggregate principal of approximately $105 million.

### (i)  Pre-Petition Loan Agreement with George Washington Bridge Bus Station and Infrastructure Development Venture, LLC

14.     The Debtor is a party to the Senior Secured Loan Agreement with the Senior Secured Lender, whereby Senior Secured Lender agreed to provide the Debtor the Senior Secured Loan in the aggregate principal amount of not less than $72,000,000 plus all accrued but

22

unpaid interest, fees, expenses, and all other obligations expressly provided for thereunder, or incurred in connection therewith (such obligations under the Senior Secured Loan and the Senior Secured Loan Documents, the "**Senior Secured Loan Obligations**").

15.     The Senior Secured Loan Obligations are guaranteed by non-debtor GWB Development Partners LLC ("**Senior Secured Loan Guarantor**") pursuant to that certain Deficiency Guaranty dated July 20, 2011 (the "**Senior Secured Loan Guaranty**").  Pursuant to the Senior Secured Loan Guaranty, Senior Secured Loan Guarantor unconditionally and absolutely guaranteed the prompt and punctual payment of the Senior Secured Loan, provided, that, the Senior Secured Loan Guaranty is limited to the deficiency obtained by Senior Secured Lender following Senior Secured Lender's suing on the mortgage note and/or foreclosure under the Mortgage (as hereinafter defined).

16.     In addition, to secure the Senior Secured Loan Obligations, the Debtor provided the Senior Secured Lender with a mortgage (the "**Mortgage**") on the leasehold estate on the premises located in New York, New York, known as Section 8, Block 2163, Lot 1 and Block 2176, Lot 17 (i.e., the Bus Station) (the "**Mortgaged Property**").  Under the Mortgage, the Debtor granted to the Senior Secured Lender a security interest in the personalty, the fixtures, plans, leases, rents, property agreements, equipment and all other Mortgaged Property which is personal property (each within the meaning of the Uniform Commercial Code ("**UCC**")).  The Debtor also assigned all right, title and interest in and to the leases and rents in connection with the Mortgaged Property, pursuant to that certain Assignment of Leases and Rents, dated as of July 20, 2011 (the "**ALR**"), a copy of which is annexed hereto as **<u>Exhibit D</u>**.  Under the ALR (1) the Debtor presently assigned its right to collect rental income to the Senior Secured Lender, (2) the Senior Secured Lender waived its right to collect rental income under a license to the

23

Debtor, so long as the Debtor continued to perform its obligations under the parties' agreements, and (3) the Senior Secured Lender retained the right to revoke the license to the Debtor, allowing the Senior Secured Lender to recoup its right to collect rental income in the event of Debtor's default on the parties' agreements.

17.    To further secure the Senior Secured Loan Obligations, the Debtor entered into various security and collateral documents pursuant to and in connection with the Senior Secured Loan Agreement, including the Intercreditor Agreements (as defined below), pursuant to which the Senior Secured Lender was granted the benefit of valid, binding, perfected, enforceable, first-priority liens and security interests in the Senior Collateral (as defined below) (the "**Senior Secured Loan Liens**").  The Senior Secured Loan Liens provide the Senior Secured Lender with valid, binding, perfected, enforceable, first-priority liens, and security interests in the Collateral (as defined in the Senior Secured Loan Agreement) (such Collateral, the "**Senior Collateral**").[4]

18.    As of the Petition Date, approximately $72,000,000 is outstanding under the Senior Secured Loan Agreement, exclusive of accrued but unpaid interest.

### (ii) Pre-Petition Loan Agreement with GWB NMTC Investment Fund LLC and GWB Leverage Lender, LLC

19.    On December 26, 2013, GWB NMTC Investment Fund LLC (the "**Funding Borrower**") made investments in, and became the 99.99% member of, each of the Building Lenders, each of which were formed for the purpose of making qualified low-income community investments in connection with the New Markets Tax Credit Program (provided for in Section 45D of the Internal Revenue Code).  The Building Lenders made Building Loans in the original

---

[4] The Senior Secured Loan issued under the Senior Secured Loan Agreement, together with any ancillary documents, security agreements, guarantees, pledge agreements and notes issued in connection therewith shall collectively be referred to herein as, the "**Senior Secured Loan Documents**".

48036/0047-17905922v4

aggregate principal amount of up to $19,065,000 to the Debtor to finance the development of the project.

20.     A portion of the Building Loans was funded by Foodco, LLC ("**Foodco**") to Funding Borrower under that certain *Senior Leverage Loan Agreement*, dated as of December 26, 2013 (as amended, restated, supplemented, or modified from time to time, the "**FoodCo Loan Agreement**," and together with any ancillary documents, pledge agreements, guarantees, and notes issued in connection therewith, collectively the "**FoodCo Loan Documents**") in respect of a loan (the "**FoodCo Loan**") in the aggregate principal amount of not more than $10,000,000 plus all accrued but unpaid interest, fees, expenses, and all other obligations expressly provided for thereunder, or incurred in connection therewith (such obligations under the FoodCo Loan and the FoodCo Loan Documents, the "**FoodCo Loan Obligations**").  The FoodCo Loan was utilized by the Funding Borrower to indirectly fund $10,000,000 of the Building Loans (such portion of the Building Loan, the "**FoodCo Building Loan**", and such obligations under the FoodCo Building Loan, the "**FoodCo Building Loan Obligations**").

21.     To secure the FoodCo Loan Obligations, the Funding Borrower entered into various security and collateral documents pursuant to and in connection with the FoodCo Loan Documents, pursuant to which FoodCo was granted or otherwise entitled to the benefit of a valid, binding, perfected, enforceable, pledge of all of Funding Borrower's assets, including all of its non-managing membership interests in each of the Building Lenders (the "**FoodCo Loan Pledge**").  The FoodCo Loan Pledge provided FoodCo with a valid, binding, perfected, enforceable, lien, security interest, and pledge of the Collateral (as defined in the FoodCo Loan Agreement) (such Collateral, the "**FoodCo Loan Collateral**").[5]

---

[5] Upon the Debtor's repayment of the FoodCo Building Loan Obligations to the Building Lenders, the Building Lenders are required to dividend such proceeds to the Funding Borrower, who is required to repay the

22.     George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC ("**EB-5 Member**") made member loans to GWB Leverage Lender, LLC (the "**Direct Lender**") pursuant to that certain Limited Liability Company Agreement of GWB Leverage Lender, LLC, dated as of April 7, 2014, by and between EB-5 Member and GWB Development Partners, LLC, in the maximum amount of $19,000,000 (the "**EB-5 Loan**").  With the EB-5 Loan in place, the Direct Lender acquired from and was assigned all rights as lender of the Foodco Loan, under which the Funding Borrower was indebted and liable to FoodCo.

