**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Mark Tsukerman
Rebecca W. Hollander
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393

*Counsel to the Debtor and*
*Debtor in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>GEORGE WASHINGTON BRIDGE BUS<br>STATION DEVELOPMENT VENTURE LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 19-13196 (SCC) |

---

**DISCLOSURE STATEMENT PURSUANT TO 11 U.S.C. § 1125**
**FOR THE CHAPTER 11 PLAN OF GEORGE WASHINGTON BRIDGE**
**BUS STATION DEVELOPMENT VENTURE LLC**

---

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.
ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A
DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS
DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS
NOT BEEN APPROVED BY THE COURT.**

Dated: February 10, 2020

---

[1] The last four digits of the debtor's federal taxpayer identification number are 8685. The debtor's business address is 626 South State Street, Newtown, Pennsylvania 18940.

THE DEBTOR IS PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN OF REORGANIZATION OF GEORGE WASHINGTON BRIDGE BUS STATION DEVELOPMENT VENTURE LLC PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN.

THE DEBTOR URGES EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTOR'S CHAPTER 11 CASE. ALTHOUGH THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTOR DOES NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THE SECURITIES THAT MAY BE ISSUED ON OR AFTER THE EFFECTIVE DATE WILL HAVE NOT BEEN THE SUBJECT OF A REGISTRATION STATEMENT

48036/0050-19728718v2

FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES LAW ("BLUE SKY LAWS"). THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN.

THE DEBTOR IS RELYING ON THE EXEMPTION FROM THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND EQUIVALENT STATE LAW REGISTRATION REQUIREMENTS PROVIDED BY SECTION 1145(A)(1) OF THE BANKRUPTCY CODE, TO EXEMPT THE OFFERING AND ISSUANCE OF NEW SECURITIES PURSUANT TO THE PLAN FROM REGISTRATION UNDER THE SECURITIES ACT AND BLUE SKY LAWS.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTOR RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTOR'S BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTOR'S BUSINESS. WHILE THE DEBTOR BELIEVES THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTOR AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTOR'S BUSINESS AND ITS FUTURE RESULTS AND OPERATIONS. THE DEBTOR EXPRESSLY CAUTIONS READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF UNITED STATES SECURITIES LAWS. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," OR "CONTINUE," OR THE NEGATIVE THEREOF, OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. YOU ARE CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTOR MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS

DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTOR IS MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTOR MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTOR HAS NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIMS ANY DUTY TO PUBLICLY UPDATE ANY FORWARD LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTOR RESERVES THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTOR HAS NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTOR HAS NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

48036/0050-19728718v2

## TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................... 1

II. PRELIMINARY STATEMENT ......................................................................... 1

III. OVERVIEW OF THE PLAN .......................................................................... 5
    A.    Purpose and Effect of the Plan ............................................................ 5
    B.    The Asset Sale Restructuring .............................................................. 6
    C.    Plan Investment Restructuring .......................................................... 10
    D.    Releases .............................................................................................. 11

IV. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE
STATEMENT AND PLAN .................................................................................. 12
    A.    What is chapter 11? ........................................................................... 12
    B.    Why is the Debtor sending me this Disclosure Statement? ............... 12
    C.    Am I entitled to vote on the Plan? ..................................................... 12
    D.    What will I receive from the Debtor if the Plan is consummated? ...... 13
    E.    What will I receive from the Debtor if I hold an Allowed
Administrative Claim, DIP Claim, or a Priority Tax Claim? ......................... 16
    F.    Are any regulatory approvals required to consummate the Plan? ....... 18
    G.    What happens to my recovery if the Plan is not confirmed or does
not go effective? ........................................................................................... 18
    H.    If the Plan provides that I get a distribution, do I get it upon
Confirmation or when the Plan goes effective, and what is meant by
"Confirmation," "Effective Date," and "Consummation?" ............................ 18
    I.    What are the sources of Cash and other consideration required to
fund the Plan? ............................................................................................... 18
    J.    Will the final amount of Allowed General Unsecured Claims affect
my recovery under the Plan? ......................................................................... 18
    K.    How will Executory Contracts and Unexpired Leases be treated
under the Plan? .............................................................................................. 19
    L.    Will there be releases and exculpation granted to parties in interest
as part of the Plan? ........................................................................................ 22
    M.    What impact does the Claims Bar Date have on my Claim? ............... 27
    N.    What is the deadline to vote on the Plan? .......................................... 27
    O.    How do I vote for or against the Plan? ............................................... 27
    P.    Why is the Bankruptcy Court holding a Confirmation Hearing? ....... 28

Q.    When is the Confirmation Hearing set to occur?.................................................... 28

R.    What is the purpose of the Confirmation Hearing? ............................................. 28

S.    What is the effect of the Plan on the Debtor's ongoing business?........................ 28

T.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ...................................................................... 29

U.    Does the Debtor recommend voting in favor of the Plan?.................................... 29

V.    Who Supports the Plan?........................................................................................ 30

V. ADDITIONAL INFORMATION ABOUT THIS DISCLOSURE STATEMENT ............................................................................................................. 30

A.    Miscellaneous Provisions..................................................................................... 30

B.    Additional Important Information.......................................................................... 31

VI. THE DEBTOR'S CORPORATE HISTORY, CAPITAL STRUCTURE, AND BUSINESS OVERVIEW ................................................................................................. 33

A.    The Debtor ............................................................................................................ 33

B.    Prepetition Capital Structure................................................................................ 33

VII. EVENTS LEADING TO THE CHAPTER 11 FILING ........................................ 38

VIII. EVENTS OF THE CHAPTER 11 CASE .............................................................. 40

A.    First and Second Day Relief ................................................................................ 40

B.    Postpetition Marketing Process............................................................................ 40

C.    Approval of the DIP Facility................................................................................ 41

D.    Schedules and Statements .................................................................................... 41

E.    General Litigation Matters.................................................................................... 41

F.    Litigation with the Port Authority and Tutor Perini in the Chapter 11 Case ................................................................................................................... 42

IX. RISK FACTORS ...................................................................................................... 43

A.    Bankruptcy Law Considerations.......................................................................... 43

B.    Risks Related to Recoveries under the Plan ........................................................ 46

C.    Risks Related to the Debtor's and the Reorganized Debtor's Business ................................................................................................................. 47

X. SOLICITATION AND VOTING PROCEDURES.................................................. 49

A.    Holders of Claims Entitled to Vote on the Plan.................................................. 49

B.    Voting Record Date ............................................................................................. 50

C.    Voting on the Plan ............................................................................................... 50

D.    Ballots Not Counted............................................................................................. 50

ii

XI. CONFIRMATION OF THE PLAN ...................................................... 51

    A.    Requirements for Confirmation of the Plan ................................. 51

    B.    Best Interests of Creditors/Liquidation Analysis .................................. 51

    C.    Feasibility .................................................................................... 51

    D.    Acceptance by Impaired Classes ......................................... 51

    E.    Confirmation Without Acceptance by All Impaired Classes ............................. 52

    F.    Valuation of the Debtor ...................................................... 53

XII. CERTAIN SECURITIES LAW MATTERS ......................................... 53

    A.    Section 1145 of the Bankruptcy Code Exemption and Subsequent Transfers ......................................................................... 53

XIII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ......................................................... 55

XIV. RECOMMENDATION .............................................................. 58

48036/0050-19728718v2

## **EXHIBITS**

EXHIBIT A          Plan of Reorganization

EXHIBIT B          Liquidation Analysis

EXHIBIT C          Disclosure Statement Order

# I. __INTRODUCTION__

George Washington Bridge Bus Station Development Venture LLC, the debtor and debtor in possession (the "**Debtor**") in this Chapter 11 case (the "**Chapter 11 Case**"), submits this disclosure statement (this "**Disclosure Statement**") pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**") to Holders of Claims against and Interests in the Debtor in connection with the solicitation of acceptances with respect to the *Chapter 11 Plan of George Washington Bridge Bus Station Development Venture LLC* (the "**Plan**"), dated February 10, 2020.[2] A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.

Bernard A. Katz, the Debtor's sole and independent manager, has approved the Plan and believes the Plan is in the best interests of the Debtor's Estate. As such, the Debtor recommends that all Holders of Claims entitled to vote accept the Plan by returning their ballots (each, a "**Ballot**") so as to be __actually received__ by Cole Schotz P.C., Attn: Ryan T. Jareck, Esq., 1325 Avenue of Americas, 19th Floor, New York, New York 10019, no later than _____, __2020, at 5:00 p.m. (prevailing Eastern Time)__. Assuming the requisite acceptances to the Plan are obtained, the Debtor will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

# II. __PRELIMINARY STATEMENT__

## Overview of the Debtor

The Debtor is the developer of the George Washington Bridge Bus Station (the "**Bus Station**"). On June 30, 2011, the Port Authority of New York and New Jersey (the "**Port Authority**") approved a $183.2 million renovation and improvement plan (the "**Project**") for the Bus Station. The Project was structured as a public-private venture between the Port Authority, as owner of the Bus Station, and the Debtor, as developer. The Project included relocating the bus terminals to the third floor of the complex and creating a state-of-the-art ground transportation hub. A new 15,000 square foot bus terminal was built increasing the number of gates from 17 to 22 and 85,000 square feet of the existing bus station was reconfigured and upgraded. By relocating the bus station terminal to the third floor of the complex, a retail center of approximately 129,000 square feet was created. The Bus Station is located at the east end of the George Washington Bridge in the Washington Heights section of New York City. The Bus Station serves approximately 13,000 weekday passengers, mainly commuting between New York City and northern New Jersey.

The Debtor was responsible for the construction of both the retail and bus terminal components of the Project. In connection with the construction, on June 25, 2013, the Debtor entered into a contract (the "**Construction Contract**") with Tutor Perini Building Corp. ("**Tutor Perini**"), as general contractor for the Project, with a guaranteed maximum price of $100,454,000. The Construction Contract provided for the demolition and abatement of portions

---

[2] All capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

of the existing structures of the Bus Station to allow the building's reconstruction and remodeling. The Construction Contract also provided for Tutor Perini to conduct the reconstruction and remodeling work, except for the build-out of the majority of the retail spaces. The Bus Station remained operational during the renovation, which began in 2012 and, after significant construction delays, was substantially completed in August of 2017.

Moreover, pursuant to an Agreement of Lease dated July 21, 2011, in addition to serving as the developer of the Bus Station, the Debtor was granted a 99-year lease to operate and maintain the retail portion of the Bus Station (the "**Retail Space**"). The Debtor began leasing operations on August 1, 2017. As of the Petition Date, approximately ninety-one percent (91%) of the Retail Space was occupied by, among others, Marshalls, Gap Factory, Blink Fitness, and Fine Fare. As of the Petition Date, tenants paid approximately $380,000 a month in rent and the Debtor had booked assets and liabilities (book value) of approximately $93.5 million and $133 million, respectively.

The Debtor, a Delaware limited liability company, was formed on March 16, 2006. The members of the Debtor are GWB Development Partners, LLC and Marketplace GWB, LLC ("**Marketplace GWB**"), with ownership interests of 91% and 9%, respectively. As of the Petition Date, the Debtor's capital structure consisted of outstanding funded debt obligations in the aggregate principal amount of approximately $105 million.

## Events Precipitating the Chapter 11 Case

At its inception, the Debtor anticipated the Project would cost $183 million and take one year to complete. The Debtor budgeted its costs and obtained financing for the Project with the expectation that Tutor Perini would meet the substantial completion dates set forth in the Construction Contract. As set forth herein, Tutor Perini caused the Project to be delayed years beyond the original anticipated dates of substantial completion.

As a result of thirty (30) months of delays by Tutor Perini, significant cost overruns existed on the Project. The Debtor incurred millions of dollars of unanticipated costs for interest on loans and additional project carrying costs, including approximately $1.7 million in delay charges that the Debtor was forced to pay the Port Authority for the failure to deliver the Project on time. Additionally, the Debtor paid over $11 million of interest during the delay period and millions of dollars of rent receipts were lost due to the delays. The Debtor also incurred more than $14 million of expenses while arbitrating its disputes with Tutor Perini (as set forth in more detail below) and the Debtor's principals were forced to infuse an additional $5.5 million of new capital to cover the Debtor's arbitration expenses. Those losses are directly attributable to the Project delays caused by Tutor Perini.

After Tutor Perini missed the contractual deadline to complete the Project, the Debtor started withholding approximately $1 million from each of Tutor Perini's progress payments as liquidated damages under the Construction Contract. The $1 million withholdings were largely consumed by debt service, delay charges to the Port Authority, additional architect and engineering costs, legal fees, and lease penalties.

Tutor Perini disputed the Debtor's entitlement to withhold funds from the progress payments. In response to that dispute, on February 26, 2015, the Debtor commenced an arbitration by way of Arbitration Demand submitted to the American Arbitration Association ("**AAA**"). The Arbitration Demand sought a declaration that (i) all claims for payment submitted by Tutor Perini were waived because they were not timely submitted or, alternatively, (ii) Tutor Perini's claims for payment were not valid. On or about January 24, 2017, Tutor Perini filed an Answering Statement and Counterclaim against the Debtor asserting $130 million of damages.

Following a lengthy arbitrator-selection period, the Debtor and Tutor Perini selected an arbitration panel and commenced the arbitration process on August 22, 2018. As of the Petition Date, 67 days of evidentiary hearings had been conducted during which Tutor Perini put on its entire case-in-chief. The Debtor, however, has not yet presented its case. After Tutor Perini's case-in-chief was complete, the Debtor's construction counsel withdrew from representing the Debtor in the arbitration. Tutor Perini took advantage of the Debtor's vulnerability and filed an application for a preliminary injunction and order of attachment. Despite repeated requests for an adjournment or stay to allow the Debtor time to secure replacement counsel, the arbitration panel held a hearing on Tutor Perini's application. Ultimately, on June 4, 2019, the panel issued an Interim Order granting Tutor Perini's request for an order of attachment in the amount of $23 million (the "**Interim Attachment Order**") against any "EB5 funds, funds paid by the Port Authority and/or net lease payments in the possession of the [Debtor]."

