<u>**Exhibit A**</u>

**Stalking Horse Agreement**

**AGREEMENT OF PURCHASE AND SALE**

by and between

**GEORGE WASHINGTON BRIDGE BUS STATION DEVELOPMENT VENTURE LLC,
a Delaware limited liability company**

as Seller

and

**GWB MADISON PURCHASER LLC**, **a Delaware limited liability company**

as Purchaser

Date: March 25, 2021

## AGREEMENT OF PURCHASE AND SALE

**THIS AGREEMENT OF PURCHASE AND SALE** ("**Agreement**") is made as of the 25th day of March 2021 (the "**Effective Date**"), by and between **GEORGE WASHINGTON BRIDGE BUS STATION DEVELOPMENT VENTURE LLC**, a Delaware limited liability company ("**Seller**") and **GWB MADISON PURCHASER LLC**, a Delaware limited liability company ("**Purchaser**") (Seller and Purchaser are also collectively referred to in this Agreement as the "**Parties**" and individually referred to in this Agreement as a "**Party**").

### R E C I T A L S

A.    On October 7, 2019, Seller commenced a voluntary bankruptcy case by filing a petition for relief under chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").  The bankruptcy case is styled *In re George Washington Bridge Bus Station Development Venture LLC*, Case No. 19-13196-scc (the "**Bankruptcy Case**").  Seller has been operating its business and managing its property and affairs as a debtor in possession.

B.    Seller is the lessee under that certain ground lease described on <u>Exhibit A</u> attached hereto (as shall be amended pursuant to the express provisions of this Agreement, the "**Ground Lease**").

C.    Pursuant to the Ground Lease, The Port Authority of New York and New Jersey (the "**Port Authority**"), the lessor thereunder, has leased to Seller the Leased Premises (as such term is defined in the Ground Lease) (the "**Leased Premises**") located at certain real property more particularly described on <u>Exhibit B</u> and commonly known as the George Washington Bridge Bus Station located in the Borough of Manhattan, New York City.

D.    Purchaser desires to purchase, and Seller desires to sell, all of Seller's right, title and interest in and to the Ground Lease and substantially all of Seller's other assets as set forth in this Agreement (the "**Sale**"), on the terms and conditions set forth in this Agreement and pursuant to the terms of a confirmed chapter 11 plan of liquidation (a "**Plan**").

NOW, THEREFORE, in consideration of the mutual undertakings of the parties hereto, it is hereby agreed as follows:

1.    **PURCHASE AND SALE; ASSUMED CONTRACTS**

(a)    <u>Purchased Assets</u>.  Upon the terms and conditions hereinafter set forth, Seller shall sell to Purchaser, and Purchaser shall purchase from Seller for the consideration set forth in <u>Section 2</u> of this Agreement, the following (collectively, the "**Assets**"): (i) the Property (as hereinafter defined); (ii) all of Seller's right, title and interest in, to and under those contracts relating to the operation, maintenance and/or management of the Property set forth on <u>Schedule 1</u> attached hereto and incorporated herein by reference (the "**Assumed Contracts**"); (iii) all claims or causes of action available to Seller (collectively, the "**Preserved Causes of Action**"), including, but not limited to, under chapter 5 of the Bankruptcy Code (including sections 544, 545, 547, 548, 549, 550 and 553) or any similar actions under any other applicable law (collectively, "**Avoidance Actions**"), including against any of the Subtenants (hereinafter

defined), counterparties to the Assumed Contracts and Seller's vendors, suppliers, customers or trade creditors with whom Purchaser continues to conduct business in regard to the Assets after the Closing (the "**Designated Parties**"); provided, however, that it is understood and agreed by the parties that (A) current or former directors, officers, members, shareholders, or principals of the Seller, including Affiliates (hereinafter defined) thereof (the "**Principals**") are not considered Designated Parties; (B) Purchaser will not pursue or cause to be pursued any Avoidance Actions against any of the Designated Parties other than as a defense (to the extent permitted under applicable law) against any claim or cause of action raised by such Designated Party; and (C) the right to collect unpaid rents of the Sellers' Subtenants was previously assigned to the Senior Secured Lender (as defined herein) and will be assigned by the Senior Secured Lender to Purchaser pursuant to the Second Lien Exit Facility (hereinafter defined); and (iv) all of Seller's right, title and interest in, to and under those certain subleases and other occupancy agreements set forth on Schedule 2 attached hereto and incorporated herein by reference (collectively, the "**Subleases**" and each a "**Sublease**"), pursuant to which Subleases certain third parties (collectively, the "**Subtenants**" and each a "**Subtenant**") have been granted rights to occupy a portion of the Leased Premises. As used herein, the term "**Affiliate**" shall mean any person, firm, corporation, association, organization, or unincorporated trade or business that, now or hereafter, directly or indirectly, controls, is controlled by, or is under common control with Seller or Purchaser, as applicable.

(b)     As used herein, the "**Property**" means all right, title and interest of Seller in and to: (i) the Ground Lease and the leasehold estate of Seller thereunder in and to the Leased Premises; (ii) all improvements, structures and fixtures located upon the Leased Premises (collectively, the "**Improvements**"; which, together with the Leased Premises, shall be herein referred to as the "**Real Property**"), which Improvements shall be conveyed to Purchaser by virtue of Purchaser's assumption of the Ground Lease as set forth in this Agreement; (iii) all equipment, machinery, and other items of tangible personal property of Seller located at the Leased Premises, including without limitation, those items forth on Schedule 6 attached hereto and incorporated herein by reference (collectively, the "**Tangible Personal Property**"); and (iv) all intangible personal property of Seller, including without limitation, those items set forth on Schedule 7 attached hereto and incorporated herein by reference (collectively, the "**Intangible Personal Property**" and, together with the Tangible Personal Property, collectively, the "**Personal Property**"), which Intangible Personal Property includes the Subtenant A/R (as hereinafter defined). On the Closing Date (as that term is defined in this Agreement), Seller shall cause to be conveyed to Purchaser title to the Ground Lease by an Assignment of Ground Lease (as that term is defined in this Agreement), title to the Personal Property and Assumed Contracts by Bill of Sale (as that term is defined in this Agreement) and title to the Subleases by Assignment of Subleases (as that term is defined in this Agreement).

(c)     Assumption, Assignment and Cure Amounts. The Plan shall provide for the assumption and assignment of the Ground Lease to Purchaser pursuant to section 365 and all other relevant provisions of the Bankruptcy Code. In addition, Purchaser (with the consent of the Senior Secured Lender (not to be unreasonably withheld) shall have the right (but not the obligation) to designate additional executory contracts and unexpired leases to be assumed by Seller and assigned to Purchaser pursuant to section 365 and all other relevant provisions of the Bankruptcy Code in Purchaser's sole and absolute discretion (the "**Designation Rights**"), and the Plan shall provide for such assumption and assignment, if any, as well. The Assumed

Contracts listed on Schedule 1 hereto and the Subleases listed on Schedule 2 hereto have been designated for assumption and assignment to Purchaser.

(d)     Purchaser reserves the right (i) through the occurrence of the Confirmation Date, to add any agreement to the Schedule of Assumed Contracts (as defined in the Plan), (ii) through the Closing Date, to remove any agreement from the Schedule of Assumed Contracts, or (iii) revise any Cure Amounts.  Notwithstanding the foregoing, if an outstanding dispute concerning a Cure Amount or other objection to assumption and assignment exists as of the Closing Date with respect to any contract or Sublease included on the Schedule of Assumed Contracts, then such contract or Sublease shall be deemed conditionally assumed and assigned to the Purchaser pending a resolution of such dispute that is satisfactory to the Purchaser.  If the dispute cannot be resolved to the satisfaction of the Purchaser, the Purchaser may remove (or direct the Seller or subsequent estate representative to remove) such contract or Sublease from the Schedule of Assumed Contracts, and in such case, such contract or Sublease shall be deemed rejected pursuant to the Plan.

(e)     Other than the Assets, all other assets of Seller, including without limitation to all cash, accounts receivable and bank deposits, are being retained by Seller and are not being sold to Purchaser under this Agreement (collectively, the "**Excluded Assets**").  Notwithstanding the foregoing, in no event shall the Excluded Assets include any accounts receivable owed by any one or more of the Subtenants (collectively, the "**Subtenant A/R**"), it being understood and agreed that a portion of the Closing Payment shall be attributable to Purchaser's acquisition of the Subtenant A/R from Seller and Senior Secured Lender.

## 2.     **PURCHASE PRICE AND OTHER CONSIDERATION**

(a)     The consideration for the Assets shall be (i) a sum calculated in accordance with this Section 2, not to exceed the Closing Payment Cap (hereinafter defined), payable by Purchaser in United States currency via wire transfer of immediately available funds at Closing (the "**Closing Payment**"), and (ii) the assumption of the Assumed Liabilities by Purchaser.  Prior to the Closing Date, Purchaser shall have the right to designate an allocation of the Closing Payment among the assets being transferred hereunder, provided that such allocation shall be subject to the approval of Seller (which approval shall not be unreasonably withheld, conditioned or delayed).  All allocations pursuant to this Section 2 shall be deemed made in conformance with Federal and State law, and Purchaser and Seller agree to file their respective tax returns and reports (federal, state and local) consistent therewith in all respects.

(b)     No later than three (3) Business Days following the Effective Date, Purchaser shall deposit into escrow with First American Title Insurance Company (in such capacity, the "**Escrow Agent**") a sum equal to One Million Two Hundred Fifty Thousand and 00/100 Dollars ($1,250,000.00) (the "**Deposit**").  Except as set forth in this Agreement, the Deposit shall be non-refundable to Purchaser but shall be applicable against the Closing Payment at Closing.  At Purchaser's election, Escrow Agent shall deposit the Deposit into an interest-bearing account acceptable to Purchaser.  The term "Deposit" shall be deemed to include all interest, if any, earned thereon while being held in escrow.  Purchaser and Seller hereby appoint Escrow Agent to act as the escrow agent for the transaction contemplated by this Agreement and to hold the Deposit in escrow subject to the terms of this Agreement.

(c)    The Closing Payment shall be funded through the proceeds of a loan to Purchaser that is secured by a first priority mortgage on the Property in an amount not less than the Closing Payment (as adjusted for the prorations, credits and adjustments contemplated by this Agreement) on substantially the terms outlined on Exhibit H hereto (the "**First Lien Exit Facility**") and, subject to the Closing Payment Cap, shall be comprised of amounts necessary to satisfy in full the following items pursuant to the terms of the Plan: (i) to repay the postpetition financing facility provided by JMB Capital Partners Lending, LLC in the aggregate principal amount of up to Eighteen Million and 00/100 Dollars ($18,000,000.00) plus all accrued and unpaid interest, fees, and other amounts payable thereon; (ii) to pay in full all statutory U.S. Trustee fees and all allowed administrative expense, priority, and other secured claims incurred in the Bankruptcy Case, based upon Seller's reasonable good faith estimate of administrative expense, priority, and other claims as of Closing; (iii) to pay in full all final Cure Amounts; (iv) to pay in full all required fees and expenses incurred by Seller in connection with the transactions contemplated hereby (including, but not limited to, the fee payable to the Broker (hereinafter defined) pursuant to the Brokerage Agreement (hereinafter defined) and any transfer taxes or mortgage recording taxes); and (v) to fund the wind-down of Seller's bankruptcy estate pursuant to the Plan and in accordance with a mutually acceptable wind-down budget.

(d)    Not later than three (3) Business Days before the Closing Date, Seller shall deliver to Purchaser a calculation of the Closing Payment, a final statement of outstanding administrative expense, priority, and other secured claims, a maximum amount for allowed professional fees and an agreed upon wind-down budget for the Bankruptcy Case; provided, however, in no event shall the amount of the final Closing Payment exceed Thirty Million Dollars ($30,000,000) (the "**Closing Payment Cap**").   Following Seller's delivery of the foregoing, the Parties shall work in good faith to agree upon the amount of the Closing Payment prior to Closing.  Once the amount of the Closing Payment has been agreed upon, Purchaser and Seller shall execute an amendment to this Agreement confirming the agreed-upon amount of such Closing Payment.  Notwithstanding anything contained herein, subject to the Closing Payment Cap, the Closing Payment shall include the amount of Subtenant A/R on Schedule 10 (the "**A/R Schedule**"), which A/R Schedule shall be updated and delivered to Purchaser with Seller's calculation of the Closing Payment pursuant to this Section 2(d) in order to account for any additional Subtenant A/R that exists on the Closing Date.

3.    **SALE FREE AND CLEAR; ASSUMED LIABILITIES; TITLE AND SURVEY REVIEW; THIRD PARTY REPORTS**

(a)    Sale free and clear.  Except for the Assumed Liabilities (defined below), and subject to Section 3(c) below, Purchaser is not assuming any pre-petition or post-petition debt, obligation or liability of Seller of any kind or nature whatsoever, and the Sale shall be free and clear of all liens, claims, encumbrances and interests, including without limitation, all general unsecured claims filed against Seller's bankruptcy estate, to the fullest extent permitted by sections 363(f), 1141(c), and all other relevant provisions of the Bankruptcy Code and the terms of the Plan.

(b)    Assumed Liabilities.  On the terms and subject to the conditions and limitations set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely perform and discharge in accordance with their respective terms, only the

following liabilities of Seller existing as of the Closing Date and no others (collectively, the
"**Assumed Liabilities**"): (i) the payment of all Cure Amounts, which shall be satisfied by Seller
using the proceeds of the Closing Payment; (ii) all liabilities of Seller under the Ground Lease,
the Assumed Contracts and the assumed Subleases, in each case solely to the extent first arising
after the Closing Date; (iii) all liabilities and obligations of Seller under the Second Lien Exit
Facility (as hereinafter defined), other than any liabilities or obligations arising under the Second
Lien Exit Facility as a result of any defaults that occurred prior to the Closing Date; and (iv) all
other liabilities of Seller that the express provisions of this Agreement state that Purchaser will
have assumed from and after Closing.  Purchaser shall not receive any additional consideration,
and no adjustment to the Closing Payment shall be made, for the assumption of the
aforementioned liabilities of Seller.

(c)     Title.  Purchaser has received and reviewed that certain Certificate of Title, Title
No. 3020-1053658 (the "**Title Commitment**") having an effective date of February 12, 2021,
prepared by First American Title Insurance Company (the "**Title Insurer**"), with respect to an
ALTA leasehold policy of title insurance to be issued by Title Insurer in favor of Purchaser at
Closing (the "**Title Policy**").  At Closing, Seller shall convey and assign to Purchaser, the
Property, free and clear of all liens, claims, encumbrances, interests, mortgages, deeds of trust,
leases, ground leases, judgments, mechanics' liens or other monetary encumbrances
(collectively, "**Liens and Encumbrances**") pursuant to sections 363(f) and 1141(c) and other
applicable provisions of the Bankruptcy Code, except for those Liens and Encumbrances under
the Second Lien Exit Facility and any other Liens and Encumbrances, if any, that Purchaser has
approved in writing before the Closing Date (collectively, the "**Permitted Exceptions**").
Purchaser shall have the right, but not the obligation, to obtain an ALTA/NSPS survey of the
Property ("**Survey**") and other Third Party Reports (hereinafter defined), at Purchaser's sole cost
and expense.

(d)     Objections; Third Party Reports.  Notwithstanding anything to the contrary
contained in this Agreement, and except for Seller's efforts to obtain the Confirmation Order (as
hereinafter defined) or as provided in this Section 3(d), Seller shall have no affirmative
obligation hereunder to expend any funds or incur any liabilities in order to cause any title
exceptions to be removed from any Title Commitment or insured over by Title Insurer.  If
Purchaser receives a draft of a Survey, Phase I ESA, zoning report or property condition
assessment (each a "**Third Party Report**" and, collectively, the "**Third Party Reports**") after
the Effective Date but before April 16, 2021 (the "**TPR Deadline**"), then Purchaser shall have
the right to object in writing to any matters that materially and adversely affect the use,
ownership or operation of the Property appearing on or issues raised by such Third Party Report
(any such objection, a "**TPR Objection**"); provided, however, that Purchaser may not object to
any matters contained in any Third Party Report received by Purchaser prior to the Effective
Date, and any such TPR Objection must be made by Purchaser within five (5) Business Days
after Purchaser has received the applicable Third Party Report, or else such TPR Objection shall
be deemed waived by Purchaser.  If any TPR Objection is delivered to Seller by Purchaser, then
Seller shall have three (3) Business Days after receipt of such TPR Objection to give Purchaser
written notice ("**Seller's Response**") stating whether: (i) Seller elects to cure and/or cause the
Title Insurer to remove such TPR Objection from the Title Policy before Closing; or (ii) Seller
elects not to cause such TPR Objection to be cured or removed.  If Seller makes an election
pursuant to clause (i) of this Section, then Seller shall be obligated to cure or cause the Title

Insurer to remove such TPR Objection to Purchaser's reasonable satisfaction prior to Closing.  If Seller fails to give such Seller's Response to Purchaser within said three (3) Business Day period, then Seller shall be deemed to have delivered a Seller's Response electing the option under clause (ii) of this Section and not to cure or remove such TPR Objection.  If Seller elects (or is deemed to have elected) not to remove or cure such TPR Objection, then Purchaser shall, by not later than the earlier of two (2) Business Days after delivery (or deemed delivery) of Seller's Response or the Closing Date, either (x) waive such TPR Objection and proceed with the Closing, or (y) terminate this Agreement by written notice to Seller, in which event a failure of a Purchaser Condition Precedent (hereinafter defined) shall be deemed to have occurred. Purchaser's failure to deliver written notice of termination to Seller within the time period set forth above will be deemed to be a waiver of the TPR Objection pursuant to clause (x) of this Section and Purchaser's election to proceed with the Closing.  Notwithstanding the foregoing, should any matters that materially and adversely affect the use, ownership or operation of the Property be first disclosed in any update to any Title Commitment received after the TPR Deadline as a result of the Ground Lease Amendment (such matters, the "**New TPR Matters**"), Purchaser's obligation to purchase the Property shall be conditioned upon its approval of such New TPR Matters, which approval shall be at Purchaser's sole discretion.

(e)    From time-to-time prior to the Closing Date during normal hours and upon reasonable prior written notice to Seller, Seller agrees to grant Purchaser's consultants, inspectors, agents and contractors access to inspect, survey and obtain any Third Party Reports. Purchaser, at its sole cost, shall pay for all Third Party Reports.  At no time will any contractors, surveyors or consultants with access to the Real Property unreasonably disturb any occupants of the Real Property.  Before entry, Purchaser shall furnish to Seller a Certificate of Insurance, acceptable to Seller in its reasonable discretion, evidencing the fact that Purchaser maintains commercial general liability insurance with a reputable insurer authorized to do business in New York, or otherwise reasonably approved in writing by Seller, against claims for bodily injury, death and property damage in a single limit amount of not less than Three Million Dollars ($3,000,000.00) with respect to all claims for bodily injury or death and Five Million Dollars ($5,000,000.00) in the aggregate with respect to all claims for property damage, naming Seller as an additional insured.  Inspections by Purchaser shall not unreasonably interfere with Seller's operation of the Real Property.  If any inspection or test damages the Real Property, Purchaser will restore the Real Property to substantially the same condition as existed before the inspection or test.  Purchaser shall defend, indemnify Seller and hold Seller, Seller's trustees, managers, officers, tenants, agents, contractors and employees (collectively, the "**Seller Parties**") harmless from and against any and all losses, costs, damages, claims, or liabilities, including but not limited to, mechanics' and materialmens' liens and Seller's reasonable attorneys' fees, in each case to the extent arising out of Purchaser's, or its agents', contractors', employees', or invitees' entry upon the Real Property.  The license to access the Real Property shall be deemed revoked upon termination of this Agreement.  The provisions of this <u>Section 3</u> shall survive the Closing or the earlier termination of this Agreement.

4.    **PRORATIONS AND EXPENSES**

(a)    The following prorations, except as specifically set forth in this Agreement to the contrary, shall be made as of 12:01 a.m. on the Closing Date ("**Proration Date**"), it being agreed

between the Parties that the Closing Date shall be an income and expense day for Purchaser, and shall be applied to reduce or increase the balance of the Closing Payment, as applicable:

(i)     Taxes. All general real estate taxes and other similar items (including, without limitation, special and other assessments) with respect to the Real Property not due and payable as of the Closing Date, shall be prorated as of the Closing Date based on the most recent ascertainable tax information for tax parcel numbers that are attributable to the Real Property. All prorations shall be final. Any general real estate taxes and other similar items and any installments of special or other assessments affecting the Real Property which are due and payable for the period prior to the Closing Date shall be paid by Seller at Closing with the proceeds of the Closing Payment, and any general real estate taxes and other similar items and any installments of special or other assessments affecting the Real Property which are due and payable for the period subsequent to the Closing Date shall be paid by Purchaser. The term "general real estate taxes" as used in this Section 4(a)(i) includes general assessments, including, without limitation, any payments in lieu of taxes in connection with the Real Property pursuant to any governmental abatement or exemption program, and any regular annual assessments payable to any property owners association.  Notwithstanding the foregoing or anything to the contrary in this Agreement, to the extent that no general real estate taxes are owed pursuant to the Ground Lease, there shall be no proration of general real estate taxes at Closing.