23.     In addition, with the EB-5 Loan in place, Direct Lender, under that certain *Loan Agreement*, dated as of April 7, 2014 (as amended, restated, supplemented, or modified from time to time, the "**Direct Loan Agreement**," and together with any ancillary documents, pledge agreements, guarantees, and notes issued in connection therewith, collectively the "**Direct Loan Documents**"), made a loan (the "**Direct Loan**," and collectively with the Senior Secured Loan and the FoodCo Building Loan, the "**Prepetition Senior Loans**") to the Debtor in the aggregate principal amount of not less than $9,000,000 plus all accrued but unpaid interest (including at the default rate, as applicable), fees, expenses, and all other obligations expressly provided for thereunder, or incurred in connection therewith (such obligations under the Direct Loan and the Direct  Loan Documents, the "**Direct Loan Obligations**" and collectively with the Senior Secured Loan Obligations and the FoodCo Building Loan Obligations, the "**Prepetition Senior Loan Obligations**").

24.     Accordingly, as of Petition Date, the Debtor was indebted and liable to the Building Lenders in respect of the Building Loans issued under the Building Loan Agreement (together with any ancillary documents, security agreements, guarantees, pledge agreements and

---

FoodCo Loan to the Direct Lender (the Direct Lender collectively with the Senior Secured Lenders and the lenders to the FoodCo Building Loan, the "**Senior Loan Parties**").

notes issued in connection therewith, collectively, the "**Building Loan Documents**" and, together with the Senior Secured Loan Documents, the UMEZ Loan Documents (as defined below), and the Intercreditor Agreements (as defined below), the "**Prepetition Secured Credit Documents**") in the aggregate principal amount of not less than $19,065,000 plus all accrued but unpaid interest, fees, expenses, and all other obligations expressly provided for thereunder, or incurred in connection therewith (such obligations under the Building Loan and the Building Loan Documents, the "**Building Loan Obligations**"), and in accordance with the Intercreditor Agreements, the Building Lenders are subordinated in right of payment to the prior payment in full of (i) the Senior Secured Loan, (ii) the Direct Loan, and (iii) the UMEZ Loan (as defined below), other than in respect of the FoodCo Building Loan, which shall be paid in full before any repayment on account of the UMEZ Loan.

25.    To secure $5,000,000 (plus interest thereon and any and all fees with respect thereto) of Building Loan Obligations (the "**Building Secured Loan Obligations**," and, together with the Senior Secured Loan Obligations and the UMEZ Loan Obligations, the "**Prepetition Secured Debt**"), the Debtor entered into various security and collateral documents pursuant to and in connection with the Building Loan Documents pursuant to which the Building Secured Lender (but not the other Building Lenders) was granted or otherwise entitled to the benefit of a valid, binding, perfected, enforceable, mortgage (the "**Building Loan Mortgage**" and, together with the Senior Secured Loan Liens and the UMEZ Mortgage (as defined below), the "**Prepetition Liens**") in the Mortgaged Property (such Mortgaged Property, the "**Building Loan Collateral**," and collectively with the Senior Collateral and the UMEZ Loan Collateral, the "**Prepetition Collateral**").    The Building Loan Mortgage provides the Building Secured Lender with valid, binding, perfected, enforceable, liens, and security interests in the Building

27

Loan Collateral that are (i) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense, or claim under the Bankruptcy Code or applicable non-bankruptcy law and (ii) as of the Petition Date, are subject and subordinate only to certain valid, perfected, and unavoidable liens, including the Senior Secured Loan Liens, which are senior to the liens of the Building Secured Lender on the Building Loan Collateral.

26.     A diagram of the New Markets Tax Credit Program financing and EB-5 investment structure, as well as the flow of the Building Loans and Direct Loan is attached hereto as **Exhibit E**.

27.     As of the Petition Date, approximately $19,065,000.00 is outstanding under the Building Loans, exclusive of accrued but unpaid interest.  As of the Petition Date, approximately $9,000,000.00 is outstanding under the Direct Loan, exclusive of accrued but unpaid interest.

> **(iii)   Pre-Petition Loan Agreement with Upper Manhattan Empowerment Zone Development Corporation**

28.     Before the Petition Date, the Debtor was indebted and liable to UMEZ in respect of the UMEZ Loan issued under the UMEZ Loan Agreement (together with any ancillary documents, security agreements, guarantees, pledge agreements and notes issued in connection therewith, collectively, the "**UMEZ Loan Documents**") in the aggregate principal amount of not less than $5,000,000 plus all accrued but unpaid interest, fees, expenses, and all other obligations expressly provided for thereunder, or incurred in connection therewith (such obligations under the UMEZ Loan and the UMEZ Loan Documents, the "**UMEZ Loan Obligations**"), and in accordance with the Intercreditor Agreement, UMEZ (subject to limited exclusions) is subordinated in right of payment to the prior payment in full of the Prepetition Senior Loans.

29.     To secure the UMEZ Loan Obligations, the Debtor entered into various security and collateral documents pursuant to and in connection with the UMEZ Loan Documents,

48036/0047-17905922v4

including the Intercreditor Agreement, pursuant to which UMEZ was granted or otherwise entitled to the benefit of a valid, binding, perfected, enforceable, mortgage (the "**UMEZ Mortgage**") on the Mortgaged Property (as defined in the UMEZ Loan Agreement) (such Mortgaged Property, the "**UMEZ Loan Collateral**").  The UMEZ Mortgage provides UMEZ with a valid, binding, perfected, enforceable, mortgage on the UMEZ Loan Collateral that is (i) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense, or claim under the Bankruptcy Code or applicable non-bankruptcy law and (ii) as of the Petition Date is subject and subordinate only to certain valid, perfected, and unavoidable liens, including the Senior Secured Loan Liens and the Building Loan Mortgage (solely to the extent the Building Loan Mortgage applies to the FoodCo Building Loan Obligations), which are senior to the liens of UMEZ on the UMEZ Loan Collateral.

30.    As of the Petition Date, approximately $4.8 million is outstanding under the UMEZ Loan Agreement, exclusive of accrued interest.

### (iv)  Intercreditor Arrangements

31.    The Debtor, the Prepetition Secured Parties, the Direct Lender, and the Building Lenders are subject to that certain *Subordination and Intercreditor Agreement* dated as of February 27, 2018 (as amended, restated, supplemented or modified from time to time before the date hereof, the "**Intercreditor Agreement**"), pursuant to which (i) the Prepetition Secured Parties set forth the respective priorities of the Prepetition Liens on the Prepetition Collateral, and (ii) the Prepetition Secured Parties, the Direct Lender, and the Building Lenders set forth the priority of payment in respect of the Prepetition Secured Debt and the Building Loans.  Pursuant to the Intercreditor Agreement (x) any lien on the Prepetition Collateral securing the Senior Secured Loan Obligations shall have priority over and be senior in all respects and before any lien on the Prepetition Collateral securing any UMEZ Loan Obligations or Building Secured

29

Loan Obligations and (y) any lien on the Prepetition Collateral securing the UMEZ Loan Obligations shall have priority over and be senior in all respects and before any lien on the Prepetition Collateral securing any Building Secured Loan Obligations (other than the liens pertaining to the FoodCo Building Loan Obligations, which such FoodCo Building Loan Obligations shall rank first and prior to the UMEZ Loan Obligations).  Furthermore, pursuant to the Intercreditor Agreement, the UMEZ Loan Obligations and the Building Loan Obligations are subordinated in right of payment to the Prepetition Senior Loan Obligations.