On June 6, 2019, Tutor Perini filed a petition to confirm the Interim Attachment Order in the United States District Court for the Southern District of New York. The Debtor, in turn, filed a cross-motion to vacate the Interim Attachment Order. On July 15, 2019, the District Court entered an order granting Tutor Perini's petition to confirm the Interim Attachment Order and denying the Debtor's cross-motion. On July 22, 2019, the District Court entered a judgment to that effect in favor of Tutor Perini. Since then, Tutor Perini has (i) served the Debtor with a Subpoena Duces Tecum Ad Testificandum requiring the production of documents and an examination of the Debtor's representative relating to its satisfaction of the Interim Attachment Order, (ii) filed a letter motion in the arbitration seeking a remedy for the Debtor's failure to comply with the Interim Attachment Order, (iii) tried to intervene in the pending foreclosure action (described below) and (iv) sought to amend its interim award to obtain an attachment on the Debtor's leasehold interest with the Port Authority.

On September 24, 2019, the AAA held oral argument on the issue of whether the Interim Attachment Order can affect the rights of third parties such as the Senior Secured Lender that are not a part of the arbitration proceeding. On October 3, 2019, the AAA issued an Order, which held that the Debtor willfully violated the Interim Attachment Order and inappropriately transferred funds subject to the Interim Attachment Order for the payment of expenses. The AAA ordered all of the aforementioned transfers, among others, be returned to the Debtor's operating account by November 1, 2019. The Debtor vehemently disagrees with the AAA's ruling.

Due to Tutor Perini's efforts to deprive the Debtor of its cash, the Debtor faced the possibility that it would be unable to pay critical contractors and trade vendors who ensured that the Retail Space was maintained in safe working condition. For example, if the Debtor was not

48036/0050-19728718v2

able to pay its contract counterparties, those parties would have ceased providing fire prevention and protection services and elevator and escalator maintenance services. The cessation of such services would have a devastating impact on the Debtor and those individuals who work at, shop at, and/or pass through the Retail Space.

Aside from the Debtor's inability to satisfy the Interim Attachment Order, Tutor Perini's delays and the resulting arbitration made it so that the Debtor was also unable to satisfy its debt service obligations to the Senior Secured Lender and defaulted on such obligations on April 10, 2019. Recognizing the cash shortfall realities of the Project, the Debtor and the Senior Secured Lender entered into negotiations with respect to a potential forbearance. During the course of those negotiations, the Interim Attachment Order was entered. Upon entry of the Interim Attachment Order, on July 19, 2019, the Senior Secured Lender commenced a foreclosure action against the Debtor in the Supreme Court of New York, County of New York. Additionally, given the Debtor's default, the Debtor was obligated to and notified the current tenants of the Retail Space that all current and future rent payments were to be deposited into a lockbox, over which the Senior Secured Lender had control. A majority of the Debtor's tenants paid rents directly to the Senior Secured Lender prior to the Petition Date.

In view of the Interim Attachment Order and pending foreclosure actions, the Debtor began exploring potential strategic alternatives to maximize value, including a sale, restructuring, or other transaction. The Debtor, in consultation with its advisors, determined that, given its deteriorating liquidity position and pending arbitration with Tutor Perini, a sale of the Debtor was the best available option to maximize value, and that an in-court marketing process was the only reasonably executable structure through which a value-maximizing transaction could be completed.

To implement the value-maximizing sale process and preserve asset value during the pendency of the Chapter 11 Case, the Debtor realized it would require an infusion of new liquidity. Before the Petition Date, the Debtor, with the assistance of its professional advisors, evaluated options to improve post-petition liquidity. After extensive arm's-length and good faith negotiations, New York City Regional Center, LLC (the "**DIP Lender**"), the managing member of the Senior Secured Lender, agreed to provide the Debtor with DIP financing. That financing has been used to facilitate the marketing process and provide the Debtor with new capital—in the form of a senior secured, priming, superpriority DIP term loan facility in the aggregate principal amount of approximately $4.4 million—needed to allow the Debtor to continue operations and fund administrative expenses through the closing of the sale. The DIP financing is conditioned on certain sale and plan milestones culminating in the consummation of a sale and/or confirmation of a Chapter 11 plan on or before March 5, 2020.

48036/0050-19728718v2

### III. <u>OVERVIEW OF THE PLAN</u>

The Plan contemplates a restructuring of the Debtor through either (a) an orderly liquidation under the Asset Sale Restructuring, or (b) a Plan Investment Restructuring. The Debtor, with the consent of the Senior Lenders, will determine by March 11, 2020 whether it will pursue an Asset Sale Restructuring or a Plan Investment Restructuring.

The key terms of the Plan are as follows:

**A.      Purpose and Effect of the Plan**

The Debtor proposes to reorganize under Chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor may reorganize its business for the benefit of its stakeholders. The consummation of a Chapter 11 plan of reorganization is the principal objective of a Chapter 11 case. A Chapter 11 plan sets forth how a debtor will treat claims and equity interests.

A bankruptcy court's confirmation of a Chapter 11 plan binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor, and any other entities and persons to the extent ordered by the bankruptcy court pursuant to the terms of the confirmed plan, whether or not such entity or person is impaired pursuant to the plan, has voted to accept the plan, or receives or retains any property under the plan.

Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will discharge the Debtor from any debt arising before the Effective Date, terminate all of the rights and interests of pre-bankruptcy equity security holders and substitute the obligations set forth in the Plan for those pre-bankruptcy Claims and Interests. Under the Plan, Claims and Interests are divided into Classes according to their relative priority and other criteria.

The Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. Holders of Allowed Claims or Interests against the Debtor will receive the same recovery provided to other Holders of Allowed Claims or Interests in the applicable Class and will be entitled to their share of assets available for distribution to such Class.

The Debtor contemplates two separate and distinct possible paths forward under its Plan, the Asset Sale Restructuring and the Plan Investment Restructuring. The Plan includes a "toggle" feature which will determine whether the Debtor completes the Asset Sale Restructuring or the Plan Investment Restructuring. The Plan thus provides the Debtor with the necessary discretion to negotiate the precise terms of its ultimate emergence from Chapter 11.

The Asset Sale Restructuring contemplates the following transactions:

- The Debtor will conduct one or more Asset Sales to sell substantially all of the Debtor's assets.

- Selection by the Debtor of the Plan Administrator who will act in the fiduciary capacity as a board of managers. As of the Effective Date, the Plan Administrator

5

would become the sole manager and officer of the Reorganized Debtor and act to wind down the business affairs of the Debtor and Reorganized Debtor;

- The Debtor pays outstanding Claims in accordance with the Bankruptcy Code's priority scheme and the Waterfall;

- The Plan Administrator will establish each of the Distribution Reserve Accounts in accordance with Article IX of the Plan and administer the distribution thereof to Holders of Allowed Claims;

- Vesting of all assets of the Debtor not sold in the Asset Sale in Reorganized Debtor for the purpose of liquidating the Estate; and

- Interests in the Debtor being canceled and extinguished.

The Plan contemplates the following transactions under the Plan Investment Restructuring:

- The issuance of the New GWB Interests to the Plan Sponsor;

- The investment by the Plan Sponsor of the Plan Sponsor Investment in exchange for 100 percent of the NEW GWB Interests;

- The Plan Sponsor Investment being utilized to fund the Distribution Reserve Accounts, the Professional Fee Escrow Account and Cash for working capital of the Reorganized Debtor and, thereafter, to the Senior Secured Lender;

- The entrance by the Reorganized Debtor into the Exit Facilities;

- The creation of a Creditor Recovery Trust to pursue Causes of Action; and

- Interests in the Debtor being canceled and extinguished.

The projected recoveries included in this Disclosure Statement and the liquidation analysis attached hereto as **Exhibit B** provide the baseline recovery for creditors under the Asset Sale Restructuring. The Debtor may determine to pursue an alternative Asset Sale Restructuring or Plan Investment Restructuring but will only do so to the extent such alternative produces higher recoveries than this baseline recovery. The feasibility of the Plan is premised upon, among other things, the Debtor's ability to achieve the goals of its long-range business plan, make the distributions contemplated under the Plan, and pay certain continuing obligations in the ordinary course of the Reorganized Debtor's business.

## B.    The Asset Sale Restructuring

If the Debtor, with the consent of the Senior Lenders, elects to consummate an Asset Sale Restructuring following consummation of an Asset Sale pursuant to a Sale Order, the following provisions shall govern.

48036/0050-19728718v2

1.      Sources of Consideration for Plan Distributions

The Reorganized Debtor will fund distributions under the Plan with Cash on hand on the Effective Date (including the proceeds of the Asset Sale) and the revenues and proceeds of all assets of the Debtor, including proceeds from all Causes of Action not settled, released, discharged, enjoined, or exculpated under the Plan or otherwise on or prior to the Effective Date.

Notwithstanding anything to the contrary in the Plan or in the Asset Purchase Agreements, on the Effective Date, any Cause of Action not settled, released, discharged, enjoined, or exculpated under the Plan on or prior to the Effective Date shall vest in the Reorganized Debtor and shall be subject to administration by the Plan Administrator, in consultation with the Senior Lenders.

2.      Vesting of Assets

Except as otherwise provided in the Plan, the Asset Purchase Agreement, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, in each case to the extent of the Senior Lenders' consent, on the Effective Date, the assets of the Debtor shall vest in the Reorganized Debtor for the purpose of liquidating the Estate, free and clear of all Liens, Claims, charges, or other encumbrances; provided that, after funding the Professional Fee Escrow Account, the collateral, or proceeds of sales of such collateral, of the Reorganized Debtor securing the DIP Claims, Senior Secured Claims, and the GWB Leverage Secured Claims shall remain subject to the liens and claims of the Senior Lenders, Building Secured Claims, and UMEZ Claims (as applicable), to the same extent as such liens and claims were enforceable against the Debtor and the Debtor's assets until such DIP Claims, Senior Secured Claims, and GWB Leverage Secured Claims are Repaid in Full.  On and after the Effective Date, except as otherwise provided for in the Plan, the Financing Orders, or the Asset Purchase Agreement, the Debtor or the Reorganized Debtor may operate its business and use, acquire, or dispose of property in accordance with the Wind-Down Budget, and compromise or settle any Claims, Interests, or Causes of Action with the prior written consent of the Senior Lenders.

3.      Reorganized Debtor

On and after the Effective Date, the Reorganized Debtor shall continue in existence for purposes of (a) winding down the Debtor's business and affairs in accordance with the Wind-Down Budget, (b) objecting to Claims and resolving and reconciling Disputed Claims, (c) making distributions on account of Allowed Claims as provided hereunder, (d) establishing and funding the Distribution Reserve Accounts in accordance with the Wind-Down Budget, (e) enforcing and prosecuting claims, interests, rights, and privileges under all Causes of Action, including, but not limited to, those Causes of Action on the Retained Causes of Action List, (f) filing appropriate tax returns, if necessary, (g) complying with its continuing obligations under the Asset Purchase Agreement and the Financing Orders, and (h) administering the Plan in an efficient manner. The Reorganized Debtor shall be deemed to be substituted as the party in lieu of the Debtor in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and Financing Orders, and (ii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each

7

case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

4.      Plan Administrator

The Plan Administrator's retention shall commence on the Effective Date and shall continue until: (i) the Bankruptcy Court enters an order closing the chapter 11 case and the Debtor is dissolved; (ii) the Bankruptcy Court enters an order removing the Plan Administrator for cause; or (iii) the Plan Administrator voluntarily resigns, upon notice to the Reorganized Debtor and Senior Lenders, and the Reorganized Debtor and Senior Lenders jointly appoint a successor.

The Plan Administrator shall act for the Reorganized Debtor in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the persons acting as managers or directors of the Debtor shall be deemed to have resigned, solely in their capacity as such, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Reorganized Debtor, and shall succeed to the authority, power, and incumbency of the Debtor's managers and officers, without any further action required on the part of the Debtor, the equity holders of the Debtor, the officers or managers, as applicable, of the Debtor, or the members of the Debtor. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Reorganized Debtor. The foregoing shall not limit the authority of the Reorganized Debtor or the Plan Administrator, as applicable, to continue the employment of any former manager or officer, including pursuant to any transition services agreement entered into on or after the Effective Date by and between the Reorganized Debtor and the Purchaser.  On the Effective Date or as soon as reasonably practicable thereafter, the Debtor shall make the Wind Down Reserve available for use by the Plan Administrator.

5.      Wind-Down Budget

The Debtor shall include in the Plan Supplement, in form and substance satisfactory to the Senior Secured Lender, the Wind-Down Budget, which shall be a 13-week statement of cash receipts and disbursements (which shall include the funding of the Distribution Reserve Accounts and the Professional Fee Escrow) for the consecutive 13 weeks immediately following the Effective Date.

6.      Wind-Down

On and after the Effective Date, the Plan Administrator will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court in accordance with the Wind-Down Budget, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtor's Estate in accordance with the Wind-Down Budget.

The Debtor shall include the Wind-Down Budget in the Plan Supplement, in form and substance satisfactory to the Senior Lenders.

8

As soon as practicable after the Effective Date, the Plan Administrator shall: (1) cause the Debtor and the Reorganized Debtor, as applicable, to comply with, and abide by, the terms of the Asset Purchase Agreement and any other documents contemplated thereby; and (2) take such other actions in accordance with the Wind-Down Budget as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. From and after the Effective Date, except with respect to the Reorganized Debtor as set forth herein, the Debtor (1) for all purposes shall be deemed to have withdrawn its business operations from any state in which the Debtor was previously conducting, or is registered or licensed to conduct, its business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have canceled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

7.      Dissolution

Subject in all respects to the terms of this Plan, the Debtor shall be dissolved no later than the closing of the Chapter 11 Case.  Subject in all respects to the terms of this Plan, the Plan Administrator shall have the power and authority to take any action necessary to Wind Down and dissolve the Debtor, and shall: (a) file a certificate of dissolution for the Debtor, together with all other necessary corporate and company documents, to effect the dissolution of the Debtor under the applicable laws of its state of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns, pay taxes required to be paid for the Debtor, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of the Debtor or its Estate for any tax incurred during the administration of the Debtor's Chapter 11 Case, as determined under applicable tax laws.