(ii)     REA Obligations. All payments and charges due and payable by Seller under any reciprocal easement agreements encumbering the Real Property (collectively, the "**REAs**").

(iii)     Ground Rents.  All base rents, percentage rents, additional rent and any other sums due from Seller under the Ground Lease (collectively, "**Ground Rents**"). Seller shall be responsible for all Ground Rents attributable to the period prior to the Closing Date. Purchaser shall be responsible for all Ground Rents attributable to the period from and after the Closing Date.

(iv)     Retail Rents.  All base rents, percentage rents, additional rent and any tax and operating expense reimbursements and escalations due from the Subtenants under the Subleases (collectively, "**Retail Rents**"), to the extent collected from the Subtenants prior to Closing.  From and after Closing, Purchaser shall have the exclusive right to collect Retail Rents under the Subleases and Seller shall have no right to pursue claims against any Subtenants.  The terms of the immediately preceding sentence shall survive the Closing Date and not be merged therein.

(v)     Retail Pass-Throughs.  Utilities, water and sewer charges and other expenses attributable to Seller's operation of the Property (collectively, "**Operating Expenses**"). Seller shall be responsible for all Operating Expenses attributable to the period prior to the Closing Date.  Purchaser shall be responsible for all Operating Expenses attributable to the period from and after the Closing Date.  All Operating Expenses paid or payable by Subtenants in accordance with the Subleases shall be allocated between Seller and Purchaser, with Seller responsible for periods prior to the Closing Date and Purchaser responsible for all periods from and following the Closing Date.  Meters for all public utilities (including water) being used on the Property shall be ordered read by Seller on the day of giving possession to Purchaser.  To the

extent that the amount of actual consumption of any utility services is not determined prior to the Closing Date, a proration shall be made at Closing based on the last available reading. Not later than ten (10) Business Days prior to Closing, Seller shall deliver to Purchaser a reconciliation statement of the Operating Expenses for the Property for the portion of the calendar year in which the Closing occurs that the Property was owned by Seller. Seller's reconciliation statement shall include tenant invoice calculations and reasonable Operating Expense invoice back-up, together with documentation as to the amounts actually collected by Seller from the Subtenants with respect to such Operating Expenses. Seller and Purchaser shall use commercially reasonable efforts to agree upon such reconciliation statement at or prior to Closing. Purchaser shall be solely responsible for performing any Operating Expense reconciliations with Subtenants under the Subleases with respect to the calendar year in which Closing occurs and subsequent years, and Seller shall have no right to perform any such reconciliations.

(vi)    Any other items of income or expense, the credit or proration of which are necessary to fairly allocate the benefits and burdens of ownership of the Real Property, shall be prorated at the Closing. All prorations shall be final.

(b)    Security Deposits. A list of all security deposits from the Subtenants under the Subleases as of the Effective Date ("**Security Deposits**") is attached as Schedule 3 hereto and incorporated herein by reference. At Closing, all Security Deposits shall be credited to Purchaser as a credit against the Closing Payment, and Seller shall otherwise retain any such Security Deposits. Any Security Deposits held by Seller in the form of letters of credit shall be transferred to Purchaser and/or re-issued naming Purchaser as beneficiary thereof at Closing, and any costs associated with such transfer and/or re-issuance shall be paid by Seller.

(c)    Leasing Incentives. A list of all unpaid leasing commissions, tenant improvement allowances and landlord work (each a "**Leasing Incentive**" and, collectively, the "**Leasing Incentives**") as of the Effective Date with respect to any Subleases is attached as Schedule 4 hereto and incorporated herein by reference. At Closing, Purchaser shall receive a credit against the Closing Payment in the amount of any unpaid Leasing Incentives and assume the obligation for the payment of such amounts as were credited to Purchaser. Except as set forth in the immediately preceding sentence, Purchaser shall have no liability for any Leasing Incentives.

(d)    At Closing, Purchaser shall pay: (i) the fee of the Escrow Agent (as defined in Section 7 of this Agreement); (ii) the cost of obtaining Third Party Reports, if any; (iii) the cost of any updated Title Commitment and any related title searches and exam fees, investigations and tests; (iv) leasehold title policies and the cost of any endorsements to such title policies; and (v) any and all recording charges, if any. The Parties shall each be solely responsible for the fees and disbursements of their respective counsel and other professional advisors.

5.    **BANKRUPTCY MATTERS; CONDITIONS TO CLOSING; COVENANTS PENDING CLOSING**

(a)    Bankruptcy Matters.

(i)    Breakup Payments.  If Seller's sale process generates an all cash bid of at least Fifty Million and 00/100 Dollars ($50,000,000.00) (such bid, an "**Alternative Bid**"), then Seller shall have the right to pursue such Alternative Bid; provided, however, that if Seller closes on such Alternative Bid, then the Deposit shall be promptly refunded to Purchaser and Seller shall pay the following sum to Purchaser as a breakup fee and expense reimbursement (collectively, the "**Breakup Payments**"): (a) all of Purchaser's costs and expenses in connection with the transactions contemplated by this Agreement, up to a maximum amount of Four Hundred Thousand and 00/100 Dollars ($400,000.00) (the "**Expense Reimbursement**"); plus (b) Six Hundred Thousand and 00/100 Dollars ($600,000.00) (the "**Breakup Fee**").  For the avoidance of doubt, notwithstanding anything to the contrary herein, the Breakup Payments shall be deemed administrative claims in the Bankruptcy Case and, if payable pursuant to this Section 5(a)(i), shall be paid from the first dollars of the sale proceeds generated by the closing of such Alternative Bid.

(ii)    Seller shall file an expedited motion seeking approval of the Bankruptcy Court of the Breakup Payments as soon as practicable following the Effective Date, but in no event later than two (2) Business Days after the Effective Date.  If no objection to such motion is filed and served on Seller by 4:00 p.m. (prevailing Eastern Time), three (3) Business Days following service of such motion, Seller shall file a certificate of no objection with the Bankruptcy Court and a proposed form of order approving Seller's selection of the stalking horse bidder and the Bid Protections.  If an objection is timely filed and served, Seller will request an expedited hearing to consider approval of this Agreement and the Bid Protections.  Any order approving the Bid Protections (the "**Bid Protections Order**") must be in form and substance reasonably acceptable to Purchaser, and shall provide, among other things: (1) that it is enforceable immediately upon entry; (2) that Purchaser may rely on the same for purposes of providing the Deposit as contemplated by this Agreement; (3) that the Breakup Payments are granted administrative expense priority status; and (4) that the amount of such Breakup Payments shall be paid from the first dollars of the sale proceeds of any sale that closes pursuant to an Alternative Bid, if such Breakup Payments have not been paid sooner.

(iii)    Plan Documents.  Purchaser shall have the right to review and provide comments to the Plan, any disclosure statement (the "**Disclosure Statement**"), the proposed form of order confirming the Plan and approving the Sale on the terms set forth herein (the "**Confirmation Order**"), and all related motions, notices and other substantive filings in advance of their filing (the "**Plan Documents**").  The Plan Documents shall not contain any provision that is in conflict with the terms of this Agreement or that would otherwise limit the Purchaser's rights or remedies under this Agreement and, with respect to those aspects of the Plan Documents that are applicable to the Sale transaction contemplated herein, must otherwise be in form and substance acceptable to Purchaser.  The Plan Documents must be filed, and the necessary orders must be obtained, in accordance with the following milestones (the "**Plan Milestones**"):

a.    Subject to the availability of the Bankruptcy Court, an order of the Bankruptcy Court approving the Disclosure Statement and

procedures for solicitation of votes on the Plan shall be entered by no later than April 27, 2021; and

b.    Subject to the availability of the Bankruptcy Court, an order of the Bankruptcy Court confirming the Plan shall be entered by no later than June 4, 2021.

(b)    <u>Seller Conditions Precedent</u>.    In addition to any other conditions and/or contingencies set forth in this Agreement, Seller's obligation to close on Purchaser's purchase of the Property is subject to each and all of the following conditions precedent (collectively, together with such other conditions and/or contingencies set forth in this Agreement, the "**<u>Seller Conditions Precedent</u>**" and each a "**<u>Seller Condition Precedent</u>**"):

(i)    All of Purchaser's representations and warranties contained in this Agreement shall be true and correct as of the Closing in all material respects; provided however Seller shall, promptly upon becoming aware of same, advise Purchaser if it believes that any of Purchaser's representations and warranties contained in this Agreement are not true and correct in any material respects, and Purchaser shall thereupon have fifteen (15) Business Days to cure any purported breach of its representations and warranties;

(ii)    All obligations of Purchaser that were to have been performed on or before the Closing Date have been timely and duly performed;

(iii)    Entry by the Bankruptcy Court of the Confirmation Order, which remains in full force and effect and has not been stayed at the time of the Closing;

(iv)    GWB Madison A LLC, a Delaware limited liability company (the "**First Lien Exit Lender**") shall have, simultaneously with the Closing, closed and funded the First Lien Exit Facility in the amount of the Closing Payment, which First Lien Exit Facility shall be substantially in accordance with the terms set forth on <u>Exhibit H</u>; and

(v)    Effective as of the Closing, George Washington Bridge Bus Station and Infrastructure Development Fund, LLC (the "**<u>Senior Secured Lender</u>**"), Seller and Purchaser shall have amended the loan evidenced by that certain Permanent Loan Agreement, dated as of July 20, 2011 (the "**Senior Secured Loan Agreement**"), that certain Promissory Note, dated as of July 20, 2011 and the other Senior Secured Loan Documents (as defined in the Plan) to be modified substantially in accordance with the terms set forth in <u>Exhibit H</u> in the principal amount of $72,000,000 (the "**Second Lien Exit Facility**") and such Second Lien Exit Facility (as modified) shall have been assumed by Purchaser; and

(vi)    The effective date under the Plan shall have occurred simultaneously with the Closing.

If there is a failure of any of the Seller Conditions Precedent set forth above by the Closing Date, then Seller, as Seller's sole and exclusive remedy, shall have the right to terminate this Agreement upon written notice to Purchaser, whereupon this Agreement shall terminate and thereafter the Parties shall have no further obligations under this Agreement other than those that by their terms specifically survive termination of this Agreement.    Notwithstanding the

foregoing, in the event that this Agreement is terminated as a result of the failure of any of the Seller Conditions Precedent (other than pursuant to subsections (iii), (v) and (vi) above), the Deposit shall be paid to Seller within two (2) Business Days thereafter.  In the event this Agreement is terminated as a result of the failure of the Seller Condition Precedent set forth in subsection (iii), (v) or (vi) above, the Deposit shall be returned to Purchaser within two (2) Business Days thereafter.

(c)    Purchaser Conditions Precedent.    In addition to any other conditions and/or contingencies set forth in this Agreement, Purchaser's obligation to close the purchase of the Property is subject to each and all of the following conditions precedent (collectively, together with such other conditions and/or contingencies set forth in this Agreement, the "**Purchaser Conditions Precedent**" and each a "**Purchaser Condition Precedent**"):

(i)    All of Seller's representations contained in this Agreement shall be true and correct as of the Closing in all material respects; provided however Purchaser shall, promptly upon becoming aware of same, advise Seller if it believes that any of Seller's representations and warranties contained in this Agreement are not true and correct as of the Closing in all material respects, and Seller shall thereupon have fifteen (15) Business Days to cure any purported breach of its representations and warranties;

(ii)    All obligations of Seller that were to have been performed on or before the Closing Date have been timely and duly performed;

(iii)    The Bid Protections Order shall have been entered, approving the Breakup Payments and other Bid Protections;

(iv)    Entry by the Bankruptcy Court of the Confirmation Order in the Bankruptcy Case, which Confirmation Order shall (x) be in form and substance acceptable to Purchaser with respect to this Agreement and the Sale transaction contemplated herein, and (y) not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered and remains in full force and effect at the time of the Closing;

(v)    The Second Lien Exit Facility shall have been entered into simultaneously with the Closing;

(vi)    By not later than fifteen (15) Business Days before the Closing Date, Seller and the Port Authority shall have executed and delivered to Purchaser an amendment to the Ground Lease containing (i) the current Basic Rent (as defined in Section 1(c) of the George Washington Bridge Bus Station Agreement Among the Parties and Fourth Amendment to Agreement of Lease (the "**Fourth GL Amendment**") and that the $25k Additional Payment (as defined in Section 1(c) of the Fourth GL Amendment) is the only annual payment of Twenty-Five Thousand and 00/100 Dollars ($25,000.00) payable under the Ground Lease, (ii) the current Exhibit AA to the Ground Lease as updated and approved by Seller and the Port Authority in accordance with Section 3(a) of the Third Amendment to Agreement of Lease between Seller and the Port Authority dated January 10, 2019 (the "**Third GL Amendment**"), (iii) the current Schedule 2.1(a) to the Ground Lease as updated and approved by Seller and the Port Authority in accordance with Section 3(a) of the Third GL Amendment, and (iv) confirmation from the Port

Authority that it is solely responsible for the maintenance and repair of the Pedestrian Underpass (the "**Required Ground Lease Amendment**"), which Required Ground Lease Amendment shall be in form and substance reasonably acceptable to Purchaser.

(vii)   By not later than three (3) Business Days before the Closing Date, Purchaser shall have received an estoppel certificate from the Port Authority as lessor under the Ground Lease (the "**Ground Lease Estoppel**") in Acceptable GLE Form (hereinafter defined). A Ground Lease Estoppel shall be in "**Acceptable GLE Form**" if such Ground Lease Estoppel: (A) is dated no more than sixty (60) days before the Closing Date (but in all events after the date of the Required Ground Lease Amendment); (B) does not allege the existence of any material default under the Ground Lease or assert any material dispute in connection with the Ground Lease, other than such defaults or disputes as are expressly stated in that certain Settlement Agreement by and between Seller, New York City Regional Center, LLC, on behalf of itself and its managed funds, the Senior Secured Lender, George Washington Bridge Bus Station and Infrastructure Fund, Phase II, LLC and the Port Authority dated as of June 2, 2020 (the "**Settlement Agreement**"); (C) certifies as to the economic and other material terms of the Ground Lease (including, without limitation, the Basic Rent); (D) does not recite any material fact that contradicts (or is inconsistent with) any of Seller's representations and warranties under this Agreement or the copies of the Subleases, the Rent Roll or the Settlement Agreement; and (E) contains an exhibit indicating the Port Authority's proposed location of the New Egress Work (as defined in the Ground Lease).

(viii)   By not later than three (3) Business Days before the Closing Date, Purchaser shall have received estoppel certificates from Subtenants under the Subleases ("**Subtenant Estoppels**") in Acceptable SE Form (hereinafter defined) from the following Subtenants: Gap, Marshalls, Fine Fare, Citibank, Time Warner and Blink (the "**Major Tenants**"). A Subtenant Estoppel shall be in "**Acceptable SE Form**" if such Subtenant Estoppel is dated no more than sixty (60) days before the Closing Date and does not allege the existence of any material default under such Sublease, assert any material dispute in connection with such Sublease or otherwise recite any material fact that contradicts (or is inconsistent with) any of Seller's representations and warranties under this Agreement or the copies of the Subleases or rent roll provided to Purchaser by Seller; provided, however, that: (A) Purchaser shall not be permitted to allege that the Subtenant Estoppel from Marshalls is not in Acceptable SE Form solely because such Subtenant Estoppel alleges such disputes or defaults as are expressly stated in Marshalls' cure objection dated February 25, 2020 (the "**Marshalls Cure Objection**"); and (B) Purchaser shall not be permitted to allege that the Subtenant Estoppel from Blink is not in Acceptable SE Form solely because such Subtenant Estoppel alleges such disputes or defaults as are expressly stated in Blink's cure objection dated February 26, 2020 (the "**Blink Cure Objection**").

(ix)   As of the Closing Date, Seller shall not have received notice from any governmental or quasi-governmental authority (other than those violations expressly alleged by the Port Authority in the Settlement Agreement) alleging that the Property is in violation of applicable laws, ordinances or regulations, including (without limitation) applicable environmental laws, rules, regulations and orders (such notice being a "**Notice of Violation**"), which violation indicated in the Notice of Violation has a material adverse effect, either

individually or in the aggregate with any one or more other Notices of Violation, on the operation of the Property.

(x)    Seller shall have filed the applicable Plan Documents on or before the applicable dates set forth in the Plan Milestones;

(xi)    The deadline to assume the Ground Lease has not expired and has not been terminated for any reason, whether by the Port Authority, an order of the Bankruptcy Court, or otherwise;

(xii)    The Port Authority has not terminated the Ground Lease or delivered written notice to Seller of its intention to terminate the Ground Lease;

(xiii)    No person or entity has obtained relief from the automatic stay with respect to the Property, which has resulted in a material disruption to the Seller's business;

(xiv)    No order of the Bankruptcy Court has been entered that discontinues or materially changes the manner in which the Seller operates the Property;

(xv)    The effective date under the Plan shall have occurred simultaneously with the Closing;

(xvi)    The Bankruptcy Case shall not have been converted to a chapter 7 liquidation or dismissed; and

(xvii)    The pending appeal by Tutor Perini Building Corp. ("**Tutor Perini**") with respect to the Cure Amount for the Ground Lease captioned *Tutor Perini Bldg. Corp. v. George Washington Bridge Bus Station Dev. Venture, LLC, et al.*, Case No. 20-07433-JSR (S.D.N.Y.) shall not have been decided in a manner that requires the payment of any Cure Amount to Tutor Perini.

If there is a failure of any of the Purchaser Conditions Precedent to be satisfied by the time period for the satisfaction of such Purchaser Condition Precedent set forth above, then Purchaser, as Purchaser's sole and exclusive remedy, shall have the right to terminate this Agreement upon written notice to Seller, whereupon the Deposit shall be returned to Purchaser, this Agreement shall terminate and thereafter the Parties shall have no further obligations under this Agreement other than those that by their terms specifically survive termination of this Agreement.

(d)    In the event that (i) the Bankruptcy Court does not enter the Confirmation Order on or before the date which is five (5) Business Days after the date required by the Plan Milestones, or (ii) the Confirmation Order is entered on or before the date which is five (5) Business Days after the date required by the Plan Milestones but is stayed or otherwise rendered unenforceable before the time of the Closing either Party will have the right to terminate this Agreement by written notice to the other Party, in which event (i) the Deposit shall be promptly returned to Purchaser, (ii) this Agreement shall immediately terminate, and (iii) the Parties shall have no further obligations under this Agreement other than those that by their terms specifically survive termination of this Agreement.

(e)    In the event that the Closing does not occur by June 30, 2021 (the "**Outside Closing Date**"), either Party may terminate this Agreement upon written notice to the other Party, provided, however, that the Party seeking to terminate this Agreement is not itself in default hereunder beyond any applicable notice or cure periods.  If this Agreement is terminated pursuant to this Section 5(e), then unless Purchaser is then in default under this Agreement, the Deposit shall immediately be returned to Purchaser and thereafter this Agreement shall terminate and the Parties shall have no further obligations under this Agreement other than those that by their terms specifically survive termination of this Agreement.   Notwithstanding anything contained in this Agreement to the contrary, in addition to the foregoing, in the event that the Closing does not occur by the Outside Closing Date or this Agreement is terminated, and such failure of the Closing to occur by the Outside Closing Date or termination of this Agreement is not a result of a breach by Purchaser under this Agreement (following the expiration of applicable notice and cure periods set forth in this Agreement), Seller shall pay the Breakup Payments to Purchaser by not later than two (2) Business Days after the Outside Closing Date; provided, however, that in the event that the Closing does not occur by the Outside Closing Date as a result of the failure to satisfy the Purchaser Condition Precedent set forth in Section 5(c)(vi) because the form of the Required Ground Lease Amendment is not reasonably acceptable to Purchaser, then Purchaser shall not be entitled to receive the Breakup Fee and shall only be entitled to receive the Expense Reimbursement.  The provisions of the preceding sentence shall survive the termination of this Agreement.

(f)    From and after the Effective Date until the Closing or earlier termination of this Agreement in accordance with the terms hereof:

(i)    Seller shall not, without the consent of Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed, modify in any respects, cancel, terminate, extend or otherwise change, the terms, covenants or conditions of the Ground Lease, any Subleases, any Assumed Contracts, any insurance policy insuring the Property or any REAs or other Liens and Encumbrances.

(ii)    Seller shall not, without the consent of Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed, enter into any contracts for services or otherwise that may be binding upon the Property following Closing or upon Purchaser, nor shall Seller enter into any new Subleases.

(iii)    Seller shall not create or permit to be created, or modify or permit to be modified, any Liens and Encumbrances.

(iv)    subject to any order that has been entered into with respect to the Bankruptcy Cases, Seller shall continue to operate and maintain the Property in the same manner, in all material respects, as Seller has prior to the Effective Date, including continuing to cooperate with the collection of payments from the Subtenants under the Subleases and maintaining all of Seller's existing insurance policies with respect to the Property in full force and effect, and Seller shall comply, in all material respects, with all of Seller's obligations under the Ground Lease, Subleases and Assumed Contracts.

(v)     Seller shall not, directly or indirectly, sell, transfer, market, offer for sale or solicit any offers for the sale and purchase of the Property or any portion thereof; provided, however, that the foregoing shall not apply to the Transferred Claims or any offers presented to Seller that are not the result of a direct solicitation by, or on behalf of, Seller.