32.    The Prepetition Senior Secured Lender, the Direct Lender, and the Debtor are subject to that certain *Subordination and Intercreditor Agreement*, dated as of February 27, 2018 (as amended, restated, supplemented or modified from time to time, the "**Senior Intercreditor**"), pursuant to which the Direct Lender is payment and lien subordinated to the Senior Secured Lender.

33.    The Direct Lender and the Building Lenders are subject to that certain *Subordination and Intercreditor Agreement*, dated as of April 7, 2014 (as amended, restated, supplemented or modified from time to time, the "**Direct Loan Intercreditor**"), pursuant to which the Building Loan Obligations, including the Secured Building Loan Obligations, are lien and payment subordinated in all respects to the Direct Loan Obligations.

34.    The Senior Secured Lender and the Building Lenders are subject to that certain *Subordination and Intercreditor Agreement*, dated as of December 26, 2013 (as amended, restated, supplemented or modified from time to time, the "**Building Loan Intercreditor**", and collectively with the Senior Intercreditor, the Direct Loan Intercreditor, and the Intercreditor Agreement, the "**Intercreditor Agreements**"), pursuant to which the Building Loan Obligations,

48036/0047-17905922v4

including the Secured Building Loan Obligations, are lien and payment subordinated in all respects to the Senior Secured Loan Obligations.

###    C.    The Debtor's Need to Use Cash Collateral and Access DIP Financing

35.    The Debtor requires immediate access to liquidity to ensure that it is able to continue operating during this Chapter 11 Case and preserve the value of its assets and estate for the benefit of all parties-in-interest.  Absent immediate access to the DIP Financing and use of Cash Collateral, the Debtor simply cannot continue operations.  Without immediate access to the DIP Financing and Cash Collateral, the Debtor will be unable to (a)  pay for necessary business expenses, including the invoices of vendors critical to business operations such as, among others station security services, elevator and escalator maintenance and repair, insurance providers, and station janitorial services; (b) preserve and maximize the value of its estate; and (c) administer this Chapter 11 Case; causing immediate and irreparable harm to the value of the Debtor's estate to the detriment of all stakeholders.  Moreover, DIP Financing and use of Cash Collateral are necessary to provide vendors with the comfort level that the Debtor can continue to operate and pay its ordinary course vendors, which is particularly important given vendor concerns regarding the Debtor's current financial situation and the Debtor's intention to market and sell substantially all of its assets during this Chapter 11 Case.

36.    In connection with its liquidity situation and the prospect of a chapter 11 filing, the Debtor, with the assistance of its advisors analyzed the projected cash needs and prepared the Approved Budget outlining the Debtor's post-petition cash needs during this Chapter 11 Case. The Debtor believes that the Approved Budget and its projections provide an accurate reflection of the funding requirements for this Chapter 11 Case, will allow the Debtor to meet its obligations, and are reasonable and appropriate under the circumstances.

31

37.     The Debtor relied on these forecasts to determine the amount of post-petition financing required to administer this Chapter 11 Case.  Access to the post-petition financing provided by the DIP Facility is critical to the Debtor's ability to smoothly enter Chapter 11 and operate post-petition, including by providing sufficient liquidity to fund the administrative cost of this Chapter 11 Case.  As a result, the Debtor believes that the DIP Facility will provide it with sufficient liquidity to stabilize operations and fund this Chapter 11 Case, while the Debtor pursues a sale transaction.

D.     **Alternative Sources of Financing Are Not Readily Available**

38.     The Debtor does not have alternative sources of financing available.  Substantially all of the Debtor's assets are encumbered under their existing capital structure, which, along with the Debtor's constrained liquidity position, restricts the availability of, and options for, post-petition financing.

39.     Any financing proposals from third-parties would undoubtedly request a "priming" DIP facility.  Given the Prepetition Secured Parties would not allow a "priming" DIP facility, the only logical course of action is to obtain a DIP from the existing lenders in the capital structure.  The Debtor therefore focused its efforts on the DIP financing proposal provided by the Senior Secured Lender.

40.     The Debtor and its advisors negotiated for approximately two months regarding the structure and economics of the proposed DIP Facility.  Ultimately, the Debtor and the Senior Secured Lender agreed to a set of terms that provide the Debtor with necessary access to liquidity during the pendency of this Chapter 11 Case at fees and rates that the Debtor and its advisors consider to be reasonable under the current circumstances. Those terms provide the Debtor with the much-needed liquidity to fund operations and a sale of substantially all of its assets.  Based on the DIP Facility's terms and the related benefits provided by the Senior

32

Secured Lender, the Debtor determined that entry into the DIP Facility is reasonable, fair, and in the best interests of its estate.

### E.    The Debtor Should Be Authorized to Utilize Rent Proceeds and DIP Proceeds to Fund Operations Irrespective of any Purported Prepetition Attachment Order

41.    In January 2017 the Debtor initiated an arbitration against Tutor Perini Building Corp. ("**Tutor Perini**") in connection with its work as the general contractor on the project. Tutor Perini subsequently filed a counterclaim against the Debtor seeking damages. *See generally Tutor Perini Building Corp. v. George Washington Bridge Bus Station Development Venture, LLC*, Case No. 1:19-cv-05344-RA ("**SDNY Action**").   In June 2019, Tutor Perini sought an order of attachment, seeking to attach $23 million of the Debtor's funds.

42.    On June 4, 2019, the American Arbitration Association panel (the "**Panel**") in that certain action styled *George Washington Bridge Bus Station Development Venture, LLC v. Tutor Perini Building Corp.*, Case No. 01-15-0002-7887, issued an interim order for the attachment of certain property of the Debtor (the "**Interim Attachment Order**").   Specifically, the Panel ordered, "attachment of Twenty Three Million Dollars ($23,000,000.00) of any EB5 funds, funds paid by the Port Authority and/or new lease payments in the possession of the [the Debtor]. Without depletion of said funds, the [the Debtor] shall disclose the location of such funds within (10) days from the date of entry of this Order."   On June 6, 2019, Tutor Perini filed a petition to confirm the Interim Attachment Order in the United States District Court for the Southern District of New York.   The Debtor, in turn, filed a cross-motion to vacate the Interim Attachment Order.   On July 15, 2019, the District Court entered an order granting Tutor Perini's petition to confirm the Interim Attachment Order and denying the Debtor's cross-motion. On July 22, 2019, the District Court entered a judgment to that effect in favor of Tutor Perini.