The filing by the Plan Administrator of the Debtor's certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of the Debtor.

8.      Release of Liens

Except as otherwise expressly provided herein, on the Effective Date, all Liens on any property of the Debtor or the Reorganized Debtor shall automatically terminate, all property subject to such Liens shall be automatically released, and all guarantees of the Debtor or the Reorganized Debtor shall be automatically discharged and released; provided that notwithstanding anything to the contrary set forth in this Plan, subject to the funding of the Professional Fee Escrow Account, (a) all Liens of the Senior Lenders, UMEZ, and the Building Secured Lender on any property of the Debtor or the Reorganized Debtor shall remain valid, binding, and in full effect on and after the Effective Date, (b) all property of the Debtor and Reorganized Debtor shall remain subject to the Liens and claims of the Senior Lenders, UMEZ, and the Building Secured Lender and shall continue to secure all obligations owing to the Senior Lenders, (c) all guarantees of the Debtor or the Reorganized Debtor in favor of the Senior

9

Lenders shall be reaffirmed and remain in full force and effect, (d) all provisions of the Intercreditor Agreements in favor of the Senior Lenders shall continue to be in full force and effect, and (a), (b), (c), and (d) shall remain in effect until the Claims of the Senior Lenders are Repaid in Full.

**C.     Plan Investment Restructuring**

If the Debtor, with the consent of the Senior Lenders, elects to consummate a Plan Investment Restructuring, the following provisions shall govern.

1.      Sources of Consideration for Plan of Reorganization Distributions

The Reorganized Debtor will fund distributions under the Plan with the Plan Sponsor Investment, Cash on hand on the Effective Date, and the revenues and proceeds of all assets of the Debtor, including proceeds from all Causes of Action not transferred to the Senior Secured Lender (or its designee), or settled, released, discharged, enjoined, or exculpated under the Plan or otherwise on or prior to the Effective Date.

2.      Issuance and Distribution of New GWB Interests

On the Effective Date, the Reorganized Debtor shall issue the New GWB Interests to the Plan Sponsor. The issuance of New GWB Interests under the Plan is duly authorized without the need for any further corporate action and without any further action by the Debtor or Reorganized Debtor or the Holders of Claims.

On the Effective Date, Holders of New GWB Interests shall be parties to the New Operating Agreement, in substantially the form included in the Plan Supplement. On the Effective Date, the Reorganized Debtor shall enter into and deliver the New Operating Agreement to each Entity that is intended to be a party thereto, and such New Operating Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of New GWB Interests shall be bound thereby, in each case without the need for execution by any party thereto other than the Reorganized Debtor.

3.      Exit Facilities

On the Effective Date, the Reorganized Debtor shall enter into the Exit Facility Credit Agreements. Confirmation of the Plan shall be deemed approval of the Exit Facilities and the Exit Facility Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtor in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtor to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the Exit Facility.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (i) shall be deemed to be granted, (ii) shall be legal, binding, and enforceable Liens on, and security interests in, the applicable collateral in accordance with the respective terms of the Exit Facility Documents, (iii) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the

10

respective Exit Facility Documents, and (iv) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtor and the Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, subject solely to the occurrence of the Effective Date, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

4.      Plan Sponsor Investment

On the Effective Date, the Plan Sponsor shall consummate the Plan Sponsor Investment pursuant to the Plan Sponsor Agreement, in exchange for 100 percent of the New GWB Interests. The Cash received from the Plan Sponsor Investment shall be contributed to the Reorganized Debtor on the Effective Date.

## D.      Releases

The Plan contains certain releases (as described more fully in Article XI thereof), including mutual releases between: (a) the Debtor and the Reorganized Debtor; (b) the Senior Lenders; (c) each Holder of a Claim or Interest entitled to vote to accept or reject the Plan that (i) votes to accept the Plan or (ii) votes to reject the Plan or does not vote to accept or reject the Plan but does not affirmatively elect to "opt out" of being a Releasing Party by timely objecting to the Plan's third-party release provisions or opting out on a ballot; (d) each Holder of a Claim or Interest that is Unimpaired and presumed to accept the Plan that does not affirmatively elect to "opt out" of being a Releasing Party by timely objecting to the Plan's third-party release provisions or opting out on the notices provided to such Holder; (e) each Holder of a Claim or Interest that is deemed to reject the Plan that does not affirmatively elect to "opt out" of being a Releasing Party by timely objecting to the Plan's third-party release provisions or opting out on the notices provided to such Holder; and (f) with respect each of the foregoing Entities described in clauses (a) through (e), such Entities' current and former affiliates, and such Entities' and such affiliates' partners, subsidiaries, predecessors, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), members, officers, principals, employees, agents, managed accounts or funds, advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, together with their respective successors and assigns.

The Debtor believes that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things: (a) the releases, exculpations, and injunctions are specific; (b) the releases provide closure with respect to prepetition Claims and Causes of Action, which the Debtor determined is a valuable component of the overall restructuring under the circumstances and is integral to the Plan; (c) the releases are a condition to the global

11

settlement and a necessary part of the Plan; and (d) each of the Released Parties and Exculpated Parties has afforded value to the Debtor and aided in the reorganization process, which facilitated the Debtor's ability to propose and pursue confirmation of a value-maximizing restructuring. Further, the Debtor anticipates that it will be able to secure the support of the Senior Lenders prior to the Confirmation Hearing for the releases, exculpations, and injunctions. The Debtor believes that each of the Released Parties and Exculpated Parties has played an integral role in formulating or enabling the Debtor to propose the Plan and has expended significant time and resources analyzing and negotiating the issues presented by the Debtor's prepetition capital structure. The Debtor will be prepared to meet its burden to establish the basis for the releases, exculpations, and injunctions for each Released Party and Exculpated Party as part of Confirmation of the Plan.

## IV. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

**A.    What is chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan of reorganization is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.    Why is the Debtor sending me this Disclosure Statement?**

The Debtor is seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. This Disclosure Statement is being submitted in accordance with these requirements.

**C.    Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold, if any. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below.

| Class | Claim or Interest | Status | Voting Rights |
|:---:|:---|:---|:---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Impaired | Entitled to Vote |
| 3 | Senior Secured Claim | Impaired | Entitled to Vote |
| 4 | Building Secured Claim | Impaired | Entitled to Vote |
| 5 | UMEZ Claim | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Interests in the Debtor | Impaired | Deemed to Reject |

**D.    What will I receive from the Debtor if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan. Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtor to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE FAILURE TO OBJECT TO CONFIRMATION BY A HOLDER OF AN ALLOWED ADMINISTRATIVE CLAIM OR PRIORITY CLAIM SHALL BE DEEMED TO BE SUCH HOLDER'S CONSENT TO RECEIVE TREATMENT FOR SUCH CLAIM AS PROVIDED IN ARTICLE II AND ARTICLE III OF THE PLAN.**

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTOR'S CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[3]**

---

[3] The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtor's business operations and general economic conditions. "Allowed" means with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim timely Filed by the Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Court a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) a Claim Allowed pursuant to the Plan, any stipulation approved by the Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan or a Final Order of the Court; provided, that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Court, or if such an objection is so interposed, such Claim shall have been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtor and without further notice to any party or action, approval, or Order of the Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. For the avoidance of doubt, a Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "Allow" and "Allowing" shall have correlative meanings.

48036/0050-19728718v2

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims[4] | Projected Recovery under the Plan[5] |
| 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim will receive, at the Debtor's election, in consultation with the Senior Lenders: (a) payment in full in Cash(which may come from the Other Secured Claims Reserve if the Asset Sale Restructuring occurs); (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Claim; or (d) other treatment rendering such Claim Unimpaired. | $_____ | 100% |
| 2 | Other Priority Claims | If the Plan Investment Restructuring occurs, except to the extent that a holder of an Allowed Other Priority Claim has agreed to less favorable treatment, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, Cash distributions in an amount equal to the Allowed amount of such Claim.  If the Asset Sale Restructuring occurs, each Holder of an Allowed Other Priority Claim will receive its Pro Rata share of the Priority Claims Reserve. The failure to object to Confirmation by a Holder of an Allowed Other Priority Claim shall be deemed to be such Holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code. | $_____ | [•]% - [•]% |
| 3 | Senior Secured Claim | If the Plan Investment Restructuring occurs, each Holder of an Allowed Senior Secured Claim will receive: (a) the Net Plan Investment Proceeds; (b) all of the interests in the First Lien Exit Facility; (c) to the extent of any Diminution in Value Claim, the Creditor Recovery Trust Interests.  If the Asset Sale Restructuring occurs, each Holder of an Allowed Senior Secured Claim shall receive (a) the Net Asset Sale Proceeds pursuant to the Waterfall until such Allowed Senior Secured Claims are paid in full, and (b) to the extent of any Diminution in Value Claim (i) the net proceeds from any Causes of Action obtained by the Plan Administrator after the Effective Date, and (ii) the Creditor Recovery Trust Interests, if any. | $_____ | [•]% - [•]% |

---

[4] The projected amount of claims will be updated in advance of the Disclosure Statement Hearing.

[5] The projected recovery under the Plan will be updated in advance of the Disclosure Statement Hearing.

14

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery under the Plan |
| 4 | Building Secured Claims | If the Plan Investment Restructuring occurs, each Holder of a Building Secured Claim would be entitled to receive its Pro Rata share of interests in the Second Lien Exit Facility; provided, that pursuant to the Financing Orders and Intercreditor Agreements, and with the consent of GWB Leverage Lender, such interests in the Second Lien Exit Facility shall be distributed directly to the Junior Lender, and each Allowed Building Secured Claim shall be treated as a Class 6 General Unsecured Claim and be subordinated to the GWB Leverage Claims and Senior Secured Loan Claims.  If the Asset Sale Restructuring occurs, each Holder of an Allowed Building Secured Claim would be entitled to receive its Pro Rata share of the Net Asset Sale Proceeds (after Allowed DIP Claims and Senior Secured Claims are Repaid in Full); provided, that pursuant to the Financing Orders, Intercreditor Agreements, and the Waterfall, and with the consent of GWB Leverage Lender, any Net Asset Sale Proceeds distributable on account of Allowed Building Secured Claims shall be distributed to the Junior Lender. | $_____ | [•]% - [•]% |
| 5 | UMEZ Claim | If the Plan Investment Restructuring occurs, each Holder of an Allowed UMEZ Claim would be entitled to receive its Pro Rata share of interests in the Second Lien Exit Facility; provided, that pursuant to the Financing Orders and Intercreditor Agreements, and with the consent of GWB Leverage Lender, such interests in the Second Lien Exit Facility shall be distributed directly to the Junior Lender, and each Allowed UMEZ Claim shall be treated as a Class 6 General Unsecured Claim and subordinated to the Building Loan Claims and GWB Leverage Claims.  If the Asset Sale Restructuring occurs, each Holder of an Allowed UMEZ Claim would be entitled to receive its Pro Rata share of the Net Asset Sale Proceeds (after the DIP Claims, Senior Secured Claims, and Building Secured Claims are Repaid in Full); provided, that pursuant to the Financing Orders, Intercreditor Agreements, and the Waterfall, and with the consent of GWB Leverage Lender, any Net Asset Sale Proceeds distributable on account of Allowed UMEZ Claims shall be distributed to the Junior Lender. | $_____ | [•]% - [•]% |

48036/0050-19728718v2

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery under the Plan |
| 6 | General Unsecured Claims | If the Plan Investment Restructuring occurs, solely to the extent the Diminution in Value Claims are paid in full, satisfaction of each Holder of an Allowed General Unsecured Claim shall receive their Pro Rata share of the Creditor Recovery Trust Interests.  If the Asset Sale Restructuring occurs, each Holder of a General Unsecured Claim shall receive their Pro Rata share of (a) any remaining Net Asset Sale Proceeds pursuant to the Waterfall until such Allowed General Unsecured Claims are paid in full, (b) solely to the extent the Diminution in Value Claims are paid in full, (i) the net proceeds from any Causes of Action received by the Plan Administrator after the Effective Date, and (ii) the Creditor Recovery Trust Interests, if any. | $_____ | [•]% - [•]% |
| 7 | Interests in the Debtor | On the Effective Date, each Allowed Interest in the Debtor shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Interests in the Debtor shall be entitled to any recovery or distribution under the Plan on account of such Interests. | N/A | 0% |

## E.    What will I receive from the Debtor if I hold an Allowed Administrative Claim, DIP Claim, or a Priority Tax Claim?

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.    Administrative Claims and Priority Tax Claims

Administrative Claims and Priority Tax Claims will be satisfied as set forth in Article II.A of the Plan, as summarized herein.

Except as otherwise provided in Article II.A of the Plan and except with respect to Administrative Claims that are Professional Fee Claims, Claims for Restructuring Expenses, DIP Claims, or subject to 11 U.S.C. § 503(b)(1)(D), requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtor pursuant to the procedures specified in the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtor or its property, and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed and served on the Reorganized Debtor and the requesting party by the Claims Objection Bar Date.

16

Except as otherwise provided in the Asset Purchase Agreement or Plan Sponsor Agreement, and except with respect to Administrative Claims that are Professional Fee Claims, Claims for Restructuring Expenses, or DIP Claims, and except to the extent that an Administrative Claim or Priority Tax Claim has already been paid during the Chapter 11 Case or a Holder of an Allowed Administrative Claim or Priority Tax Claim and the Debtor agree to less favorable treatment: (i) if the Plan Investment Restructuring occurs, the Reorganized Debtor shall pay each holder of an Allowed Administrative Claim or Priority Tax Claim, in full and final satisfaction of such Claim, Cash distributions in an amount equal to the Allowed amount of such Claim, or (ii) if the Asset Sale Restructuring occurs,  each Holder of an Allowed Administrative Claim or Priority Tax Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, its Pro Rata share of the Priority Claims Reserve.