(vi)     Seller shall not apply any Security Deposits (other than with respect to the return of any Security Deposits under the Subleases pursuant to the terms thereof) or make any payments of any Leasing Incentives without Purchaser's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed.

(vii)     Seller shall use commercially reasonable efforts to obtain the Required Ground Lease Amendment.  Seller shall provide Purchaser with a draft of the proposed Required Ground Lease Amendment before requesting such Required Ground Lease Amendment from the Port Authority.  Purchaser shall, within three (3) Business Days after Purchaser's receipt of the proposed Required Ground Lease Amendment, provide Seller in writing with any specific comments or concerns that Purchaser has with respect to such Required Ground Lease Amendment due to Purchaser's review of such Required Ground Lease Amendment and the Ground Lease.  If a fully-executed Required Ground Lease Amendment in the form approved by Purchaser is timely delivered to Purchaser, then promptly following Purchaser's receipt of such fully-executed Required Ground Lease Amendment, Purchaser and Seller shall execute an amendment to this Agreement to modify this Agreement as needed to reflect the modification of Exhibit AA to the Ground Lease and Schedule 2.1(a) to the Ground Lease pursuant to such Required Ground Lease Amendment or any other provisions agreed to therein that may affect the terms hereof.

(viii)     Seller shall request and use commercially reasonable efforts to obtain the Ground Lease Estoppel.  The form of Ground Lease Estoppel requested shall be in a form delivered to Seller by Purchaser.  Seller shall provide Purchaser with a draft of the proposed Ground Lease Estoppel before requesting such Ground Lease Estoppel from the Port Authority.  Purchaser shall, within three (3) Business Days after Purchaser's receipt of the proposed Ground Lease Estoppel, provide Seller in writing with any specific comments or concerns that Purchaser has with respect to such Ground Lease Estoppel due to Purchaser's review of such Ground Lease Estoppel and the Ground Lease.

(ix)     Seller shall request, and use commercially reasonable efforts to obtain, the Subtenant Estoppels from Subtenants under the Subleases.  The form of the Subtenant Estoppel requested shall be substantially in the form of Exhibit G attached hereto and incorporated herein by reference or the form otherwise attached to the applicable Subtenant's Sublease.  Seller shall provide Purchaser with drafts of the proposed Subtenant Estoppels before requesting such Subtenant Estoppels from the Subtenants. Purchaser shall, within three (3) Business Days after Purchaser's receipt of the proposed Subtenant Estoppels, provide Seller in writing with any specific comments or concerns that Purchaser has with respect to such Subtenant Estoppels due to Purchaser's review of such Subtenant Estoppels and the applicable Sublease for such Subtenant.

(x)    To the extent requested by the First Lien Exit Lender, Seller shall request from each Subtenant a SNDA in a form reasonably acceptable to the First Lien Exit Lender.

(xi)    If Seller becomes aware that any of Seller's representations or warranties set forth in this Agreement are no longer true in any respects, then within two (2) Business Days after Seller obtains such awareness, Seller shall deliver written notice to Purchaser indicating the manner in which such representations or warranties are no longer true and the reasons therefor.

(xii)    To the extent applicable, Seller shall timely and accurately file any New York City Real Property Income and Expense Statements with respect to the Property ("**RPIEs**") that are required to be filed before Closing and will deliver copies of such RPIEs to Purchaser not later than three (3) business days after the filing thereof.

(xiii)    If Seller receives a written Notice of Violation after the Effective Date, then within three (3) Business Days after Seller's receipt thereof, Seller shall deliver a copy of such Notice of Violation to Purchaser.

(xiv)    Not less than ten (10) business days before the Closing Date, Purchaser shall deliver to Seller a completed New York State Department of Taxation and Finance ("**NYS Tax Department**") Form AU-196.10 for Seller's review and approval, which approval shall not be unreasonably withheld, conditioned or delayed.  If Seller has not delivered such approval or a written notice of disapproval (specifying Seller's reasons for disapproval in reasonable detail) within three (3) Business Days after Seller's receipt of such Form AU-196.10, then Seller shall be deemed to have approved such Form AU-196.10.  Not later than two (2) Business Days after Seller's approval or deemed approval of such Form AU-196.10, Purchaser shall deliver such Form AU-196.10 to the NYS Tax Department as required.  Seller agrees to reasonably cooperate with Purchaser to the extent necessary to obtain a Form AU-197.1 from the NYS Tax Department.

(xv)    Seller shall continue to pay all post-petition administrative claims in the ordinary course of business up to Closing, and shall not take any action in the Bankruptcy Case that is inconsistent with the terms of this Agreement or interferes with Seller's or Purchaser's ability to consummate the Sale as provided for herein.

6.    **CLOSING**

(a)    Provided all conditions and/or contingencies to Closing described in this Agreement have been fulfilled or waived in writing, the closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place in escrow through the Escrow Agent, on the date that is the earlier of ten (10) Business Days after the entry of the Approval Order or the Outside Closing Date, or such other date mutually agreed to by Purchaser and Seller in writing (the "**Closing Date**").

(b)    On or before the Closing Date, Seller shall deliver or cause to be delivered to Purchaser the following Closing documents:

(i)    A certified copy of the Confirmation Order;

(ii)    Two (2) duly executed and acknowledged original counterparts of an Assignment and Assumption of Ground Lease (the "**Assignment of Ground Lease**") substantially in the form of Exhibit C;

(iii)    An original FIRPTA Affidavit in accordance with the Foreign Investment in Real Property Tax Act, 26 U.S.C. § 1445, duly executed by Seller and in a form reasonably acceptable to Seller and Purchaser;

(iv)    Two (2) duly executed original counterparts of a Bill of Sale and General Assignment executed by Seller conveying and transferring to Purchaser all of Seller's right, title and interest in the Personal Property, the Assumed Contracts and all certificates, licenses, approvals, permits, warranties and other rights relating to the Property, to the extent the same are assignable ("**Bill of Sale**") substantially in the form of Exhibit D;

(v)    Two (2) duly executed and acknowledged original counterparts of an assignment and assumption of Subleases executed by Seller assigning and transferring to Purchaser all of Seller's right, title and interest in the Subleases ("**Assignment of Subleases**") substantially in the form of Exhibit E-1;

(vi)    Counterparts of notice letters to the Subtenants notifying them of the sale of the Property to Purchaser ("**Subtenant Notices**") substantially in the form of Exhibit E-2;

(vii)    All keys, access, security, and alarm codes for the Real Property;

(viii)    Such documents and instruments as may be reasonably required for Seller to execute, acknowledge and/or deliver in order to enter into the Second Lien Exit Facility as of Closing;

(ix)    A certificate certifying to Purchaser that Seller's representations and warranties are true, accurate and complete as of the Closing Date, subject, in all respects, to any materiality qualifiers set forth therein; and

(x)    Such other instruments, certificates, affidavits, transfer tax returns and other documents as are required to effect the transfer of the Property under applicable state or local law.

(c)    On the Closing Date, Purchaser shall deliver or cause to be delivered to Seller the following for Closing:

(i)    The Closing Payment, subject to the prorations, credits and adjustments set forth in this Agreement;

(ii)    Two (2) duly executed original counterparts of the Bill of Sale executed by Purchaser;

(iii)     Two (2) duly executed and acknowledged original counterparts of the Assignment of Ground Lease executed by Purchaser;

(iv)     Two (2) duly executed and acknowledged original counterparts of the Assignment of Subleases executed by Purchaser;

(v)     Counterparts of the Subtenant Notices;

(vi)     Such documents and instruments as may be required for Purchaser to execute, acknowledge and/or deliver in order to enter into the Second Lien Exit Facility as of Closing;

(vii)     A certificate certifying to Seller that Purchaser's representations and warranties are true, accurate and complete as of the Closing Date, subject, in all respects, to any materiality qualifiers set forth therein; and

(viii)     Such other documents, certificates, instruments, affidavits, transfer tax returns and other documents as are required to effect the transfer of the Property under applicable state or local law.

(d)     On the Closing Date:

(i)     Purchaser shall pay (i) all transfer and recording taxes imposed upon the sale of the Property as contemplated herein, (ii) applicable sales and use taxes, if any, on the transfer of the Personal Property pursuant to this Agreement (but not any sales or use taxes attributable to Seller's period of ownership of the Property), (iii) the title premium for any owner's title policy and the cost of any endorsements thereto, (iv) all fees, costs or expenses in connection with Purchaser's due diligence reviews hereunder, and (v) all fees, costs or expenses in connection with any financing obtained by Purchaser in connection with the transaction hereby contemplated hereby.

(ii)     Any other Closing costs shall be allocated in accordance with local custom.  Seller and Purchaser shall pay their respective shares of prorations as hereinafter provided.

(e)     On or before the Closing Date, Seller and Purchaser shall jointly execute and deliver or cause to be executed and delivered an agreed closing proration statement and all other documents reasonably required by the Title Insurer in order to consummate the Closing as contemplated in this Agreement.

7.     **CLOSING ESCROW**

(a)     The Closing shall take place through escrow at the Escrow Agent in accordance with the provisions of this <u>Section 7</u>.  All documents required to be provided by Purchaser and Seller pursuant to this Agreement and otherwise appropriate to consummate the sale and purchase transaction contemplated by this Agreement shall be delivered to the Escrow Agent on or before Closing.  Notwithstanding the foregoing, the Parties agree that the Closing may be set up remotely and/or in a manner so that the Parties and their respective attorneys, or any of them,

need not be physically present and may deliver all necessary documents by overnight mail or other means, in which event the Parties agree to complete all arrangements for Closing not later than the Closing Date so that all requirements, with the exception of the Closing Payment, for Closing are in place by the scheduled time for the Closing.

(b)      This Agreement shall serve as escrow instructions to the Escrow Agent, subject to the Escrow Agent's standard conditions of acceptance of escrow where not contrary to the terms hereof.  The Escrow Agent is hereby authorized to close this transaction in accordance with the terms of this Agreement and to make all prorations and allocations which, in accordance with this Agreement, are to be made between the Parties hereto. Escrow Agent is acting solely as a stakeholder and depository, and is not responsible or liable in any manner whatsoever for the sufficiency, correctness, genuineness, or validity of the subject matter of the escrow.  In addition, the following provisions shall apply with respect to Escrow Agent:

(i)      Each of Purchaser and Seller agrees to indemnify, defend and hold harmless the Escrow Agent from and against any loss, cost, damage, expense and attorney's fees in connection with or in any way arising out of this Agreement, other than expenses resulting from the Escrow Agent's own negligence or willful misconduct; provided, however, that neither Purchaser nor Seller shall be obligated to indemnify Escrow Agent for the other's acts or omissions.

(ii)      In the event of a dispute concerning the Deposit, Escrow Agent may continue to hold the Deposit pursuant to the terms hereof, or may, after giving Purchaser and Seller at least fifteen (15) days' advance written notice, at the joint and several cost of Purchaser and Seller, deposit the same in a court of competent jurisdiction.  Escrow Agent may dispose of the Deposit in accordance with a court order, and shall be fully protected if it acts in accordance with any such court order.

(iii)      Escrow Agent may, at its own expense, consult with legal counsel in the event of any dispute or questions as to the construction of any provisions hereof or its duties hereunder, and it shall be fully protected in acting in accordance with the opinion or instructions of such counsel.

(iv)      Escrow Agent shall be protected in acting upon any written notice, request, waiver, consent, certificate, receipt, authorization, power of attorney or other document Escrow Agent in good faith believes to be genuine and what it purports to be.

(v)      If Seller delivers written notice to Escrow Agent indicating that Seller is entitled to the Deposit under this Agreement (a "**Seller EM Demand**"), then Escrow Agent shall disburse the Deposit to Seller; provided, however, that: (A) Escrow Agent shall, within one (1) Business Day after receipt of the Seller EM Demand, deliver a copy of such Seller EM Demand to Purchaser in accordance with Section 12 of this Agreement; (B) if Escrow Agent receives written notice from Purchaser objecting to such Seller EM Demand within five (5) Business Days after the date on which Escrow Agent provided a copy of the Seller EM Demand to Purchaser, then Escrow Agent shall not be obligated to honor such Seller EM Demand and the provisions of Section 7(b)(ii) above shall apply; and (C) if Escrow Agent does not receive written notice from Purchaser

20

objecting to such Seller EM Demand within such five (5) Business Day period (or if Purchaser otherwise agrees that Seller is entitled to the Deposit), then Purchaser shall be deemed to have waived Purchaser's right to object to such Seller EM Demand, and Escrow Agent shall be obligated and authorized to disburse the Deposit to Seller in accordance with the Seller EM Demand.

(vi)    If Purchaser delivers written notice to Escrow Agent indicating that Purchaser is entitled to the Deposit under this Agreement (a "**Purchaser EM Demand**"), then Escrow Agent shall disburse the Deposit to Purchaser; provided, however, that: (A) Escrow Agent shall, within one (1) Business Day after receipt of the Purchaser EM Demand, promptly deliver a copy of such Purchaser EM Demand to Seller in accordance with Section 12 of this Agreement; (B) if Escrow Agent receives written notice from Seller objecting to such Purchaser EM Demand within five (5) Business Days after the date on which Escrow Agent provided a copy of the Purchaser EM Demand to Seller, then Escrow Agent shall not be obligated to honor such Purchaser EM Demand and the provisions of Section 7(b)(ii) above shall apply; and (C) if Escrow Agent does not receive written notice from Seller objecting to such Purchaser EM Demand within such five (5) Business Day period (or if Seller otherwise agrees that Purchaser is entitled to the Deposit), then Seller shall be deemed to have waived Seller's right to object to such Purchaser EM Demand, and Escrow Agent shall be obligated and authorized to disburse the Deposit to Purchaser in accordance with the Purchaser EM Demand.

(c)    On the Closing Date, the Escrow Agent shall cause the Title Commitment to be updated by the Title Company and if and when (i) the Title Company will issue the Title Policy in accordance with this Agreement, (ii) the Escrow Agent has received all funds and documents required to be deposited hereunder, and (iii) all of the terms and conditions of this Agreement have been satisfied or waived as provided herein, then the Escrow Agent shall cause the Assignment of Ground Lease to be filed for record and the funds disbursed in accordance with this Agreement.

(d)    Escrow Agent shall timely file all forms, notices and documents required to be filed with the Internal Revenue Service in connection with the sale of real property.

8.    **REPRESENTATIONS AND WARRANTIES**

(a)    Seller represents and warrants to Purchaser that as of the date hereof and as of the Closing Date:

(i)    Provided that the Confirmation Order is entered and has become final and non-appealable, Seller will have by the Closing Date, full right, power and authority to execute, deliver and perform this Agreement and all documents to be executed by Seller pursuant hereto, and all required action and approvals therefor have been duly taken and obtained. The individuals signing this Agreement and all other documents executed or to be executed pursuant hereto on behalf of Seller are and shall be duly authorized to sign the same on Seller's behalf and to bind Seller thereto, subject to entry of the Confirmation Order.  Subject to entry of the Confirmation Order, this Agreement and all documents required hereby to be executed by Purchaser hereunder are and shall be valid, legally binding obligations of and enforceable against

Purchaser in accordance with their terms. To Seller's Knowledge, the execution and delivery of this Agreement and performance by Seller will not conflict with or result in a violation of, or breach of, or constitute a default under, any law or administrative regulation or any of the terms, conditions or provisions of any judgment, decree, loan agreement, bond, note, resolution, indenture, mortgage, deed of trust, contract or other agreement or instrument to which Seller is a party or which affects the Property.

(ii)     Seller has good and marketable title to the Property.

(iii)    To Seller's Knowledge, Seller is not required to file any Real Property Income and Expense Statements with the City of New York.

(iv)     Seller is not a "foreign person", "foreign partnership", "foreign trust" or "foreign estate", as those terms are defined in Section 1445 of the Internal Revenue Code.

(v)      Except for the Bankruptcy Case and those matters set forth on Schedule 9, to Seller's Knowledge, there are no legal actions, suits or similar proceedings pending and served, nor has any legal action, suit or similar proceeding been threatened, against Seller or the Property.

(vi)     There are no pending, nor to Seller's Knowledge, are there any threatened, actions by any governmental or quasi-governmental authority having the power of condemnation or eminent domain that might result in all or any portion of the Property or any interest therein being taken by eminent domain, condemnation or conveyed in lieu thereof.

(vii)    Except as set forth on Schedule 8, to Seller's Knowledge (A) Seller has not received any written Notice of Violation indicating any violation which remains uncured, (B) Seller has not received written notice of actual or threatened cancellation or suspension of any utility services or certificates of occupancy for any portion of the Property, and (C) Seller has not received written notice of actual or threatened special assessments or reassessments of the Property or any "Impositions" (as defined in the Ground Lease).

(viii)   Except for the Ground Lease, the Subleases set forth on the rent roll attached as Schedule 5 hereto and incorporated herein by reference (the "**Rent Roll**") are the only leases, subleases and occupancy agreements in effect with respect to the Property or any portion thereof, and except for the Ground Lease and Subleases, there are no other leases, subleases or possessory rights of others regarding the Property, including any oral leases. To Seller's Knowledge, the Subtenant A/R indicated on Schedule 10 attached hereto is a true, accurate and complete list of the unpaid rent under the Subleases as of the Effective Date (and as may be amended pursuant to Section 2(d) above, as of the Closing Date).   To Seller's Knowledge, the copies of the Ground Lease and Subleases provided to Purchaser (including amendments, modifications, extensions, renewals, side letters, guarantees and other documents relating thereto) and the information contained in the Rent Roll are true, accurate and complete in all material respects.  To Seller's Knowledge, except the Sublease with Lerner New York, Inc. d/b/a New York & Company and the Sublease with FFC Accounting Inc., all Subtenants under the Subleases are in possession of their respective premises, subject to governmental orders from the State of New York and/or City of New York related to the COVID-19 pandemic.  To Seller's

Knowledge, no Subtenant has paid any rent, fees, or other charges for more than one month in advance which would result in any Subtenant's ability to credit such advance payment against any payment due by such Subtenant after the Closing Date, nor to Seller's Knowledge is any Subtenant entitled to any free rent, abatement of rent or similar concession, except in each case, as disclosed on the Rent Roll.  To Seller's Knowledge, the Subleases are in full force and effect, and to Seller's Knowledge, except as expressly stated in the Blink Cure Objection, Marshalls Cure Objection, the Cooling Tower Disputes and the Subtenant A/R indicated on Schedule 10 attached hereto, there are no material defaults under any of the Subleases.  To Seller's Knowledge, except for ongoing disputes with Marshalls of MA, Inc. and GW&L Food Corp. d/b/a Fine Fare, concerning charges related to the Cooling Tower and the supply of chilled water for air conditioning (the "**Cooling Tower Disputes**"), no Subtenant has contested any operating cost or other escalation payments, occupancy charges or any other amounts payable under its Sublease.  To Seller's Knowledge, all work required to be performed in connection with the Subleases has been completed and fully paid for, and to Seller's Knowledge, each Subtenant has unconditionally accepted its premises.  Except as set forth on Schedule 4 attached hereto, to Seller's Knowledge, all Leasing Incentives payable under the Subleases are fully paid for, whether such payment obligations accrue before or after the Closing Date.  Except as set forth on Schedule 3 attached hereto, to Seller's Knowledge, there are no security deposits under the Subleases.    Except for the Bankruptcy Case, the Blink Cure Objection, the Marshalls Cure Objection or as disclosed on Schedule 9 attached hereto, to Seller's Knowledge, there are no actions or proceedings pending or threatened in writing by any Subtenant against Seller or by Seller against any Subtenant under any Sublease.

(ix)    To Seller's Knowledge, except for this Agreement, there is no agreement of sale, option, right of first refusal, right of first offer or similar agreement with respect to the Property giving any party (including, without limitation, the Subtenants under the Subleases) a right to purchase all or any interest in the Property.

(x)    Except as set forth on Schedule 4 attached hereto, to Seller's Knowledge, there are no lease brokerage agreements, leasing commission agreements or other agreements providing for payments of any amounts for leasing activities or procuring subtenants with respect to the Property, nor is any tail period currently in effect with respect to any of the foregoing agreements.  Except as set forth on Schedule 4 attached hereto, to Seller's Knowledge, no brokerage commission or other compensation is payable (or will, with the passage of time or occurrence of any event, or both, be payable) with respect to any Sublease, including in connection with the exercise of any options to extend or renew (whether previously or hereafter exercised).  Except for the commission payable to the Broker (hereinafter defined) pursuant to the Brokerage Agreement (hereinafter defined), no fee, commission or other compensation is or will be payable to any third party broker in connection with the Closing.  The Brokerage Agreement shall not be binding upon Purchaser or the Property after Closing.

(xi)    To Seller's Knowledge, the copy of each Assumed Contract (including amendments, modifications, extensions, renewals, side letters, guarantees and other documents relating thereto) delivered to Purchaser is true, accurate and complete in all material respects, and except for the Ground Lease, Subleases or as listed on Schedule 1 attached hereto, to Seller's Knowledge, no other unrecorded contracts exist with respect to the Property.

(xii)   To Seller's Knowledge, except for the Phase I Environmental Site Assessment Report dated December 10, 2019 prepared by AEI Consultants, Project No. 415276, Seller has not received any Notice of Violation or written reports indicating the presence of hazardous substances on the Property in violation of applicable environmental laws.