33

43.     On July 19, 2019, Senior Secured Lender filed a foreclosure action (New York County, Index No. 850155/2019) on the Debtor's leasehold interest.  As set forth above, Senior Secured Lender is, under the Senior Secured Loan Agreement, the senior secured lender to the Debtor, and maintains a first-priority, perfected interest in the leasehold mortgage securing the property that is the subject of the foreclosure.  Furthermore, pursuant to the ALR between the Debtor and Senior Secured Lender, the Debtor made a present assignment of the leases and rents. Following the Debtor's defaults under and pursuant to the Senior Secured Loan Agreement and the ALR, on July 20, 2019, Senior Secured Lender revoked the Debtor's license to collect rents under the leasehold mortgage and ALR.  The Debtor's right to collect rents was therefore terminated and all monies received constituting rents are the property of Senior Secured Lender as of July 20, 2019.

44.     The Debtor complied with the revocation by directing all tenants to convey rents directly to the Senior Secured Lender, and as of the Petition Date, a majority of the tenants pay rents directly to the Senior Secured Lender.  Since the commencement of the foreclosure action, the Debtor has also taken rents tenants have conveyed to the Debtor and turned those rents over to the Senior Secured Lender.  Nevertheless, certain tenants improperly paid amounts of rent during the month of September and October 2019 to the Debtor instead of to the Senior Secured Lender in the amount of approximately $350,000.  Between October 4, 2019 and October 7, 2019, the Debtor, with the consent of the Senior Secured Lender, utilized those funds to pay necessary prepetition expenses.  Subject to those amounts, as of the Petition Date, the Senior Secured Lender is the recipient of all rents that emanate from the project.

45.     On August 21, 2019, Tutor Perini submitted a letter motion to the District Court in which it sought to amend and expand the confirmation of the Interim Attachment Order.  This

letter improperly misrepresented the reach of the Interim Attachment Order as follows: "The Arbitrators' Interim Order of Attachment granted Tutor Perini a right of attachment to the assets of Respondent DV, including any and all 'EB5' funds paid to or due DV, funds received by DV from the Port Authority of New York and New Jersey, **and the leasehold interest in, and rental income generated by, the ground lease granted to DV, as lessee, of the real property known and described as 4200-4218 Broadway a/k/a 110-110 Wadsworth Avenue a/k/a 651-66 West 178th Street a/k/a 650-664 West 179th Street, Section 8, Block 2163, Lot 1, and Block 2176, Lot 17, as shown on the Land and Tax Map of the County of New York** (the "Leasehold Premises"), up to a total amount of Twenty Three Million Dollars ($23,000,000), and further ordered DV to disclose the location of such funds or the disposition thereof within ten (10) days of the date of entry hereof." (emphasis added).

46.    A telephonic conference call was held with the Court on September 4, 2019. During that call, the Court agreed that Tutor Perini was attempting to make substantive changes to the Interim Attachment Order and directed the parties to return to the arbitration.

47.    An in-person hearing was held before the Panel on September 6, 2019, where the Debtor presented Mr. Stephen Winiarski and evidence related to the Debtor's finances.  The testimony and documents confirmed that since the initiation of the July 19, 2019 foreclosure action, the Senior Secured Lender had revoked the Debtor's license to accept rents from the leasehold tenants.

48.    Most recently, on September 24, 2019, the Panel conducted oral argument on the issue of whether the Interim Attachment Order can affect the rights of third parties such as the Senior Secured Lender that are not a part of the arbitration proceeding.  On October 3, 2019, the Panel issued an Order, which held the following:

(i)     The Debtor willfully violated the Panel's Interim Attachment Order;

(ii)    The Debtor transferred funds subject to the Interim Attachment Order for the payment of personal expenses of one of its principals and for the payment of legal expenses; and

(iii)   The Debtor wrongfully transferred net rental income received to the Senior Secured Lender.

49.    The Panel has ordered all of the aforementioned transfers, among others, be returned to the Debtor's operating account by November 1, 2019. The Debtor vehemently disagrees with the Panel's Order dated October 3, 2019.

50.    The Debtor may continue to receive rent from certain tenants that mistakenly do not send such rent to the Senior Secured Lender. The Debtor is seeking authority to use such proceeds (subject to the terms of the Financing Orders) as well the proceeds of the DIP Facility, to continue to pay necessary expenses of the Debtor in accordance with the Approved Budget.

## BASIS FOR RELIEF REQUESTED

### A.    The Debtor Should Be Authorized to Use Cash Collateral

51.    Section 363 of the Bankruptcy Code generally governs the use of estate property and permits a debtor in possession to use cash collateral with the consent of the secured party. 11 U.S.C. § 363(c). Specifically, section 363(c)(2) of the Bankruptcy Code provides that the Debtors may not use, sell or lease cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Therefore, the Debtor may not use the Cash Collateral without the consent of the Prepetition Secured Parties or authority granted by the Court. Further, section 363(e) of the Bankruptcy Code provides that on request of an entity that has an interest in property to be used by a debtor, the Court shall prohibit

36

or condition such use as necessary to provide adequate protection of such interest.  11 U.S.C. §
363(e).

52.    In this Chapter 11 Case, the Debtor requires use of Cash Collateral to (a) pay
vendors necessary to maintain business operations consistent with pre-petition practices; (b) pay
certain pre-petition obligations as further described in the Debtor's "first day" motions; and (c)
otherwise pay disbursements as set forth in and pursuant to the Budget.  The Prepetition Secured
Parties have consented to the use of the Cash Collateral pursuant to the Budget and under the
proposed Interim Order.  In addition, the Debtor submits that the adequate protection to be
provided to the Prepetition Secured Parties, as detailed herein, is sufficient to approve the use of
the Cash Collateral under section 363 of the Bankruptcy Code.

53.    Accordingly, based upon the foregoing, the Debtor respectfully requests that the
Court authorize the Debtor to use the Cash Collateral in accordance with the terms set forth in
the Interim Order.

**B.    Entry into the DIP Facility Is a Sound Exercise of the Debtor's Business
Judgment**

54.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or
superpriority financing under certain circumstances.  When reviewing a motion to obtain credit,
courts grant a debtor considerable deference in acting in accordance with its sound business
judgment.  *See In re Republic Airways Holding, Inc.*, Case No. 16-10429 (SHL), 2016 WL
2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016) ("[i]n determining whether to authorize post-
petition financing, bankruptcy courts will generally defer to the debtor's business judgment"); *In
re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[T]he court's discretion
under section 364 is to be utilized on grounds that permit reasonable business judgment to be
exercised so long as the financing agreement does not contain terms that leverage the bankruptcy

37

process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."). Furthermore, in determining whether the Debtor has exercised sound business judgment in deciding to enter into the DIP Loan Documents, the Court may appropriately take into consideration certain non-economic benefits to the Debtor offered by a proposed post-petition facility.