THE FAILURE TO OBJECT TO CONFIRMATION BY A HOLDER OF AN ALLOWED ADMINISTRATIVE CLAIM OR PRIORITY TAX CLAIM SHALL BE DEEMED TO BE SUCH HOLDER'S CONSENT TO RECEIVE TREATMENT FOR SUCH CLAIM THAT IS (I) DIFFERENT FROM THAT SET FORTH IN SECTION 1129(A)(9) OF THE BANKRUPTCY CODE, AND (II) PROVIDED HEREIN. NOTWITHSTANDING THE FOREGOING, NO REQUEST FOR PAYMENT OF AN ADMINISTRATIVE CLAIM NEED BE FILED WITH RESPECT TO AN ADMINISTRATIVE CLAIM ALLOWED BY FINAL ORDER.

If the Asset Sale Restructuring occurs, any amounts remaining in the Priority Claims Reserve after payment of all Allowed Administrative Claims and all Allowed Priority Claims shall promptly be transferred to the General Account and shall be distributed according to the priority set forth in Article IX.G without any further notice to, or action, order, or approval of, the Bankruptcy Court.

2.      DIP Claims

DIP Claims will be satisfied as set forth in Article II.C of the Plan, as summarized herein.

As of the Effective Date, the DIP Claims shall be Allowed Claims in the full amount outstanding under the DIP Agreement and Financing Orders, including principal, interest, fees, and expenses.

Except to the extent that a Holder of an Allowed DIP Claim agrees in writing to a less favorable treatment, in full and final satisfaction of the Allowed DIP Claims, each Holder of an Allowed DIP Claim shall be indefeasibly Repaid in Full in Cash on the Effective Date. *provided, however*, that DIP Claims in respect of contingent and unliquidated obligations of the Debtor under the DIP Documents shall survive the Effective Date on an unsecured basis and shall not be discharged or released pursuant to the Plan or the Confirmation Order and shall be paid by the Reorganized Debtor as and when due under the DIP Documents. "Repaid in Full" shall mean, in each case to the extent authorized by the Financing Orders, the indefeasible payment in full in Cash of all liquidated DIP Claims.

17

**F.      Are any regulatory approvals required to consummate the Plan?**

There are no known regulatory approvals that are required to consummate the Plan. However, to the extent such any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

**G.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtor will be able to reorganize its business. It is possible that any alternative transaction may provide Holders of Claims with less than they would have received pursuant to the Plan.

**H.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to Holders of Allowed Claims or Interests will only be made on the date the Plan becomes effective— the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan. "Consummation" means the occurrence of the Effective Date.

**I.       What are the sources of Cash and other consideration required to fund the Plan?**

If the Plan Investment Restructuring occurs, the Plan and distributions thereunder will be funded by the following sources of Cash and consideration: (a) Cash on hand, (b) the revenues and proceeds of all assets of the Debtor, including proceeds from all Causes of Action not settled, released, discharged, enjoined, or exculpated under the Plan or otherwise on or prior to the Effective Date, and (c) the issuance of the Creditor Recovery Trust Interests.

If the Asset Sale Restructuring occurs, the Reorganized Debtor will fund distributions under the Plan with Cash on hand and the revenues and proceeds of all assets of the Debtor, including proceeds from all Causes of Action not settled, released, discharged, enjoined or exculpated under the Plan or otherwise on or prior to the Effective Date.

**J.       Will the final amount of Allowed General Unsecured Claims affect my recovery under the Plan?**

The final amount of Allowed General Unsecured Claims will affect each Holder of an Allowed General Unsecured Claim's recovery under the Plan.  If the Plan Investment Restructuring occurs, solely to the extent the Diminution in Value Claims are paid in full, satisfaction of each Holder of an Allowed General Unsecured Claim shall receive their Pro Rata

18

share of the Creditor Recovery Trust Interests.  If the Asset Sale Restructuring occurs, each Holder of a General Unsecured Claim shall receive their Pro Rata share of (a) any remaining Net Asset Sale Proceeds pursuant to the Waterfall until such Allowed General Unsecured Claims are paid in full, (b) solely to the extent the Diminution in Value Claims are paid in full, (i) the net proceeds from any Causes of Action received by the Plan Administrator after the Effective Date, and (ii) the Creditor Recovery Trust Interests, if any.

Although the Debtor's estimate of General Unsecured Claims set forth above is the result of the Debtor's and their advisors' careful analysis of available information, General Unsecured Claims actually asserted against the Debtor may be higher or lower than the Debtor's estimate provided herein, which difference could be material.

Moreover, the Debtor may in the future reject certain Executory Contracts and Unexpired Leases, which may result in additional rejection damages claims not accounted for in this estimate. Further, the Debtor may object to certain proofs of claim, and any such objections could ultimately cause the total amount of General Unsecured Claims to change.

Further, as of the Petition Date, the Debtor was a party to certain litigation matters that arose in the ordinary course of operating its business and could become party to additional litigation in the future as a result of conduct that occurred prior to the Petition Date. Although the Debtor has disputed, is disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtor herein, the total amount of Allowed General Unsecured Claims could change as well.

**K.    How will Executory Contracts and Unexpired Leases be treated under the Plan?**

1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtor believes that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.

The Debtor is a party to a large number of unexpired non-residential real property leases and executory contracts. In connection with its restructuring efforts, the Debtor is attempting to enhance the competitiveness of its operations, which involves a comprehensive evaluation of all aspects of the Debtor's leases and contracts. The Debtor intends to utilize the tools afforded a chapter 11 debtor, including modifying or, in some cases rejecting burdensome contracts and leases.

The Debtor intends to file the Schedule of Assumed Executory Contracts and Unexpired Leases and the Schedule of Rejected Executory Contracts and Unexpired Leases no later than 7 days before the Confirmation Hearing, as part of the Plan Supplement.

19

If the Debtor, with the consent of the Senior Lenders, elects to consummate a Plan Investment Restructuring, on the Effective Date, except as otherwise provided in the Plan or otherwise agreed to by the Debtor and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Case, shall be deemed assumed by the Reorganized Debtor, effective as of the Effective Date, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that are the subject of a motion to reject such Executory Contracts or Unexpired Leases that is pending on the Effective Date. Except as otherwise provided in the Plan, the Debtor shall assume, assume and assign, or reject, as the case may be, Executory Contracts and Unexpired Leases set forth in the applicable schedules in the Plan Supplement. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Schedule of Assumed Executory Contracts and Unexpired Leases, or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order. Unless otherwise indicated or agreed by the Debtor and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease.  On the Effective Date, the Ground Lease shall be deemed assumed by the Reorganized Debtor.

If the Debtor, with the consent of the Senior Lenders, elects to consummate an Asset Sale Restructuring, on the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtor or assumed by the Debtor and assigned to another third party, as applicable, in connection with the any Asset Sale or pursuant to the Sale Order; or (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assumptions and assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

2.        Claims Based on Rejection of Executory Contracts or Unexpired Leases

Proofs of Claims with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court within the latest to occur of: (1) 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; (2) 30 days after the Debtor provides notice of surrender of possession to a landlord of a rejected lease where surrender occurs after entry of an order approving such rejection; and (3) 30 days after notice of any rejection that occurs after the Effective Date. **Any Holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims are not timely Filed shall not (1) be treated as a creditor with respect to such Claim, (2) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (3) participate in any distribution in the Chapter 11 Case on account of such Claim, and any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtor, the Debtor's Estate, the Reorganized Debtor, or the property for any of the foregoing without the need for any objection by the Debtor, Reorganized Debtor, or the Plan Administrator, as applicable, or further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** Claims arising from the rejection of the Debtor's Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

If a Plan Investment Restructuring occurs, counterparties to Executory Contracts or Unexpired Leases listed on the Schedule of Rejected Executory Contracts and Unexpired Leases shall be served with a notice of rejection of Executory Contracts and Unexpired Leases substantially in the form approved by the Bankruptcy Court, pursuant to the Bankruptcy Court order approving the Disclosure Statement, as soon as reasonably practicable following entry of the Bankruptcy Court order approving the Disclosure Statement.

3.  Cure of Defaults for Assumed, or Assumed and Assigned, Executory Contracts and Unexpired Leases

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed, or assumed and assigned pursuant to the Plan, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim, as reflected on the Cure Notice or as otherwise agreed or determined by a Final Order of the Bankruptcy Court, in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, or on such other terms as the parties to such Executory Contract or Unexpired Leases may otherwise agree. In the event of a dispute regarding: (1) the amount of any Cure Claim; (2) the ability of the Reorganized Debtor, the Purchaser, or any assignee, as applicable, to provide "adequate assurance of future performance" (with the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assumed and assigned; or (3) any other matter pertaining to assumption or the assumption and assignment, the Cure Claims shall be made following the entry of a Final Order resolving the dispute and approving the assumption or the assumption and assignment. Notwithstanding the foregoing, nothing herein

48036/0050-19728718v2

shall prevent the Reorganized Debtor from settling any Cure Claim without further notice to or action, order, or approval of the Bankruptcy Court.

Unless otherwise provided by an order of the Bankruptcy Court or in the Asset Purchase Agreement, at least seven days before the Voting Deadline, the Debtor shall distribute, or cause to be distributed, Cure Notices to the applicable third parties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption, assumption and assignment, or related Cure Claim must be Filed by the Cure/Assumption Objection Deadline. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or Cure Notice will be deemed to have assented to such assumption, assumption and assignment, or Cure Claim. To the extent that the Debtor seeks to assume and assign an Executory Contract or Unexpired Lease pursuant to the Plan, the Debtor will identify the assignee in the applicable Cure Notice and/or Schedule and provide "adequate assurance of future performance" by such assignee (within the meaning of section 365 of the Bankruptcy Code) under the applicable Executory Contract or Unexpired Lease to be assumed and assigned.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and the payment of the Cure Claim, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtor assumes or assumes and assigns such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to, or action, order, or approval of, the Bankruptcy Court.

Notwithstanding anything contained herein, neither the Port Authority nor any other party may assert a Cure Claim under Section 5.7(c) of the Ground Lease.

4.    Adequate Assurance of Future Performance Under Assumed Executory Contracts and Unexpired Leases

The Debtor will provide financial projections and demonstrate the feasibility of the Plan at the Confirmation Hearing in satisfaction of any obligation to provide adequate assurance of future performance under Executory Contracts and Unexpired Leases that are assumed under the Plan.

**L.    Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, Article XI of the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.

Among others, (a) each Holder of a Claim or Interest entitled to vote to accept or reject the Plan that (i) votes to accept the Plan or (ii) votes to reject the Plan or does not vote to accept or reject the Plan but does not affirmatively elect to "opt out" of being a Releasing Party by

22

timely objecting to the Plan's third-party release provisions or opting out on a ballot, (b) each Holder of a Claim or Interest that is Unimpaired and presumed to accept the Plan that does not affirmatively elect to "opt out" of being a Releasing Party by timely objecting to the Plan's third-party release provisions or opting out on the notices provided to such Holder; and (c) each Holder of a Claim or Interest that is deemed to reject the Plan that does not affirmatively elect to "opt out" of being a Releasing Party by timely objecting to the Plan's third-party release provisions or opting out on the notices provided to such Holder, will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtor and the Released Parties. The releases represent an integral element of the Plan.

Based on the foregoing, the Debtor believes that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Second Circuit. Moreover, the Debtor will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

## 1. Release of Liens

**Except as otherwise specifically provided in the Plan, the Exit Facility Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns, in each case, without any further notice to, or action, order, or approval of, the Bankruptcy Court and without any action or Filing being required to be made by the Debtor or the Reorganized Debtor, as applicable. If a Plan Investment Restructuring occurs pursuant to the Plan, then the Senior Lenders, Building Secured Lender, and UMEZ shall execute and deliver all documents reasonably requested by the Reorganized Debtor to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests on such assets of the Debtor that are subject to the Plan Investment Restructuring; provided that if an Asset Sale Restructuring occurs, then, subject to the funding of the Professional Fee Escrow Account, all Liens securing the Claims of the Senior Lenders, Building Secured Lender, and UMEZ, or any other obligations shall continue in full force and effect on and after the Effective Date and nothing in this Plan shall or shall be construed to release, discharge, relieve, limit, or impair in any way the rights of the Senior Lenders, Building Secured Lender, and UMEZ until the claims of the Senior Lenders are Repaid in Full.**

## 2. Debtor Release

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtor, the Reorganized Debtor, Plan Administrator, and the Estate from any and all Causes of Action, including any derivative claims asserted on behalf of the**

23

Debtor, that the Debtor, the Reorganized Debtor, Plan Administrator, or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtor, based on or relating to, or in any manner arising from, in whole or in part:

(a)    the Debtor, the Debtor's in- or out-of-court restructuring efforts, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Documents;

(b)    any Restructuring Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan;

(c)    the Chapter 11 Case (including the events leading thereto), the Disclosure Statement, the Plan, the DIP Agreement, the Asset Purchase Agreement, the Asset Sale, the Plan Sponsor Agreement, the filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities (including the New GWB Interests) pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

(d)    the business or contractual arrangements between the Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth above, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the releases set forth above are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the releases set forth above; (3) in the best interests of the Debtor and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after reasonable investigation by the Debtor and after notice and opportunity for hearing; and (6) a bar to the Debtor asserting any claim released by the releases set forth above against any of the Released Parties.