(xiii)   Seller is not, and will not become, a person or entity with whom U.S. persons are restricted from doing business with under the regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of Treasury (including those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), the USA Patriot Act (hereinafter defined) or other governmental action.

(xiv)   To Seller's Knowledge, none of the funds used by Seller to operate the Property is or shall be subject to 18 U.S.C. §§ 1956 1957 (Laundering of Money Instruments), 18 U.S.C. §§ 981 986 (Federal Asset Forfeiture), 18 U.S.C. §§ 881 (Drug Property Seizure), Executive Order Number 13224 on Terrorism Financing, effective September 24, 2001, or the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107 56 (the "**USA Patriot Act**").

(xv)   As of the Effective Date, Seller has no employees, and Seller will not hire any employees before the Closing Date.

(xvi)   To Seller's Knowledge, each of the list of Tangible Personal Property contained in Schedule 6 attached hereto and the list of Intangible Personal Property contained in Schedule 7 attached hereto is true, accurate and complete in all material respects.

For purposes of this Section 8(a), "Seller's Knowledge" shall mean the actual knowledge of Bernard Katz, and shall not be construed to refer to the knowledge of any other partner, officer, director, agent, employee or representative of Seller, or any affiliate of Seller, or to impose upon Bernard Katz any duty to investigate the matter to which such actual knowledge or the absence thereof pertains, or to impose upon Bernard Katz any individual personal liability.

Notwithstanding anything contained herein to the contrary, except as expressly provided by Section 13 of this Agreement, Purchaser hereby acknowledges and agrees that no officer, employee, member or manager (including without limitation, Bernard Katz) of Seller will have any personal liability to Purchaser for any obligations of Seller under this Agreement (including without limitation, as a result of a breach of any representation or warranty hereunder), or for any claim based on, in respect of, or by reason of, such obligations, whether arising before or after the Closing. Except as expressly provided by Section 13 of this Agreement, Purchaser hereby expressly waives and releases all such liability, and agrees that its sole recourse after Closing for a breach of any representation or warranty hereunder is to any representation and warranty insurance policy that Purchaser, at its sole cost and expense, may obtain. The foregoing waiver and release are part of the consideration for the purchase and sale of the Assets.

(b)   Purchaser represents and warrants to Seller that as of the date hereof and as of the Closing Date:

(i)     Purchaser has full right, power and authority to execute, deliver and perform this Agreement and all documents to be executed by Purchaser pursuant hereto, and all required action and approvals therefor have been duly taken and obtained. Neither the execution of this Agreement nor the performance of Purchaser's obligations hereunder will conflict with, or with or without notice or the passage of time or both, result in a breach of, violate any term or provision of, or constitute a default under any of Purchaser's organizational documents. The individuals signing this Agreement and all other documents executed or to be executed pursuant hereto on behalf of Purchaser are and shall be duly authorized to sign the same on Purchaser's behalf and to bind Purchaser thereto.

(ii)    Purchaser is not in default under any agreement or instrument to which Purchaser is a party where the liability thereunder might adversely affect Purchaser's ability to perform its obligations under this Agreement.

(iii)   This Agreement and all documents required hereby to be executed by Purchaser hereunder are and shall be valid, legally binding obligations of and enforceable against Purchaser in accordance with their terms.

(iv)    As of the Closing Date, Purchaser shall not have commenced, within the meaning of Title 11 of the U.S. Code, or any similar state law for the relief of debtors ("**Bankruptcy Law**") a voluntary case, nor shall there have been commenced against Purchaser an involuntary case, nor shall Purchaser have consented to the appointment of a receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law (a "**Custodian**") of it or for all or any part of its property, nor shall a court of competent jurisdiction have entered an order or decree under any Bankruptcy Law that is for relief against Purchaser in an involuntary case or appoints a Custodian of Purchaser for all or any part of its property.

(v)     Prior to the Closing Date, Purchaser will not create any easements, liens, mortgages or other encumbrances with respect to the Real Property.

(c)     The continued validity in all material respects of all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Agreement shall be conditions precedent to the performance of Seller's and Purchaser's respective obligations hereunder.    All representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Agreement shall be continuing and shall be true and correct, in all material respects, on and as of the Closing Date with the same force and effect as if made at that time; provided however, a Party (the "**Non-Breaching Party**") shall promptly provide written notice to the other Party (the "**Breaching Party**") after becoming aware that any of the Breaching Party's representations and warranties contained in this Agreement are not true and correct in all material respects, and the Breaching Party shall thereupon have a fifteen (15) Business Days to cure any purported breach of its representations and warranties. If the Breaching Party fails to cure the breach within such fifteen (15) Business Day period, the Non-Breaching Party shall have the right to (1) terminate this Agreement by giving written notice thereof to the Breaching Party (and in the event the Non-Breaching Party is the Purchaser, the Deposit shall be promptly refunded to Purchaser), this Agreement shall terminate and thereafter neither Party shall have any further obligations under this Agreement except for such obligations that expressly survive the termination of this Agreement; or (2) waive

the condition in writing and proceed to Closing. Further, all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this <u>Section 8</u> shall not survive Closing.  Upon consummation of Closing, Seller and Purchaser shall have no further liability with respect to any claim which Purchaser or Seller may have against the other party for a breach of any such representation or warranty, whether such breach is known or unknown.

(d)    EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY DOCUMENT DELIVERED BY THE SELLER PURSUANT TO THIS AGREEMENT: (I) SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, RELATING TO ITS BUSINESS, THE GROUND LEASE, THE ASSUMED CONTRACTS, THE PROPERTY OR THE ASSUMED LIABILITIES, INCLUDING ANY REPRESENTATION OR WARRANTY AS TO VALUE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR FOR ORDINARY PURPOSES, OR ANY OTHER MATTER, (II) SELLER MAKES NO, AND HEREBY DISCLAIMS ANY, OTHER REPRESENTATION OR WARRANTY REGARDING ITS BUSINESS, THE GROUND LEASE, THE ASSUMED CONTRACT, THE PROPERTY OR THE ASSUMED LIABILITIES, AND (III) THE GROUND LEASE, THE ASSUMED CONTRACT, THE PROPERTY AND THE ASSUMED LIABILITIES ARE CONVEYED ON AN "AS IS, WHERE IS" BASIS AS OF THE CLOSING, AND THE PURCHASER SHALL RELY UPON ITS OWN EXAMINATION THEREOF. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY DOCUMENT DELIVERED BY THE SELLER PURSUANT TO THIS AGREEMENT, SELLER MAKES NO REPRESENTATION OR WARRANTY REGARDING ANY BUSINESS OTHER THAN ITS BUSINESS, ANY ASSETS OTHER THAN THE GROUND LEASE, THE PROPERTY AND THE ASSUMED CONTRACTS OR ANY LIABILITIES OTHER THAN THE ASSUMED LIABILITIES, AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY.

9.    **<u>AS IS/NO WARRANTIES</u>**

(a)    Purchaser expressly acknowledges that, except as otherwise provided for in the representations and warranties in this Agreement or any document delivered by Seller pursuant to this Agreement, Purchaser is buying the Property in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" with regard to the physical condition of the Property without warranty or representation of any kind by Seller or any of Seller's employees, agents or contractors (the "**<u>Seller's Related Parties</u>**"), including specifically and without limitation, any warranty or representation as to the presence or absence of any Hazardous Material. As used in this Agreement, the term "**<u>Hazardous Material</u>**" shall mean asbestos, petroleum, polychlorinated biphenyl and any other materials defined as a hazardous substance, hazardous waste, hazardous constituents or solid waste in (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601 et seq., and any amendments thereto and regulations thereunder, (b) the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq., and any amendments thereto and regulations thereunder, (c) Section 311 of the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq. (33 U.S.C. §1321), and (d) any other federal, state or local environmental statute or regulation.

(b)    Purchaser warrants, acknowledges to, and agrees with Seller that Purchaser is purchasing the Property in "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION", and specifically and expressly without any warranties, representations or guarantees, either express or implied, of any kind, nature, or type whatsoever from, or on behalf of, Seller, except as otherwise provided for in the representations and warranties in this Agreement or any document delivered by Seller pursuant to this Agreement.  Purchaser acknowledges that Purchaser's agreement hereunder to purchase the Property in its "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" was bargained for in the consideration given under this Agreement. Without in any way limiting the generality of the immediately preceding sentences, Purchaser and Seller further acknowledge and agree that in entering into this Agreement and closing the transactions hereunder, except as otherwise provided for in the representations and warranties in this Agreement or any document delivered by Seller pursuant to this Agreement:

    (i)    Seller expressly disclaims, has not made, will not, and does not, make, any warranties or representations, express or implied, with respect to the Property, the physical condition, existence or repair or disrepair thereof, the value, profitability or marketability thereof, or of any of the appurtenances, facilities or equipment thereon;

    (ii)    Seller expressly disclaims, has not made, will not, and does not, make, any warranties, express or implied, of merchantability, habitability or fitness for a particular use; and

    (iii)    Upon the Closing, Purchaser shall be deemed to have made such legal, factual and other inquiries and investigations as Purchaser deems necessary, desirable or appropriate with respect to the Property, the value and marketability thereof, and of the appurtenances, facilities and equipment thereof.  Such inquiries and investigations of Purchaser shall be deemed to include, but shall not be limited to, the physical components of all portions of the Real Property, the environmental condition of the Real Property, the condition of repair of the Real Property, such state of facts as an accurate survey would show, and the present and future zoning, ordinances, resolutions and regulations of the City, County, and State where the Real Property are located.

    (c)    WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE PRECEDING SUBSECTIONS 9(A) AND 9(B), SUBJECT TO THE PROVISIONS OF SECTION 13 OF THIS AGREEMENT, PURCHASER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES, RELEASES AND DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD, OR MAY HAVE, AGAINST THE SELLER AND SELLER'S RELATED PARTIES RELATING TO, ARISING OUT OF OR WITH RESPECT TO (i) THE CONDITION OF THE PROPERTY, EITHER PATENT OR LATENT, (ii) PURCHASER'S ABILITY, OR INABILITY, TO OBTAIN OR MAINTAIN TEMPORARY OR FINAL CERTIFICATES OF OCCUPANCY, PERMITS OR OTHER LICENSES FOR THE USE OR OPERATION OF THE REAL PROPERTY, AND/OR CERTIFICATES OF COMPLIANCE FOR THE REAL PROPERTY, (iii) THE ACTUAL OR POTENTIAL INCOME, OR PROFITS, TO BE DERIVED FROM THE PROPERTY, (iv) THE REAL ESTATE, OR OTHER, TAXES OR SPECIAL ASSESSMENTS, NOW OR HEREAFTER PAYABLE ON ACCOUNT OF, OR WITH RESPECT TO, THE PROPERTY, (v) PURCHASER'S ABILITY OR INABILITY TO DEMOLISH THE IMPROVEMENTS OR OTHERWISE DEVELOP THE REAL PROPERTY, OR (vi) ANY OTHER MATTER

RELATING TO THE PROPERTY. NOTWITHSTANDING THE FOREGOING AND FOR THE AVOIDANCE OF DOUBT, IN NO EVENT SHALL THE PROVISIONS OF THIS SECTION 9(C) BE DEEMED TO LIMIT PURCHASER'S RIGHTS AND REMEDIES TO ENFORCE THE PROVISIONS OF THIS AGREEMENT AGAINST SELLER.

### 10. __NON-FOREIGN SELLER CERTIFICATION__

Seller represents that Seller is not a foreign person as defined in Section 1445 of the Internal Revenue Code of 1986, as amended (the "__Code__"), and the regulations promulgated thereunder, and is therefore exempt from the withholding requirements of said Section. At Closing, Seller will deliver to Purchaser the certification set forth in Section 1445 of the Code and regulations.

### 11. __DEFAULT AND REMEDIES; TERMINATION__

If Seller fails or refuses to comply with the terms of this Agreement within fifteen (15) Business Days of receipt by Seller of notice of such default (the "__Seller Cure Period__") for any reason other than Purchaser's uncured default hereunder (following the expiration of the applicable Purchaser Cure Period (hereinafter defined)), then Purchaser shall have as its sole and exclusive remedy, the right to terminate the Agreement upon written notice to Seller, whereupon the Deposit shall be promptly returned to Purchaser and thereafter this Agreement shall be terminated and of no further force or effect except as to any obligations that by their terms specifically survive termination of this Agreement.

If Purchaser fails or refuses to comply with the terms of this Agreement within fifteen (15) Business Days of receipt by Purchaser of notice of such default (the "__Purchaser Cure Period__") for any reason other than Seller's uncured default (following the expiration of the applicable Seller Cure Period), then Seller shall have as its sole and exclusive remedy, the right to terminate the Agreement, whereupon the Deposit shall be disbursed to, and retained by, Seller and this Agreement shall be terminated and of no further force or effect except as to any obligations that by their terms specifically survive termination of this Agreement.

Notwithstanding anything contained herein to the contrary, Seller may terminate this Agreement if the manager of Seller determines, based upon consultation with Seller's advisors, that proceeding with the transactions contemplated herein would be inconsistent with its fiduciary duties under applicable law in light of any material event, change, development or occurrence arising after the date of this Agreement that was not known to the manager of Seller, including without limitation, with respect to an Alternative Bid. In the event Seller terminates this Agreement in accordance with the preceding sentence, the Deposit shall be promptly returned to Purchaser and thereafter this Agreement shall be terminated and of no further force or effect except as provided for in this Agreement.

### 12. __NOTICES__

Any notice which either Party desires or is required to give hereunder shall be in writing and effective and deemed properly served (a) when hand delivered, provided that the addressee of such notices signs an acknowledgement of receipt of such notice, or (b) when received if sent with the United States Postal Service, as registered or certified mail, return receipt requested,

bearing adequate postage, or (c) when received if sent with a reputable overnight courier service for guaranteed next day delivery with required signature acknowledgement of receipt to the Parties, or (d) when sent if sent via email (provided that notices sent via email shall not be deemed effective unless such notice is concurrently sent via another permitted means of delivery set forth in this sentence), at the following addresses:

> To Seller:
> George Washington Bridge Bus Station Development Venture LLC
> c/o Cole Schotz PC
> 1325 Avenue of the Americas, 19th Floor
> New York, New York 10019
> Attention: Michael Sirota, Esq.
>       Ryan Jareck, Esq.
> Email:  msirota@coleschotz.com;
>       rjareck@coleschotz.com

> To Purchaser:
> c/o Monarch Alternative Capital LP
> 535 Madison Avenue
> New York, NY 10022
> Attention: Ian Glastein
> Email: ian.glastein@monarchlp.com

> With a required copy to:
> c/o Monarch Alternative Capital LP
> 535 Madison Avenue
> New York, NY 10022
> Attention: Colin Daniels
> Email: colin.daniels@monarchlp.com

> With a required copy to:
> Benesch, Friedlander, Coplan & Aronoff LLP
> 200 Public Square, Suite 2300
> Cleveland, OH 44114-2378
> Attention:  Jared E. Oakes, Esq.
>       Barry J. Guttman, Esq.
> Email:  joakes@beneschlaw.com;
>       bguttman@beneschlaw.com

Notice of change of address for receipt of notices shall be sent in the manner set forth in this Section 12.  Notices sent by counsel to a Party on such Party's behalf shall be deemed notice sent by the Party itself.

13.   **MUTUAL RELEASES.**

Effective as of the Closing, and other than with respect to any claims pursuant to, and subject to the terms, conditions and limitations of, the terms and conditions of this Agreement, each of Seller and Purchaser, on behalf of itself and each of its Affiliates, hereby releases (i) Purchaser and its Affiliates, and their current and former officers, directors, stockholders, employees, agents, representatives, attorneys, investors, parents, predecessors, subsidiaries, successors and assigns (collectively, the "**Purchaser Released Parties**") and (ii) Seller and its managing member, attorneys, accountants, financial advisor and investment banker as of the Closing (collectively, the "**Seller Released Parties**"), respectively, from any and all liabilities, actions, rights of action, contracts, Indebtedness, obligations, claims, causes of action, suits, damages, demands, costs, expenses and attorneys' fees whatsoever, of every kind and nature, known or unknown, disclosed or undisclosed, accrued or unaccrued, existing at any time, in all circumstances arising at or prior to the Closing, that such Seller or Purchaser, respectively, or any of their respective Affiliates or any of their respective successors and assigns, have or may have against any of the Purchaser Released Parties or the Seller Released Parties, respectively; provided, however, that this Section 13 shall not apply to any causes of action arising from the fraud or willful misconduct of the Purchaser Released Parties or the Seller Released Parties, as applicable, or brought to enforce rights under this Agreement.

14.   **ENTIRE CONTRACT, AMENDMENTS AND WAIVERS**

This Agreement contains the entire agreement and understanding of the Parties with respect to the subject matter hereof, and the same may not be amended, modified or discharged nor may any of its terms be waived except by an instrument in writing signed by the Party to be bound thereby.

15.   **FURTHER ASSURANCES**

The Parties each agree to do, execute, acknowledge and deliver all such further acts, instruments and assurances and to take all such further action before or after the Closing as shall be necessary or desirable to fully carry out this Agreement and to fully consummate and effect the transaction contemplated hereby.

16.   **SURVIVAL AND BENEFIT**

Except to the extent specifically stated to the contrary elsewhere in this Agreement, all representations, warranties, agreements and obligations of the Parties contained in this Agreement shall not survive the Closing. Wherever in this Agreement there is a reference to termination of this Agreement, such termination shall not be construed to terminate the obligations of the Parties with respect to any representations, warranties and obligations of the Parties contained in this Agreement which by their terms to the extent specifically stated in this Agreement shall survive termination of this Agreement.

17.   **CONFIDENTIALITY**

(a)   Purchaser agrees that all terms of this Agreement as well as any information provided to Purchaser pertaining to Seller (the "**Seller Confidential Information**") will remain

confidential and will not be divulged by Purchaser without the written consent of Seller. Notwithstanding anything contained in this Agreement to the contrary, the obligation of confidentiality does not apply to (a) Seller Confidential Information which is now, or in the future becomes, part of the public domain, other than by breach of the terms of this Section 17(a), (b) Seller Confidential Information lawfully obtained from independent sources, and (c) disclosure specifically authorized by Seller in writing. Without limiting the foregoing, Purchaser agrees and acknowledges that no copies, summaries, abstracts or other reproductions of this Agreement or its terms will be provided to any third party not subject to substantially the same confidentiality obligation as Purchaser; provided, however, that for the avoidance of doubt, Purchaser shall have the right to disclose Seller Confidential Information to Purchaser's managers, partners, directors, officers, employees, agents, representatives and advisors (including, without limitation, financial advisors, accountants, legal advisors and consultants), equity or debt investors, the First Lien Exit Lender, the Senior Secured Lender or other debt or equity financing sources. In the event Purchaser breaches the terms of this Section, Purchaser acknowledges and agrees that Seller will be irreparably harmed, but that Seller's damages are difficult to calculate and, therefore, Seller shall be entitled to pursue an action for equitable relief, including, but not limited to, temporary or permanent injunctions, against any actual or threatened breach of this Section 17(a), in addition to Seller's rights and remedies under Section 11 of this Agreement or otherwise available at law or in equity; provided, however, that if Seller exercises Seller's remedy to retain the Deposit under Section 11 above, then (i) the amount of the Deposit shall offset against any damages to which Seller may be entitled pursuant to this Section 17(a), and (ii) if Seller does not prevail in any action brought against Purchaser under this Section 17(a), then Seller shall promptly return the Deposit to Purchaser.

(b)    Seller agrees that all terms of this Agreement as well as any information provided to Seller pertaining to Purchaser (the "**Purchaser Confidential Information**") will remain confidential and will not be divulged by Seller without the written consent of Purchaser. Notwithstanding anything contained in this Agreement to the contrary, the obligation of confidentiality does not apply to (a) Purchaser Confidential Information which is now, or in the future becomes, part of the public domain, other than by breach of the terms of this Section 17(b), (b) Purchaser Confidential Information lawfully obtained from independent sources, and (c) disclosure specifically authorized by Purchaser in writing. Without limiting the foregoing, Seller agrees and acknowledges that no copies, summaries, abstracts or other reproductions of this Agreement or its terms will be provided to any third party not subject to the same confidentiality obligation as Seller. In the event Seller breaches the terms of this Section, Seller acknowledges and agrees that Purchaser will be irreparably harmed, but that Purchaser's damages are difficult to calculate and, therefore, Purchaser shall be entitled to pursue an action for equitable relief, including, but not limited to, temporary or permanent injunctions, against any actual or threatened breach of this Section 17(b), in addition to all other rights and remedies set forth in this Agreement or otherwise available at law or in equity.

(c)    Notwithstanding the foregoing provisions of this Section 17 or anything to the contrary in this Agreement, the Parties agree that this Agreement will be publicly filed with the Bankruptcy Court in connection with obtaining approval hereof, and the mere filing of this Agreement with the Bankruptcy Court in connection with the Bankruptcy Case by either Party shall not be deemed a breach of the terms of this Section 17.

(d)     The provisions of this Section 17 shall survive the termination of this Agreement for a period of one (1) year but shall not survive the Closing.