55.    For example, in *In re ION Media Networks, Inc.,* the Bankruptcy Court held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including noneconomic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and establishing allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

56.    The *In re ION Media Networks, Inc.* decision is informative here. The DIP Facility represents a resolution between the Debtor and the Senior Secured Lender. Following negotiations, the parties were able to come to a resolution not only on economic terms, but also achieved a resolution regarding case milestones and controls that provide the Debtor with flexibility to ensure it maintains a value-maximizing marketing process. The Debtor's access to the DIP Facility preserves value as a going concern, ensures stability for a potential marketing process, and provides much needed liquidity to pursue a sale and/or plan of reorganization.

57.    Based on the facts and circumstances present in this Chapter 11 Case, it is clear that the proposed DIP Facility represents a proper exercise of the Debtor's business judgment.

48036/0047-17905922v4

*See In re MSR Hotels & Resorts, Inc.*, Case No. 13-11512 (SHL), 2013 WL 5716897, at *23 (Bankr. S.D.N.Y. Oct. 1, 2013). Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money. *See In re Ames Dep't Stores, Inc.*, 115 B.R. at 38 (courts should approve borrowings pursuant to section 364(c) and 364(d) of the Bankruptcy Code if the debtor was within its business judgment); *see also In re Barbara K. Enterprises, Inc.*, Case No. 08-11474 (MG), 2008 WL 2439649, at *8 (Bankr. S.D.N.Y. June 16, 2008). To determine whether the business judgment test is met, the court "is required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs, Inc.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006).

58.    Here, the Debtor has exercised sound business judgment in determining that the DIP Facility is appropriate and have satisfied the legal requirements to obtain the proposed DIP Facility. The Debtor's decision to obtain the DIP Facility is reasonable under the circumstances, given there was no other financing available on superior terms and the Debtor requires an infusion of liquidity to operate and administer this Chapter 11 Case. Further, the Debtor heavily negotiated the terms of the DIP Facility, which is being made available on reasonable economic terms. Therefore, the Debtor has demonstrated sound business judgment and should be granted authority to enter into the DIP Facility on the terms described herein.

48036/0047-17905922v4

### C.    The Debtor Should Be Authorized To Obtain Post-Petition Financing On A Senior Secured Superpriority Basis

59.    The Debtor seeks to obtain financing under the DIP Credit Agreement by providing security interests and liens pursuant to Section 364(c) of the Bankruptcy Code.

60.    Section 364(c) provides as follows:

> (i)    If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —
>
>> (a)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>>
>> (b)    secured by a lien on property of the estate that is not otherwise subject to a lien; or
>>
>> (c)    secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

61.    Courts have articulated a three-part test to determine whether a debtor is entitled to financing under Section 364(c) of the Bankruptcy Code.  More specifically, courts analyze whether:

> (i)    the debtor cannot obtain credit unencumbered or without superpriority status;
>
> (ii)    the credit transactions are necessary to preserve assets of the estate; and
>
> (iii)    the terms of the credit agreements are fair, reasonable and adequate.

*See In re Barbara K. Enters., Inc.*, 2008 WL 2439649, at *10.

62.    In addition, Section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where (A) the debtor "is unable to obtain such credit otherwise," and (B) "there is adequate protection of the interest of the holder of the lien on the property of the

48036/0047-17905922v4

estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1); *see also In re Republic Airways Holding, Inc.*, 2016 WL 2616717, at *11.

63.     Section 364(d) "does not require that debtors seek alternative financing from every possible lender. However, the debtor must make an effort to obtain credit without priming a senior lien." *See In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 630–31 (Bankr. S.D.N.Y. 1992). Additionally, Section 364(d)(1) requires the debtor to show that the interests of the holder of the lien that is being primed are adequately protected. *See id.* at 631.

64.     The focus of a bankruptcy court's approval of a financing agreement on a priming secured basis is whether the transaction would enhance the value of the debtor's assets. Courts advocate using a "holistic approach" to evaluate post-petition financing agreements that focus on the transaction as a whole, not just on the priming of liens. As one court has noted:

> [o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and that the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere.

*In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991).

65.     In furtherance of this approach, courts consider a number of factors, including: (1) whether the proposed financing is an exercise of sound and reasonable business judgment; (2) whether alternative financing is available on any other basis; (3) whether the proposed financing is in best interest of the estate and its creditors; (4) whether any better offers, bids, or timely proposals are before the court; (5) whether the proposed financing is necessary to preserve the assets of the estate, and is necessary, essential and appropriate for the continued operation of the debtor's business; (6) whether the terms of proposed financing are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender; and (7) whether the

41

financing agreement was negotiated in good faith and at arm's length between debtor and proposed lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 880 (Bankr. W.D. Mo. 2003).

66.     Here, for the reasons that follow, the Debtor satisfies the requirements of Section 364 of the Bankruptcy Code to obtain post-petition financing on a superpriority basis.  First, the Debtor is unable to obtain debtor-in-possession financing without providing a superpriority claim and priming liens.  As set forth in the Katz Declaration, the Debtor has made reasonable efforts to obtain financing on the best terms available in light of its current situation.  All of the Debtor's existing assets are fully encumbered, and any workable financing will require the support of, or must be provided by, the Debtor's existing lender group.  Despite meaningful efforts, the Debtor has been unable to obtain post-petition financing from any alterative prospective lender on more favorable terms and conditions than those for which approval is sought herein. Under the proposed financing, the DIP Lender has agreed to prime its own pre-petition collateral, eliminating many of the concerns applicable in contested priming cases.

67.     Section 364 of the Bankruptcy Code does not require that a debtor seek alternative financing from every possible lender.  *See In re 495 Central Park Ave.  Corp.*, 136 B.R. at 630–31.  Rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien.  *Id.*; *see also In re Aqua Assocs.*, 123 B.R. at 195 ("Section 364(d)(1)(A) seemingly requires only a showing that the Debtor has attempted unsuccessfully to obtain credit on better terms from other sources."); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 37.

68.     Second, it is critical that the Debtor obtains access to Cash Collateral and DIP financing in order to continue operating in the ordinary course of business.  As described above, the Debtor requires the DIP Facility to pay its ongoing business expenses and to conduct a sale

42

process. Without immediate access to Cash Collateral, and the right to access the liquidity under the DIP Facility, the Debtor's assets would be placed in a perilous position, to the detriment of all stakeholders.

69.    Third, the proposed DIP Facility subjects the security interests of the DIP Lender to a Carve-Out.  Such "carve outs" for professional fees have been found to be not only reasonable but necessary to ensure that debtors' estates will be assured of the assistance of counsel and other bankruptcy professionals.  *See In re Ames Dep't Stores, Inc*., 115 B.R. at 38. Here, the DIP Facility does not directly or indirectly deprive the Debtor's estate of possible rights and powers by restricting the services for which professionals may be paid in this case.  *Id.* (noting that courts insist on carve-outs for professionals representing parties in the case because "absent such protection, the collective rights and expectation of all parties in interest are solely prejudiced").