3.    **Release by Holders of Claims or Interests**

24

As of the Effective Date, each Releasing Party is deemed to have released and discharged the Debtor or Reorganized Debtor, as applicable, and the Released Parties from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtor, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

(a)    the Debtor, the Debtor's in- or out-of-court restructuring efforts, the formulation, preparation, dissemination, negotiation, or filing of the other Restructuring Documents;

(b)    any Restructuring Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Releasing Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan;

(c)    the Chapter 11 Case (including the events leading thereto), the Disclosure Statement, the Plan, the DIP Agreement, the Asset Sale, the Asset Purchase Agreement, the Plan Sponsor Agreement, the filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

(d)    the business or contractual arrangements between the Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party release set forth above, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the third-party release set forth above is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtor and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the third-party release set forth above against any of the Released Parties.

4.    Exculpation

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any

25

Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the Disclosure Statement, the Plan, the DIP Agreement, the Asset Purchase Agreement, the Asset Sale, the Plan Sponsor Agreement, the Exit Facility Credit Agreements, the Exit Facility Documents, or any Restructuring Document, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Case, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon the Effective Date shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

5.    **Injunction**

Except with respect to the obligations arising under the Plan or the Confirmation Order, and except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that held, hold, or may hold Claims or Interests that have been released, discharged, or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtor or Reorganized Debtor, or the other Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

48036/0050-19728718v2

**M.     What impact does the Claims Bar Date have on my Claim?**

The Bankruptcy Court established January 7, 2020, at 11:59 p.m., prevailing Eastern Time, as the Claims bar date (the "**Bar Date**") in the Chapter 11 Case. The following entities holding Claims against the Debtor that arose (or that are deemed to have arisen) prior to the Petition Date, were required to file Proofs of Claim on or before the Bar Date: (1) any entity whose Claim against the Debtor is not listed in the Debtor's schedules of assets and liabilities ("**Schedules**") or is listed in the Debtor's Schedules as contingent, unliquidated, or disputed if such entity desires to participate in any of the Chapter 11 Case or share in any distribution, if any, of the Chapter 11 Case; (2) any entity that believes its Claim is improperly classified in the Schedules or is listed in an incorrect amount and desires to have its Claim Allowed in a different classification or amount from that identified in the Schedules; and (3) any entity that believes its Claim against the Debtor is or may be an administrative expense pursuant to section 503(b)(9) of the Bankruptcy Code (but not any entity that believes it holds an administrative expense Claim under section 503(b)(1) of the Bankruptcy Code).

In accordance with Bankruptcy Rule 3003(c)(2), for any Person or Entity that is required, but fails, to file a Proof of Claim on or before the Bar Date: (1) such Person or Entity will be forever barred, estopped, and enjoined from asserting such Claim against the Debtor (or filing a Proof of Claim with respect thereto); (2) the Debtor and its property may be forever discharged from any and all indebtedness or liability with respect to or arising from such Claim; (3) such Person or Entity will not receive any distribution in the Chapter 11 Case on account of that Claim; and (4) such Person or Entity will not be permitted to vote on any plan or plans of reorganization for the Debtor on account of these barred Claims or receive further notices regarding such Claim.

As described in this Disclosure Statement, the distribution you receive on account of your Claim (if any) may depend, in part, on the amount of Claims for which Proofs of Claim are filed on or before the Bar Date.

**N.     What is the deadline to vote on the Plan?**

The Voting Deadline is _____, 2020, at 5:00 p.m. (prevailing Eastern Time).

**O.     How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be completed and signed so that it is **actually received** by _____, 2020, at 5:00 p.m. (prevailing Eastern Time) at the following address: Cole Schotz P.C., Attn: Suhailah Sallie, 1325 Avenue of the Americas, 19th Floor, New York, New York 10019.

If a creditor whose Claim was not listed in the Debtor's Schedules timely files a proof claim, the Debtor shall promptly provide a Ballot to such creditor; however, if the Holder of such Claim wants to have its Ballot counted, it is required to file a motion with the Bankruptcy Court seeking to have its vote counted.

27

If a Class of Claims is eligible to vote and no Holder of Claims in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by such Class.

**P.    Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**Q.    When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for _____, 2020, at 11:00 a.m. (prevailing Eastern Time). The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed and served on the Debtor, and certain other parties, by no later than _____, 2020, at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **Exhibit C** and incorporated herein by reference.

The Debtor will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the *New York Times* to provide notification to those persons who may not receive notice by mail. The Debtor may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtor may choose.

**R.    What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**S.    What is the effect of the Plan on the Debtor's ongoing business?**

The Debtor is seeking to reorganize under chapter 11 of the Bankruptcy Code. If the Plan Investment Restructuring occurs, Confirmation means that the Debtor will not be liquidated. If the Asset Sale Restructuring occurs, the Debtor will consummate one or more Asset Sales which it believes may provide for a going concern transaction. Following Confirmation, the Plan will be consummated on the Effective Date, which is a Business Day selected by the Debtor on which: (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article XII.A of the Plan have been satisfied or waived (in accordance with Article XII.B of the Plan); and (c) the Plan is declared effective. On or after the Effective Date, and unless otherwise

provided in the Plan, the Reorganized Debtor may operate or wind-down its business, as applicable, and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**T.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Cole Schotz P.C.:

By hand delivery or overnight mail at:

Cole Schotz P.C.
Attn: Michael D. Sirota, Esq.
Attn: Ryan T. Jareck, Esq.
1325 Avenue of the Americas, 19th Floor
New York, New York 10019

By electronic mail at:

msirota@coleschotz.com
rjareck@coleschotz.com

By telephone at:

(212) 752-8000

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Case are available upon written request to the Debtor's counsel or for a fee via PACER at: https://www.nysb.uscourts.gov.

**U.    Does the Debtor recommend voting in favor of the Plan?**

Yes. The Debtor believes the Plan provides for a larger distribution to the Debtor's creditors than would otherwise result from any other available alternative. The Debtor believes the Plan is in the best interest of all Holders of Claims and Interests, and that other alternatives fail to realize or recognize the value inherent under the Plan.

48036/0050-19728718v2

## V.      Who Supports the Plan?

The Plan is supported by the Debtor. Additionally, the Debtor anticipates that they will be able to secure the support of most creditors prior to the Confirmation Hearing.

## V. <u>ADDITIONAL INFORMATION ABOUT THIS DISCLOSURE STATEMENT</u>

### A.      Miscellaneous Provisions

1.      Immediate Binding Effect

Subject to the terms of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order, shall be immediately effective and enforceable and deemed binding upon the Debtor or Reorganized Debtor, as applicable, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor. All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

2.      Additional Documents

On or before the Effective Date, the Debtor may File with the Bankruptcy Court such agreements and other documents as may be necessary or advisable to effectuate and further evidence the terms and conditions of the Plan. The Debtor or the Reorganized Debtor, as applicable, all Holders of Claims and Interests receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

3.      Reservation of Rights

Before the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by the Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to any Claims or Interests.

4.      Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to, the benefit of any heir, executor, administrator, successor, assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of such Entity.

5.      Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtor will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and, pursuant to section 1125(e) of the Bankruptcy Code, the Debtor and each of its respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals nor the Reorganized Debtor or Plan Administrator, as applicable, will have any liability for the violation of any applicable law (including the Securities Act), rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan and any previous plan.

6.      Term of Injunctions or Stays

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

7.      Waiver or Estoppel

As of the Confirmation Date, each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtor or its counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed before the Confirmation Date.

**B.      Additional Important Information**

The confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article XII of the Plan. There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to go effective will be satisfied (or waived).

You are encouraged to read this Disclosure Statement in its entirety, including the section entitled "*Risk Factors*," and the Plan before submitting your ballot to vote on the Plan.

***The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.***

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan. The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entirety by reference to those documents. The statements contained in this

31

Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtor is under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose. In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provisions of the Plan will govern.

This Disclosure Statement has not been approved or disapproved by the SEC or any similar federal, state, local or foreign regulatory agency, nor has the SEC or any other agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtor has sought to ensure the accuracy of the financial information provided in this Disclosure Statement; however, the financial information contained in this Disclosure Statement or incorporated herein by reference has not been, and will not be, audited or reviewed by the Debtor's independent auditors unless explicitly provided otherwise.

The Debtor makes statements in this Disclosure Statement that are considered forward-looking statements under federal securities laws. The Debtor considers all statements regarding anticipated or future matters, to be forward-looking statements. Forward-looking statements may include statements about the Debtor's:

- business strategy;

- financial condition, revenues, cash flows, and expenses;

- levels of indebtedness, liquidity, and compliance with debt covenants;

- financial strategy, budget, projections, and operating results;

- general economic and business conditions;

- counterparty credit risk;

- the outcome of pending and future litigation;

- uncertainty regarding the Debtor's future operating results; and

- plan, objections, and expectations.

Statements concerning these and other matters are not guarantees of the Reorganized Debtor's future performance. There are risks, uncertainties, and other important factors that could cause the Reorganized Debtor's actual performance or achievements to be different from those they may project, and the Debtor undertakes no obligation to update the projections made herein. These risks, uncertainties, and factors may include the following: (a) the Debtor's ability to confirm and consummate the Plan; (b) the potential that the Debtor may need to pursue an

48036/0050-19728718v2

alternative transaction if the Plan is not confirmed; (c) the Debtor's ability to reduce its overall financial leverage; (d) the potential adverse impact of the Chapter 11 Case on the Debtor's operations and management; the risks associated with operating the Debtor's business during the Chapter 11 Case; (e) tenant and vendor responses to the Chapter 11 Case; (f) the Debtor's inability to discharge or settle Claims during the Chapter 11 Case; (g) general economic, business, and market conditions; (h) exposure to litigation; (i) the Debtor's ability to implement cost reduction initiatives in a timely manner; (j) the Debtor's ability to divest existing businesses; and (k) adverse tax changes.

## VI. <u>THE DEBTOR'S CORPORATE HISTORY, CAPITAL STRUCTURE, AND BUSINESS OVERVIEW</u>

### A.    The Debtor

As set forth above, on June 30, 2011, the Port Authority approved a $183.2 million renovation and improvement plan for the 294,000 square foot Bus Station, a commuter bus terminal located at the east end of the George Washington Bridge in the Washington Heights section of New York City. The renovation project was structured as a public-private venture between the Port Authority, as owner of the Bus Station, and the Debtor, as developer. The redevelopment project included relocating the bus terminals to the third floor of the complex and creating a state-of-the-art ground transportation hub. A new 15,000 square foot bus terminal was built increasing the number of gates from 17 to 22 and 85,000 square feet of the existing bus station was reconfigured and upgraded. By relocating the bus station operations to the third floor of the complex, a retail center of approximately 129,000 square feet was created. The Bus Station remained operational during the renovation, which began in 2012 and was officially completed on May 6, 2017.

Pursuant to an Agreement of Lease dated July 21, 2011, in addition to serving as the developer of the Bus Station, the Debtor was granted a 99-year lease to operate the retail portion of the Bus Station (the "**Retail Space**"). After significant construction delays, the Debtor began leasing operations in the Retail Space on August 1, 2017.

### B.    Prepetition Capital Structure

As of the Petition Date, the Debtor's capital structure consisted of outstanding funded debt obligations in the aggregate principal of approximately $105 million.

1.    Pre-Petition Loan Agreement with George Washington Bridge Bus Station and Infrastructure Development Venture, LLC

The Debtor is a party to the *Permanent Loan Agreement*, dated as of July 20, 2011 (as amended, restated, supplemented, or modified from time to time, the "**Senior Secured Loan Agreement**") with George Washington Bridge Bus Station and Infrastructure Development Fund, LLC, in its capacity as the lender (the "**Senior Secured Lender**"), whereby Senior Secured Lender agreed to provide the Debtor a $72,000,000 loan (the "**Senior Secured Loan**"), plus all accrued but unpaid interest, fees, expenses, and all other obligations expressly provided for thereunder, or incurred in connection therewith (such obligations under the Senior Secured Loan and the Senior Secured Loan Documents, the "**Senior Secured Loan Obligations**").

33

The Senior Secured Loan Obligations are guaranteed by non-debtor GWB Development Partners LLC ("**Senior Secured Loan Guarantor**") pursuant to that certain Deficiency Guaranty dated July 20, 2011 (the "**Senior Secured Loan Guaranty**").  Pursuant to the Senior Secured Loan Guaranty, Senior Secured Loan Guarantor unconditionally and absolutely guaranteed the prompt and punctual payment of the Senior Secured Loan, provided, that, the Senior Secured Loan Guaranty is limited to the deficiency obtained by Senior Secured Lender following Senior Secured Lender's suing on the mortgage note and/or foreclosure under the Mortgage (as hereinafter defined).

In addition, to secure the Senior Secured Loan Obligations, the Debtor provided the Senior Secured Lender with a mortgage (the "**Mortgage**") on the leasehold estate on the premises located in New York, New York, known as Section 8, Block 2163, Lot 1 and Block 2176, Lot 17 (i.e., the Bus Station) (the "**Mortgaged Property**").  Under the Mortgage, the Debtor granted to the Senior Secured Lender a security interest in the personalty, the fixtures, plans, leases, rents, property agreements, equipment and all other Mortgaged Property which is personal property (each within the meaning of the Uniform Commercial Code ("**UCC**")).  The Debtor also assigned all right, title and interest in and to the leases and rents in connection with the Mortgaged Property, pursuant to that certain Assignment of Leases and Rents, dated as of July 20, 2011 (the "**ALR**").  Under the ALR (1) the Debtor assigned its right to collect rental income to the Senior Secured Lender, (2) the Senior Secured Lender waived its right to collect rental income under a license to the Debtor, so long as the Debtor continued to perform its obligations under the parties' agreements, and (3) the Senior Secured Lender retained the right to revoke the license to the Debtor, allowing the Senior Secured Lender to recoup its right to collect rental income in the event of Debtor's default on the parties' agreements.

To further secure the Senior Secured Loan Obligations, the Debtor entered into various security and collateral documents pursuant to and in connection with the Senior Secured Loan Agreement, including the Intercreditor Agreements (as defined below), pursuant to which the Senior Secured Lender was granted the benefit of valid, binding, perfected, enforceable, first-priority liens and security interests in the Senior Collateral (as defined below) (the "**Senior Secured Loan Liens**").  The Senior Secured Loan Liens provide the Senior Secured Lender with valid, binding, perfected, enforceable, first-priority liens, and security interests in the Collateral (as defined in the Senior Secured Loan Agreement) (such Collateral, the "**Senior Collateral**").