18.    **BROKERAGE**

Seller hereby indemnifies, protects and defends and holds Purchaser harmless from and against all losses, claims, costs, expenses, damages (including, but not limited to, attorneys' fees of counsel selected by the indemnified party) resulting from the claims of any broker (including any broker representing Seller), finder, or other such party claiming by, through or under the acts or agreements of Seller.  Purchaser hereby indemnifies, protects and defends and holds Seller harmless from and against all losses, claims, costs, expenses, damages (including, but not limited to, attorneys' fees of counsel selected by the indemnified party) resulting from the claims of any broker (other than any broker representing Seller), finder, or other such party claiming by, through or under the acts or agreements of Purchaser.  Any commission or other compensation due any broker representing Seller or Purchaser shall be the sole responsibility of Seller or Purchaser, as applicable, and any broker representing Seller or Purchaser shall be paid at the Closing in accordance with separate agreements between such broker and Seller or Purchaser, as applicable.  Notwithstanding the foregoing provisions of this Section 18, if and only if Closing occurs, then at Closing, Seller shall pay the commission owed to Houlihan Lokey Capital, Inc. ("**Broker**") pursuant to a separate agreement between Seller and Broker (the "**Brokerage Agreement**").

19.    **ASSIGNMENT**

Purchaser may not assign or transfer its rights or obligations under this Agreement without Seller's prior written consent, the granting or denial of which shall not be unreasonably withheld, conditioned or delayed; provided, however, that no consent shall be required to an assignment by Purchaser to any affiliate of Purchaser or entity controlling, controlled by or under common control with Purchaser.  No transfer or assignment by Purchaser in violation of the provisions hereof shall be valid or enforceable.

20.    **NO THIRD-PARTY BENEFITS**

This Agreement is for the sole and exclusive benefit of the Parties hereto and their respective successors and permitted assigns, and no third party is intended to or shall have any rights hereunder.  This Agreement is binding upon and inures to the benefit of the successors and assigns of the Parties.

21.    **INTENTIONALLY OMITTED**

22.    **SEVERABILITY**

In the event that any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision in this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained in the Agreement.

23. **GOVERNING LAW**

This Agreement shall be construed and governed in accordance with the laws of the State of New York without regard to its conflicts of laws principles.

24. **COUNTERPARTS**

This Agreement may be signed in several counterparts, each of which shall be deemed an original, and all such counterparts shall constitute one and the same instrument.  Any counterpart to which is attached the signatures of all Parties shall constitute an original of this Agreement. Any counterpart of this Agreement executed by a Party may be delivered via facsimile, email or other electronic transmission, and shall be legally binding upon the Parties to the same extent as delivery of an original counterpart of this Agreement executed by a Party.

25. **SUCCESSORS AND ASSIGNS**

This Agreement shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the Parties to this Agreement; provided, however, that Purchaser may only assign this Agreement in accordance with the provisions of <u>Section 18</u> of this Agreement.

26. **NO RECORDING**

Purchaser agrees not to record this Agreement or any memorandum or short form of this Agreement. Any such recording by Purchaser shall be a default under this Agreement and shall entitle Seller to terminate this Agreement in accordance with the terms hereof.

27. **TIME FOR PERFORMANCE**

All references in this Agreement to "**days**" shall mean calendar days unless specifically stated. Notwithstanding the foregoing, whenever any expiration of a time limit or specific date provided in this Agreement falls on a Saturday, Sunday, or other day on which national banks in the State of New York are authorized or required to be closed, then that date is extended to the next day that is not a Saturday, Sunday, or other day on which national banks in the State of New York are authorized or required to be closed. The term "**Business Day**" as used in this Agreement means any day that is not a Saturday, Sunday, legal holiday or other day on which national banks in the State of New York are authorized or required to be closed.

28. **TIME OF THE ESSENCE**

Time is of the essence of this Agreement.

29. **CONDEMNATION AND CASUALTY**

In the event of any taking, or notice is given of the intention to take any of the Real Property by the exercise of the power of eminent domain of all or a substantial portion (hereinafter defined) of the Real Property prior to the Closing Date, Purchaser shall have the right to terminate this Agreement by giving written notice to Seller within five (5) business days

after receipt by Purchaser of written notification of any such condemnation. If Purchaser elects to terminate this Agreement, then the Deposit shall be promptly returned to Purchaser and thereafter this Agreement shall be terminated and of no further force or effect except as to any obligations that by their terms specifically survive termination of this Agreement, and all awards and compensation arising out of said condemnation shall be the property of Seller.  If Purchaser elects not to terminate this Agreement or fails to give Seller notice of termination within said five (5) Business Day period, said right to terminate shall be deemed waived and, effective as of Closing, Purchaser shall be assigned all of Seller's right, title, and interest to all awards and compensation arising out of said condemnation, and Purchaser shall remain obligated to purchase the Property, with no reduction in the consideration provided hereunder.

In the event of any damage to all or any substantial portion of the Real Property, Purchaser shall have the right to terminate this Agreement by giving written notice to Seller within five (5) Business Days after receipt by Purchaser of written notification from Seller of any such damage.  If Purchaser elects to terminate this Agreement, then the Deposit shall be promptly returned to Purchaser and this Agreement shall be terminated and of no further force or effect except as to any obligations that by their terms specifically survive termination of this Agreement, and all insurance proceeds arising out of or payable in connection with said casualty shall be the property of Seller.  If Purchaser elects not to terminate this Agreement or fails to give Seller notice of termination within said five (5) Business Day period, said right to terminate shall be deemed waived and, effective as of Closing, Purchaser shall be assigned all of Seller's right, title, and interest to all insurance proceeds arising out of or payable in connection with said casualty, and Purchaser shall remain obligated to purchase the Property, with no reduction in the consideration provided hereunder.

For purposes of this Section 29, a "**substantial portion**" of the Real Property shall mean a portion of the Real Property that: (a) has a value reasonably determined by Purchaser to be equal to not less than ten percent (10%) of the Purchase Price; (b) the condemnation or damage of which would give a Major Subtenant the right to terminate its Sublease; (c) the condemnation or damage of which would result in the termination of the Ground Lease or the Port Authority having the right to terminate the Ground Lease; or (d) otherwise materially affects access to the Property or its use or operation.

30. **SECTION HEADINGS**

The section headings contained in this Agreement are for convenience only and shall in no way enlarge or limit the scope or meaning of the various and several sections hereof

31. **INTERPRETATION**

Whenever used in this Agreement, the singular number shall include the plural, the plural the singular, and the use of any gender shall include all genders.

32. **JURY TRIAL**

SELLER AND PURCHASER HEREBY RESPECTIVELY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM WHETHER IN CONTRACT, TORT OR

OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THIS CONTRACT AND THE
OBLIGATIONS AND CONTRACTS CONTAINED IN THIS CONTRACT.

33.    **AMENDMENTS**

No agreement, amendment, modification, understanding or waiver of or with respect to
this Agreement or any term, provision, covenant or condition hereof; nor any approval or consent
given under or with respect to this Agreement, shall be effective for any purpose unless
contained in writing and executed by each Party hereto. However, such amendments and/or
supplements may be executed in counterparts, all of which shall be deemed to constitute one
document.

34.    **ENTIRE CONTRACT**

The Parties acknowledge and agree that at all times they have intended that none of the
preliminary negotiations concerning this transaction would be binding on either Party, and that
they would be bound to each other only by a single, formal, comprehensive document containing
this Section and all of the agreements of the Parties, in final form, which has been executed and
delivered by Purchaser and Seller. The Parties acknowledge that none of the prior oral
agreements between them (and none of the representations on which either of them has relied)
relating to the subject matter of this Agreement shall have any force or effect whatever, except as
and to the extent that such agreements and representations have been incorporated in this
Agreement.

35.    **PATRIOT ACT**

To Seller's knowledge, neither Seller nor its parent, subsidiary or affiliated entities are (i)
in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals
or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of
identifying suspected terrorists or on the most current list published by the U.S. Treasury
Department Office of Foreign Assets Control.  Purchaser certifies that its name is GWB Madison
Purchaser LLC, and to Purchaser's knowledge, neither Purchaser or affiliated entities are (i) in
violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or
entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of
identifying suspected terrorists or on the most current list published by the U.S. Treasury
Department Office of Foreign Assets Control.

36.    **FIDUCIARY OBLIGATIONS.**

Nothing in this Agreement, or any document related to the transactions contemplated
hereby, will require Seller or any of its managers, directors, officers or members, in each case, in
their capacity as such, to take any action, or to refrain from taking any action, to the extent
inconsistent with their fiduciary obligations. For the avoidance of doubt, Seller retains the right
to pursue any transaction or restructuring strategy that, in Seller's business judgment, will
maximize the value of its estate, subject to the obligations to return the Deposit to Purchaser as
provided for herein.

37.    **EXCULPATION; LIMITATION OF LIABILITY.**

Notwithstanding anything to the contrary contained in this Agreement, no officer, director, shareholder, employee, agent, manager, member or partner of Seller or Purchaser shall have any personal liability with respect to any of the obligations contained in this Agreement. Under no circumstances shall Seller or Purchaser be responsible for consequential, special or punitive damages, and Seller and Purchaser hereby waive any and all such claims against the other for such consequential, special or punitive damages. The provisions of this <u>Section 37</u> shall survive the expiration of the term or any earlier termination of this Agreement.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

**IN WITNESS WHEREOF**, the Parties have executed this Agreement of Purchase and Sale as of the date first above written.

**SELLER:**

**GEORGE WASHINGTON BRIDGE BUS STATION DEVELOPMENT VENTURE LLC**, a Delaware limited liability company

By: _____
Name:   BERNARD A. KATZ
Title:   MANAGER

**PURCHASER:**

**GWB MADISON PURCHASER LLC**, a Delaware limited liability company

By: _____
Name:
Title:

**(Signature Page to Agreement of Purchase and Sale)**

**IN WITNESS WHEREOF**, the Parties have executed this Agreement of Purchase
and Sale as of the date first above written.

**SELLER:**

**GEORGE WASHINGTON BRIDGE
BUS STATION DEVELOPMENT
VENTURE LLC**, a Delaware limited
liability company

By: _____
Name:
Title:

**PURCHASER:**

**GWB MADISON PURCHASER LLC**,
a Delaware limited liability company
 By:  M Manager LLC, as Manager

By: _____
Name:    Andrew Herenstein
Title:    Authorized Person

**(Signature Page to Agreement of Purchase and Sale)**

## ESCROW CONSENT AND ACKNOWLEDGMENT

The undersigned agrees to act as the Title Insurer and Escrow Agent for the transaction described in the above Agreement as provided herein.  Receipt of the Deposit is hereby acknowledged.  The undersigned agrees to hold and deliver the Deposit in accordance with the terms of this Agreement.

FIRST AMERICAN TITLE INSURANCE COMPANY

Escrow No. _____    By: _____
                                             _____ (Print Name)
                                             Authorized Representative

Date: _____, 2021

First American Title Insurance Company
666 Third Avenue
New York, New York 10017
Attn: Larissa Kravanja, Esq. (lkravanja@firstam.com)

## <u>EXHIBITS / SCHEDULES</u>

Exhibit A:      Ground Lease
Exhibit B:      Legal Description
Exhibit C:      Form of Assignment of Ground Lease
Exhibit D:      Form of Bill of Sale
Exhibit E-1:    Form of Assignment of Subleases
Exhibit E-2:    Form of Subtenant Notices
Exhibit F:      Intentionally Omitted
Exhibit G:      Form of Sublease Estoppel
Exhibit H:      Exit Loan Terms
Schedule 1:     Assumed Contracts
Schedule 2:     Subleases
Schedule 3:     Security Deposits
Schedule 4:     Leasing Incentives
Schedule 5:     Rent Roll
Schedule 6:     Tangible Personal Property
Schedule 7:     Intangible Personal Property
Schedule 8:     Violations
Schedule 9:     Litigation
Schedule 10:    Subtenant A/R

## EXHIBIT A

## GROUND LEASE

1.  Agreement of Lease by and between The Port Authority of New York and New Jersey and George Washington Bridge Bus Station Development Venture LLC dated July 21, 2011, as amended and supplemented by the First Amendment to the Agreement of Lease dated September 19, 2011, a letter agreement dated January 14, 2016, a subsequent letter agreement dated October 31, 2016, a subsequent letter agreement dated November 30, 2016, a subsequent letter agreement dated December 31, 2016, a subsequent letter agreement dated January 31, 2017, the Second Amendment to Lease dated May 15, 2017, a Waiver under Agreement of Lease and a Commitment to Provide Community Space at the GWBBS, each dated October 1, 2018, the Third Amendment to Agreement of Lease dated January 10, 2019, a settlement letter agreement dated January 10, 2019, and the Fourth Amendment to Agreement of Lease dated October 2, 2019.

2.  Memorandum of Lease made by and between The Port Authority of New York and New Jersey and George Washington Bridge Bus Station Development Venture LLC dated as of July 21, 2011, and recorded on August 2, 2011 as CRFN 2011000271826

## EXHIBIT B

## LEGAL DESCRIPTION

BLOCK 2163 LOT 1:

**ALL THAT CERTAIN** plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the northerly side of West 178th Street and the easterly side of Broadway;

RUNNING THENCE northerly along the easterly side of Broadway a distance of 204 feet 2 inches to the corner formed by the intersection of the easterly side of Broadway and the southerly side of West 179th Street;

THENCE easterly along the southerly side of West 179th Street a distance of 260 feet 8 7/8 inches to the corner formed by the intersection of the southerly side of West 179th Street and the westerly side of Wadsworth Avenue;

THENCE southerly along the westerly side of Wadsworth Avenue a distance of 200 feet to the corner formed by the intersection of the westerly side of Wadsworth Avenue and the northerly side of West 178th Street;

THENCE westerly along the northerly side of West 178th Street a distance of 301 feet 9 1/2 inches to the corner formed by the intersection of the northerly side of West 178th Street and the easterly side of Broadway to the point or place of BEGINNING.

SAID premises being more particularly bounded and described as follows:

**ALL THAT CERTAIN** plot, piece or parcel of land, being Tax Lot I in Tax Block 2163, situate, lying and being in the Borough of Manhattan, City, County and State of New York, being more particularly bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southeasterly side of Broadway (100 feet wide) with the southwesterly side of West 179th Street (60 feet wide), as the streets are laid out on the Borough President of Manhattan Final Sectional Map No. 30, said point having the Memorial Church coordinates of North 24122.640 East 5478.278 (NAD 83 New York East coordinates of North 734630.813 East 647889.374);

RUNNING THENCE southeasterly along the southwesterly side of West 179th Street, a distance of 260.76 feet to the corner formed by the intersection of the southwesterly side of West 179th Street with the northwesterly side of Wadsworth Avenue (80 feet wide) said line forming an interior angle of 101 degrees 36 minutes 38 seconds with the southeasterly side of Broadway;

RUNNING THENCE southwesterly along the northwesterly side of Wadsworth Avenue, a distance of 200.00 feet to the corner formed by the intersection of the northwesterly side of Wadsworth Avenue with the northeasterly side of West 178th Street (60 feet wide); said line forming an interior angle of 89 degrees 58 minutes 55 seconds with the southwesterly side of West 179th Street;

RUNNING THENCE northwesterly along the northeasterly side of West 178th Street, a distance of 301.79 feet to the corner formed by the intersection of the northeasterly side of West 178th Street with the southeasterly side of Broadway; said line forming an interior angle of 90 degrees 00 minutes 53 seconds with the northwesterly side of Wadsworth Avenue;

RUNNING THENCE northeasterly along the southeasterly side of Broadway, a distance of 204.16 feet to the place and point of BEGINNING; said line forming an interior angle of 78 degrees 23 minutes 34 seconds with the northeasterly side of West 178th Street, to the point or place of BEGINNING.

BLOCK 2176 LOT 17:

**ALL THAT CERTAIN** plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the northerly side of West 178th Street and the westerly side of Broadway;

RUNNING THENCE northerly along the westerly side of Broadway a distance of 206 feet and 0 1/2 inches to the corner formed by the intersection of the westerly side of Broadway and the southerly side of West 179th Street;

THENCE westerly along the southerly side of West 179th Street a distance of 423 feet 9 7/8 inches to the corner formed by the intersection of the southerly side of West 179th Street and the easterly side of Fort Washington Avenue;

THENCE southerly along the easterly side of Fort Washington Avenue a distance of 185 feet 2 1/4 inches to the corner formed by the intersection of the easterly side of Fort Washington Avenue and the northerly side of West 178th Street;

THENCE easterly along the northerly side of West 178th Street a distance of 341 feet 3 1/8 inches to the corner formed by the intersection of the northerly side of West 178th Street and the westerly side of Broadway to the point or place of BEGINNING.

EXCEPTING therefrom so much of the premises that may be taken for widening of West 178th Street and West 179th Street.

SAID premises being more particularly bounded and described as follows:

**ALL THAT CERTAIN** plot, piece or parcel of land, being Tax Lot 17 in Tax Block 2176, situate, lying and being in the Borough of Manhattan, City, County and State of New York, being more particularly bounded and described as follows:

BEGINNING at a point on the southeasterly side of Fort Washington Avenue (80 feet wide) extended northeasterly 20.02 feet, distant from the corner formed by the intersection of the southeasterly side of Fort Washington Avenue with the southwesterly side of West 179th Street (60 feet wide), as the streets are laid out on the Borough President of Manhattan Final Sectional Map No. 30, said point having the Memorial Church coordinates of North 24251.823 East 4956.112 (NAD 83 New York East coordinates of North 734756.743 East 647366.432);

Exhibit B – Page 2 of 3

RUNNING THENCE southeasterly along the northerly line of said Parcel B, a distance of 423.73 feet to an angle point on the northwesterly side of Broadway (100 feet wide) extended northeasterly; said line forming an interior angle of 92 degrees 32 minutes 33 seconds with the southeasterly side of Fort Washington Avenue extended northeasterly;

RUNNING THENCE southwesterly along the northwesterly side of Broadway extended, a distance of 205.98 feet to an angle point; said line forming an interior angle of 63 degrees 52 minutes 49 seconds with the last mentioned course;

RUNNING THENCE northwesterly along the southerly line of said Parcel B, a distance of 341.28 feet to an angle point on the southeasterly side of Fort Washington Avenue extended southwesterly; said line forming an interior angle of 116 degrees 07 minutes 57 seconds with the northwesterly side of Broadway extended southwesterly;

RUNNING THENCE northeasterly along the southeasterly side of Fort Washington Avenue extended, a distance of 185.22 feet to the place and point of BEGINNING; said line forming an interior angle of 87 degrees 26 minutes 41 seconds with the last mentioned course.

## EXHIBIT C

## FORM OF ASSIGNMENT OF GROUND LEASE

(See attached)

Exhibit C – Page 1 of 7

## ASSIGNMENT AND ASSUMPTION OF GROUND LEASE

**THIS AGREEMENT**, made as of _____, 2021, between **GEORGE WASHINGTON BRIDGE BUS STATION DEVELOPMENT VENTURE LLC** (the "Assignor"), a limited liability company organized and existing under the laws of the State of Delaware, and having an office at_____ (the "Assignee"), a _____ organized and existing under the laws of ___ _____ and having an office at _____.

### WITNESSETH, THAT:

**WHEREAS**, the Assignor desires to assign to the Assignee that certain Agreement of Lease dated as of July 21, 2011, made by and between The Port Authority of New York and New Jersey, a body corporate and politic created by compact between the States of New York and New Jersey with the consent of the Congress of the United States of America, and the Assignor (as the same may heretofore have been amended or extended, the "Lease"), a Memorandum of which dated as of July 21, 2011 was recorded August 2, 2011 in (as) CRFN 2011000271826, covering premises located within the Borough of Manhattan, the City of New York, as more particularly described in **Exhibit A** annexed hereto (the "Premises").

**NOW, THEREFORE**, in consideration of the covenants and mutual promises herein contained, the Assignor and the Assignee hereby agree as follows:

1.      The Assignor does hereby assign, convey, transfer and set over the Lease and the leasehold estate created thereby, and all right, title and interest of the Assignor in and to the Premises, to the Assignee, its legal representatives, successors and permitted assigns, to its and their own proper use, benefit and behoof, to have and to hold the same unto the Assignee, its legal representatives, successors and permitted assigns, from the date hereof (the "Effective Date"), for and during all the rest, residue and remainder of the term of the letting under the Lease, subject nevertheless to all the terms, provisions, covenants and conditions therein contained.

2.      The Assignee does hereby, effective from and after the Effective Date, assume the performance of and does hereby agree to perform, observe and be subject to all the terms, provisions, covenants and conditions, including without limitation the obligations to pay Rental, contained in the Lease which are to be performed or observed by or are applicable to the Lessee thereunder on and after the Effective Date, subject to the provisions of Section 17.11 of the Lease, which is incorporated in this Agreement by reference.

3.      The Assignor agrees that this assignment of the Lease shall not in any way whatsoever affect or impair the liability of the Assignor to perform all the terms, provisions, covenant and conditions of the Lease (including without limitation thereto the obligation to pay Rental) on the part of the Lessee to be performed prior to the Effective Date, subject to the provisions of Section 17.11 and 25.3 of the Lease.  However, the Assignor shall be, and hereby is, relieved of all liability and obligations accruing under the Lease on and after the Effective Date.

Exhibit C – Page 2 of 7

4.      The provisions of this Agreement shall be binding upon, and shall inure to the benefit of, the successors and assigns of Assignor and Assignee, respectively.