70.    The Debtor submits that the terms of the DIP Credit Agreement are fair and reasonable in light of the Debtor's current situation and are in the best interests of the Debtor's estate.  The terms of the DIP Facility were negotiated by the parties each represented by experienced restructuring counsel in good faith and at arm's length.  Therefore, the terms of the DIP Facility are reasonable and appropriate under the circumstances, and in the best interest of stakeholders.

71.    Finally, the Prepetition Secured Parties are adequately protected, and consenting to the proposed use of Cash Collateral.  Adequate protection may be provided in various forms, including payment of adequate protection fees and interest, or granting of replacement liens or administrative claims.  What constitutes adequate protection is decided on a case-by-case basis. *See*, *e.g.*, *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[t]he determination of

43

adequate protection is a fact specific inquiry . . . left to the vagaries of each case"); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection is case specific, but "its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process").   The purpose of adequate protection is to protect against the diminution of a secured creditor's collateral during the period when such collateral is being used by the debtor.  *See In re 495 Central Park Ave. Corp.*, 136 B.R. at 631 ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization."); *In re Beker Indus. Corp.*, 58 B.R. at 736.

72.     The DIP Facility provides the Prepetition Secured Parties with adequate protection in the form of a superpriority claim status, replacement liens on all DIP Collateral, junior only to the liens of the DIP Lender and prior senior liens.  This adequate protection appropriately safeguards the Prepetition Secured Parties from the diminution in the value of their interests in the Cash Collateral, and, as such, is fair and reasonable and satisfies the requirements of Section 364 of the Bankruptcy Code.

### E.     The Debtor Should Be Authorized to Provide Adequate Protection to the Prepetition Secured Parties

73.     Section 361 of the Bankruptcy Code governs adequate protection and states that the Debtor may provide adequate protection by making a cash payment or periodic cash payments "to such entity, to the extent that . . . any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property."  11 U.S.C. § 361(1). Adequate protection may also be provided by granting to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property.  11 U.S.C. § 361(2).

48036/0047-17905922v4

74.     The Debtor requests that the Court approve certain protections in favor of the Prepetition Secured Parties to protect against any diminution in value resulting from (i) the use, sale, or lease of the Prepetition Collateral, including the Cash Collateral, (ii) the priming of their security interests and liens in the applicable Prepetition Collateral, and (iii) the imposition of the automatic stay pursuant to Section 362 of the Bankruptcy Code.  Such protections include:

(i)     superpriority claim status under section 507(b) of the Bankruptcy Code;

(ii)    replacement liens on all DIP Collateral, junior only to the liens of the DIP Lender, but subject to any prior Senior Liens;

(iii)   payment of all fees, expenses, and disbursements to the Senior Secured Lender; and

(iv)    information and financial reporting to the Senior Secured Lender.

75.     The Debtor submits that the proposed Adequate Protection for the Prepetition Secured Parties is appropriate to protect the Prepetition Secured Parties from any diminution in the value of their interest in the Prepetition Collateral.  Moreover, the Prepetition Secured Parties have consented to the Debtor's proposed adequate protection as sufficient to protect against any diminution in the value of the Prepetition Collateral.

**F.      The DIP Lender is Entitled to the Protections under Section 364(e) of the Bankruptcy Code**

76.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  More specifically, Section 364(e) provides that:

The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal,

45

unless such authorization and the incurring of such debt, or the
granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

77. Because "good faith" is not defined in the Bankruptcy Code, courts often look to
case law under section 363(m). 7 COLLIER ON BANKRUPTCY, 16th ed. ¶ 364.08, ("Section 364(e)
is consistent with section 363(m), which provides similar protection to a buyer or lessee of
property of the estate in a section 363 transaction."). As one court in this district explained, "the
misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud,
collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly
unfair advantage of other bidders." *In re Pan Am Corp.*, No. 91 CIV. 8319 (LMM), 1992 WL
154200, at *4 (S.D.N.Y. June 18, 1992) (*citing In re Rock Indus. Mach. Corp.*, 572 F.2d 1195,
1198 (7th Cir. 1978)).

78. The terms of the DIP Facility were negotiated at arm's length and in good faith
between the Debtor and the DIP Lender. Moreover, no consideration is being provided to any
party to, or guarantor of, obligations arising under the DIP Facility, other than as disclosed in the
DIP Credit Agreement. Finally, the DIP Facility has been extended in express reliance upon the
protections offered by Section 364(e) of the Bankruptcy Code. As such, the DIP Lender should
be entitled to the full protection of Section 364(e) in the event that the Interim Order is vacated,
reversed, or modified on appeal.

**G.     The DIP Facilities' Fees Were Negotiated at Arms' Length and in Good
        Faith, and Should be Approved**

79. The Debtor has agreed to pay certain fees described in the DIP Credit Agreement
as well as the reasonable costs and expenses of the DIP Lender. These fees and other obligations
under the DIP Credit Agreement were negotiated in good faith and at arms' length and represent
the most favorable terms to the Debtor on which the DIP Lender would agree to fund the DIP

46

Facility.  The Debtor considered the fees when determining in its reasonable business judgment

that the DIP Facility constituted the best terms on which the Debtor could much needed

financing, and that paying these fees in order to obtain the DIP Facility is in the best interests of

the Debtor's estate, creditors, and other stakeholders.

80.     Accordingly, the Court should authorize the Debtor to pay the fees provided

under the DIP Credit Agreement in connection with entering into the DIP Credit Agreement.

> **H.     The Interim Attachment Order and Other Orders of the Panel Cannot Affect
> the Rights of Third Parties that are Not a Part of the Arbitration and Should
> be Invalidated**

81.     The relief afforded by the Interim Attachment Order should be invalidated for

several reasons.  First, on July 20, 2019, Senior Secured Lender **revoked** the Debtor's license to

collect rents under the leasehold mortgage and the ALR.  The Debtor's right to collect rents was

therefore **terminated** and all monies received constituting rents are the property of Senior

Secured Lender as of July 20, 2019.  *See In re Soho Retail, LLC*, Case No. 10-15114 (SHL),

2011 WL 1333084, at *6-8 (Bankr. S.D.N.Y. March 31, 2011) (the assignment of leases and

rents was absolute and unconditional and the lender took numerous affirmative steps to enforce it

rights and, as a result, the rents are not property of the estate).  As a result, there is no rental

income that the Debtor possesses that could be subject to any order of attachment, especially

given the District Court did not enter an Order granting Tutor Perini's petition confirming the

Interim Attachment Order until two days later on July 22, 2019 pursuant to Section 9 of the

Federal Arbitration Act, 9 U.S.C. § 9.  A petition to confirm or vacate an arbitration award under

the FAA is "a summary proceeding that merely makes what is already a final arbitration award a

judgment of the court."  *D.H Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (internal

quotation marks omitted).  Given the Senior Secured Lender's revocation prior to confirmation,

the Interim Attachment Order should be invalidated and of no import because any award by the

Panel providing for attachment of rental income (and confirmed by the District Court) would levy against Senior Secured Lender's, and not the Debtor's assets. *See In re Soho Retail, LLC*, 2011 WL 1333084, at *6-8.