As of the Petition Date, approximately $72,000,000 is outstanding under the Senior Secured Loan Agreement, exclusive of accrued but unpaid interest.

2.    Pre-Petition Loan Agreements with GWB NMTC Investment Fund LLC and GWB Leverage Lender, LLC

On December 26, 2013, GWB NMTC Investment Fund LLC (the "**Funding Borrower**") made investments in, and became the 99.99% member of, GSNMF Sub-CDE 12 LLC, as one of the lenders (the "**Building Secured Lender**," and together with the Senior Secured Lender and UMEZ, the "**Prepetition Secured Parties**"), LIIF Sub-CDE XXVI, LLC ("**LIIF CDE**") and DVCI CDE XIII, LLC ("**DV CDE**") as co-lenders (collectively with the Building Secured Lender, the "**Building Lenders**"), each of which were formed for the purpose of making qualified low-income community investments in connection with the New Markets Tax Credit

34

Program (provided for in Section 45D of the Internal Revenue Code).  The Building Lenders made $19,065,000 in loans (the "**Building Loans**") under that certain *Building Loan Agreement*, dated as of December 26, 2013 (as amended, restated, supplemented, or modified from time to time, the "**Building Loan Agreement**") to the Debtor to finance the development of the project.

A portion of the Building Loans was funded by Foodco, LLC ("**Foodco**") to Funding Borrower under that certain *Senior Leverage Loan Agreement*, dated as of December 26, 2013 (as amended, restated, supplemented, or modified from time to time, the "**FoodCo Loan Agreement**," and together with any ancillary documents, pledge agreements, guarantees, and notes issued in connection therewith, collectively the "**FoodCo Loan Documents**") in respect of a loan (the "**FoodCo Loan**") in the aggregate principal amount of not more than $10,000,000 plus all accrued but unpaid interest, fees, expenses, and all other obligations expressly provided for thereunder, or incurred in connection therewith (such obligations under the FoodCo Loan and the FoodCo Loan Documents, the "**FoodCo Loan Obligations**").  The FoodCo Loan was utilized by the Funding Borrower to indirectly fund $10,000,000 of the Building Loans (such portion of the Building Loan, the "**FoodCo Building Loan**", and such obligations under the FoodCo Building Loan, the "**FoodCo Building Loan Obligations**").

To secure the FoodCo Loan Obligations, the Funding Borrower entered into various security and collateral documents pursuant to and in connection with the FoodCo Loan Documents, pursuant to which FoodCo was granted or otherwise entitled to the benefit of a valid, binding, perfected, enforceable, pledge of all of Funding Borrower's assets, including all of its non-managing membership interests in each of the Building Lenders (the "**FoodCo Loan Pledge**").  The FoodCo Loan Pledge provided FoodCo with a valid, binding, perfected, enforceable, lien, security interest, and pledge of the Collateral (as defined in the FoodCo Loan Agreement) (such Collateral, the "**FoodCo Loan Collateral**").[6]

George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC ("**Junior Lender**", and collectively with the Senior Secured Lender and DIP Lender, the "**Senior Lenders**") made member loans to GWB Leverage Lender, LLC (the "**Direct Lender**") pursuant to that certain Limited Liability Company Agreement of GWB Leverage Lender, LLC, dated as of April 7, 2014, by and between EB-5 Member and GWB Development Partners, LLC, in the maximum amount of $19,000,000 (the "**Junior Loan**").  With the Junior Loan in place, the Direct Lender acquired from and was assigned all rights as lender of the Foodco Loan, under which the Funding Borrower was indebted and liable to FoodCo.

In addition, with the Junior Loan in place, Direct Lender, under that certain *Loan Agreement*, dated as of April 7, 2014 (as amended, restated, supplemented, or modified from time to time, the "**Direct Loan Agreement**," and together with any ancillary documents, pledge agreements, guarantees, and notes issued in connection therewith, collectively the "**Direct Loan Documents**"), made a loan (the "**Direct Loan**," and collectively with the Senior Secured Loan and the FoodCo Building Loan, the "**Prepetition Senior Loans**") to the Debtor in the aggregate

---

[6] Upon the Debtor's repayment of the FoodCo Building Loan Obligations to the Building Lenders, the Building Lenders are required to dividend such proceeds to the Funding Borrower, who is required to repay the FoodCo Loan to the Direct Lender (the Direct Lender collectively with the Senior Secured Lenders and the lenders to the FoodCo Building Loan, the "**Senior Loan Parties**").

48036/0050-19728718v2

principal amount of not less than $9,000,000 plus all accrued but unpaid interest (including at the default rate, as applicable), fees, expenses, and all other obligations expressly provided for thereunder, or incurred in connection therewith (such obligations under the Direct Loan and the Direct Loan Documents, the "**Direct Loan Obligations**" and collectively with the Senior Secured Loan Obligations and the FoodCo Building Loan Obligations, the "**Prepetition Senior Loan Obligations**").

Accordingly, as of Petition Date, the Debtor was indebted and liable to the Building Lenders in respect of the Building Loans issued under the Building Loan Agreement (together with any ancillary documents, security agreements, guarantees, pledge agreements and notes issued in connection therewith, collectively, the "**Building Loan Documents**" and, together with the Senior Secured Loan Documents, the UMEZ Loan Documents (as defined below), and the Intercreditor Agreements (as defined below), the "**Prepetition Secured Credit Documents**") in the aggregate principal amount of not less than $19,065,000 plus all accrued but unpaid interest, fees, expenses, and all other obligations expressly provided for thereunder, or incurred in connection therewith (such obligations under the Building Loan and the Building Loan Documents, the "**Building Loan Obligations**"), and in accordance with the Intercreditor Agreements, the Building Lenders are subordinated in right of payment to the prior payment in full of (i) the Senior Secured Loan, (ii) the Direct Loan, and (iii) the UMEZ Loan (as defined below), other than in respect of the FoodCo Building Loan, which shall be paid in full before any repayment on account of the UMEZ Loan.

To secure $5,000,000 (plus interest thereon and any and all fees with respect thereto) of Building Loan Obligations (the "**Building Secured Loan Obligations**," and, together with the Senior Secured Loan Obligations and the UMEZ Loan Obligations, the "**Prepetition Secured Debt**"), the Debtor entered into various security and collateral documents pursuant to and in connection with the Building Loan Documents pursuant to which the Building Secured Lender (but not the other Building Lenders) was granted or otherwise entitled to the benefit of a valid, binding, perfected, enforceable, mortgage (the "**Building Loan Mortgage**" and, together with the Senior Secured Loan Liens and the UMEZ Mortgage (as defined below), the "**Prepetition Liens**") in the Mortgaged Property (such Mortgaged Property, the "**Building Loan Collateral**," and collectively with the Senior Collateral and the UMEZ Loan Collateral, the "**Prepetition Collateral**"). The Building Loan Mortgage provides the Building Secured Lender with valid, binding, perfected, enforceable, liens, and security interests in the Building Loan Collateral that are (i) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense, or claim under the Bankruptcy Code or applicable non-bankruptcy law and (ii) as of the Petition Date, are subject and subordinate only to certain valid, perfected, and unavoidable liens, including the Senior Secured Loan Liens, which are senior to the liens of the Building Secured Lender on the Building Loan Collateral.

As of the Petition Date, approximately $19,065,000.00 is outstanding under the Building Loans, exclusive of accrued but unpaid interest. As of the Petition Date, approximately $9,000,000.00 is outstanding under the Direct Loan, exclusive of accrued but unpaid interest.

3.    Pre-Petition Loan Agreement with Upper Manhattan Empowerment Zone Development Corporation

36

Before the Petition Date, the Debtor was indebted and liable to Upper Manhattan Empowerment Zone Development Corporation, in its capacity as a lender ("**UMEZ**") in respect of the a $5,000,000 loan (the "**UMEZ Loan**") made pursuant to that certain *Loan Agreement*, dated as of February 27, 2018 (as amended, restated, supplemented, or modified from time to time, the "**UMEZ Loan Agreement**"), between the Debtor and UMEZ (plus all accrued but unpaid interest, fees, expenses, and all other obligations expressly provided for thereunder, or incurred in connection therewith (such obligations under the UMEZ Loan and the UMEZ Loan Documents, the "**UMEZ Loan Obligations**")).

To secure the UMEZ Loan Obligations, the Debtor entered into various security and collateral documents pursuant to and in connection with the UMEZ Loan Documents, including the Intercreditor Agreement, pursuant to which UMEZ was granted or otherwise entitled to the benefit of a valid, binding, perfected, enforceable, mortgage (the "**UMEZ Mortgage**") on the Mortgaged Property (as defined in the UMEZ Loan Agreement) (such Mortgaged Property, the "**UMEZ Loan Collateral**").  The UMEZ Mortgage provides UMEZ with a valid, binding, perfected, enforceable, mortgage on the UMEZ Loan Collateral that is (i) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense, or claim under the Bankruptcy Code or applicable non-bankruptcy law and (ii) as of the Petition Date is subject and subordinate only to certain valid, perfected, and unavoidable liens, including the Senior Secured Loan Liens and the Building Loan Mortgage (solely to the extent the Building Loan Mortgage applies to the FoodCo Building Loan Obligations), which are senior to the liens of UMEZ on the UMEZ Loan Collateral.

As of the Petition Date, approximately $4.8 million is outstanding under the UMEZ Loan Agreement, exclusive of accrued interest.

4.       Intercreditor Arrangements

The Debtor, the Prepetition Secured Parties, the Direct Lender, and the Building Lenders are subject to that certain *Subordination and Intercreditor Agreement* dated as of February 27, 2018 (as amended, restated, supplemented or modified from time to time before the date hereof, the "**Intercreditor Agreement**"), pursuant to which (i) the Prepetition Secured Parties set forth the respective priorities of the Prepetition Liens on the Prepetition Collateral, and (ii) the Prepetition Secured Parties, the Direct Lender, and the Building Lenders set forth the priority of payment in respect of the Prepetition Secured Debt and the Building Loans.  Pursuant to the Intercreditor Agreement (x) any lien on the Prepetition Collateral securing the Senior Secured Loan Obligations shall have priority over and be senior in all respects and before any lien on the Prepetition Collateral securing any UMEZ Loan Obligations or Building Secured Loan Obligations and (y) any lien on the Prepetition Collateral securing the UMEZ Loan Obligations shall have priority over and be senior in all respects and before any lien on the Prepetition Collateral securing any Building Secured Loan Obligations (other than the liens pertaining to the FoodCo Building Loan Obligations, which such FoodCo Building Loan Obligations shall rank first and prior to the UMEZ Loan Obligations).  Furthermore, pursuant to the Intercreditor Agreement, the UMEZ Loan Obligations and the Building Loan Obligations are subordinated in right of payment to the Prepetition Senior Loan Obligations.

37

The Prepetition Senior Secured Lender, the Direct Lender, and the Debtor are subject to that certain *Subordination and Intercreditor Agreement*, dated as of February 27, 2018 (as amended, restated, supplemented or modified from time to time, the "**Senior Intercreditor**"), pursuant to which the Direct Lender is payment and lien subordinated to the Senior Secured Lender.

The Direct Lender and the Building Lenders are subject to that certain *Subordination and Intercreditor Agreement*, dated as of April 7, 2014 (as amended, restated, supplemented or modified from time to time, the "**Direct Loan Intercreditor**"), pursuant to which the Building Loan Obligations, including the Secured Building Loan Obligations, are lien and payment subordinated in all respects to the Direct Loan Obligations.

The Senior Secured Lender and the Building Lenders are subject to that certain *Subordination and Intercreditor Agreement*, dated as of December 26, 2013 (as amended, restated, supplemented or modified from time to time, the "**Building Loan Intercreditor**", and collectively with the Senior Intercreditor, the Direct Loan Intercreditor, and the Intercreditor Agreement, the "**Intercreditor Agreements**"), pursuant to which the Building Loan Obligations, including the Secured Building Loan Obligations, are lien and payment subordinated in all respects to the Senior Secured Loan Obligations.

## VII. <u>EVENTS LEADING TO THE CHAPTER 11 FILING</u>

As a result of thirty (30) months of delays by Tutor Perini, significant cost overruns existed on the Project. The Debtor incurred millions of dollars of unanticipated costs for interest on loans and additional project carrying costs, including approximately $1.7 million in delay charges that the Debtor was forced to pay the Port Authority for the failure to deliver the Project on time. Additionally, the Debtor paid over $11 million of interest during the delay period and millions of dollars of rent receipts were lost due to the delays. The Debtor also incurred more than $14 million of expenses while arbitrating its disputes with Tutor Perini (as set forth in more detail below) and the Debtor's principals were forced to infuse an additional $5.5 million of new capital to cover the Debtor's arbitration expenses. Those losses are directly attributable to the Project delays caused by Tutor Perini.

After Tutor Perini missed the contractual deadline to complete the Project, the Debtor started withholding approximately $1 million from each of Tutor Perini's progress payments as liquidated damages under the Construction Contract. The $1 million withholdings were largely consumed by debt service, delay charges to the Port Authority, additional architect and engineering costs, legal fees, and lease penalties.

Tutor Perini disputed the Debtor's entitlement to withhold funds from the progress payments. In response to that dispute, on February 26, 2015, the Debtor commenced an arbitration by way of Arbitration Demand submitted to the American Arbitration Association ("**AAA**"). The Arbitration Demand sought a declaration that (i) all claims for payment submitted by Tutor Perini were waived because they were not timely submitted or, alternatively, (ii) Tutor Perini's claims for payment were not valid. On or about January 24, 2017, Tutor Perini filed an Answering Statement and Counterclaim against the Debtor asserting $130 million of damages.