5.      This Assignment of Lease may be executed in counterparts and once fully executed in counterparts, it shall be in full force and effect as if all parties hereto executed the same original.

6.      Assignor, in compliance with Lien Law Section 13, agrees that Assignor will receive the consideration for this conveyance and will hold the right to receive that consideration as a trust fund to be applied first to pay the cost of the improvement before using any part of it for any other purpose.

**BALANCE OF PAGE INTENTIONALLY LEFT BLANK**

Exhibit C – Page 3 of 7

**IN WITNESS WHEREOF,** the Assignor and the Assignee have executed this Agreement as of the date first hereinabove set forth.

ASSIGNOR:

GEORGE WASHINGTON BRIDGE BUS
STATION DEVELOPMENT VENTURE
LLC, a Delaware limited liability company

By:_____
Name:
Title:

ASSIGNEE:

_____
a _____


By:_____
Name:
Title:

[notary blocks to be inserted]

Exhibit C – Page 4 of 7

## EXHIBIT A

## LEGAL DESCRIPTION

BLOCK 2163 LOT 1:

**ALL THAT CERTAIN** plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the northerly side of West 178th Street and the easterly side of Broadway;

RUNNING THENCE northerly along the easterly side of Broadway a distance of 204 feet 2 inches to the corner formed by the intersection of the easterly side of Broadway and the southerly side of West 179th Street;

THENCE easterly along the southerly side of West 179th Street a distance of 260 feet 8 7/8 inches to the corner formed by the intersection of the southerly side of West 179th Street and the westerly side of Wadsworth Avenue;

THENCE southerly along the westerly side of Wadsworth Avenue a distance of 200 feet to the corner formed by the intersection of the westerly side of Wadsworth Avenue and the northerly side of West 178th Street;

THENCE westerly along the northerly side of West 178th Street a distance of 301 feet 9 1/2 inches to the corner formed by the intersection of the northerly side of West 178th Street and the easterly side of Broadway to the point or place of BEGINNING.

SAID premises being more particularly bounded and described as follows:

**ALL THAT CERTAIN** plot, piece or parcel of land, being Tax Lot I in Tax Block 2163, situate, lying and being in the Borough of Manhattan, City, County and State of New York, being more particularly bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southeasterly side of Broadway (100 feet wide) with the southwesterly side of West 179th Street (60 feet wide), as the streets are laid out on the Borough President of Manhattan Final Sectional Map No. 30, said point having the Memorial Church coordinates of North 24122.640 East 5478.278 (NAD 83 New York East coordinates of North 734630.813 East 647889.374);

RUNNING THENCE southeasterly along the southwesterly side of West 179th Street, a distance of 260.76 feet to the corner formed by the intersection of the southwesterly side of West 179th Street with the northwesterly side of Wadsworth Avenue (80 feet wide) said line forming an interior angle of 101 degrees 36 minutes 38 seconds with the southeasterly side of Broadway;

RUNNING THENCE southwesterly along the northwesterly side of Wadsworth Avenue, a distance of 200.00 feet to the corner formed by the intersection of the northwesterly side of Wadsworth Avenue with the northeasterly side of West 178th Street (60 feet wide); said line forming an interior angle of 89 degrees 58 minutes 55 seconds with the southwesterly side of West 179th Street;

Exhibit C – Page 5 of 7

RUNNING THENCE northwesterly along the northeasterly side of West 178th Street, a distance of 301.79 feet to the corner formed by the intersection of the northeasterly side of West 178th Street with the southeasterly side of Broadway; said line forming an interior angle of 90 degrees 00 minutes 53 seconds with the northwesterly side of Wadsworth Avenue;

RUNNING THENCE northeasterly along the southeasterly side of Broadway, a distance of 204.16 feet to the place and point of BEGINNING; said line forming an interior angle of 78 degrees 23 minutes 34 seconds with the northeasterly side of West 178th Street, to the point or place of BEGINNING.

BLOCK 2176 LOT 17:

**ALL THAT CERTAIN** plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the northerly side of West 178th Street and the westerly side of Broadway;

RUNNING THENCE northerly along the westerly side of Broadway a distance of 206 feet and 0 1/2 inches to the corner formed by the intersection of the westerly side of Broadway and the southerly side of West 179th Street;

THENCE westerly along the southerly side of West 179th Street a distance of 423 feet 9 7/8 inches to the corner formed by the intersection of the southerly side of West 179th Street and the easterly side of Fort Washington Avenue;

THENCE southerly along the easterly side of Fort Washington Avenue a distance of 185 feet 2 1/4 inches to the corner formed by the intersection of the easterly side of Fort Washington Avenue and the northerly side of West 178th Street;

THENCE easterly along the northerly side of West 178th Street a distance of 341 feet 3 1/8 inches to the corner formed by the intersection of the northerly side of West 178th Street and the westerly side of Broadway to the point or place of BEGINNING.

EXCEPTING therefrom so much of the premises that may be taken for widening of West 178th Street and West 179th Street.

SAID premises being more particularly bounded and described as follows:

**ALL THAT CERTAIN** plot, piece or parcel of land, being Tax Lot 17 in Tax Block 2176, situate, lying and being in the Borough of Manhattan, City, County and State of New York, being more particularly bounded and described as follows:

BEGINNING at a point on the southeasterly side of Fort Washington Avenue (80 feet wide) extended northeasterly 20.02 feet, distant from the corner formed by the intersection of the southeasterly side of Fort Washington Avenue with the southwesterly side of West 179th Street (60 feet wide), as the streets are laid out on the Borough President of Manhattan Final Sectional Map No. 30, said point having the Memorial Church coordinates of North 24251.823 East 4956.112 (NAD 83 New York East coordinates of North 734756.743 East 647366.432);

Exhibit C – Page 6 of 7

RUNNING THENCE southeasterly along the northerly line of said Parcel B, a distance of 423.73 feet to an angle point on the northwesterly side of Broadway (100 feet wide) extended northeasterly; said line forming an interior angle of 92 degrees 32 minutes 33 seconds with the southeasterly side of Fort Washington Avenue extended northeasterly;

RUNNING THENCE southwesterly along the northwesterly side of Broadway extended, a distance of 205.98 feet to an angle point; said line forming an interior angle of 63 degrees 52 minutes 49 seconds with the last mentioned course;

RUNNING THENCE northwesterly along the southerly line of said Parcel B, a distance of 341.28 feet to an angle point on the southeasterly side of Fort Washington Avenue extended southwesterly; said line forming an interior angle of 116 degrees 07 minutes 57 seconds with the northwesterly side of Broadway extended southwesterly;

RUNNING THENCE northeasterly along the southeasterly side of Fort Washington Avenue extended, a distance of 185.22 feet to the place and point of BEGINNING; said line forming an interior angle of 87 degrees 26 minutes 41 seconds with the last mentioned course.

Exhibit C – Page 7 of 7

## EXHIBIT D

## FORM OF BILL OF SALE

(See attached)

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, as of this _____ day of _____, 2021, the undersigned, _____, a Delaware limited liability company ("**Seller**"), hereby sells, transfers, assigns and conveys to _____, a Delaware limited liability company ("**Buyer**"), with respect to the "Property" (as hereinafter defined), the following:

1.  <u>Personal Property</u>.  All right, title and interest of Seller in and to the "Personal Property" (as hereinafter defined).

2.  <u>Assumed Contracts</u>.  All right, title and interest of Seller in and to the "Assumed Contracts" (as hereinafter defined).

3.  <u>Other Rights</u>.  All right, title and interest of Seller, to the extent assignable, in and to all certificates, licenses, approvals, permits, warranties and other rights relating to the Property.

This Bill of Sale, Assignment and Assumption is given pursuant to that certain Agreement of Purchase and Sale (the "**APA**") dated as of _____, by and between Seller and Buyer, providing for the sale of the Property.  Buyer hereby accepts the foregoing assignment and agrees to assume and discharge, in accordance with the terms thereof, all of the obligations of Seller under the Assumed Contracts, to the extent the same arise on or after the date hereof.  This Bill of Sale, Assignment and Assumption shall inure to the benefit of and shall be binding upon Seller and Buyer, and their respective successors and assigns.  As used herein, the terms "Assumed Contracts", "Personal Property" and "Property" shall have the respective meanings set forth for the same in the APA.

This Bill of Sale, Assignment and Assumption may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same document.

*[remainder of this page intentionally left blank]*

SELLER:

GEORGE WASHINGTON BRIDGE BUS
STATION DEVELOPMENT VENTURE
LLC, a Delaware limited liability company


By:_____
Name:
Title:

BUYER:

_____
a _____


By:_____
Name:
Title:

## EXHIBIT E-1

## FORM OF ASSIGNMENT OF SUBLEASES

(See attached)

## ASSIGNMENT AND ASSUMPTION OF SUBLEASES

THIS ASSIGNMENT AND ASSUMPTION OF SUBLEASES ("*Assignment*") is entered into as of _____, 20__ ("*Effective Date*") by and between GEORGE WASHINGTON BRIDGE BUS STATION DEVELOPMENT VENTURE LLC, a Delaware limited liability company ("*Assignor*"), and _____ ("*Assignee*").

## R E C I T A L S :

A.    Assignor is the lessee under that certain Agreement of Lease dated as of July 21, 2011, made by and between The Port Authority of New York and New Jersey, a body corporate and politic created by compact between the States of New York and New Jersey with the consent of the Congress of the United States of America, and the Assignor (as the same may have been amended, modified or extended, the "*Ground Lease*"), covering premises located within the Borough of Manhattan, the City of New York, as more particularly described on **Exhibit A** attached hereto and incorporated herein by reference (the "*Property*").

B.    Assignor has agreed to sell to Assignee and Assignee has agreed to purchase Assignor's interest in the Ground Lease in accordance with the terms and conditions of a certain Agreement of Purchase and Sale between Assignor and _____ dated as of _____, 20__ (as the same may have been amended, modified and/or assigned, the "*Agreement*").

C.    The Property is currently subject to those certain subleases set forth on Exhibit "B" attached hereto and incorporated herein by reference (collectively, the "*Leases*").

D.    Assignor desires to assign Assignor's rights under the Subleases to Assignee and Assignee desires to assume Assignor's obligations thereunder from and after the Effective Date.

NOW, THEREFORE, for and in consideration of the sum of One Dollar ($1.00), paid by Assignee to Assignor, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

7.    Effective as of the Effective Date, Assignor does hereby assign, transfer and set over to Assignee all of Assignor's right, title and interest in and to the Subleases, subject, however, to all of the covenants, terms, conditions and provisions thereof.

8.    Assignee covenants and agrees to assume, keep and perform, from and after the Effective Date, all of the terms, covenants and conditions contained in the Subleases required to be kept and performed by the owner or landlord thereunder first arising on or after the Effective Date.

9.    This Assignment shall be governed and construed in accordance with the laws of the State of New York, without giving effect to any conflicts of laws provisions thereof.

10.    This Assignment shall be binding upon and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

11.     This Assignment may be executed in multiple identical counterparts all of which, when taken together, shall constitute one document.

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment as of the Effective Date.

**ASSIGNOR**:

GEORGE WASHINGTON BRIDGE BUS STATION DEVELOPMENT VENTURE LLC, a Delaware limited liability company

By:_____
Name:_____
Title: _____


**ASSIGNEE**:

_____,
a _____


By:_____
Name:_____
Title: _____


[notary blocks and exhibits to be inserted]

## EXHIBIT E-2

## FORM OF SUBTENANT NOTICES

(See attached)

## <u>NOTICE LETTER</u>

_____, 202\_\_

[TENANT NAME]
[TENANT ADDRESS]

Re:    Your Lease at George Washington Bridge Bus Station, New York, NY ("<u>Lease</u>") –
Notice of Change of Ownership and 1099 Reporting Information for Calendar Year
2021

Dear Tenant,

You are hereby notified by George Washington Bridge Bus Station Development Venture LLC,
a Delaware limited liability company ("<u>Seller</u>"), and GWB MADISON PURCHASER LLC, a
Delaware limited liability company (the "<u>New Landlord</u>"), as follows:

On _____, 202\_\_ (the "<u>Transfer Date</u>"), Seller conveyed its interest in and
to that certain Agreement of Lease by and between The Port Authority of New York and New
Jersey, as lessor, and Seller, as lessee, dated July 21, 2011 (as the same may have been amended
and/or modified before the Transfer Date, the "<u>Ground Lease</u>") to New Landlord.  By virtue of
this conveyance, New Landlord is now the lessee under the Ground Lease and the landlord
under your Lease.

Effective as of the Transfer Date, your landlord, payment address, W-9 reporting
requirements, and insurance certificate will change.    Please see below for additional
instructions.

### <u>New Landlord:</u>

As of the Transfer Date, the landlord under your Lease is now **GWB Madison
Purchaser LLC**, a Delaware limited liability company.  Please reference the copy of the
Assignment and Assumption of the Ground Lease between Seller and New Landlord attached as
<u>Exhibit A</u> for proof of transfer.

### <u>New Bank Account/Payment Information:</u>

As of the Transfer Date, rental payments to be made via Electronic Automated Clearing
House ("<u>ACH</u>") payment method should be immediately changed to the following new bank
account information:

| | |
|---|---|
| Bank Name: | _____ |
| ABA: | _____ |
| Account Number: | _____ |

Account Name: _____

If you currently do not make rental payments via ACH but would like to do so, please contact Nina Wash/cash receipts via email at epay@rptrealty.com or call (248) 592-6018.

Rental payments made by check should be mailed to:

GWB Madison Purchaser LLC

_____
_____
_____

### 2021 W-9 Reporting Requirements:

Pursuant to the assignment of the Ground Lease on the Transfer Date, all payments reported on IRS Form 1099 for the period commencing on the Transfer Date and all future reporting periods should show the recipient's name and TIN as that of _____. Attached as Exhibit B is the W-9 reflecting the recipient's name on Line 1 and the TIN applicable for such period.

### Insurance Certificate Change:

In addition, please contact your insurance broker and notify them to send a revised certificate of insurance with both the New Landlord's name (GWB Madison Purchaser LLC) and the Managing Agent's name (RPT Realty, Inc.) as additional named insureds, along with any other additional named insured as required by your Lease. The revised certificates of insurance are due within 10 days of receipt of this letter and may be sent via USPS or email to the following contact in our office:

Ms. Sophia Loveless
c/o RPT Realty, Inc.
20750 Civic Center Dr., Suite 310
Southfield, MI  48076
Telephone: (248) 350-9900
sloveless@rptrealty.com

Sales reports should be emailed to leaseadmininfo@rptrealty.com or mailed to our corporate office's address listed below, to the attention of Tenant Sales Department.

All correspondence and notifications should be mailed to our corporate offices at the address listed below:

c/o RPT Realty
20750 Civic Center Dr., Suite 310
Southfield, MI  48076

With a copy to:          c/o Monarch Alternative Capital LP

535 Madison Avenue, 26th Floor
New York, NY 10022
Attn: James Carroll
Email: james.carroll@monarchlp.com


With copies of all Legal Notices to:

c/o RPT Realty
19 W 44th Street, Suite 1002
New York, NY  10036

With a copy to:        c/o Monarch Alternative Capital LP
535 Madison Avenue, 26th Floor
New York, NY 10022
Attn: James Carroll
Email: james.carroll@monarchlp.com


If there is a security deposit with respect to your Lease, it has been transferred to the New Landlord, and the New Landlord will be responsible for holding the same in accordance with the terms of your lease.

We appreciate your attention to these details.  If you have any questions, please do not hesitate to reach out to _____.

This Notice Letter may be executed by Seller and New Landlord in counterparts, and once fully executed in counterparts, it shall be in full force and effect as if Seller and New Landlord executed the same original.

*[remainder of this page intentionally left blank; signature page follows]*

**SELLER**:

**GEORGE WASHINGTON BRIDGE BUS
STATION DEVELOPMENT VENTURE LLC**,
a Delaware limited liability company


By: _____
Name:
Title:

**NEW LANDLORD**:

**GWB MADISON PURCHASER LLC**,
a Delaware limited liability company


By: _____
Name:
Title:

[Exhibits A and B to be attached]

## EXHIBIT F

**INTENTIONALLY OMITTED.**

## EXHIBIT G

## FORM OF SUBLEASE ESTOPPEL

(See attached)

## <u>TENANT ESTOPPEL CERTIFICATE</u>

To:    _____ ("**Landlord**")
GWB Madison Purchaser LLC, a Delaware limited liability company, and its successors, assigns and designees ("**Purchaser**")
GWB Madison A LLC, a Delaware limited liability company, and its successors, assigns and designees ("**First Lien Exit Lender**")
_____ and its successors, assigns and designees ("**Senior Secured Lender**")

Tenant:    _____ ("**Tenant**")

Ladies and Gentlemen:

Tenant hereby certifies to you, as of the date hereof, the following:

1.    Tenant is the tenant under that certain Lease Agreement, dated as of _____ (the "**Lease**"), by and between Landlord and Tenant, for _____ consisting of approximately _____ leasable square feet (the "**Premises**") in the center known as_____ ("**Shopping Center**").  [The Lease is guaranteed by _____ ("**Guarantor**") pursuant to that certain [Guaranty of Lease] dated _____ ("**Guaranty**")]. All capitalized terms not otherwise defined herein shall have the meanings provided in the Lease.

2.    The Lease is in full force and effect.  The Lease constitutes the entire written agreement between Tenant and Landlord has not been amended, modified or supplemented except as follows: _____. There are no other agreements or understandings, whether written or oral, between Tenant and Landlord with respect to the Lease or the Premises.

3.    The term ("**Term**") of the Lease commenced on _____, ____, and expires on _____, 20__, subject to the following renewal options: _____.

4.    Tenant has accepted possession of and occupies the entire Premises under the Lease and is open and conducting business therein.  Tenant has not entered into any assignment, sublease, hypothecation, leasehold mortgage or other agreement transferring or encumbering any of its interest in the Lease or Premises.

5.    Tenant is currently obligated to pay annual base rent in the amount of $_____ payable in monthly installments of $_____, [on a gross basis,] and such amount been paid through _____, 20__.  The Lease provides for percentage rent payable as follows _____.The annual percentage rent was last paid in the amount of $_____for the period of_____.Tenant has paid percentage rent payable under the Lease for the period up to and including _____.

6.      Payments of additional rent on account of common area maintenance, real estate taxes and insurance ("**CAM Charges**") are currently payable monthly in the amount of $_____ and such amounts have been paid through _____.  Tenant's proportionate share for such CAM Charges is ___%. There are no other additional charges due under the Lease except for _____.  No rent or other charge or expense has been paid more than 30 days in advance of its due date.

7.      The amount of the security deposit is: $_____. {insert if security deposit in held in form of letter of credit]

8.      As of this date, Tenant is not in default under the Lease and, to the best of Tenant's knowledge, Landlord is not in default under the Lease. Tenant is not disputing the computation of any base rent, CAM Charges or any other amounts due under the Lease. Tenant has no claims, counterclaims, defenses or setoffs against Landlord arising under the Lease or in connection with the Premises or Shopping Center, and Tenant is not entitled to any concession, abatement, rebate, allowance or free or reduced rent for any period after the date hereof.

9.      Landlord has completed all construction required by the Lease, and Landlord has no
current obligation to pay for any Tenant finish, leasehold improvements or other construction, or (b) to pay to Tenant any Tenant improvement allowances or inducements.

10.     To the undersigned's knowledge, all space and improvements leased by Tenant have been completed in compliance with applicable laws. Tenant has received no notice of and has no knowledge of, any violation of any governmental law or requirement with respect to the Premises or its operations or use.

11.     There are no actions pending against Tenant or Guarantor, if any, pursuant to bankruptcy, insolvency or other similar laws of any jurisdiction.

12.     Tenant does not have any right to expand or lease additional space, rights of first
refusal, rights of first offer, or any option or preferential right to purchase all or any part of the Premises or Shopping Center.

13.     The undersigned is authorized to execute this Tenant Estoppel Certificate on behalf of Tenant and realizes that Landlord is proposing to sell the  Shopping Center in which the Premises are located, and any Purchaser and any of its successors, assigns and designees as well as First Lien Exit Lender, Senior Secured Lender and any other parties providing financing for the transaction shall be entitled to rely upon this certification by Tenant and Guarantor, if applicable.

Very truly yours,

_____

By: _____
Name:
Title:


Date: _____, 20____

[if applicable]

## GUARANTOR'S ACKNOWLEDGMENT

The undersigned, as Guarantor acknowledges and agrees that Guarantor has guaranteed the obligations of Tenant under the Lease as more particularly  set forth in the Guaranty and that the Guaranty referenced above in this Tenant Estoppel Certificate is in full force and effect and that there are no defenses to and/or offsets  against the enforcement of such Guaranty of the Lease.

GUARANTOR:

_____

By: _____
Name:
Title:

Date:

## EXHIBIT H

## FINANCING TERMS

**Use of Proceeds:**   The proceeds of the First Lien Exit Facility shall be used (a) by Seller to (i) repay the facility provided by JMB Capital Partners Lending, LLC in the aggregate principal amount of up to $18,000,000; (ii) satisfy allowed administrative expense claims incurred in Seller's chapter 11 case; (iii) satisfy allowed cure claims under the ground lease underlying the Property (or other contracts to be assumed and assigned to Purchaser); (iv) pay all required fees and expenses incurred by Seller in connection with the transactions contemplated hereby (including, but not limited to, any transfer taxes or mortgage recording taxes), and (v) efficiently wind-down its chapter 11 case (collectively, the "Proceed Uses"); and (b) by Purchaser after the Closing to fund operating shortfalls at the Property.