82.    Moreover, Tutor Perini, who holds an attachment interest, takes its interest subject to the rights of others that may have a superior claim—i.e., Tutor Perini "steps into the shoes" of the Debtor.  In this case, Tutor Perini's claim is subject and inferior to that of the Senior Secured Lender, who holds a previously perfected senior secured interest in connection with the project and funds at issue.  For this reason alone, the attachment order simply cannot reach the rental income or leasehold interest in the project.  But beyond even this basic concept, further caselaw confirms that with respect to attachment, Tutor Perini is affirmatively left without recourse because the funds are the property of the Senior Secured Lender—a third-party that is not a part of this arbitration and is therefore outside of the reach of the attachment order.  To the extent the Debtor holds any rental proceeds because they were improperly delivered to the Debtor by tenants, those proceeds are the rightful property of the Senior Secured Lender and, therefore, not subject to the Interim Attachment Order, because the Debtor is merely holding such proceeds in trust for the Senior Secured Lender.  Proceeds that are in the Senior Secured Lender's possession is automatically outside the Interim Attachment Order.  Moreover, there are no "net lease payments," since all rental income has been used to pay for necessary operating expenses in connection with the project.

83.    The New York attachment statute itself does not "contemplate execution against property that once belonged to the judgment creditor but now lawfully belongs to a third party." *Exp.-Imp. Bank of the Republic of China v. Grenada*, 768 F.3d 75, 87 (2d Cir. 2014); *see also Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina")*,

48

313 F.3d 70, 83 (2d Cir. 2002) ("In New York, then, a party seeking to enforce a judgment 'stand[s] in the shoes of the judgment debtor in relation to any debt owed him or a property interest he may own.' … Nonetheless, a party cannot 'reach ... assets in which the judgment debtor has no interest.'") (internal citation omitted); *Bass v. Bass*, 140 A.D.2d 251, 253 (1st Dep't 1988).

84.     Any award by the Panel providing for the attachment of rental income would levy against Senior Secured Lender's, and not the Debtor's assets.  To the extent that Tutor Perini argues that the attachment order should still reach the rental income or the leasehold interest, the Panel is without power to extend the order in such a manner.  Because the Senior Secured Lender is not a party to the arbitration proceeding, an order that would impinge on its rights would run afoul of the long-held rule of law that a third-party that is a non-signatory to an arbitration agreement cannot be forced to arbitrate.  *See Tellium, Inc. v. Corning Inc.*, No. 03 CIV. 8487 (NRB), 2004 WL 307238, at *8 (S.D.N.Y. Feb. 13, 2004); *see also Lindland v. U.S. Wrestling Ass'n, Inc.*, 227 F.3d 1000, 1003 (7th Cir. 2000) (Where an arbitral award threatens the rights of a non-party, the award is an *ultra vires* by the arbitrator and cannot be confirmed).

85.     Importantly, the District Court has explained that only in limited circumstances could a non-willing third-party be forced to arbitrate:

> Absent an express agreement to arbitrate, the Second Circuit has recognized only limited theories upon which it will enforce an arbitration agreement against a non-signatory. There are five such possible theories: "1) incorporation by reference; 2) assumption; 3) agency; 4) veil piercing/alter ego; and 5) estoppel." *Merrill Lynch*, 337 F.3d at 129. A willing signatory seeking to arbitrate with a non-signatory that is unwilling must establish at least one of these five bases. *See id.* at 131 (citing *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 97 (2d Cir.1999)). The party seeking to compel arbitration has the burden of demonstrating by a preponderance of the evidence the existence of an agreement to arbitrate. *See Progressive Cas. v. C.A. Reaseguradora Nacional*, 991 F.2d 42, 46 (2d Cir.1993).

*Tellium*, *supra*, 2004 WL 307238, at *5.

86.     None of these five exceptions are present in this matter and it is clear that the Senior Secured Lender is unwilling to participate in the arbitration.  In addition to the Senior Secured Lender, an extension of the Interim Attachment Order to the leasehold interest in the premises would also impinge upon the rights of the Port Authority.  The lease is a central part of a high-profile public project.  The leasehold interest cannot be transferred to Tutor Perini in any way, let alone through a prejudgment attachment order entered in an arbitration that does not involve the Port Authority itself.

87.     To the extent Tutor Perini claims that it is entitled to rental income pursuant to an equitable mechanic's lien for construction at the subject property, its arguments lack merit and do not establish that it holds an equitable lien against the Debtor.  The subject property is publicly owned by the Port Authority.  Mechanic's liens against publicly-owned real property are prohibited by statutory authority and case law. *See, e.g.*, N.Y. Lien Law § 2(8) (McKinney) (prohibiting liens against real property belonging to the state or a public benefit corporation); *Paerdegat Boat & Racquet Club, Inc. v. Zarelli*, 57 N.Y.2d 966 (1982) (holding that the statutory prohibition against liens on property belonging to the State, applies equally to municipal property used for public purposes and a lease of municipal property for nonpublic purposes); *George Washington Bridge Bus Station Development Venture, LLC v. Associated Specialty Contracting, Inc.*, 149 A.D. 3d 525 (1st Dep't 2017) (rejecting enforcement of a lien against the exact same property at issue in this case, finding that "[i]t is well-settled that a private mechanic's lien may not attach to privately-leased, but publicly-owned, land.").

88.     For these additional reasons, it is respectfully submitted that the Interim Attachment Order does not reach the rental income and cannot be extended to reach any aspect

of the leasehold interest in the property, because such a result would impinge upon the rights of third-parties that are not subject to this litigation. The Senior Secured Lender has permitted the Debtor to use rents to fund operating expenses pursuant to the Approved Budget, provided that such rents shall first be applied to reduce the Senior Secured Loan Obligations (applied as provided for in the proposed Interim DIP Order) and then be deemed, dollar-for-dollar, DIP Obligations under the DIP Facility. The Debtor should be authorized to utilize all DIP financing proceeds to pay necessary and critical operating expenses, and the Debtor's prepetition use of approximately $350,000 of rent proceeds to pay necessary expenses should be found to be valid and appropriate. Further, under the DIP Facility, to the extent the Senior Secured Lender's ability to collect rents or exercise their rights under the ALR is invalidated, the DIP Lender would have a right to terminate the DIP Credit Agreement, which would leave the Debtor without funding to finance its chapter 11 case.