38

Following a lengthy arbitrator-selection period, the Debtor and Tutor Perini selected an arbitration panel and commenced the arbitration process on August 22, 2018. As of the Petition Date, 67 days of evidentiary hearings had been conducted during which Tutor Perini put on its entire case-in-chief. The Debtor, however, has not yet presented its case. After Tutor Perini's case-in-chief was complete, the Debtor's construction counsel withdrew from representing the Debtor in the arbitration. Tutor Perini took advantage of the Debtor's vulnerability and filed an application for a preliminary injunction and order of attachment. Despite repeated requests for an adjournment or stay to allow the Debtor time to secure replacement counsel, the arbitration panel held a hearing on Tutor Perini's application. Ultimately, on June 4, 2019, the panel issued an Interim Order granting Tutor Perini's request for an order of attachment in the amount of $23 million (the "**Interim Attachment Order**") against any "EB5 funds, funds paid by the Port Authority and/or net lease payments in the possession of the [Debtor]."

On June 6, 2019, Tutor Perini filed a petition to confirm the Interim Attachment Order in the United States District Court for the Southern District of New York. The Debtor, in turn, filed a cross-motion to vacate the Interim Attachment Order. On July 15, 2019, the District Court entered an order granting Tutor Perini's petition to confirm the Interim Attachment Order and denying the Debtor's cross-motion. On July 22, 2019, the District Court entered a judgment to that effect in favor of Tutor Perini. Since then, Tutor Perini has (i) served the Debtor with a Subpoena Duces Tecum Ad Testificandum requiring the production of documents and an examination of the Debtor's representative relating to its satisfaction of the Interim Attachment Order, (ii) filed a letter motion in the arbitration seeking a remedy for the Debtor's failure to comply with the Interim Attachment Order, (iii) tried to intervene in the pending foreclosure action (described below) and (iv) sought to amend its interim award to obtain an attachment on the Debtor's leasehold interest with the Port Authority.

Upon entry of the Interim Attachment Order, on July 19, 2019, the Senior Secured Lender commenced a foreclosure action against the Debtor in the Supreme Court of New York, County of New York. Additionally, given the Debtor's default, the Debtor was obligated to and notified the current tenants of the Retail Space that all current and future rent payments were to be deposited into a lockbox, over which the Senior Secured Lender has control. A majority of the Debtor's tenants now pay rents directly to the Senior Secured Lender.

In view of the Interim Attachment Order and pending foreclosure actions, the Debtor began exploring potential strategic alternatives to maximize value, including a sale, restructuring, or other transaction. The Debtor, in consultation with its advisors and counsel, determined that, given its deteriorating liquidity position and pending arbitration with Tutor Perini, a sale of the Debtor was the best available option to maximize value, and that an in-court marketing process was the only reasonably executable structure through which a value-maximizing transaction could be completed. Led by its experienced proposed investment banker, Houlihan Lokey, the Debtor intends to conduct a thorough post-petition marketing process of no more than 135 days, thereby providing significant opportunity for interested bidders to formally bid for the Debtor's assets and business operations.

# VIII. <u>EVENTS OF THE CHAPTER 11 CASE</u>

## A.    First and Second Day Relief

On the Petition Date, along with its voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "**Petition**"), the Debtor filed several motions (the "**First Day Motions**") requesting various types of relief which were approved by the Bankruptcy Court. The relief granted enabled the Debtor to preserve value and efficiently administer the Chapter 11 Case, including, among other things: (a) an order authorizing the Debtor to obtain postpetition financing and use cash collateral during the Chapter 11 Case, and granting certain adequate protection to certain secured parties; (b) an order authorizing the Debtor to pay certain prepetition fees and expenses owed to contractors; (c) an order authorizing the Debtor to pay their obligations under insurance policies entered into prepetition, continue paying brokerage fees, honor the terms of their premium financing agreement and pay premiums thereunder, enter into new premium financing agreements in the ordinary course of business, and renew, supplement, modify, and purchase insurance coverage in the ordinary course of business; and (d) an order approving procedures for, among other things, determining adequate assurance for utility providers, prohibiting utility providers from altering, refusing, or discontinuing services, and determining that the Debtor are not required to provide additional adequate assurance.

A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Bernard A. Katz in Support of Chapter 11 Petitions and First Day Motions*, filed on the Petition Date.

The First Day Motions, and all entered orders for relief in the Chapter 11 Case, can be viewed for a fee via PACER at: https://www.nysb.uscourts.gov/.

To assist the Debtor in carrying out its duties as debtor in possession and to otherwise represent the Debtor's interests in the Chapter 11 Case, the Debtor filed motions requesting that the Bankruptcy Court authorize the Debtor to retain and employ the following advisors: (a) Cole Schotz P.C. as counsel to the Debtor; (c) Kreisberg & Maitland LLP as special counsel to the Debtor; and (c) Houlihan Lokey, Inc. as investment banker to the Debtor. The Bankruptcy Court entered orders approving the aforementioned retentions on October 30, 2019. Further, the Debtor filed motions seeking approval of procedures for the interim compensation and reimbursement of expenses of retained professionals in the Chapter 11 Case.

## B.    Postpetition Marketing Process

The Debtor is conducting a marketing process for substantially all of its assets. The Debtor began a multi-phase postpetition marketing process shortly following the Petition Date, which it anticipated would last for approximately 120 days following the Petition Date. The Debtor, working with its advisors and in consultation with certain creditors, determined that this marketing period would ensure the transaction that is ultimately consummated represents the highest and best offer.

During the initial phase of the Debtor's marketing process, the Debtor reached out to potential interested parties, executed confidentiality agreements, shared information regarding

40

the Debtor, and solicited non-binding indications of interest by January 9, 2020.  On or before January 9, 2020, the Debtor received eight (8) indications of interest.

During the next phase of the Debtor's marketing process, the Debtor plans to transition those parties that submitted non-binding indications of interest to firm, binding and qualified bids and to participate in an auction that will maximize the value of the Debtor's assets.  The following key dates apply:

- Bid Deadline – February 28, 2020, at 4:00 p.m. (prevailing Eastern Time);

- Auction - March 3, 2020, at 10:00 a.m. (prevailing Eastern Time); and

- Sale Hearing – March 11, 2020, at 11:00 a.m. (prevailing Eastern Time).

Consistent with its fiduciary duty to maximize value for the benefit of all stakeholders, the Debtor reserves all rights to amend the Plan, as necessary, to incorporate the terms of any transaction proposed in connection with the marketing process, and, to the extent permitted by law, seek confirmation of any such amended Plan without resoliciting votes on such amended Plan.

## C.    Approval of the DIP Facility

Based on the Debtor's need for debtor-in-possession financing and its conclusion that the DIP Facility represents the best terms available, on the Petition Date, the Debtor filed a motion seeking authorization to enter into the DIP Facility on an interim and final basis (the "**DIP Motion**"). On October 11, 2019, the Bankruptcy Court approved the DIP Motion on an interim basis. [Docket No. 22] On October 30, 2019, the Bankruptcy Court approved the DIP Motion on a final basis. [Docket No. 62] The final order approving the DIP Motion included changes from the interim order approving the DIP Motion.

## D.    Schedules and Statements

On the Petition Date, the Debtor filed its *Motion For Entry of an Order (I) Extending Time to File Schedule of Assets and Liabilities and Statement of Financial Affairs, and (II) Granting Related Relief* (the "**Schedule Extension Motion**").

On October 10, 2019, the Bankruptcy Court approved the Schedule Extension Motion. On November 4, 2019, the Debtor filed its Schedule of Assets and Liabilities and Statement of Financial Affairs.

## E.    General Litigation Matters

In the ordinary course of business, the Debtor is a party to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of its business operations. The Debtor cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

48036/0050-19728718v2

The filing of the Chapter 11 Case operates as a stay with respect to the commencement or continuation of litigation against the Debtor that was or could have been commenced before the commencement of the Chapter 11 Case. In addition, the Debtor's liability with respect to litigation stayed by the commencement of the Chapter 11 Case generally is subject to discharge, settlement, and release upon confirmation of a plan under Chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtor may be subject to discharge in connection with the Chapter 11 Case.

## F.    Litigation with the Port Authority and Tutor Perini in the Chapter 11 Case

On January 3, 2020, Tutor Perini filed a motion to standing to pursue certain purported estate causes of action against the Lenders [Docket No. 117] (the "**Standing Motion**").  Among other asserted claims, Tutor Perini contended the Lenders' claims were subordinate to the payment of Tutor Perini's claim under the Construction Contract by virtue of an interest subordination provision at Section 14A.10 of the Ground Lease.  The Debtor, the Senior Lenders, and other parties filed objections to the Standing Motion.  The Court held a hearing on January 23, 2020 at which time it denied the Standing Motion.

On December 13, 2019, Tutor Perini filed a motion seeking to modify the automatic stay to allow the Arbitration to move forward on a "parallel track" with the Debtor's sale process [Docket No. 104] (the "**RFS Motion**").  Tutor Perini's RFS Motion is premised on its contention that its claim under the Construction Contract is entitled to "cure claim" status by virtue of Section 5.7 of the Ground Lease, and therefore, must be liquidated and paid as a prerequisite to the Debtor's ability to complete the Sale.  The Debtor and the Senior Lenders filed objections to the RFS Motion.  The Port Authority filed a response to the Debtor's and Lenders' objections to the RFS Motion, as did Tutor Perini.  The Port Authority has asserted that it is entitled to a cure claim by virtue of Section 5.7 of the Ground Lease.  The Debtor and Senior Lenders vehemently dispute the Port Authority and Tutor Perini's assertions.

On January 28, 2020, the parties agreed to and the Court entered that certain *Stipulated Order Regarding Adjudication of "Cure" and Indemnification Disputes* [Docket No. 165], which, among other things, agreed to following as it relates to the ongoing cure and indemnification disputes (collectively, the "**Disputes**"):

- ▪ The parties shall file opening briefs and any supplemental evidence to address the Disputes, with such briefs and supplemental evidence to be filed and served on February 10, 2020 at 4:00 p.m. (prevailing Eastern Time).

- ▪ The parties shall file responsive briefs and supplemental evidence to address the Disputes, with such briefs to be filed and served on February 20, 2020 at 12:00 p.m. (prevailing Eastern Time).

- ▪ The hearing on the Disputes shall be conducted on February 25, 2020 at 9:30 a.m. (prevailing Eastern Time).

- ▪ The RFS Motion shall be held in abeyance pending disposition of the Disputes.  The hearing on the RFS Motion is continued until February 25, 2020 at 9:30 a.m. (prevailing Eastern Time).

- The automatic stay, pursuant to 11 U.S.C. § 362(a), shall remain in effect pending the adjudication of the Stay Relief Motion, notwithstanding anything in 11 U.S.C. § 362(e) to the contrary.

## IX. <u>RISK FACTORS</u>

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtor's business or the Plan and its implementation.

### A.    **Bankruptcy Law Considerations**

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

1.    Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtor believes that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.    The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article XII of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place.

3.    The Debtor May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtor intends to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtor may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Interests as those proposed in the Plan.

4.    The Debtor May Not Be Able to Secure Confirmation of the Plan

43

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such Holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtor will be able to reorganize its business and what, if anything, Holders of Allowed Claims against them would ultimately receive on account of such Allowed Claims.

Confirmation of the Plan is also subject to certain conditions as described in Article XII of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive on account of such Allowed Claims.

The Debtor, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as is necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

5.      Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtor believes that the Plan satisfies these requirements, and the Debtor may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

44

6.      Continued Risk Upon Confirmation

Even if a chapter 11 plan of reorganization is consummated, the Debtor will continue to face a number of risks, including certain risks that are beyond their control, such as further industry deterioration or other changes in economic conditions and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtor's stated goals.

In addition, at the outset of the Chapter 11 Case, the Bankruptcy Code will give the Debtor the exclusive right to propose the Plan and will prohibit creditors and others from proposing a plan. The date, the Debtor has retained the exclusive right to propose the Plan. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtor's ability to achieve confirmation of the Plan in order to achieve the Debtor's stated goals.

Furthermore, even if the Debtor's debts are reduced and/or discharged through the Plan, the Debtor may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtor's business after the completion of the proceedings related to the Chapter 11 Case. Adequate funds may not be available when needed or may not be available on favorable terms.

7.      The Chapter 11 Case May Be Converted to a Case Under Chapter 7 of the
         Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtor believes that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

8.      The Debtor May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtor reserves the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

45

9.      Risk of Non-Occurrence of the Effective Date

Although the Debtor believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

10.     Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtor cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

11.     Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article XI of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases from any and all Causes of Action that may otherwise be asserted against the Debtor, Reorganized Debtor, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

**B.     Risks Related to Recoveries under the Plan**

With respect to Holders of Interests in the Reorganized Debtor, the Reorganized Debtor may not be able to achieve its projected financial results. The Financial Projections set forth in this Disclosure Statement represent the Debtor's best estimate of the Debtor's future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtor's operations, as well as the United States and world economies in general, and the real estate industry segment in which the Debtor operates in particular, and other matters, many of which are beyond the control of the Debtor and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date that the Disclosure Statement is approved by the Court may affect the actual financial results of the Debtor's operations. These variations may be material and may adversely affect the ability of the Debtor to make payments with respect to indebtedness following the Effective Date. Because the actual results achieved throughout the periods covered by the projections may vary from the projected results, the projections should not be relied upon

46

as an assurance of the actual results that will occur. Except with respect to the projections and except as otherwise specifically and expressly stated, the Disclosure Statement does not reflect any events that may occur subsequent to the date of the Disclosure Statement. Such events may have a material impact on the information contained in the Disclosure Statement. The Debtor does not intend to update the projections and, therefore, the projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the projections. If the Debtor does not achieve its projected financial results, (a) the value of the New GWB Interests may be negatively affected, (b) the Debtor may lack sufficient liquidity to continue operating as planned after the Effective Date, and (c) the Debtor may be unable to service its debt obligations as they come due. Moreover, the financial condition and results of operations of the Reorganized Debtor from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtor's historical financial statements.