**Interest Rate:**   1.   The First Lien Exit Facility shall bear interest at a per annum rate equal to 11.75% payable monthly in cash (or payable in kind, in whole or in part, if operating cash flow is insufficient to satisfy debt service in any month).

38.   The Second Lien Exit Facility shall bear interest at a per annum rate equal to 4.75% payable monthly (i) in cash (or as deferred compounding interest, in whole or in part, if operating cash flow is insufficient to satisfy debt service in any month) in an amount equal to 1.50%, and (ii) as deferred compounding interest at a rate of 3.25%.

**Call Protection:**   Second Lien Exit Facility to include customary make-whole to ensure Senior Secured Lender receives bargained-for yield (the "Make-whole Payment").

**Term:**   Five (5) years with respect to First Lien Exit Facility and the Second Lien Exit Facility (such date, the "Initial Maturity Date").

**Amortization:**   None, Interest-only.

**Structure/Security:**   Purchaser shall secure its obligations to repay the First Lien Exit Facility with a recorded first priority mortgage, an assignment of all leases and rents, perfected first priority security interests in all personal property and in all escrows, reserves and other related documentation. The Second Lien Exit Facility shall be secured by a (i) second-lien mortgage, subject to a customary intercreditor agreement, and (ii) a limited nonrecourse carveout guaranty, covering actual losses incurred, solely to the extent directly caused

by fraud, impermissible voluntary transfers by the Purchaser or First Lien Exit Lender (or the principals thereof) to third parties, and intentional violations of the agreed upon payment waterfalls by the Purchaser or the First Lien Exit Lender (or the principals thereof) (each of such principals being a "<u>Property Investor</u>"), from a credit-worthy entity designated by a Property Investor.

The Senior Secured Lender shall incorporate any necessary mechanics or structures necessary to comply with that certain Settlement Agreement among the Seller, the New York City Regional Center and the Port Authority dated as June 2, 2020 (the "<u>Settlement Agreement</u>"), in connection with the transactions contemplated hereby.

**Decision Rights; Property Management, Leasing and Asset Management:**  Purchaser shall have the right to manage and operate the Property, including leasing and capital expenditures, subject to customary consent/major decision rights of the Senior Secured Lender. Purchaser shall hire a nationally-recognized property manager (which property manager shall be reasonably acceptable to Purchaser and the Senior Secured Lender to manage and operate the Property (including leasing activities) on a day-to-day basis. The Senior Secured Lender hereby pre-approves RPT Realty to serve as the property and leasing manager under a commercially reasonable property management agreement and leasing agreement (or one combined document), and Monarch Alternative Capital LP or an affiliate thereof to serve as asset manager under a commercially reasonable asset management agreement, with an asset management fee of $250,000 per year. Any costs, fees and expenses for such property manager, leasing manager and asset manager shall be the borne by Purchaser, but shall be payable as project expenses prior to the distribution of net operating income or capital event proceeds, as more particularly described below.

**Property Reserve Account:**  All amounts needed for tenant improvements and capital expenditures will be funded from a designated reserve account (the "<u>Property Reserve Account</u>"). To the extent the amount in the Property Reserve Account is insufficient to make such payments, the First Lien Exit Lender shall be required to fund additional amounts under the First Lien Exit Facility to satisfy such obligations, in which event the principal amount due under the First Lien Exit Facility shall be increased by the amount funded. Upon a capital event, all amounts in the Property Reserve Account shall be distributed in accordance with the Capital Event Waterfall contained herein.

**Application of**  All net operating income of the Property shall be applied in the

**Operating Proceeds:**          following order:

       (a)    First, to make the cash interest payments under the First Lien Exit Facility;

       (b)    Second, to fund the Property Reserve Account in an amount of $1,000,000;

       (c)    Third, to make the cash interest payments under the Second Lien Exit Facility;

       (d)    Fourth, to pay the outstanding principal and all other amounts due under the First Lien Exit Facility;

       (e)    Fifth, to pay the outstanding principal and all other amounts due under the Second Lien Exit Facility;

       (f)    Sixth, all remaining cash flow, if any, shall be released to Purchaser.

**Capital Event:**          Purchaser shall not sell the Property without the prior consent of the Senior Secured Lender unless the proceeds of such sale are sufficient to repay all obligations under the First Lien Exit Facility and the Second Lien Exit Facility, including any accrued but unpaid interest thereon and the Make-whole Payment (the "Minimum Sale Price"). In the event Purchaser has not closed on a sale of the Property on or prior to the Initial Maturity Date, then the maturity date of the First Lien Exit Facility and Second Lien Exit Facility shall be automatically extended by twelve (12) months (such 12-month period, the "Extended Term"). During the Extended Term, unless the Property is then under contract to be sold, Purchaser shall commence a marketing process to sell the Property. The Senior Secured Lender shall have reasonable approval over the mechanics of the marketing and sale process and full consultation rights with respect thereto, including, but not limited to that (i) the Senior Secured Lender shall receive copies of all bids submitted to the broker, and (ii) Purchaser shall engage either a broker from a list of preapproved brokers or a broker reasonably approved by Purchaser and the Senior Secured Lender on terms reasonably acceptable to the Senior Secured Lender, which shall include a percentage-based commission.

If Purchaser is unable to sell the Property for a price equal to or greater than the Minimum Sale Price prior to the end of the Extended Term, then the Senior Secured Lender shall no longer have any consent rights with respect to the sale of the Property and Purchaser shall be permitted to accept an arms-length, third-party

offer to purchase the Property in its sole discretion with a view towards obtaining the highest price and taking into consideration other factors deemed relevant by Purchaser, including, without limitation, the ability and certainty of closing by any prospective purchaser, size of deposit, due diligence performed by the buyer, the timeline for such closing and conditions precedent to such closing. During the Extended Term, the Senior Secured Lender shall have the right to purchase the First Lien Exit Facility at par plus all accrued and unpaid interest and the First Lien Exit Fee (as defined below).

In the event of a capital event (including a refinancing), the parties shall have an economic interest in any proceeds of such capital event pursuant to the following waterfall:

(a)     First, such proceeds shall be used to pay all accrued and unpaid interest and the outstanding principal of the First Lien Exit Facility;

(g)     Second, to pay all accrued and unpaid interest, any Make-whole Payment obligation, and the outstanding principal of the Second Lien Exit Facility and any other obligations thereunder, up to a maximum of $65,000,000 *plus* the amount of any accrued and unpaid cash interest on the entire Second Lien Exit Facility (which shall accrue compounding interest at a rate of 1.50% per annum as outlined in Interest Rate subsection (B) above);

(h)     Third, an "exit fee" in an amount equal to $500,000 shall be paid to a Property Investor designated by Purchaser or First Lien Exit Lender (the "First Lien Exit Fee");

(i)     Fourth, to pay the outstanding principal of the Second Lien Exit Facility, up to a maximum of $7,500,000;

(j)     Fifth, until all outstanding principal of the Second Lien Exit Facility and any other remaining amounts owed thereunder have been paid in full, ninety percent (90%) of all remaining proceeds shall be paid to the Senior Secured Lender, and ten percent (10%) of all remaining cash flow shall be paid to Purchaser.

(k)     Sixth, all remaining cash flow, if any, shall be released to Purchaser.

Following a sale of the Property during the Extended Term in

compliance with the terms hereof, and the distribution of proceeds pursuant to the waterfall above, any remaining outstanding amounts due under the Second Lien Exit Facility shall be cancelled and shall no longer be due and payable.

**Sale of Property Investor Interest**

Notwithstanding any provision hereof to the contrary, each Property Investor shall have the right at any time prior to a sale of the Property, to market and sell all or a portion of its interest in the First Lien Exit Facility and its interest in Purchaser, as applicable (collectively, the "<u>Property Investor Interest</u>") to another institutional investor or lender (the term "institutional investor or lender" shall be defined in the agreements and documentation for the transactions contemplated hereby (the "<u>Transaction Documents</u>") in a manner acceptable to the Senior Secured Lender and the applicable Property Investor); provided, however, that (a) in any such sale, each Property Investor's interest under the First Lien Exit Facility and its interest in Purchaser, as applicable, shall both be sold to the same buyer (although such buyer may use separate affiliated entities to hold such ownership), (b) the loan amounts payable under, and the structure of and collateral for the First Lien Exit Facility and the Second Lien Exit Facility remains unchanged, and (c) the terms of the Transaction Documents, including without limitation, the net operating income and capital events distribution waterfalls, remain unchanged. Each Property Investor's right to sell all or a portion of the Property Investor Interest will be subject to a right of first offer in favor of the Senior Secured Lender, the terms of which will be more particularly set forth in the Transaction Documents. Additionally, upon such sale, the Senior Secured Lender shall have approval rights over any replacement property manager, which approval shall not be unreasonably withheld, conditioned or delayed so long as the proposed property manager is nationally recognized and has substantial experience in managing urban retail properties. The sale of all or a portion of the Property Investor Interest shall not be considered a capital event as described herein and all proceeds of such sale of all or a portion of the Property Investor Interest shall belong to the applicable Property Investor.

**Single Purpose Entity:**

Purchaser and its managing member/general partner will be a single-purpose, bankruptcy-remote entity, prohibited from engaging in any business activity other than owning and operating the Property, and otherwise complying with all applicable rating agency standards for such entities.

**Title Insurance and Transaction**

Purchaser may elect, in its sole discretion, to obtain a leasehold owner's title insurance policy and a lender's title insurance policy in

| | |
|---|---|
| **Expenses:** | favor of Purchaser and First Lien Exit Lender, respectively, insuring their respective title interests in and to the Property.  In addition, each Property Investor will incur other out of pocket expenses associated with evaluating, documenting and closing the proposed transactions, including legal fees, due diligence costs (e.g., title, survey, environmental, property condition and zoning) and closing expenses (collectively, the "<u>Transaction Expenses</u>").    The Transaction Expenses will be included as Proceed Uses and included in the First Lien Exit Facility Amount. |
| **Additional Financing:** | None permitted, except as may be agreed upon in the loan documents as agreed to by the Senior Secured Lender. |
| **Subtenant A/R:** | Senior Secured Lender shall assign to Purchaser all of Senior Secured Lender's right, title and interest in and to the Subtenant A/R and the collection thereof.  Senior Secured Lender shall consent to the Closing Payment attributable to the Subtenant A/R being paid to the Debtor in accordance with the terms of the Agreement and the Plan. |
| **Reporting:** | Purchaser shall be required to provide certain financial reporting, including without limitation, annual audited financial and operating statements prepared by a CPA, that is reasonably acceptable to the Senior Secured Lender, and a monthly rent roll and profit and loss statement, all in accordance with GAAP or such other accounting basis reasonably acceptable to the Senior Secured Lender. |
| **Preserved Causes of Action:** | The Purchaser shall assign to the Senior Secured Lender all Preserved Causes of Action (as defined in the Plan) excluding Preserved Causes of Action against the Designated Parties, but including, for the avoidance of doubt, the Principals (such assigned claims, the "**Transferred Claims**"). |
| **Application of Reserves:** | Any excess funds in the Distribution Reserve Accounts (as defined in the Plan) transferred by the Debtor or Plan Administrator (as defined in the Plan) to the First Lien Exit Lender shall be applied against the amounts owed by the Purchaser under the First Lien Exit Facility. |

## SCHEDULE 1

## ASSUMED CONTRACTS

| Agreement | Counterparty | Counterparty Address |
|---|---|---|
| Elevator Advertising Agreement | Hispanic Indoor Media | 5547 Main Street, Williamsville, NY 14221 |
| Elevator Maintenance Agreement | KONE Inc. | Metro New York, 1384 Broadway, 21st Floor, New York, NY 10018 |
| Fire Prevention Contract | Sirina Fire Protection Corp. | 151 Herricks Road, New Hyde Park, NY 11040 |
| Fire Preventive Maintenance Agreement | DavED Fire Systems, Inc. | 307 West Pleasant View Avenue, Hackensack, NJ 07601 |
| General Liability Policy | Underwriters Lloyds London(IL) | CRC Swett, 1 North Franklin - 14th FL, Chicago, IL 60606 |
| Insurance Policy - Commercial | Starr Surplus Lines Insurance Company | 399 Park Avenue - 8th FL, New York, NY 10022 |
| Insurance Policy - Excess Liability | Fireman's Fund Insurance Company, AmWins Brokerage of New Jersey | Raritan Plaza, 110 Fieldcrest Avenue, Edison, NJ 08837 |
| Insurance Policy - Excess Liability | Navigators Insurance Company, AmWins Brokerage of New Jersey | Raritan Plaza, 110 Fieldcrest Avenue, Edison, NJ 08837 |
| Insurance Policy - Excess Liability | North River Insurance Company, AmWins Brokerage of New Jersey | Raritan Plaza, 110 Fieldcrest Avenue, Edison, NJ 08837 |
| Insurance Policy - Excess Liability | Westchester Fire Insurance Company, AmWins Brokerage of New Jersey | Raritan Plaza, 110 Fieldcrest Ave, Edison, NJ 08837 |
| Insurance Policy - Excess Property | Homeland Insurance Company of Delaware, CRC Swett | 1 Financial Sq - Suite 401, New York, NY 10005 |
| Insurance Policy - General Liability | Hiscox Insurance Company Inc. | 104 South Michigan Avenue - Suite 600, Chicago, IL 60603 |
| Insurance Policy - Terrorism | Miller Insurance Services LLP | 70 Mark Lane, London EC3R 7NQ, United Kingdom |
| Insurance Policy - Terrorism | Underwriters Lloyds London(IL) | CRC Swett, 32 Old Slip, New York, NY 10005 |
| Insurance Premium Financing Agreement | Bank Direct Capital Finance, a division of Texas Capital Bank, N.A. | 150 North Field Drive - Suite 190, Lake Forest, IL 60045 |
| Water Treatment Contract | The Metro Group, Inc. | 50-23 Twenty-Third Street, Long Island City, NY 11101 |
| Professional Cleaning Services | Facility Value | 5030 Broadway, Suite 633, New York, NY 10034 |

# SCHEDULE 2

# SUBLEASES

| Agreement | Counterparty | Counterparty Address |
|---|---|---|
| Lease between Blink Broadway Marketplace Inc. and George Washington Bridge Bus Station Development Venture LLC dated 10/28/2010<br><br>Guaranty by Equinox Holdings, Inc. and Blink Holdings, Inc. dated 10/28/2010<br><br>Limited Guaranty by Equinox Holdings, Inc. dated 10/28/2010<br><br>Limited Guaranty No. 2 by Blink Holdings, Inc. dated 10/28/2010<br><br>First Amendment to Lease between Tenant and Landlord dated 11/16/2015 Second Amendment to Lease between Tenant and Landlord dated 6/__/2017 | Blink Broadway Marketplace, Inc. d/b/a Blink Fitness | 895 Broadway - 3rd FL, New York, NY 10003 |
| Lease between Café Buunni, GWB Inc. and George Washington Bridge Bus Station Development Venture LLC dated 04/09/2014<br><br>Guaranty by Sarina Prabasi and Elias Gurmu in favor of Landlord dated 03/15/2014<br><br>First Amendment to Lease between Tenant and Landlord dated 10/__/2017<br><br>Confidentiality Agreement and Lease Amendment | Cafe Buunni, GWB Inc. | 213 Pinehurst Avenue, New York, NY 10033 |

| | | |
|---|---|---|
| between Tenant and Landlord dated 09/_/2018 | | |
| Lease between Citibank, N.A., a national banking association and George Washington Bridge Bus Station Development Venture LLC, a Delaware limited liability company dated 12/17/2016<br><br>First Amendment to Lease between Tenant and Landlord dated 10/03/2017 | Citibank, N.A. | 4201 Broadway - Space #E 1.4, New York, NY 10033 |
| Lease between Cobbler & Shine 4211 GWB, LLC and George Washington Bridge Bus Station Development Venture LLC dated 3/23/2015<br><br>Assignment and Assumption of Lease between Original Tenant and Miranda International Inc. dated 2/__/2016<br><br>Consent to Assignment and Assumption of Lease between Landlord, Original Tenant, and Tenant dated 5/11/2016<br><br>Guaranty executed by William Miranda dated 4/6/2016<br><br>First Amendment to Lease between Landlord and Tenant dated 10/4/2017 | Cobbler & Shine 4211 GWB, LLC<br><br>Miranda International Inc. | PO Box 671089, Flushing, NY 11367<br><br>509 Madison Avenue, Lower Level, New York, NY 10022 |
| Lease between Orthodontic Management Company, LLC and George Washington Bridge Bus Station Development Venture LLC dated October __, 2019 | Orthodontic Management Company, LLC d/b/a Diamond Braces | |
| [No documents reviewed/not in Box/DataSite] | FFC Accounting, Inc. | 5030 Broadway - Suite 711, New York, NY 10034 |

| | | |
|---|---|---|
| Lease between First Financial Consulting Corp. ("Tenant") and George Washington Bridge Bus Station Development Venture LLC dated 10/31/2014<br><br>Guaranty of Annie Rodriguez dated 11/4/2014<br><br>Letter Agreement supplementing Lease between Tenant and Landlord dated ___/___/2016<br><br>First Amendment to Lease Agreement between Tenant and Landlord dated 2/24/2018 | First Financial Consulting Corp. | 5030 Broadway - Suite 711 New York, NY 10034 |
| Lease between Tombar International, Inc. and George Washington Bridge Bus Station Development Venture LLC dated ___/___/2011 | Tombar International, Inc. d/b/a Gateway Newstands | c/o Tobmar International, Inc., 240 Chrislea Road, Woodbridge, Ontario, Canada L4L 8V1 |
| Lease Agreement between GW&L Food Corp. and George Washington Bridge Bus Station Development Venture LLC dated 7/___/2010<br><br>Limited Guaranty of Miguel Luna dated 7/30/2010<br><br>First Amendment to Lease Agreement between Tenant and Landlord dated 9/30/2011 | GW&L Food Corp. d/b/a Fine Fare | 4211 Broadway, New York, NY 10033 |
| Lease between GWB 4971, Corp. and George Washington Bridge Bus Station Development Venture LLC dated September 18, 2014 | GWB 4971 d/b/a VS Berry | 730 East 165th Street, Bronx, NY 10456 |

| | | |
|---|---|---|
| Modification Letter from Landlord dated March 30, 2015<br><br>First Amendment to Lease between Tenant and Landlord dated October ___, 2017<br><br>Guaranty by Victor Sidberry dated August 28, 2014 | | |
| Lease between Inho Beauty Inc. and George Washington Bridge Bus Station Development Venture LLC dated 2/18/2018<br><br>Guaranty executed by Inho Shin dated 2/13/2018<br><br>First Amendment to Lease between Tenant and Landlord dated 9/10/2018 | Inho Beauty Inc. d/b/a In Beauty Supply | c/o Inho Beauty Inc., 1429 St. Nicholas Avenue, New York, NY 10033 |
| Lease between Juan Pablo Duarte Foundation and George Washington Bridge Bus Station Development Venture LLC dated 06/___/2019 | Juan Pablo Duarte Foundation | 4211 Broadway - Suite 23A, Attn: Laura Acosta, New York, NY 10033 |
| Lease Agreement between Marshalls of MA, Inc. and George Washington Bridge Bus Station Development Venture LLC dated 08/18/10<br><br>First Amendment to Lease between Tenant and Landlord dated 08/30/11<br><br>Second Amendment to Lease between Tenant and Landlord dated 04/05/13<br><br>Third Amendment to Lease between Tenant and Landlord dated 12/13/13<br><br>Fourth Amendment to | Marshalls of MA, Inc. | 770 Cochituate Road, Framingham, MA 01701 |

| | | |
|---|---|---|
| Lease between Tenant and Landlord dated 07/31/15<br><br>Fifth Amendment to Lease between Tenant and Landlord dated 02/12/18 | | |
| Lease between PNC Bank, National Association and George Washington Bridge Bus Station Development Venture LLC dated 07/31/2016<br><br>First Amendment to Lease between Tenant and Landlord dated 07/25/2017 | PNC Bank, National Association | c/o PNC Realty Service, Two PNC Plaza, 620 Liberty Avenue - 19th FL, Pittsburgh, PA 15222-2401 |
| Lease between RCBS Media Group, LLC and George Washington Bridge Bus Station Development Venture LLC dated 1/29/2016<br><br>Guaranty by Angel Cardenas dated 1/13/2016 | RCBS Media Group, LLC | 236 Fulton Avenue - Suite 214, Hempstead, NY 11550 |
| Standard Form of Store Lease between The Gap, Inc. and George Washington Bridge Bus Station Development Venture LLC dated 09/30/2014<br><br>Subordination, Non-Disturbance and Attornment Agreement between Overlandlord, as Mortgagee, Tenant, and Landlord, as Landlord, dated 10/16/2014<br><br>First Lease Modification Agreement between Tenant and Landlord dated 09/30/2015 | The Gap, Inc. | 2 Folsom Street, San Francisco, CA 94105 |
| Lease between Time Warner Cable New York City LLC and George Washington Bridge Bus Station Development | Time Warner Cable New York City LLC | 120 East 23rd Street, New York, NY 10010 |

| | | |
|---|---|---|
| Venture LLC dated 10/22/2014<br><br>Subordination, Non-Disturbance and Attornment Agreement among George Washington Bridge Bus Station and Infrastructure Development Fund, LLC, Tenant and Landlord dated 12/11/2014<br><br>Subordination Agreement; Acknowledgement of Lease Assignment Attornment and Non-Disturbance Agreement among Landlord, Tenant and GSNMF Sub-CDE 12, LLC dated __/__/2014<br><br>First Amendment to Lease between Tenant and Landlord dated 02/10/2016 SNDA Consent to First Amendment from Mortgagee to Landlord dated 03/15/2016 | | |
| Lease between Vista Eyecare, PLLC ("Tenant") and George Washington Bridge Bus Station Development Venture LLC dated 8/31/2015<br><br>Guaranty by Boris Nemirovskiy dated 7/27/2015<br><br>Guaranty by Eugene Orloff dated 7/27/2015<br><br>Guaranty by Michael Orloff dated 7/27/2015<br><br>Guaranty by Vladimir Dvoretsky dated 7/27/2015 | Vista Eyecare, PLLC | 817-819 West 181st Street, New York, NY 10033 |
| Lease between GWB Juice Bar LLC and George Washington Bridge Bus | GWB Juice Bar LLC | 275 West 238th, Unit 5, Bronx New York 10463 |

| | | |
|---|---|---|
| Station Development Venture LLC dated October 31, 2014<br><br>Modification Letter from Landlord dated March 30, 2015<br><br>First Amendment to Lease between Tenant and Landlord dated November 17, 2017<br><br>Consent to Assignment of Lease Interests between Landlord, Luis Perez and Tenant dated November 17, 2017<br><br>Guaranty by Ingrid Amparo and Nayla Mejia dated October 13, 2014 | | |