89.    Accordingly, the Debtor's request to invalidate the Interim Attachment Order and Order of the Panel dated October 3, 2019, and enter the Financing Orders authorizing the Debtor to use rent it receives as well as the DIP proceeds in the ordinary course (in accordance with the Approved Budget), is in the best interest of the estate and should be approved.

## I.    Modification of the Automatic Stay Should be Authorized

90.    The DIP Credit Agreement and the proposed Interim Order contemplates that the automatic stay arising under Section 362 of the Bankruptcy Code shall be vacated or modified to permit the DIP Lender to enforce its rights under the DIP Documents and the proposed Interim Order. Specifically, upon the occurrence and during the continuance of any Event of Default, the Debtor has agreed that the DIP Lender may, notwithstanding the automatic stay under Section 362 of the Bankruptcy Code (which automatic stay shall be automatically terminated without further notice or order of the Bankruptcy Court) take such action, without notice or demand, as it

51

deems advisable to protect and enforce its rights against the Debtor and in and to the DIP Collateral.  Moreover, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to permit the DIP Lender to enforce all of its rights under the DIP Documents and (i) immediately upon the occurrence of an Event of Default, declare (A) the termination, reduction or restriction of any further DIP Commitment to the extent any such DIP Commitment remains and (B) all Secured Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Borrower and (ii) upon the occurrence of an Event of Default and the giving of seven (7) days' prior written notice (which shall run concurrently with any notice required to be provided under the DIP Documents) via email to counsel to the Debtor, counsel to the Creditors' Committee, and the U.S. Trustee to (A) withdraw consent to the Borrower's continued use of Cash Collateral and (B) exercise all other rights and remedies provided for in the DIP Documents and under applicable law.  In any hearing regarding any exercise of rights or remedies under the DIP Documents, the only issue that may be raised by the Debtor and the Prepetition Secured Parties in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing.  *See* DIP Credit Agreement, § 7.02; Interim Order, ¶ 12(d).

91.    The Debtor believes that this seven (7) days' prior written notice period will provide the Debtor and other parties-in-interest with sufficient time to seek an expedited hearing before the Court for the purpose of determining whether, in fact, an Event of Default has occurred.  Stay modification provisions are ordinary features of debtor in possession financing facilities and, in the Debtor's business judgment, this modification is reasonable under the circumstances.

**J.     Failure to Obtain Immediate Access to DIP Financing and Cash Collateral Would Cause Immediate and Irreparable Harm**

48036/0047-17905922v4

92.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral pursuant to Section 363 of the Bankruptcy and to obtain credit pursuant to Section 364 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, pursuant to Bankruptcy Rules 4001(b) and (c) and Local Bankruptcy Rule 4001-2, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtor's estate.

93.     The Court may grant the relief requested in this Motion immediately if the "relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  In explaining the standards governing preliminary injunctions, the Second Circuit instructed that irreparable harm "'is a continuing harm which cannot be adequately redressed by final relief on the merits' and for which 'money damages cannot provide adequate compensation.'"  *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quoting *N.Y. Pathological & X-Ray Labs., Inc. v. INS*, 523 F.2d 79, 81 (2d Cir. 1975)).  Further, the "harm must be shown to be actual and imminent, not remote or speculative."  *Id.; see also Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1998).  The Debtor also requests that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).

94.     Here, the Debtor seeks authorization to access DIP financing and use Cash Collateral immediately following the Petition Date.  The Debtor will use the DIP financing and Cash Collateral to, among other things, operate its business and fund the administration of this Chapter 11 Case.  The Debtor believes that substantially all of its available cash constitutes the

53

Prepetition Lenders' Cash Collateral. The Debtor therefore will be unable to operate its business or fund this Chapter 11 Case without immediate access to DIP financing and Cash Collateral and will suffer immediate and irreparable harm to the detriment of all creditors.  Here, the Debtor's ability to administer this Chapter 11 Case through access to the DIP financing and the use of Cash Collateral is vital to preserve and maximize value.

**K.    Request for a Final Hearing**

95.    The Debtor respectfully requests that the Court schedule the Final Hearing and authorize the Debtor to serve a copy of the Interim Order which fixes the time and date for the Final Hearing and the filing of objections within three (3) business days after entry thereof by first-class mail upon the notice parties set forth below.

<u>**RESERVATION OF RIGHTS**</u>

96.    Nothing in this Motion should be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtor's ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise to pay any claim; (d) granting third-party-beneficiary status or bestowing any additional rights on any third party; or (e) being otherwise enforceable by any third party.

<u>**NOTICE**</u>

97.    Notice of this Motion will be given to: (i) Office of the United States Trustee, 201 Varick Street, Suite 1006, New York, New York, 10014, (ii) counsel for the DIP Lender and the Senior Secured Lender, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn:  Matthew S. Barr, Esq. and David J. Cohen, Esq.); (iii) counsel for UMEZ, Venable LLP, Rockefeller Center, 1270 Avenue of the Americas, 24th Floor, New York, New York

48036/0047-17905922v4

10020 (Attn: Rishi Kapoor, Esq. and Michael C. Phillipou, Esq.); (iv) counsel for the Building Secured Lender and the Building Loan Agent, Manatt, Phelps & Phillips, LLP, 7 Times Square, New York, New York 10036 (Attn: Neil S. Faden, Esq.); (v) counsel for The Port Authority of New York and New Jersey, Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036 (Attn: Jay M. Goffman, Esq. and Christine A. Okike, Esq.); (vi) counsel for Tutor Perini Building Corp., Nida & Romyn, P.C., 1900 Avenue of the Stars, Suite 650, Los Angeles, CA 90067 (Attn: Robert Nida, Esq.), (vii) the Internal Revenue Service, (viii) the Securities and Exchange Commission, (ix) the parties included on the Debtor's consolidated list of their 20 largest unsecured creditors, (x) the United States Attorney of the Southern District of New York, and (xi) all parties entitled to notice pursuant to Local Bankruptcy Rule 9013-1(b). The Debtor submits that no other or further notice is required.

## NO PRIOR REQUEST

98.     No previous request for the relief sought herein has been made to this Court or any other court.

*[Remainder of Page Intentionally Left Blank]*

48036/0047-17905922v4

## CONCLUSION

The Debtor respectfully requests that this Court enter the Interim Order substantially in the form annexed hereto, and ultimately at the Final Hearing, the Final Order, granting the relief requested herein and such other and further relief as may be just and proper.


Dated: October 7, 2019       Respectfully submitted,
New York, New York

            COLE SCHOTZ P.C.

            */s/ Michael D. Sirota*
            Michael D. Sirota
            Felice R. Yudkin
            Ryan T. Jareck
            Mark Tsukerman
            Rebecca W. Hollander
            1325 Avenue of the Americas, 19th Floor
            New York, New York 10019
            Telephone: (212) 752-8000

            *Proposed Counsel to the Debtor and*
            *Debtor in Possession*

48036/0047-17905922v4