## C.    Risks Related to the Debtor's and the Reorganized Debtor's Business

      1.    The Debtor May Not Be Able to Generate Sufficient Cash to Service All of its Indebtedness

The Debtor's ability to make scheduled payments on, or refinance its debt obligations depends on the Debtor's financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Debtor's control. The Debtor may be unable to maintain a level of cash flow from operating activities sufficient to permit the Debtor to pay the principal, premium, if any, and interest on its indebtedness.

      2.    The Debtor Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Case

For the duration of the Chapter 11 Case, the Debtor's ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the restructuring transactions specified in the Plan or an alternative restructuring transaction; (b) ability to obtain court approval with respect to motions filed in the Chapter 11 Case from time to time; (c) ability to maintain relationships with suppliers, service providers, vendors, and other third-parties; (d) ability to maintain contracts and leases that are critical to the Debtor's operations; (e) ability of third-parties to seek and obtain court approval to terminate contracts and other agreements with the Debtor; and (f) ability of third-parties to seek and obtain court approval to terminate or shorten the exclusivity period for the Debtor to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Case to a chapter 7 proceeding.

These risks and uncertainties could affect the Debtor's business and operations in various ways. For example, negative events associated with the Chapter 11 Case could adversely affect the Debtor's relationships with suppliers, service providers, and other third-parties, which in turn could adversely affect the Debtor's operations and financial condition. In addition, the Debtor will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course

of business, which may limit the Debtor's ability to respond promptly to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Case, the Debtor cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Case that may be inconsistent with the Debtor's plans.

      3.      Operating in Bankruptcy for a Long Period of Time May Harm the Debtor's Business

The Debtor's future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtor's business, financial condition, results of operations, and liquidity. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtor's business. Moreover, so long as the proceedings related to the Chapter 11 Case continue, the Debtor will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Case.

      4.      Financial Results May Be Volatile and May Not Reflect Historical Trends

During the Chapter 11 Case, the Debtor expects that its financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtor's consolidated financial statements. As a result, the Debtor's historical financial performance likely will not be indicative of its financial performance after the Petition Date.

In addition, if the Debtor emerges from Chapter 11, the amounts reported in subsequent financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtor's operating plans pursuant to a plan of reorganization.

      5.      The Reorganized Debtor May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Case

The Debtor is currently subject to or interested in certain legal proceedings, some of which may adversely affect the Debtor. In the future, the Reorganized Debtor may become party to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtor's financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtor may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtor's business and financial stability, however, could be material.

      6.      Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtor's Financial Condition and Results of Operations

48036/0050-19728718v2

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtor's filing a petition for reorganization under the Bankruptcy Code or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized Entities and may have an adverse effect on the Reorganized Debtor's financial condition and results of operations on a post-reorganization basis.

## X. <u>SOLICITATION AND VOTING PROCEDURES</u>

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **<u>Exhibit C</u>**.

**The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.**

> **<u>THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY</u>.**
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.    Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims and interests against a debtor are entitled to vote on a chapter 11 plan. The table in Article IV.C of this Disclosure Statement provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtor is soliciting votes to accept or reject the Plan only from Holders of Claims in Classes 2, 3, 4, 5 and 6 (the "**Voting Classes**"). The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtor is **_not_** soliciting votes from Holders of Claims and Interests in Classes 1 and 7. Additionally, the Disclosure Statement Order provides that certain Holders of Claims in the Voting Classes, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan. The solicitation and voting procedures provide for the resolution of disputed claims for voting purposes, including by

49

creditors who obtain entry of an order temporarily allowing their claims for voting purposes pursuant to Bankruptcy Rule 3018(a).

**B.      Voting Record Date**

**The Voting Record Date is [    ], 2020**. The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

**C.      Voting on the Plan**

**The Voting Deadline is [    ], 2020, at 5:00 p.m**. prevailing Eastern Time; provided, that the Voting Deadline with respect to an Executory Contract or Unexpired Lease that is included on a Schedule of Assumed Executory Contracts and Unexpired Leases filed in advance of _____, 2020, but is added to the Schedule of Rejected Executory Contracts and Unexpired Leases after _____, 2020, shall be _____, 2020. In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered in accordance with the instructions on your ballot so that the ballots are **actually received** by the Debtor's voting and claims agent (the "**Voting and Claims Agent**") on or before the Voting Deadline.

**D.      Ballots Not Counted**

**No ballot will be counted toward Confirmation if, among other thing**s: (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by facsimile, email, or other electronic means not specifically approved pursuant to the Disclosure Statement Order; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtor's schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtor but not Filed; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT COLE SCHOTZ P.C. ATTN: RYAN T. JARECK, ESQ. AT (201) 489-3000.**
**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

---

48036/0050-19728718v2

# XI. <u>CONFIRMATION OF THE PLAN</u>

## A.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims and Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtor believes that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11; (2) the Debtor has complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

## B.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtor was liquidated under chapter 7.

Attached hereto as **<u>Exhibit B</u>** and incorporated herein by reference is a liquidation analysis (the "**Liquidation Analysis**") prepared by the Debtor.  As reflected in the Liquidation Analysis, the Debtor believes that liquidation of the Debtor's business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims as compared to distributions contemplated under the Plan. Consequently, the Debtor believes that Confirmation of the Plan will provide a substantially greater return to Holders of Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

## C.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

The Debtor will demonstrate at the Confirmation Hearing that it will be a viable operation following its emergence from chapter 11 and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

## D.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the

plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by Holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

## E.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtor reserves the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtor will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtor reserves the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

1.    No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

2.    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtor submits that if a "cramdown" Plan is necessary pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. The Debtor believes that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## F.    Valuation of the Debtor

Any valuation of any of the assets to be distributed under the Plan is necessarily speculative, and the value will be based upon the Debtor's continued marketing process. Accordingly, the ultimate value, if any, of these assets could materially affect, among other things, recoveries to the Debtor's creditors, including holders of Claims in the Voting Classes.

The Debtor believes the value determined by the successful consummation of the Plan Investment Restructuring or the Asset Sale Restructuring will be a reasonable measure of the Debtor's value in light of, among other things, (1) the robust and exhaustive nature of the marketing process, and (2) the active bidding that took place during the marketing process.

## XII. <u>CERTAIN SECURITIES LAW MATTERS</u>

The issuance of, and the distribution under, the Plan of the New GWB Interests will be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.

## A.    Section 1145 of the Bankruptcy Code Exemption and Subsequent Transfers

Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied: (a) the securities must be issued "under a plan" of reorganization by the debtor or its successor or by an affiliate participating in a joint plan of reorganization with the debtor; (b) the recipients of the securities must hold a claim against, an interest in, or a claim for administrative expenses in the case concerning the debtor or such affiliate; and (c) the securities must be issued in exchange for the recipient's claim against or interest in the debtor, or such affiliate, or "principally" in such exchange and "partly" for cash or property. In reliance upon this exemption, the Debtor believes that the offer and sale, under the Plan, of the New GWB Interests will be exempt from registration under the Securities Act and state securities laws with respect to any Holder of Allowed Claims who is not deemed to be an "underwriter" as defined in Section 1145(b) of the Bankruptcy Code.

In addition, the Debtor will seek to obtain, as part of the Confirmation Order, a provision confirming such exemption. Accordingly, subject to compliance with the New Organizational Documents and the New Operating Agreement, such securities generally may be resold: (a) without registration under the Securities Act or other federal securities laws pursuant to an exemption provided by Section 4(a)(1) of the Securities Act, unless the Holder is an "underwriter" (see discussion below) with respect to such securities, as that term is defined under the Bankruptcy Code, and (b) without registration under state securities or Blue Sky laws

pursuant to various exemptions provided by the respective laws of the several states. However, recipients of securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirement or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "**underwriter**" as one who, except with respect to ordinary trading transactions, (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

"**Control**," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. The legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of voting securities of a reorganized debtor may be presumed to be a "**controlling person**" and, therefore, an underwriter.

To the extent that persons deemed to be "underwriters" receive New GWB Interests pursuant to the Plan, resales by such persons would not be exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such persons would not be permitted to resell such Plan Securities, unless such securities were registered under the Securities Act or an exemption from such registration requirements were available. Entities deemed to be statutory underwriters for purposes of Section 1145 of the Bankruptcy Code may, however, be able, at a future time and under certain conditions, to sell securities without registration pursuant to the resale provisions of Rule 144 under the Securities Act or another available exemption under the Securities Act.

The issuer of the New GWB Interests will not be required to file periodic reports under the Securities Exchange Act or seek to list the New GWB Interests for trading on a national securities exchange. Consequently, there may not be "current public information" (as such term is defined in Rule 144) regarding the issuer of the New GWB Interests.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New GWB Interests to be issued pursuant to the Plan or an "affiliate" of the issuer of the New GWB Interests would depend upon various facts and circumstances applicable to that person. Accordingly, we express no view as to whether any such person would be such an "underwriter" or "affiliate."

PERSONS WHO RECEIVE NEW GWB INTERESTS UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS. THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR

48036/0050-19728718v2

INFORMATIONAL PURPOSES. THE DEBTOR MAKES NO REPRESENTATIONS CONCERNING, AND DOES NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE NEW GWB INTERESTS OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, THE DEBTOR ENCOURAGES EACH PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE NEW GWB INTERESTS.

## XIII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a summary of certain U.S. federal income tax consequences of the Plan. Except where noted, this summary deals only with Holders of Interests that hold such Interests as capital assets. This summary does not represent a detailed description of the U.S. federal income tax consequences applicable under all circumstances. The tax consequences of the Plan are complex, and the tax treatment of certain aspects of the Plan may be subject to considerable uncertainty. You should consult your own tax advisors as to the particular U.S. federal income tax consequences to you of the Plan, as well as the consequences to you arising under other U.S. federal tax laws and the laws of any other taxing jurisdiction. This summary does not represent a detailed description of the U.S. federal income tax consequences applicable to you if you are subject to special treatment under the U.S. federal income tax laws, including if you are:

- A dealer in securities or currencies;
- A financial institution;
- A regulated investment company;
- A real estate investment trust;
- An insurance company;
- A tax-exempt organization;
- A person holding Interests as part of a hedging, integrated or conversion transaction, a constructive sale or a straddle;
- A trader in securities that has elected the mark-to-market method of accounting for its securities;
- A person required to accelerate the recognition of any item of gross income with respect to the Interests as a result of such income being recognized on an applicable financial statement;
- A person liable for the alternative minimum tax;
- A partnership or other pass-through entity for U.S. federal income tax purposes; or
- A U.S. Holder (as defined below) whose "functional currency" is not the U.S. dollar.

55

As used herein, the term "**U.S. Holder**" means a beneficial owner of Interests that is for U.S. federal income tax purposes:

- An individual citizen or resident of the United States;

- A corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- An estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- A trust if it (1) is subject to the primary supervision of a court within the United States and one or more United States persons have the authority to control all substantial decisions of the trust or (2) has a valid election in effect under applicable U.S. Treasury Regulations to be treated as a United States person.

The term "**non-U.S. Holder**" means a beneficial owner of Interests (other than a partnership or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) that is not a U.S. Holder. If a partnership holds Interests, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. If you are a partner of a partnership holding an Interest, you should consult your tax advisors. This summary assumes that the various debt and other arrangements to which the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form. This summary does not discuss tax consequences to Holders of Interests that act or receive consideration in a capacity other than as a Holder of Interests, and the tax consequences for such Holders may differ materially from that described below. The discussion below is based upon the provisions of the Internal Revenue Code of 1986, as amended (the "**Internal Revenue Code**"), and regulations, rulings and judicial decisions thereunder as of the date hereof, and such authorities may be replaced, revoked or modified, possibly with retroactive effect, so as to result in U.S. federal tax consequences different from those discussed below. Except as otherwise noted, this discussion is limited to U.S. Holders and does not address the consequences to non-U.S. Holders.

## Consequences to the Debtor and its Owners

The Debtor is a pass-through entity for U.S. federal income tax purposes, and any U.S. federal income tax consequences of the Plan will generally not be borne by the Debtor, but instead will be taken into account by the direct or indirect owners of the Debtor (each, a "**Pass-Through Owner**") immediately pursuant to the Plan. Direct and indirect owners of the Debtor should consult their own tax advisors regarding the consequences of the Plan to them as a result of their ownership of the Debtor. In general, absent an applicable exception, a Pass-Through Owner will realize and recognize cancellation of debt income ("**COD Income**") upon satisfaction of the outstanding indebtedness of the Debtor for total consideration less than the adjusted issue price of such indebtedness. The amount of COD Income recognized by a Pass-Through Owner, in general, is such Pass-Through Owner's distributive share (generally determined in accordance with the existing limited liability company agreement of each Debtor

56

and applicable law) of the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of cash paid, and (y) the fair market value of any other consideration given in satisfaction of such indebtedness at the time of the exchange.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY U.S. FEDERAL, STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

48036/0050-19728718v2

## XIV. <u>RECOMMENDATION</u>

In the opinion of the Debtor, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtor's creditors than would otherwise result in any other scenario. Accordingly, the Debtor recommends that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  February 10, 2020   Respectfully Submitted,
   New York, New York

       GEORGE WASHINGTON BRIDGE BUS
       STATION DEVELOPMENT VENTURE LLC

       By:_____
       Name:  Bernard A. Katz
       Title:   Manager

Dated:  February 10, 2020   **COLE SCHOTZ P.C.**
   New York, New York

       By:  _____
       Michael D. Sirota
       Warren A. Usatine
       Ryan T. Jareck
       Mark Tsukerman
       Rebecca W. Hollander
       1325 Avenue of the Americas, 19th Fl.
       New York, New York 10019
       Telephone: (212) 752-8000

       *Counsel to the Debtor and*
       *Debtor in Possession*

# **EXHIBIT A**

## **Plan of Reorganization**

# **EXHIBIT B**

## **Liquidation Analysis**

**<u>EXHIBIT C</u>**

**<u>Disclosure Statement Order</u>**