## SCHEDULE 3

## SECURITY DEPOSITS

Security Deposits - Detail Transaction Activity

| Tenant | Date | Amount | Tenant Total |
|---|---|---|---|
| Café Buunni | 4/5/2014 | 7,125.00 | 7,125.00 |
| Dr. Shine | 3/27/2015 | 3,667.67 | |
| Dr. Shine | 5/13/2016 | 11,000.00 | 14,667.67 |
| FFC / Credit City | 11/6/2014 | 4,787.50 | |
| FFC / Credit City | 3/27/2015 | 5,000.00 | |
| FFC / Credit City | 9/9/2016 | 5,000.00 | |
| FFC / Credit City | 11/9/2016 | 2,000.00 | 16,787.50 |
| GWB Juice Bar | 11/6/2014 | 1,991.67 | |
| GWB Juice Bar | 2/23/2015 | 1,991.67 | 3,983.34 |
| INHO Beauty | 2/15/2018 | 51,400.00 | 51,400.00 |
| RCBS | 3/17/2016 | 15,000.00 | 15,000.00 |
| Vista Eye Care | 10/6/2015 | 20,933.34 | 20,933.34 |
| Vs Berry | 10/6/2014 | 6,500.00 | |
| Vs Berry | 12/29/2014 | 6,500.00 | 13,000.00 |
| Orthodontic Mgmt. | 9/16/2020 | 7,934.00 | 7,934.00 |
| | | 150,830.85 | 150,830.85 |

## SCHEDULE 4

## LEASING INCENTIVES

None.

## **SCHEDULE 5**

## **RENT ROLL**

See attached.

**PRIVILEGED AND CONFIDENTIAL**

NTM Rent Roll Beginning April 1, 2021

| Tenants | Area Sq. Ft. | % of Total GLA | Beginning 2021 Rent PSF | Beginning 2021 Rent | Monthly Rent | | | | | | | | | | | | NTM Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Sep-21 | Oct-21 | Nov-21 | Dec-21 | Jan-22 | Feb-22 | Mar-22 | |
| 1.1 (Vacant) - Previously NY&Co. | 1,215 | 1.2% | $ | $ | $ | | | | | | | | | | | | $ |
| 1.2A VistaCare | 629 | 0.6% | 208.08 | 130,882 | 10,907 | 10,907 | 10,907 | 10,907 | 10,907 | 10,907 | 11,125 | 11,125 | 11,125 | 11,125 | 11,125 | 11,125 | 132,191 |
| 1.2B PNC | 540 | 0.5% | 200.00 | 108,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 108,000 |
| 1.4 CitiBank | 1,800 | 1.7% | 208.08 | 374,544 | 31,836 | 31,836 | 31,836 | 31,836 | 31,836 | 31,836 | 31,836 | 31,836 | 31,836 | 31,836 | 32,473 | 32,473 | 383,308 |
| 1.6 RCBS Media Group | 420 | 0.4% | 145.71 | 61,200 | 5,100 | 5,100 | 5,100 | 5,100 | 5,100 | 5,100 | 5,202 | 5,202 | 5,202 | 5,202 | 5,202 | 5,202 | 61,812 |
| 2.1 (Vacant) - Previously NY&Co. | 8,016 | 7.7% | - | | | | | | | | | | | | | | |
| 3.1 Blink Fitness | 15,369 | 14.9% | 30.74 | 472,500 | 39,375 | 39,375 | 39,375 | 39,375 | 39,375 | 39,375 | 39,375 | 39,375 | 39,375 | 39,375 | 39,375 | 39,375 | 472,500 |
| **Total East Building - Leasable** | **27,989** | **27.1%** | **$    40.98** | **$    1,147,126** | **$    96,218** | **$    96,218** | **$    96,218** | **$    96,218** | **$    96,218** | **$    96,218** | **$    96,538** | **$    96,538** | **$    96,538** | **$    96,538** | **$    97,175** | **$    97,175** | **$    1,157,811** |
| 1.1 GAP | 3,318 | 3.2% | $    93.18 | $    309,166 | $    25,764 | $    25,764 | $    25,764 | $    25,764 | $    25,764 | $    26,537 | $    26,537 | $    26,537 | $    26,537 | $    26,537 | $    26,537 | $    26,537 | 314,576 |
| 1.2 Time Warner | 5,023 | 4.9% | 198.00 | 994,554 | 82,880 | 82,880 | 82,880 | 82,880 | 82,880 | 82,880 | 82,880 | 82,880 | 82,880 | 82,880 | 82,880 | 82,880 | 994,554 |
| 1.3 In Beauty Supply | 2,255 | 2.2% | 127.72 | 288,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 288,000 |
| 1.5A Doctor Shine | 440 | 0.4% | 102.00 | 44,880 | 3,740 | 3,740 | 3,740 | 3,740 | 3,740 | 3,740 | 3,740 | 3,815 | 3,815 | 3,815 | 3,815 | 3,815 | 45,254 |
| 1.5B (Vacant) | 500 | 0.5% | - | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 1.6 (Vacant) | 942 | 0.9% | - | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 1.7 Fine Fare | 15,116 | 14.6% | 29.77 | 450,000 | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 450,000 |
| 1.8 (Vacant)[1] | 1,785 | 1.7% | - | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 1.9 A Previously Gateway News - Subject to Future Negotiations[2] | 150 | 0.1% | - | | | | | | | | | | | | | | |
| 1.9 B Café Buunni | 150 | 0.1% | 102.00 | 15,300 | 1,275 | 1,275 | 1,275 | 1,275 | 1,275 | 1,275 | 1,275 | 1,301 | 1,301 | 1,301 | 1,301 | 1,301 | 15,428 |
| 1.9 C (Vacant) | 259 | 0.3% | - | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 1.10 A FFC Accounting Inc.[3] | 761 | 0.7% | - | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 1.10 B First Financial Consulting Corp.[3] | 766 | 0.7% | 79.90 | 61,200 | 5,100 | 5,100 | 5,100 | 5,100 | 5,100 | 5,100 | 5,100 | 5,202 | 5,202 | 5,202 | 5,202 | 5,202 | 61,608 |
| 1.11 (Vacant) | 1,200 | 1.2% | - | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2.1 GAP | 6,357 | 6.1% | 93.18 | 592,334 | 49,361 | 49,361 | 49,361 | 49,361 | 49,361 | 50,842 | 50,842 | 50,842 | 50,842 | 50,842 | 50,842 | 50,842 | 602,700 |
| 2.2 Marshall's | 29,225 | 28.3% | 35.00 | 1,022,875 | 85,240 | 85,240 | 85,240 | 85,240 | 85,240 | 85,240 | 85,240 | 85,240 | 85,240 | 85,240 | 85,240 | 85,240 | 1,022,875 |
| 2.3 A JPDF Community Center | 919 | 0.9% | 113.25 | 104,079 | - | - | - | 8,673 | 8,673 | 8,673 | 8,673 | 8,673 | 8,673 | 8,673 | 8,673 | 8,673 | 78,059 |
| 2.3 B JPDF Community Center | 606 | 0.6% | 113.25 | 68,631 | - | - | - | 5,719 | 5,719 | 5,719 | 5,719 | 5,719 | 5,719 | 5,719 | 5,719 | 5,719 | 51,473 |
| 2.3 C Café Buunni | 705 | 0.7% | 102.00 | 71,910 | 5,993 | 5,993 | 5,993 | 5,993 | 5,993 | 5,993 | 5,993 | 6,112 | 6,112 | 6,112 | 6,112 | 6,112 | 72,509 |
| 2.4 A VS Berry | 780 | 0.8% | 102.00 | 79,560 | 6,630 | 6,630 | 6,630 | 6,630 | 6,630 | 6,630 | 6,630 | 6,763 | 6,763 | 6,763 | 6,763 | 6,763 | 80,223 |
| 2.4 B (Vacant) | 796 | 0.8% | - | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2.5 Previously Gateway News - Subject to Future Negotiations[2] | 547 | 0.5% | - | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2.6 Diamond Braces[4] | 556 | 0.5% | 85.61 | 47,600 | - | - | - | 3,967 | 3,967 | 3,967 | 3,967 | 3,967 | 3,967 | 3,967 | 3,967 | 3,967 | 35,700 |
| 2.7 (Vacant) | 992 | 1.0% | - | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2.8 GWB Juice Bar | 239 | 0.2% | 102.00 | 24,378 | 2,032 | 2,032 | 2,032 | 2,032 | 2,032 | 2,032 | 2,072 | 2,072 | 2,072 | 2,072 | 2,072 | 2,072 | 24,622 |
| 2.9 (Vacant) | 1,070 | 1.0% | - | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total West Building - Leasable** | **75,457** | **72.9%** | **$    55.32** | **$    4,174,467** | **$    329,513** | **$    329,513** | **$    329,513** | **$    347,872** | **$    347,872** | **$    350,126** | **$    350,167** | **$    350,619** | **$    350,621** | **$    350,621** | **$    350,621** | **$    4,137,581** |
| **Total Building - Leasable** | **103,446** | **100.0%** | **$    51.44** | **$    5,321,593** | **$    425,731** | **$    425,731** | **$    425,731** | **$    444,090** | **$    444,090** | **$    446,344** | **$    446,705** | **$    447,158** | **$    447,160** | **$    447,160** | **$    447,796** | **$    447,796** | **$    5,295,393** |

| *Memo: Rent Abatements [5]* | Monthly Rent Abatements | | | | | | | | | | | NTM Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Sep-21 | Oct-21 | Nov-21 | Dec-21 | Jan-22 | Feb-22 | Mar-22 | |
| GAP | $    (18,781) | $    (18,781) | $    (18,781) | $    (18,781) | $    (18,781) | $    (19,345) | $    (19,345) | $    (19,345) | $    (19,345) | $    (19,345) | $    (19,345) | $    (19,345) | $    (229,319) |
| Time Warner | (14,434) | (14,434) | (14,434) | (14,434) | (14,434) | (14,434) | (14,434) | (14,434) | (14,434) | (14,434) | (14,434) | (14,434) | (173,202) |
| Diamond Braces | - | - | - | (3,967) | (3,967) | (3,967) | (1,983) | (1,983) | (1,983) | (1,983) | (1,983) | (1,983) | (23,800) |
| **Total Building - Abated Rent** | **$    (33,215)** | **$    (33,215)** | **$    (33,215)** | **$    (37,181)** | **$    (37,181)** | **$    (37,745)** | **$    (35,762)** | **$    (35,762)** | **$    (35,762)** | **$    (35,762)** | **$    (35,762)** | **$    (35,762)** | **$    (426,321)** |
| **Total Building - Net Rent Collected** | **$    392,516** | **$    392,516** | **$    392,516** | **$    406,909** | **$    406,909** | **$    408,599** | **$    410,943** | **$    411,296** | **$    411,398** | **$    411,398** | **$    412,035** | **$    412,035** | **$    4,869,071** |

(1) While the Company and European Wax Center have been in late-stage negotiations regarding space 1.8, a finalized and executed leasehold agreement has not been reached. The latest draft of the leasehold agreement contemplates beginning monthly rent of approximately $12.7k.

(2) In the fall of 2020, Gateway News, the subtenant leasing spaces 1.9A and 2.5, notified the Debtor of its plan to dissolve operations and terminate its lease. The individual who previously operated the Gateway franchise at these locations approached the Debtor about entering into a lease agreement with the Debtor but, in light of the amount the individual was able to pay during COVID and the fact that the Debtor was in the midst of a sale process, the Debtor was unwilling to enter into a long-term lease agreement at that time. The Debtor and Hari-OM Newstand Inc. subsequently entered into a short-term license agreement that provided for monthly $2.0k payments covering both the 1.9A and 2.5 spaces. This agreement is set to expire after March 31, 2021. Any future agreement will be negotiated by the Debtor in conjunction with the Purchaser.

(3) The same individual signed the leases for spaces 1.10A (FFC Accounting Inc.) and 1.10B (First Financial Consulting Corp.). As of the FFC Accounting Inc. space has not been completed and, due to financial constraints, the Company does not believe this tenant will be able to build out its space. In exchange for rent concessions with respect to First Financial Consulting Corp., the Company asked for FFC Accounting Inc. to surrender the 1.10A space and terminate its lease. Although First Financial Consulting Corp. has since paid the reduced rent provided for in the Company's offer, FFC Accounting Inc., to-date, has not returned the draft surrender agreement the Company sent.

(4) Assumes a Rent Commencement Date of July 1, 2021

(5) Blink Fitness has full rent abatements in the 24th, 36th and 48th calendar months following the Rent Commencement Date (April 2020)

## SCHEDULE 6

## TANGIBLE PERSONAL PROPERTY

1- HP Officejet Pro X576dw MFP
1- Toshiba E45t-A4100 Windows 8.1 Laptop
1- HP Pavilion Notebook V0q02ua-aba Windows 10
5- Motorola DTR550 Walkie Talkies with charging bases
1- ATT Cordless Desk Phone with 1 extension for Anthony's desk
1- Dymo LabelWriter
1- Seagate & Synology Server given to us by SJM
1- Anker USB Charging Stand
1- Brother P-touch label printer
1- Sony XBR-49X800E TV
1- Magic Chef small refrigerator
1- Amazon Basic Shredder
2- Racks for drawings
1- Key Storage Box
2- Desk with Credenza
5- Folding Chairs
1- Wire Shelving unit
1- White Board
1- Cork Board
1- Wire Small Basket
1- Staples Stapler
1- Scotch Tape dispenser
1- Global Salt Spreader
11- QMark 208V/3Ph 42Amp 15kw Electric Heaters (2 New in a Box, 9 Units Used)

## SCHEDULE 7

## INTANGIBLE PERSONAL PROPERTY

1.      Trade names:          The George Washington Bridge Market Place/GWB Mercado
                              GWB Market/Mercado

2.      The Subtenant A/R

## SCHEDULE 8

## VIOLATIONS

As set forth in more detail in that certain proof of claim filed by the Port Authority in the Bankruptcy Case [Claim No. 38], the Port Authority has alleged the following work remains outstanding.

a.   753 & 755 - East & West Buildings - Provide unique identifications for each of the fire dampers and access doors installed throughout

b.   818 - Complete successful testing of all fire dampers

c.   964 - Passenger elevators

d.   583 - Provision of required signage on sprinkler systems

e.   276 - Handicap ramp

f.   610 – Provide as-built mechanical drawings [already completed]

The Port Authority has, more recently, informed the Seller of certain potential violations related to the fire-ratings on certain elevator doors and door frames.

**SCHEDULE 9**

**LITIGATION**

| | |
|---|---|
| 1. | George Washington Bridge Bus Station Development Venture, LLC v. Tutor Perini Building Corp.<br>American Arbitration Association<br>Case No. 001-0002-7881 |
| 2. | Tutor Perini Building Corp. v. George Washington Bridge Bus Station Development Venture, LLC, et al.<br>United States District Court, Southern District of New York<br>Case No. 19-05344 |
| 3. | Stempel Bennett Claman & Hochberg, P.C. v. George Washington Bridge Bus Station Development Venture, LLC<br>Supreme Court, New York County<br>Index No. 651809/2016 |
| 4. | Perez v. Port Authority of New York and New Jersey et al.<br>Supreme Court, New York County<br>Index No. 154910/2018 |
| 5. | George Washington Bridge Bus Station and Infrastructure Development Fund, LLC v. George Washington Bridge Bus Station Development Venture LLC et al.<br>Supreme Court, New York County<br>Index No. 850155/2019 |
| 6. | SRS Real Estate Partners-Northeast, L.L.C. v. George Washington Bridge Bus Station Development Venture LLC<br>Supreme Court, New York County<br>Index No. 653405/2019 |
| 7. | Green v. Port Authority of New York and New Jersey et al.<br>Supreme Court, New York County<br>Index No. 153931/2017 |
| 8. | Williams v. Port Authority of New York and New Jersey et al.<br>Supreme Court, New York County<br>Index No. 154033/2017 |
| 9. | Ayars v. Port Authority of New York and New Jersey et al.<br>Supreme Court, New York County<br>Index No. 158178/2017 |
| 10. | Wortham v. George Washington Bridge Bus Station Development Venture LLC |

| | |
|---|---|
| | Supreme Court, New York County<br>Index No. 159755/2018 |
| 11. | Mahoney v. George Washington Bridge Bus Station Development Venture LLC et al.<br>Supreme Court, Bronx County<br>Index No. 33198/2018E |
| 12. | FTI Consulting, Inc. v. George Washington Bridge Bus Station Development Venture LLC<br>Supreme Court, New York County<br>Index No. 655425/2019 |
| 13. | Café at 178th LLC et al. v. George Washington Bridge Bus Station Development Venture LLC<br>Supreme Court, New York County<br>Index No. 652001/2019 |
| 14. | Padilla v. The City of New York<br>Supreme Court, New York County<br>Index No. 159235/2019 |
| 15. | Castro v. Port Authority of New York and New Jersey et al.<br>Supreme Court, Bronx County<br>Index No. 24002/2015E |
| 16. | Valverde v. Marshall's et al.<br>Supreme Court, New York County<br>Index No. 150692/2020 |
| 17. | Any and all litigation arising under or relating to the Seller's Bankruptcy Case including any and all litigation with Tutor Perini Building Corporation. |

## **SCHEDULE 10**

## **SUBTENANT A/R**

See attached.

# GWB Bus Station Development Venture LLC
## A/R Aging Summary
### As of March 24, 2021

| | Current | 1 - 30 | 31 - 60 | 61 - 90 | 91 - 120 | 121 - 150 | 151 and over | Total |
|---|---|---|---|---|---|---|---|---|
| E1.2 - Vista Eyecare | | | | | | | 33,818.85 | 33,818.85 |
| E1.4 - CitiBank | | | | 532.02 | 593.50 | 593.50 | 8,059.49 | 9,778.51 |
| E1.6 - RCBS Media Group | | 500.00 | | | | | | 500.00 |
| E3.1 - Blink Fitness | | 22,249.00 | 22,249.00 | 22,249.00 | 22,249.00 | 22,249.00 | 18,007.00 | 129,252.00 |
| W1.10B - Credit City Corp. | | | | 1,246.83 | | | 9,903.24 | 11,150.07 |
| W1.2 - Time Warner Cable | | | | | | | 6,772.42 | 6,772.42 |
| W1.3 - INHO Beauty Inc. | | | 15,708.88 | | | | | 15,708.88 |
| W1.5A - Cobbler & Shine 4211 GWB, LLC | | 3,881.78 | 3,881.78 | 3,881.78 | 1,975.12 | 1,975.12 | 13,019.62 | 28,615.20 |
| W1.7 - Fine Fare Fresh Supermarket | | | | | | | 106,801.72 | 106,801.72 |
| W1.9A - GateWay News Stands | | | | | | | 3,983.92 | 3,983.92 |
| W2.2 - Marshalls | | | | | | | 90,524.93 | 90,524.93 |
| W2.4A - GWB 4971, Corp. VS Berry | | | | | | | 5,415.20 | 5,415.20 |
| W2.5 - GateWay News Stands | | | | | | | 8,949.20 | 8,949.20 |
| TOTAL | $ 0.00 | $ 26,630.78 | $ 41,839.66 | $ 27,909.63 | $ 24,817.62 | $ 24,817.62 | $ 305,255.59 | $ 451,270.90 |

Note:

Marshalls A/R relates only to Cooling Tower

Fine Fare A/R relates only to Cooling Tower